BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

IN RE: COVID-19 BUSINESS             )
INTERRUPTION PROTECTION  )           MDL No. 2942
INSURANCE LITIGATION           )

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR SUBSEQUENT MOTION
FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR
COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

Pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Plaintiffs Christie Jo Berkseth-Rojas DDS; Bridal Expressions LLC; Caribe Restaurant & Nightclub, Inc. (d/b/a Laz Luz Ultralounge); Dakota Ventures, LLC d/b/a Kokopelli Grill and Coyote BBQ Pub); GIO Pizzeria & Bar Hospitality, LLC; GIO Pizzeria Boca, LLC; Rising Dough, Inc. (d/b/a Madison Sourdough); Willy McCoys of Albertville LLC; Willy McCoys of Shakopee LLC (d/b/a McCoys Copper Pint); Whiskey Jacks of Ramsey, LLC (d/b/a Willy McCoys Ramsey); and Troy Stacy Enterprises Inc. (d/b/a/ Craft & Vinyl) ("Movants") respectfully submit this brief in support of their Subsequent Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings.

Movants seek transfer and assignment of all pending Actions[1] against those insurers who have wrongfully denied coverage for business interruption due to the COVID-19 pandemic as listed in the Schedule of Actions, as well as any subsequently-filed actions involving similar facts or claims, to the Honorable Matthew F. Kennelly, United States District Court for the Northern District of Illinois. There are presently not less than sixteen substantially-similar Actions, filed on behalf of plaintiffs and proposed nationwide and statewide classes in thirteen different federal district courts alleging similar wrongful conduct on the part of the named defendants. Movants

---

[1] All defined terms have the definitions assigned to them in Plaintiffs' contemporaneously-filed transfer motion.

are plaintiffs in seven of these actions, which represent a substantial majority of the nine class actions that have been filed thus far.

All Actions involve common questions of law and fact that arise from the defendants' wrongful denial of coverage for business interruption due to the COVID-19 pandemic, an historically unprecedented event that led to nationwide, government-ordered shutdowns of numerous businesses who purchased business interruption insurance precisely to guard against losses stemming from this type of event.

**I.    BACKGROUND**

As the Panel is surely well aware, our nation is currently in the midst of a deadly pandemic spread by the SARS-CoV-2 virus, often referred to as the "coronavirus" or by one of the names of the disease that it causes such as "COVID-19."[2]  COVID-19 has spread rapidly throughout the United States, having resulted in, by the time of filing, over 750,000 diagnosed cases (and an indeterminate number of undiagnosed cases) and over 36,000 confirmed deaths.[3]  In response to the COVID-19 pandemic, civil authorities throughout the country have issued orders requiring the suspension of business at a wide range of establishments (the "Closure Orders").  Beginning with California in mid-March, presently 42 states have issued statewide stay-at-home orders, practically preventing all but the most essential economic activity.[4]

The Closure Orders have caused devastating business interruption losses to American businesses.  Many of these affected businesses carry some form of business interruption insurance.  However, many insurers have been denying claims for business interruption losses caused by the

---

[2] For ease of reference, this virus and the disease it causes will be referred to as "COVID-19" herein.

[3] https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html

[4] https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html

Closure Orders. For example, The Hartford and Travelers have both declared their intent not to provide business interruption coverage:

> Most property insurance includes business interruption coverage, which often includes civil authority and dependent property coverage. This is generally designed to cover losses that result from direct physical loss or damage to property caused by hurricanes, fires, wind damage or theft and is not designed to apply in the case of a virus.[5]

> Insurance for business interruption can provide coverage when a policy holder suffers a loss of income due to direct physical loss or damage to covered property at its location or another location. It does not cover loss of income due to market conditions, a slowdown of economic activity or a general fear of contamination. Nor does the policy provide coverage for cancellations, suspensions and shutdowns that are implemented to limit the spread of the coronavirus. These are not a result of direct physical loss or damage. Accordingly, business interruption losses resulting from these types of events do not present covered losses under our property coverage forms.[6]

## II. LEGAL STANDARD

Transfer is appropriate when actions pending in different judicial districts involve similar questions of fact such that coordinating or consolidating pretrial proceedings would "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. In relevant part, Section 1407 provides as follows:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

*Id*; *see also In re Nifedipine*, 266 F. Supp. 2d 1382, 1382 (J.P.M.L. 2003).

