BEFORE THE UNITED STATES

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

IN RE: COVID-19 BUSINESS
INTERRUPTION PROTECTION            MDL No. 2942
INSURANCE LITIGATION
_____/

RESPONSE IN PARTIAL SUPPORT OF
MOTION TO TRANSFER PURSUANT TO 28 U.S.C. § 1407

Plaintiffs El Novillo Restaurant, d/b/a DJJ Restaurant Corporation and El Novillo Restaurant, d/b/a Triad Restaurant Corporation ("Plaintiffs"), pursuant to Rules 6.1(c) and 6.2(e) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, respectfully submit their response in partial support of the motions for transfer of the Related Actions.[1] At this time, Plaintiffs agree with Movants that a Section 1407 transfer and consolidation of the Related Actions is appropriate.[2] Plaintiffs, however, do not believe that either the Eastern District of Pennsylvania or the Northern District of Illinois are the most appropriate forums. Rather, the Southern District of Florida has a greater concentration of underlying victims and business activity. The Southern District of Florida had the first-filed nationwide class action regarding the applicability of business insurance coverage and currently has three class action cases pending. Accordingly, Plaintiffs recommend the Southern District of Florida as the most appropriate forum for transfer and consolidation or coordination of the Related Actions.

All of the factors considered by the Panel support the transfer and consolidation or

---

[1] "Related Actions" refers to the cases identified in the motion to transfer (D.E. 1), the subsequent motion to transfer (D.E. 4), and the Notice of Related Actions (D.E. 6) filed on April 23, 2020.

[2] However, Plaintiffs reserve their right to oppose transfer and consolidation or coordination pending the nature of any additional "tag-along" cases that are subsequently filed.

1

1256417

coordination of these actions to a single court. Centralization of this litigation will serve the interests of justice, judicial economy, and notions of legal comity by avoiding inconsistent pre-trial rulings and duplicative discovery. The risk of inconsistent pre-trial rulings is particularly high here, where various plaintiffs have filed, and will continue to file, overlapping actions against the same insurers.

## I.  BACKGROUND

Since at least the beginning of March 2020, the United States has been in the middle of a global pandemic caused by a virus commonly referred to as the "coronavirus" or by the disease the virus causes – "COVID-19."[3]  In mid-March the federal government issued guidance advising individuals to adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.[4]  In response to this guidance, and in an effort to combat the spread of the virus, various state governments and other civil authorities across the nation entered orders suspending, or severely curtailing, operations of non-essential businesses that interact with the public and provide gathering places for the individuals.  Currently, almost all states within the United States have issued some sort of "stay-at-home" order and required private non-essential business operations to close.[5]

The result of these far-reaching restrictions and prohibitions has been catastrophic for most commercial businesses, especially hotels, restaurants and other food service establishments, retail stores, elective medical practitioners and dentists, entertainment venues, and numerous

---

[3] The virus and the disease it causes will be collectively referred to as COVID-19.

[4]  *See*  https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf

[5] See https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html

other small, medium, and large enterprises that have been forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their very survival.

Many of these businesses insure against such catastrophic events like the current unforeseen COVID-19 pandemic through standard all-risk commercial property insurance policies. These standard policies contain various coverages that are meant to protect the policyholder for business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, when access to the premises is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property. These standard coverages include, but are not limited to, coverage for business income loss, civil authority closures, and "extra expense" coverage.

However, insurance companies who have issued these all-risk commercial property insurance policies are denying policyholder claims and any obligation to pay for business income losses and other covered expenses incurred by policyholders. For example, in response to a request for insurers to cover these losses, the heads of insurance industry trade groups responded, stating, "[b]usiness interruption policies do not, and were not designed to, provide coverage against communicable diseases such as COVID-19."[6] Each of the Related Actions is premised on the same uniform conduct by the insurers – namely the denial of their obligations to cover for these business losses.

## II.   ARGUMENT

### A.  Transfer is Appropriate Pursuant to 28 U.S.C. § 1407

Centralization and transfer of these cases is appropriate pursuant to 28 U.S.C. § 1407. The purpose of multidistrict litigation is to ensure the just, efficient, and consistent conduct and

---

[6] *See* https://www.insurancejournal.com/news/national/2020/03/20/561810.htm

adjudication of actions pending in multiple districts by providing for the centralized management of pre-trial proceedings under a single court's supervision. *See* 28 U.S.C. § 1407(a). Accordingly, courts have held that multidistrict litigation is appropriate where it "promote[s] the just and efficient conduct of 'civil actions involving one or more common questions of fact' that are pending in different districts." *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1229 (9th Cir. 2006) (quoting 28 U.S.C. § 1407(a)).