---

[5] https://www.thehartford.com/coronavirus/businesses

[6] https://www.travelers.com/about-travelers/covid-19-business-interruption

### III. ARGUMENT

The Actions, and the many tag-along actions that will follow, are appropriate for Section 1407 transfer because they involve common issues and transfer will benefit the parties, witnesses, and courts. Further, given the number of defendants located in the Northern District of Illinois and the fact that many witnesses will be located in that jurisdiction, transfer to that district is the most appropriate.

#### A. Transfer and Consolidation or Coordination Is Appropriate Under 28 U.S.C § 1407.

Multidistrict litigation "eliminate[s] the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in multidistrict related civil actions." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491-92 (J.P.M.L. 1968). Multidistrict litigation thus avoids 'duplicative discovery; prevent[s] inconsistent pretrial rulings; and conserve[s] the resources of the parties, their counsel, and the judiciary." *In re Ethicon Physiomesh Flexible Composite Hernia Mesh Products Liability Litigation*, _ F. Supp. 3d _, 2017 WL 2402828, at *1 (J.P.M.L. June 2, 2017).

Pursuant to 28 U.S.C. § 1407, transfer of actions to one district for coordinated or consolidated pretrial proceedings is appropriate where: (1) actions pending in different districts involve one or more common questions of fact, and (2) the transfer of such actions will be for the convenience of the parties and witnesses and will promote the just and efficient conduct of such actions. 28 U.S.C. § 1407(a). Consolidation is especially important in multidistrict litigations where "the potential for conflicting, disorderly, chaotic" action is greatest. *In re Plumbing Fixture Cases*, 298 F. Supp. at 493. Here, these factors heavily in favor of multidistrict litigation.

> **1.    The Actions Involve Common Fact Issues and Should be Heard Together.**

At least sixteen federal insurance coverage cases have been filed across the country seeking recovery under property insurance policies for property damage and business interruption losses caused by COVID-19.  Numerous insurers have been sued under multiple insurance policies by a great many plaintiffs, including various proposed classes of plaintiffs.  Because there are great similarities and standard or near-standard terms across all the property insurance policies at issue, each of the complaints allege almost identical claims, irrespective of which insurer issued the particular policy.  Fundamentally, each of the complaints alleges:

- The insured purchased a property policy or a similar insurance policy from the defendant insurance company.

- The property policy provides coverage for all risks of physical damage or loss to covered property.

- The insured suffered property damage and/or business interruption losses occasioned by COVID-19.

- The insurer owes coverage to the insured under one or more of the insuring agreements typically found in the standard-form property insurance policies issued in the United States, such as:

    o   The business interruption insuring agreement

    o   The civil authority insuring agreement

    o   The Extra Expense insuring agreement

    o   The Sue and Labor insuring agreement

    o   The ingress and egress insuring agreement

    o   The preservation of property insuring agreement.

- The insurer has breached its obligation to provide coverage, or there is a dispute as to what that coverage obligation is.

- The policyholder is entitled to payment or to a declaration of coverage.

The near identity of claims means that any court tasked with resolving one of these lawsuits would face the same basic legal and factual issues. Indeed, each of the cases filed to date turns on two basic questions, the same two questions necessarily raised by *any* potential complaint alleging that an insured can recover property damage and business interruption losses caused by COVID-19: (1) Whether COVID-19 causes "physical damage or loss to property" as that phase is used in property insurance policies; and (2) whether COVID-19 was present on the insured property or on property sufficiently connected by proximity or in other ways to the insured property such that coverage is triggered.

The first of these questions is a mixed question of law and fact, requiring an interpretation and application of insurance policy language in light of the presence or impact of COVID-19 on covered property. That question should lead to only one answer whether the insured's property is in Bakersfield, California, or Des Moines, Iowa, or Sarasota, Florida. Indeed, the insurance industry uses standardized terms in insurance policies precisely because the predictability of results from standardized language allows insurers to compile information in order to charge appropriate rates based on the relevant risks and prior loss experience. If the presence of COVID-19 meant "physical injury or loss to property" for one policyholder but not another, that actuarial data on losses would be rendered meaningless, undermining both the property insurance market and the reliability of standard contract terms.