Additionally, as the Panel has repeatedly recognized, when multiple, overlapping class actions are filed in different districts across the country, "centralization under Section 1407 will serve the convenience of the parties and promote the just and efficient conduct of [the] litigation" and "is necessary in order to avoid the duplication of discovery, prevent inconsistent or repetitive pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary." *In re Visa/MasterCard Antitrust Litig.*, 295 F. Supp. 2d 1379, 1380 (J.P.M.L. 2003).

Transfer and consolidation of the various actions will also avoid the possibility of conflicting pre-trial rulings. Plaintiffs in the Related Actions are asserting the same or similar claims including a declaratory judgment count seeking a declaration that the businesses are covered under the various insurance coverages at issue and a count for breach of contract for the denial of their claims under their policies. *See In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 2d 1377, 1378 (J.P.M.L. 2003) (noting that transfer is favored where there are overlapping legal issues among the various cases).

The plaintiffs in the Related Actions will likely seek the same discovery from the insurer defendants related to their standard insurance policies. Without consolidation, the plaintiffs in these cases would be required to issue, and defendants would be required to answer, multiple and duplicative discovery requests seeking the same information, and key witnesses, some of whom

may reside abroad,[7] would be required to sit for multiple and duplicative depositions. Consolidation will promote efficiency and allow these disputes to be argued and resolved just once. *See, e.g., In re Ocean Fin. Corp. Prescreening Litig.,* 435 F. Supp. 2d 1350, 1351-52 (J.P.M.L. 2006) (holding that centralization would eliminate duplicative discovery where plaintiffs brought claims on behalf of overlapping classes).

By eliminating or reducing duplicative discovery and avoiding the possibility of conflicting pre-trial rulings, consolidation will significantly reduce the efforts and expenditures of the parties' resources.  Transfer preserves the parties' and the judiciary's resources because the same documents, witnesses, and physical evidence will be involved, document discovery and other written discovery would be provided once through coordinated discovery, and depositions would proceed once as to all parties instead of the numerous times that would otherwise be required if transfer were denied.  In addition, the judiciary's resources are further preserved by transfer because it would allow one Judge to preside over these matters as opposed to the numerous federal judges that would otherwise be required to adjudicate the same claims involving many of the same parties.

Centralization of the Related Actions is therefore appropriate, and none of the parties will be unfairly prejudiced by transfer. All of the cases, including the three in the requested transferee district here, are in the early stages of litigation—all of them having been filed in the last month—and thus there are no practical impediments to expedient coordination and the implementation of uniform pre-trial procedures and scheduling in the Southern District of Florida.

**B. <u>The Related Cases Should be Transferred to the Southern District of Florida</u>.**

The Panel should transfer the Related Cases to the Southern District of Florida.  Plaintiffs

---

[7] For example, the defendant in Plaintiffs' case and in other Related Cases – Lloyds of London – maintains its principal place of business in London, England.

filed the first nationwide class action case related to insurance coverage for the COVID-19 pandemic and three class action cases are now pending in the Southern District of Florida. Furthermore, South Florida's economy has been particularly hard-hit by the business closures and curtailment. Much of Florida's economy relies on the tourism and service industry, specifically restaurants and hotels, which are at the forefront of the type of "non-essential" businesses that were closed or severely curtailed by civil authorities.[8]

In selecting an MDL location, along with South Florida's particular nexus to the litigation, the Panel looks at factors including the available district court's docket conditions and the district's accessibility. *See In re Veeco Instruments, Inc. Sec. Litig.*, 387 F. Supp. 2d 1365, 1366 (J.P.M.L. 2005) (selecting the Southern District of New York over the Eastern District of New York because it had more favorable caseload statistics). Here, all of these factors support transfer to the Southern District of Florida

**1. The Southern District of Florida has the Strongest Nexus to the Litigation Because Florida Businesses Are Likely to Suffer the Effects of Civil Authority Closures at a Rate Higher than Nearly All Other Forums.**

Based on Department of Labor Statistics, Florida has the third-highest concentration of hospitality jobs in the nation,[9] and is the second-most visited state in terms of tourism.[10] As of March 2020, 7.6% of the nation's hospitality jobs were in Florida, a disproportionately high share

---

[8] The majority of plaintiffs in the Related Actions are restaurants as the food and beverage industry has been one of the most affected industries from the COVID-19 pandemic and the civil authority closures.

[9] The only states with larger shares in the hospitality industry are California and Texas. Derived from Department of Labor, Bureau of Labor Statistics, Employment by Sector, Leisure and Hospitality, current to March 2020, data.bls.gov.