Furthermore, the same type of evidence will be needed in every case to consider and ultimately to determine whether COVID-19 caused or constituted "physical damage or loss to

property."  All parties will likely rely upon scientific experts in order to explore the nature of "physical damage or loss" caused by this particular virus, and very similar expert deposition testimony will be solicited and challenged in all of these lawsuits.  Similarly, plaintiffs in every case likely will seek discovery into the drafting history of these standard terms as well as other evidence concerning the meaning the insurance industry placed upon the phrase "physical damage or loss."  Transferring these cases to the same forum will permit more efficient coordination of discovery as well as more consistent answers to these same basic questions.

The second issue, concerning the actual presence of COVID-19, is a pure question of fact whose proof for one insured will require the same type of expert evidence as the proof by every other insured.  Claimants will almost certainly need to present epidemiological modeling of the spread of the virus in order to ascertain its likely presence and impact.  If these myriad cases were not coordinated for discovery, thousands of plaintiffs would potentially be seeking to retain the same limited pool of epidemiological modelers.  Not only would that competition create a costly logistical nightmare for litigants, but that same pool of experts is also needed to help lawmakers fashion the best policies for dealing with the pandemic.  Coordination across these insurance cases would not only reduce the burden on all of the parties involved but would also reduce the broader impact on society.  More of these critical experts could remain available to focus on assisting with saving lives and promoting economic recovery.

These two core factual issues alone compel coordination for the sake of efficiency and the avoidance of conflicting rulings.  In addition, however, many other common issues are present in each of these cases, and coordination of pre-trial proceedings and discovery would promote orderly and consistent resolution of these legal and factual questions.  For example, any court presiding over one of the COVID-19 insurance cases would likely be asked to decide:

- Whether the phrase "all risk of physical damage or loss of property" includes the risk of disease and virus;

- Whether the insurance industry understood at the time it was selling insurance policies that virus and disease could cause physical damage or loss to property;

- Whether a safer-at-home or self-quarantine order based on the presence of COVID-19 in surrounding property is sufficient to trigger the civil authority coverage in property insurance policies;

- At what point the period of restoration (which determines the amount of business interruption loss) begins and ends in connection with a safer-at-home or self-quarantine order by a civil authority;

- Whether the expenses incurred by closing a business or reducing services in response to a safer-at-home or self-quarantine order by a civil authority constitute "extra expenses" covered by a property policy;

- Whether the expenses incurred by closing a business or reducing services in response to a safer-at-home or self-quarantine order by a civil authority constitute "sue and labor" expenses covered by a property policy; and

- Whether the expenses incurred by closing a business or reducing services in response to a safer-at-home or self-quarantine order by a civil authority constitute "preservation of property expenses" covered by a property policy.

Determination of these and other common issues in a single District will promote uniform resolution of these key questions, reduce costs for parties and witnesses, promote the efficient prosecution and resolution of all of the cases, and, consequently, provide speedier and more consistent decisions that society as a whole may use to structure the economy and the insurance

market. For these reasons, although there are multiple defendants involved, these cases exhibit the same factual commonalities that has led this Panel to create multidistrict litigations under similar circumstances. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, MDL No. 2804 (J.P.M.L. Mar. 30, 2020) ("Despite some variances among the actions before us, all share a factual core with the MDL actions: the manufacturer and distributor defendants' alleged knowledge of and conduct regarding the diversion of these prescription opiates, as well as the manufacturers' allegedly improper marketing of the drugs.");[7] *In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F. Supp. 415, 416-17 (J.P.M.L. 1991) (centralizing litigation involving thousands of different products nearly five hundred different defendants in light of the "common questions of fact relating to injuries or wrongful death allegedly caused by exposure to asbestos or asbestos containing products");

> **2.  Transfer will serve the convenience of the parties and witnesses and will promote the just and efficient conduct of the Actions.**

According to the Manual for Complex Litigation, the following four factors govern whether transfer will facilitate the convenience of the parties and promote the just and efficient conduct of the transferred cases:

1. The elimination of duplicative discovery;

2. The avoidance of conflicting rules and schedules;

3. The reduction of litigation cost; and

4. The conservation of the time and effort of the parties, attorneys, witnesses, and courts.

Manual for Complex Litigation (Fourth), § 20.131, at 219.