[10] *The Most Visited States in the U.S.*, WORLD ATLAS, https://www.worldatlas.com/articles/the-most-visited-states-in-the-us.html (last visited April 23, 2020.

1256417

given that Florida only represents 6.3% of the nation's population.[11]  In Florida, hospitality is a $111.7 billion industry,[12] and locals depend on tourists to fill the state's 4,583 hotels[13] and dine at the state's 41,366 restaurants. [14]

In the first three quarters of 2019, over 100 million tourists visited Florida.[15]  Prior to the COVID-19 pandemic, the Florida tourism industry was on a continuous streak of growth, with the total number of annual visitors breaking the previous record every year since at least 2010.[16] In 2017 alone, Florida took in $88.6 billion in out-of-state tourism spending.[17]  A high concentration of that spending is in counties within the Southern District of Florida: $19.7 billion in Miami-Dade; $5.8 billion in Broward; $3.9 billion in Palm Beach; and $2.9 billion in Monroe.[18]  Statewide, flights into Florida are down more than 65% from this time last year and

---

[11] UNITED STATES CENSUS BUREAU, QUICK FACTS, FLORIDA (2019), www.census.gov/quickfacts/FL (last visited April 23, 2020.

[12] FLORIDA RESTAURANT & LODGING ASSOCIATION, https://frla.org/about/ (last visited April 23, 2020)

[13] VISIT FLORIDA, FREQUENTLY ASKED QUESTIONS, https://www.visitflorida.org/resources/research/research-faq/ (last visited April 23, 2020).

[14] NATIONAL RESTAURANT ASSOCIATION, FLORIDA RESTAURANT INDUSTRY AT A GLANCE (2019), https://restaurant.org/Downloads/PDFs/State-Statistics/florida.pdf

[15] VISIT FLORIDA, ESTIMATES OF VISITORS TO FLORIDA BY QUARTER, visitflorida.org/resources/research (last visited April 23, 2020).

[16] Adam Leposa, *Stats: Record 126.1 Million Visitors to Florida in 2018*, Travel Agent Central, Feb. 25, 2019, https://www.travelagentcentral.com/running-your-business/stats-record-126-1-million-visitors-to-florida-2018.

[17] This includes $24.3 billion in lodging, $20.2 billion in food and beverage, $15 billion in shopping, $18 billion in transportation, and $11.3 billion in entertainment and recreation. A Banner Year for Florida Tourism Performance: The 2017 Contribution of Travel & Tourism to the Florida Economy, 3, https://www.visitflorida.org/media/71465/2017-contribution-of-travel-tourism-to-the-florida-economy.pdf

[18] *Id*. at 31. Of the top-ten Florida counties by tourism spending, four are in the Southern District.

international flights have been reduced by nearly 80%,[19] particularly devastating since international travelers spend significantly more money in Florida than do domestic travelers.[20]

Of the nation's top 25 tourism markets, the Miami/Hialeah area has suffered the steepest decline in average daily hotel room rate.[21] For the week ending April 18, 2020, Miami hotels fell in occupancy from 95.7% capacity in 2019 to 20.3% capacity in 2020.[22] The effects in Monroe County have been similarly drastic: for the week ending with April 18, 2020, hotels were only at 7.6% capacity, down from 99.2% during the same week in 2019.[23] So too in Broward County, where occupancy has fallen from 94.6% in 2019 to 22.5% in 2020, a drop of 72.1%.[24] In comparison, the national hotel occupancy rate has fallen from 64.4% to 23.4%[25]—severe, but not nearly as extreme as the decline in South Florida.

The Port of Miami (Miami-Dade County) and Port Everglades (Broward County) are, respectively, the first- and third-busiest cruise ports in the world by number of passengers.[26] The

---

[19] Terry Spencer, *Florida Tourism Industry Plans to Ease into Reopening*, ASSOCIATED PRESS (Apr. 21, 2020), https://apnews.com/c70864a5d3f89113b945b0616d4eeed6

[20] On average, international visitors spend $1,180 on goods and services in Florida, compared to $616 spent by out-of-state domestic visitors. The Statewide Economic Impacts of Florida Seaports, Florida Ports Council, December 2016, 10, http://scdn.flaports.org/wp-content/uploads/EconomicImpactsofFloridaSeaports.pdf.

[21] Michelle Kaufman and Taylor Dolven, *South Florida Hotels Hurting More than Anywhere Else as COVID-19 Pandemic Continues*, MIAMI HERALD (APR. 22, 2020) https://www.miamiherald.com/news/business/tourism-cruises/article242178741.html

[22] *Id*.