---

[7] https://www.jpml.uscourts.gov/sites/jpml/files/MDL-2804-Tag-Along-Transfer-03-20.pdf.

With sixteen cases in thirteen different Districts—and with those numbers about to materially increase—the size of this litigation weighs in favor of transfer. Indeed, without transfer, this litigation, which addresses the very survival of many of the businesses in the United States, would create the needless and unnecessary expense of overlapping discovery (including expert discovery) and judicial inefficiency. Further, different federal courts would make duplicative rulings on the same issues, which could result in contradictory findings on significant pretrial disputes. Litigation of this scope and importance should not be beset with such inconsistencies and inefficiencies.

### a. Transfer Will Eliminate Duplicative Discovery.

Because each action is based upon similar facts, plaintiffs in each of the Actions are, in turn, likely to seek overlapping discovery. *See In re Auto Body Shop*, 2014 WL 3908000, at *1-2 (J.P.M.L. 2014) (noting that transfer was appropriate to eliminate duplicative discovery when the actions shared a common factual core).

Given the similarity of the Actions and the potential for duplicative discovery, transfer would inevitably conserve the parties' resources. *See, e.g., In re Air Crash at Dallas/Fort Worth Airport*, 623 F. Supp. 634, 635 (J.P.M.L. 1985). It would also conserve the courts' resources, as it would assign responsibility for overseeing a pretrial plan to one judge as opposed to many different federal judges. *See, e.g., In re PineIntel*, 342 F. Supp. 2d 1348, 1349 (J.P.M.L. 2004).

### b. Transfer Will Avoid Conflicting Rules and Schedules.

The Panel considers the possibility of inconsistent rulings on pretrial issues because of the possible *res judicata* or collateral estoppel effects on other cases. *See In re Enron Sec. Derivative & ERISA Litig.*, 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002) (granting transfer in part to prevent inconsistent pretrial rulings, particularly with respect to questions of class certification).

Pretrial procedures will necessarily involve motions to dismiss, discovery motions, *Daubert* motions, and class certification motions. Conflicting rulings on these motions will cause unnecessary confusion and duplicative effort. Further, although only thirteen district courts have cases now, given the sheer number of businesses who are being denied coverage for business interruption due to the COVID-19 pandemic, there will undoubtedly be many more materially similar cases filed across the United States.

Section 1407 transfer is the most efficient way to ensure that pretrial processes across all of these cases are uniformly litigated and adjudicated, thereby avoiding the situation where multiple courts reach contrary conclusions and potentially subject litigants to conflicting responsibilities and obligations.

### c. Transfer Will Reduce Litigation Costs and Conserve the Time and Effort of the Parties, Attorneys, Witnesses, and Courts.

Each of the Actions, and the many tag-along actions soon to follow, will benefit from having a single transferee judge address and adjudicate issues related to discovery and pretrial motion practice. Otherwise courts and lawyers may be briefing the same issues in several different district courts, across several circuits, with conflicting laws, witnesses may be called to depositions in numerous cases, and third parties may be called to produce documents and witnesses in several different cases.

### B. The Northern District of Illinois Is the Most Appropriate Transferee Forum.

The Northern District of Illinois has three of the first sixteen cases filed, more than any other District. The Honorable Matthew F. Kennelly of that District is uniquely well-positioned to tackle the procedural and organizational challenges of this multidistrict litigation. A member of this Panel, Judge Kennelly clearly has the requisite experience in multidistrict litigation. Most recently, he has been overseeing *In re Testosterone Replacement Therapy Products Liability*

*Litigation*, MDL No. 2545, which involved 7,870 total historical actions. The bellwether trials in this MDL are largely concluded and most of the actions have been dismissed or are close to settlement; thus, the timing of the assignment of this multidistrict litigation to Judge Kennelly would be a good utilization of judicial resources.