[23] *Id*.

[24] *Id*.

[25] *Id*.

[26] NAFTA Region Port Cruise Traffic 2015–2017, http://aapa.files.cms-plus.com/Statistics/CRUISE%20TRAFFIC%20NORTH%20AMERICA%202015-

cruise industry supports approximately 140,000 jobs in Florida, for a total wage and salary income impact of approximately $2.3 billion.[27]  Business derived from food, beverage, and other services related to cruise traffic added another $7.2 billion to statewide revenue.[28]

The curfew orders, capacity-reductions, and eventual closure of restaurants have decimated the food and beverage business.  Nationwide, restaurant and hospitality jobs account for at least 60% of the jobs lost since the pandemic began.[29]  Florida bears a disproportionate share of the burden, with the third-highest volume of food service employment in the nation.[30]  The majority of these food service jobs are concentrated in the greater Miami-Fort Lauderdale-West Palm area, in the Southern District of Florida.[31]  In 2018, the 41,366 restaurants in Florida provided approximately 1.1 million jobs, 12% of the State's employment, and took in an estimated $50 billion in sales.[32]  In contrast, Pennsylvania had 26,548 restaurants in 2018 employing 580,000 people equaling 10% of Pennsylvania's employment and Illinois had 25,488 restaurants employing 588,700 people, also equaling 10% of its employment.[33]

---

2017%20REVISED.pdf.

[27] FLORIDA SEAPORT TRANSPORTATION AND ECONOMIC DEVELOPMENT COUNCIL, THE STATEWIDE ECONOMIC IMPACTS OF FLORIDA SEAPORTS, 22 (DECEMBER 2016), http://scdn.flaports.org/wp-content/uploads/EconomicImpactsofFloridaSeaports.pdf

[28] *Id.*

[29] News Release, Bureau of Labor Statistics, The Employment Situation—March 2020 (Apr. 3, 2020), https://www.bls.gov/news.release/pdf/empsit.pdf

[30] U.S. BUREAU OF LABOR STATISTICS, OCCUPATIONAL EMPLOYMENT AND WAGES (MAY 2019), https://www.bls.gov/oes/current/oes350000.htm

[31] *Id.*

[32] NATIONAL RESTAURANT ASSOCIATION, FLORIDA RESTAURANT INDUSTRY AT A GLANCE (2019), https://restaurant.org/Downloads/PDFs/State-Statistics/florida.pdf

[33] NATIONAL RESTAURANT ASSOCIATION, PENNSYLVANIA RESTAURANT INDUSTRY AT A GLANCE

### 2. Docket Conditions in the Southern District of Florida Are More Favorable than in the Eastern District of Pennsylvania or the Northern District of Illinois.

The Southern District of Florida is better equipped to handle a large and complex MDL than either the Eastern District of Pennsylvania or the Northern District of Illinois.[34] As of December 31, 2019, the Southern District of Florida had 12,729 cases pending, and 18 judgeships. Per judgeship, the court received 707 new filings, and terminated 728 cases throughout the year. For the same time period, the Eastern District of Pennsylvania had 8,704 cases pending, and 22 judgeships. Per judgeship, the court received 381 new filings, and terminated 338 cases throughout the year. The Northern District of Illinois had 15,874 cases pending, and 22 judgeships. Per judgeship, the court received 459 new filings, and terminated 497 cases throughout the year.

The Southern District of Florida moves cases forward more efficiently than either of the other proposed districts and resolves its civil cases both at a faster pace and in higher volume. For civil cases in the Southern District of Florida in 2019, the median time from filing to disposition was 3.9 months and the median time from filing to trial in civil cases was 15.8 months. In the Eastern District of Pennsylvania, the median time from filing to disposition was 6 months. The median time from filing to trial in civil cases was 19.6 months. In the Northern District of Illinois, the median time from filing to disposition was 8.4 months. The median time from filing to trial in civil cases was 39 months.

The Southern District of Florida also has the lowest percentage of active cases that are

---

(2019), https://restaurant.org/Downloads/PDFs/State-Statistics/pennsylvania.pdf; NATIONAL RESTAURANT ASSOCIATION, ILLINOIS RESTAURANT INDUSTRY AT A GLANCE (2019), https://restaurant.org/Downloads/PDFs/State-Statistics/illinois.pdf

[34] United States District Courts—National Judicial Caseload Profile, Combined Civil and Criminal Federal Court Management Statistics (December 31, 2019), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2019.pdf.