Transfer of the pending Actions to the Honorable Matthew F. Kennelly of the Northern District of California will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation.

> **1.    The Northern District of Illinois bears a unique nexus to witnesses and evidence.**
>
> **a.    Many of the Nation's Largest Property and Casualty Insurers— Likely Defendants in This Consolidated Action—Are Headquartered in the Northern District of Illinois.**

This Panel has recognized that maintenance of corporate headquarters in a District is one reason to select that district as a transferee forum.[8] Relevant documents and witnesses will likely be found in the district wherein a defendant maintains its corporate headquarters.[9]

Though not currently defendants in the presently-filed cases, many of the largest property and casualty insurers in the nation—who, upon information and belief, will likely be added as defendants in soon-to-be-filed cases—are headquartered in the Northern District of Illinois. These insurers include Allstate (ranked #4 based on net premiums written in 2018[10] and

---

[8] *In re Foundry Resins Antitrust Litig.*, 342 F. Supp. 2d 1346, 1347 (J.P.M.L. 2004) ("On balance, we are persuaded that the Southern District of Ohio is a preferable transferee forum for this litigation. Two defendants maintain headquarters within the district, which implies that relevant documents and witnesses will likely be found there.").

[9] *Id.*

[10] "The largest P&C insurers in the United States," Reinsurance News, https://www.reinsurancene.ws/top-100-u-s-property-casualty-insurance-companies/.

headquartered in Northbrook, Illinois),[11] CNA (ranked #19 and headquartered in Chicago);[12] Zurich (ranked #29, with its US headquarters in Schaumburg, Illinois);[13] and Allianz (ranked #40, with its US headquarters in Chicago).[14] Large insurance brokers Aon and Willis are also headquartered in the Northern District of Illinois. Key personnel (and likely witnesses) from these insurers and brokers live and work within the Northern District of Illinois.

### b. Many of the Insurers Already Sued in the Present Actions Have Substantial Illinois Connections.

Of the insurers that have already been sued in the existing actions, many have substantial Illinois connections. Society Insurance, for example, has already been sued by numerous restaurants and movie theaters in the Chicago area.[15] The Cincinnati Insurance Company and its subsidiaries have also been sued by a policyholder in the Northern District of Illinois.[16]

Moreover, most of the insurer defendants in the existing federal actions are licensed to do business, and do substantial business in the State of Illinois, including the Northern District of

---

[11] Company Profile, Allstate Insurance Company, Illinois Department of Insurance https://insurance.illinois.gov/applications/RegEntPortal/ViewEntityDetails.aspx?en=28200&s=Active&t=INS.

[12] Company Profile, Continental Casualty Company, Illinois Department of Insurance https://insurance.illinois.gov/applications/RegEntPortal/ViewEntityDetails.aspx?en=210900&s=Active&t=INS (CNA's principal insurance subsidiary is Continental Casualty Company).

[13] Company Profile, American Zurich Insurance Company, Illinois Department of Insurance https://insurance.illinois.gov/applications/RegEntPortal/ViewEntityDetails.aspx?en=79570&s=Active&t=INS

[14] Company Profile, Allianz Global Risk US Insurance Company, Illinois Department of Insurance https://insurance.illinois.gov/applications/RegEntPortal/ViewEntityDetails.aspx?en=25550&s=Active&t=INS

[15] *See, e.g., Big Onion Tavern Group, LLC et al v. Society Insurance, Inc.*, Case No. 1:20-cv-02005 (N.D. Ill.) & *Billy Goat Tavern I, Inc. et al v. Society Insurance*, Case No. 1:20-cv-02068 (N.D. Ill.).

[16] *See Sandy Point Dental PC v. The Cincinnati Insurance Company et al.*, Case No. 1:20-cv-02160 (N.D. Ill.) (involving a dental office based in Lake Zurich, Illinois).

Illinois. The Cincinnati Insurance Company, for instance, wrote approximately $218 million in direct premiums in Illinois for the year ending December 31, 2018.[17] Aspen American Insurance Company wrote $20 million in direct premiums in Illinois for the year ending December 31, 2018.[18] Admiral Indemnity Company wrote approximately $9 million in direct premiums in Illinois for the year ending December 31, 2018.[19] And, Lloyd's of London has a Chicago office.[20]

Thus, most of the existing insurer defendants have substantial operations in, and generate substantial revenues from, the State of Illinois, including the Northern District.