1256417

more than 3 years old, by a significant margin. The Southern District of Florida, a total of 113 cases, or 2.4% of the docket, are more than 3 years old. In the Eastern District of Pennsylvania, a total of 1,507 cases, or 20.7% of the docket, are more than 3 years old. In the Northern District of Illinois, a total of 5,067 cases, or 36.9% of the docket, are more than 3 years old.

The judges in the Southern District of Florida are exceptionally qualified and experienced with MDL litigation, as evidenced by the Panel's selection of the Southern District of Florida as the transferee court in numerous MDL actions. Specifically, the Honorable Judge Ursula Ungaro is an extremely qualified and capable jurist and is presiding over Plaintiffs' case. Furthermore, Southern District of Florida judges are well-versed in insurance-related lawsuits[35] due to South Florida being in the path of "Hurricane Alley."[36] The Panel has consistently acknowledged that MDL experience is an important factor in deciding upon a transferee court. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 626 F. Supp. 2d 1346, 1347 (J.P.M.L. 2009) (finding that centralization in the chosen district permits the Panel to "effect the section 1407 assignment to a judge who has extensive experience in multidistrict litigation as well as the ability and temperament to steer this complex litigation on a steady and expeditious course"); *In re Trasylol Prods. Liab. Litig.*, 545 F. Supp. 2d 1357, 1358 (J.P.M.L. 2008) (assigning case to the Southern

---

[35] *See e.g.*, Ron Hurtibise, *Hurricane Irma powers sharp increase in lawsuits against insurers*, (May 3, 2018) https://www.sun-sentinel.com/business/fl-bz-hurricane-irma-suits-on-rise-against-insurers-20180502-story.html; *see also*, *QBE Ins. Corp. v. Dome Condo. Ass'n, Inc.*, No. 08–20906–CIV. (S.D. Fla. 2008) (involving property insurer and disputed insurance claim following hurricane.); *Townhouses of Highland Beach Condo. Ass'n, Inc. v. QBE Ins. Corp.,* No. 06–81132–CIV, (S.D. Fla. 2007) (Insured condominium association brought suit against property insurer for coinsurance provisions.) *Fabricant v. Kemper Indep. Ins. Co.*, No. 06-80527-CIV, (S.D. Fla. 2007) (Insureds brought class action against their insurer based on insurer's failure to provide loss assessment coverage.)

[36] Hurricane Alley is an area of warm water in the Atlantic Ocean stretching from the west coast of northern Africa to the east coast of Central America and Gulf Coast of the Southern United States.

1256417

District of Florida and reasoning that by centralizing litigation in the Southern District of Florida, the matter would be before a district court judge with "the experience to steer this litigation on a prudent course"). Any of the Southern District of Florida judges who have been assigned one of the related cases, or any of the judges who may receive future tag-along actions, would be a worthy choice to handle this complex and important litigation.

### III.  CONCLUSION

The collective weight of all of the factors decisively supports the selection of the Southern District of Florida over the Eastern District of Pennsylvania or the Northern District of Illinois — or any other district — as the most appropriate site for this MDL litigation. Should the Panel decide that transfer is appropriate, Plaintiffs respectfully request that the Panel order transfer of the Related Actions, plus any future tag-along actions, to the Southern District of Florida for consolidated or coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.

Dated:  April 24, 2020.                              Respectfully submitted,

By: /s/ *Harley S. Tropin*

| | |
|---|---|
| Harley S. Tropin, Esq. (FBN 241253)<br>hst@kttlaw.com<br>Benjamin Widlanski, Esq. (FBN 1010644)<br>bwidlanski@kttlaw.com<br>Gail A. McQuilkin, Esq. (FBN 969338)<br>gam@kttlaw.com<br>Javier A. Lopez, Esq. (FBN 16727)<br>jal@kttlaw.com<br>Robert Neary, Esq. (FBN 81712)<br>rn@kttlaw.com<br>**KOZYAK TROPIN & THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Tel:   (305) 372-1800 /Fax: (305) 372-350 | Allan Kanner, Esq.<br>a.kanner@kanner-law.com<br>(*pro hac vice* forthcoming in<br>Case No. 20-cv-21525-UU, S.D. Fla.)<br>**KANNER & WHITELEY, LLC**<br>701 Camp Street<br>New Orleans, Louisiana 70130<br>Tel: (504) 524-5777<br>Fax: (504) 524-5763 |
| *Counsel for Plaintiffs*<br>**El Novillo Restaurant, d/b/a DJJ Restaurant Corporation and El Novillo Restaurant, d/b/a Triad Restaurant Corporation, Case No 1:20-cv-21525-UU (S.D. Fla.)** ||

1256417