### 2. The Northern District of Illinois Is Convenient Because of Its Central Location.

The Northern District of Illinois is also a geographically central district. *In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.*, 408 F. Supp. 2d 1354, 1355 (J.P.M.L. 2005) ("[T]his geographically central district [the Northern District of Illinois] will be a convenient location for a litigation already nationwide in scope."). This panel has underscored the reality that "although air travel renders both [coasts of the United States] readily accessible, there is still something to be said for the convenience of a geographically central forum in coast-to-coast litigation." *In re Library Editions of Children's Books*, 297 F. Supp. 385, 387 (J.P.M.L. 1968). The Northern District of Illinois fits that definition. It is readily accessible to the parties and

---

[17] *See* Schedule T, Statutory Annual Statement for the Cincinnati Insurance Company for the year-ended December 31, 2018.

[18] *See* Schedule T, Amendment to Statutory Annual Statement for Aspen American Insurance Company for the year-ended December 31, 2018.

[19] *See* Schedule T, Statutory Annual Statement for Admiral Indemnity Company for the year-ended December 31, 2018.

[20] Company Profile, Underwriters at Lloyd's, London, Illinois Department of Insurance https://insurance.illinois.gov/applications/RegEntPortal/ViewEntityDetails.aspx?en=967300&s=Active&t=INS (showing the contact information for Lloyd's Illinois, Inc.).

counsel, as the Chicago area is served by two major airports, O'Hare International Airport and Chicago Midway International Airport. In fact, O'Hare alone offers 1,083 daily direct flights to 169 U.S. cities.[21]

In addition, the Northern District of Illinois is just a short drive from the largest property and casualty insurer in the nation, State Farm, which is located in Bloomington, Illinois[22] and the 13th largest property and casualty insurer, American Family Insurance, which is located a few hours away in Madison, Wisconsin.[23] Key personnel (and likely witnesses) from these insurers, who may also be added as defendants in future cases, thus live and work within a short distance of the Northern District.

## IV. CONCLUSION

For the above-stated reasons, Movants respectfully request that the Panel transfer the Actions set forth on the attached Schedule and all subsequently filed tag-along cases for coordinated or consolidated pretrial proceedings before the Honorable Matthew F. Kennelly in the United States District Court for the Northern District of Illinois.

---

[21] "Where Can You Fly Without Making a Connection?," Chicago Dep't of Aviation, https://www.flychicago.com/ohare/myflight/non-stop/Pages/default.aspx

[22] Company Profile, State Farm Fire & Casualty Company, Illinois Department of Insurance https://insurance.illinois.gov/applications/RegEntPortal/ViewEntityDetails.aspx?en=834600&s=Active&t=INS

[23] Company Profile, American Family Mutual Insurance Company, Illinois Department of Insurance https://insurance.illinois.gov/applications/RegEntPortal/ViewEntityDetails.aspx?en=42200&s=Active&t=INS

Dated:  April 21, 2020						Respectfully submitted,


/s/ *Adam J. Levitt*
Adam J. Levitt
John E. Tangren
Amy E. Keller
Daniel R. Ferri
Mark Hamill
Laura E. Reasons
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
akeller@dicellolevitt.com
dferri@dicellolevitt.com
mhamill@dicellolevitt.com
lreasons@dicellolevitt.com

Mark A. DiCello
Kenneth P. Abbarno
Mark Abramowitz
**DICELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio  44060
Telephone:  440-953-8888
madicello@dicellolevitt.com
kabbarno@dicellolevitt.com
mabramowitz@dicellolevitt.com

Mark Lanier
Alex Brown
Ralph (Skip) McBride
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas  77064
Telephone:  713-659-5200
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com
Skip.McBride@lanierlawfirm.com

Timothy W. Burns
Jeff J. Bowen
Jesse J. Bair

16

Freya K. Bowen
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Douglas Daniels
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas  77057
Telephone:  713-917-0024
douglas.daniels@dtlawyers.com

*Counsel for Movants*