BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: COVID-19 BUSINESS INTERRUPTION PROTECTION INSURANCE LITIGATION | MDL No. 2942 |

**Interested Parties Westchester Surplus Lines Insurance Company and Indemnity Insurance Company of North America's Response to Plaintiffs'
<u>Motions for Transfer and Coordination or Consolidation Under 28 U.S.C. § 1407</u>**

Interested parties Westchester Surplus Lines Insurance Company ("Westchester") and Indemnity Insurance Company of North America ("IINA")[1] oppose Plaintiffs' Motion for Transfer and Coordination or Consolidation Under 28 U.S.C. § 1407 (Dkt. 1) and Subsequent Motion for Transfer of Actions Under 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings (Dkt. 4), and all papers filed in support or partial support of those motions (Dkts. 9, 19, 169, 184, 189, 369) (collectively, the "Motions").

**I.      INTRODUCTION**

An MDL requires common facts that can be efficiently addressed in a combined proceeding. But the plaintiffs themselves cannot agree on the purportedly common facts that would warrant consolidation, or even whether an MDL is appropriate. Some moving plaintiffs allege that the presence of the coronavirus at their business sites caused physical loss or property damage (*e.g.*, Dkt. 12-1 & case no. 1:20-cv-21641, Dkt. 1 at ¶ 43); others allege that government-mandated precautionary measures to prevent the future spread of disease, not the virus itself, caused their purported losses (*e.g.*, Dkt. 10-4 at ¶ 46). Yet those governmental orders

---

[1] Westchester and IINA each is a defendant to two potential tag-along actions. (Dkts. 10, 12, 179, 335.)

have varied across the nation—a patchwork approach that has been described as a "hodgepodge" (*USA Today*), a "mishmash" (*CNN*), a "scattershot effort" (*Politico*), a "crazy quilt" (*Bulletin of the Atomic Scientists*), and a "jumble of half measures" (*New York Times*).

MDLs involving multiple defendants are rare. MDLs formed to resolve insurance coverage cases against multiple defendants are even rarer.[2] And MDLs in which no defendant is a party to more than a small percentage of cases are unprecedented. The cases movants seek to consolidate here show why. They involve insurance contract disputes with more than 100 different insurers that issued different individually underwritten policies with different wording to different policyholders with different businesses—ranging from restaurants, to nightclubs, to dental practices, to marketing firms—that were affected differently by different "stay at home" orders issued by different governmental authorities in different jurisdictions. Each plaintiff asserts claims only against the insurer that issued that plaintiff's policy. Aside from plaintiffs purporting to sue two or more defendants in the same insurance group[3] on the same policy, there are no multi-defendant actions. Most insurers, like Westchester and IINA, are a defendant to no more than two of the more than 130 actions.[4] Even within the policies issued by a single insurer,

---

[2] Although insurance coverage claims have in rare cases been transferred to a preexisting MDL, Westchester and IINA are aware of only two MDLs formed to resolve coverage claims, and none in the last quarter-century. *See In re White Consol. Indus., Inc., Envtl. Ins. Coverage Litig.*, 1994 WL 52568, at *1 (J.P.M.L. Feb. 16, 1994) (involving two actions by one plaintiff against the same three insurance companies based on the same insurance policies); *In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage Litig.*, 1988 U.S. Dist. LEXIS 17043, at *1 (J.P.M.L. May 31, 1988) (involving two actions against multiple insurers, one of which was a defendant in both actions).

[3] Westchester and IINA, for example, both are affiliates of Chubb.

[4] Of the approximately 116 insurer defendants, 93, or 80%, are a defendant to only one or two of the 133 actions: 75 are a defendant to one action and 18 are a defendant to two actions. Only 6, or 5% of all defendants, are a defendant to more than 5 actions.

The point does not change materially when the cases are evaluated by insurer group: of the approximately 36 insurer groups, 21 have an affiliated company named as a defendant to only

there are different terms, conditions, exclusions and endorsements—some that contain a "virus exclusion" and some that contain other terms and exclusions that may apply to claims related to COVID-19.  And, contrary to movants' assertion, the resolution of the different plaintiffs' insurance coverage claims under each individually underwritten and separately issued policy will require a series of individualized assessments based on the specific language of each policy as applied to the facts unique to each policyholder under the insurance laws of each state.[5]  Even many plaintiffs agree:  more than 50 have said so in response to the Motions, vehemently opposing an MDL.

Transfer would not promote efficiency or conserve resources.  It would uproot localized disputes, complicate rather than simplify discovery, prolong rather than streamline pretrial proceedings, and create one massive docket that could not conceivably be managed efficiently or effectively by a single federal judge.  These cases do not satisfy the standards for an MDL.

## II. BACKGROUND

On April 20 and April 21, 2020, movants filed two motions to transfer and consolidate several cases (together with potential tag-along actions, the "Actions") in which various types of businesses seek business interruption insurance coverage for alleged losses related to COVID-19. The Actions assert claims against approximately 116 different insurers, each of which issued separate policies to separate insureds.

The following potential tag-along actions each names one of Westchester or IINA as a defendant:

---

one or two actions.  Only 6 have an affiliated company named as a defendant to more than 5 of the 133 actions.

[5] Even if the insurers contend there is no coverage based on plaintiffs' allegations, resolution of plaintiffs' claims will involve individualized issues.

| Defendant | Case Name | Case number | Court | Judge | MDL Dkt. |
|---|---|---|---|---|---|
| Westchester | *Cafe Int'l Holding Co. LLC v. Chubb Ltd. and Westchester Surplus Lines Ins. Co.* | 1:20-cv-21641 | S.D. Fla. | Marcia G. Cooke | 12 |
| Westchester | *The K's Inc. v. Westchester Surplus Lines Ins. Co.* | 1:20-cv-01724 | N.D. Ga. | William M. Ray, II | 335 |
| IINA | *Truhaven Enters., Inc. d/b/a Fiorino Ristorante v. Chubb Ltd. and Indem. Ins. Co. of N. Am.* | 2:20-cv-04586 | D.N.J. | Stanley R. Chesler | 10 |
| IINA | *Beniak Enters., Inc. v. Chubb Ltd. and Indem. Ins. Co. of N. Am.* | 2:20-cv-05536 | D.N.J. | Kevin McNulty | 179 |

The plaintiffs in these actions allege entirely different theories of loss: the *Cafe International* and *The K's* plaintiffs allege that "[t]he presence of COVID-19 caused direct physical loss of and/or damage to the covered premises," (*see* Dkt. 12-1 & case no. 1:20-cv-21641, Dkt. 1 at ¶ 43; Dkt. 335-3 at ¶ 31), while the *Truhaven* and *Beniak* plaintiffs claim that "losses were not caused by a 'virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease,'" but were instead caused by "precautionary measures taken by [the state] to prevent the spread of COVID-19 in the future." (Dkt. 10-4 at ¶ 46; Dkt 179-3 at ¶ 49.)

### III.   ARGUMENT

To justify an MDL, movants must show that (1) the Actions share sufficient common questions of fact, (2) transfer would be for the convenience of the parties and witnesses, and (3) transfer would advance the just and efficient conduct of the Actions. 28 U.S.C. § 1407(a); *In re Highway Accident Near Rockville, Conn., on Dec. 30, 1972*, 388 F. Supp. 574, 575 (J.P.M.L.

4

1975) ("Before transfer will be ordered, the Panel must be satisfied that all of the statutory criteria have been met."); *see also* Manual for Complex Litigation § 20.131 (4th ed. 2004), *available at* https://public.resource.org/scribd/8763868.pdf ("The objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save time and effort of the parties, the attorneys, the witnesses, and the courts."). Because movants cannot satisfy any of these requirements, and because an MDL would hinder rather than further the objectives of transfer, the Motions should be denied.

### A. Movants Have Failed to Demonstrate Sufficient Common Questions of Fact

To warrant centralization, it is not enough for movants to show some "common legal questions and, perhaps, a few factual questions." *In re Pharmacy Benefit Plan Adm'rs Pricing Litig.*, 206 F. Supp. 2d 1362, 1363 (J.P.M.L. 2002). Movants bear "a heavy burden to show that [the] common questions of fact are sufficiently complex and that the accompanying discovery will be so time-consuming as to justify transfer under Section 1407." *In re 21st Century Prods., Inc. "Thrilsphere" Contract Litig.*, 448 F. Supp. 271, 273 (J.P.M.L. 1978). Movants fail to satisfy this standard.

#### 1. The Actions Involve Different Policies with Different Provisions Issued by Different Insurers to Different Policyholders

Movants claim there are "great similarities and standard or near-standard terms across all the property insurance policies at issue," (Dkt. 4 at 5), but the complaints make clear that the policies contain variations that policyholders likely will argue—and indeed, some already have argued[6]—matter. For example:

- ***Virus exclusion.*** The policies issued by IINA in the *Truhaven* and *Beniak* cases

---

[6] In their opposition to the Motions, the "Big Onion Plaintiffs" argue: "Although [movants] attempt to characterize the differences in policy language to be 'slight,' [Dkt. 1 at 8], this is grossly misleading and fails to account for the fact that coverage questions often turn on slight differences in policy language." (*See* Dkt. 198 at 8-9; *see also id.* at 13-15.)

5

contain a virus exclusion, while other policies do not.  (*See* Dkt. 10-4 at ¶ 46; Dkt. 179-3 at ¶ 49.)

- *Pandemic endorsement.*  Some policies contain a pandemic endorsement while other policies do not.  (*See* Dkt. 4-18 at ¶ 7.)

- *Business income coverage.*  Some policies provide business income coverage if (among other things) the suspension of operations is caused by "direct physical loss or direct physical damage to property," (*see* Dkt. 12-3 & case no. 2:20-cv-02034 at Dkt. 1-1), while others provide business income coverage if (among other things) the suspension of operations is "caused by direct physical loss *of* or damage to property" (*see* Dkt. 1-8 & case no. 1:20-cv-21525 at Dkt. 1-2; Dkt. 1-9 & case no. 1:20-cv-03107 at Dkt. 1-1).  Some policies issued by other insurers provide business income coverage if (among other things) the suspension of operations is "caused by direct 'loss' to property" and define "loss" separately.  (*See* Dkt. 4-14 & case no. 1:20-cv-00312 at Dkt. 1-2.)

- *Civil authority coverage.*  Some policies provide civil authority coverage if (among other things) "a Covered Cause of Loss causes damage to property other than property at the described premises," (*see* Dkt. 1-8 & case no. 1:20-cv-21525 at Dkt. 1-2; Dkt. 1-9 & case no. 1:20-cv-03107 at Dkt. 1-1), while other policies provide civil authority coverage if (among other things) the prohibition of access to property is "due to direct *physical* 'loss' to property, other than at the 'premises'" (*see* Dkt. 4-11 & case no. 1:20-cv-02160 at Dkt. 1-1).

- *Civil authority coverage area.*  Some policies provide civil authority coverage if (among other things) the covered premises are "within the area" of damaged property, (*see* Dkt. 1-7 & case no. 1:20-cv-02005 at Dkt. 1-3; Dkt. 1-10 & case no. 2:20-cv-00623 at Dkt. 1-1), while others provide civil authority coverage if (among other things) the covered premises are "within [the] area but [] not more than 100 miles" from damaged property, (*see* Dkt. 29-4 & case no. 4:20-cv-01478 at Dkt. 1-2), and still others provide civil authority coverage if (among other things) the covered premises are "within [the] area but [] not more than one mile" from damaged property (*see* Dkt. 12-3 & case no. 2:20-cv-02034 at Dkt. 1-1).

- *Ordinance or law exclusion.*  Some policies contain an ordinance or law exclusion, but other policies have modifications to this exclusion through an endorsement.  (*See* Dkt. 1-10 & case no. 2:20-cv-00623, Dkt. 1-6.)

- *State-specific terms.*  Nearly all policies have state-specific endorsements that change the terms of the policies.

Because the Actions involve several different insurers, each of which sold different

insurance policies to different insureds, there are insufficient common questions of fact to

6

warrant consolidation. At least 55 plaintiffs to the Actions already have said that they agree. (*See* Dkt. 198 at 2, 6 (arguing that "[a]ll 83-some lawsuits seek to recover losses pursuant to unique circumstances present at each insured's specific location, under terms and conditions of different insurance policies issued by different insurers under different states' laws" and "granting the Motions would do more harm than good").) Additionally, United Policyholders, which has a self-described mission of serving "as an effective voice for a broad range of insurance policyholders . . . throughout the United States," acknowledged in an amicus brief *opposing* consolidation of Pennsylvania state court cases involving COVID-19-related business interruption claims that there are "thousands of different insurance policy iterations in Pennsylvania alone" and that those policies are "varied in their language, scope, and covered risks." (*See* 5/15/20 Application of United Policyholders for Leave to Submit *Amicus Curiae* Brief in Opposition to the Emergency Application for Extraordinary Relief, filed in *Tambellini v. Erie Ins. Exch.*, PA. Sup. Ct. No. 52 WM 2020, at 1, 5, attached as Ex. A.) United Policyholders argued, *inter alia*, that findings in one insured's case likely could not be extrapolated to a different insured's case, and consolidation likely would be *less* efficient than permitting cases to proceed separately, in the jurisdictions in which they are filed. (*Id.* at 5-8, 19-21.) Although it ruled before receiving United Policyholders' amicus brief, the Pennsylvania Supreme Court denied the plaintiff's request to consolidate cases before a single judge or group of judges. (*See* 5/14/20 Order Denying Application for Extraordinary Relief, issued in *Tambellini v. Erie Ins. Exch.*, PA. Sup. Ct. No. 52 WM 2020, attached as Ex. B.)

This Panel, likewise, routinely has rejected motions to transfer in similar circumstances. *See In re: The Great West Cas. Co. Ins. Litig.*, 176 F. Supp. 3d 1371, 1371 (J.P.M.L. 2016) (denying motion to transfer actions against insurance company because the actions "involve no

common factual issues aside from the broad fact that, in each action, a common insurance company has denied coverage of an insurance claim"); *In re Ins. Cos. "Silent" Preferred Provider Org. (PPO) Litig.*, 517 F. Supp. 2d 1362, 1363 (J.P.M.L. 2007) (denying motion to transfer because actions were "against different defendant insurance companies and involve[d] different contracts"); *In re: Mortgage Indus. Home Affordable Modification Program (HAMP) Contract Litig.*, 867 F. Supp. 2d 1338, 1338 (J.P.M.L. 2012) (denying motion to transfer industry-wide mortgage misconduct cases because circumstances surrounding each loan's history were different and there were "many different non-overlapping defendants"); *In re: Credit Card Payment Protection Plan Mktg. and Sales Practices Litig.*, 753 F. Supp. 2d 1375, 1375 (J.P.M.L. 2010) (denying motion to transfer due to insufficient common questions of fact where "each defendant appears to have offered several different products, which were marketed in different ways and subject to different disclosures"); *In re Florida, Puerto Rico, and U.S. Virgin Islands 2016 and 2017 Hurricane Seasons Flood Claims Litig.*, 325 F. Supp. 3d 1367, 1368 (J.P.M.L. 2018) (denying motion to transfer because "[t]hese actions possess only a superficial factual commonality—all plaintiffs allege that they suffered property damage as a result of one or another of several hurricanes, and that their respective insurance companies breached the terms of plaintiffs' policies by settling plaintiffs' claims for amounts lower than the losses actually sustained").

2. **Policyholders Have Argued That Different States May Interpret Common Insurance Terms Differently Under Their Different Laws**

The existence of some similarly worded contractual terms alone does not create common issues of fact justifying consolidation. Where plaintiffs' claims implicate a patchwork of regulatory and legal landscapes, the Panel does not hesitate to deny transfer and consolidation. *See In re Title Ins. Real Estate Settlement Procedures Act (RESPA) & Antitrust Litig.*, 560 F.

8

Supp. 2d 1374, 1376 (J.P.M.L. 2008) (denying motion to transfer because actions "encompass different regulatory regimes in the states in which actions are pending along with variances in insurance regulation and law in each state").

Policyholders have argued that different courts should interpret the same policy language differently, based on different states' rules of contract construction.[7]  Plaintiffs opposing consolidation argue there are several examples, although not at issue in these coverage cases, that illustrate this fact:  "courts around the country have reached vastly different determinations on the proper interpretation of so-called 'common' policy provisions like the 'pollution exclusion,' the 'flood exclusion,' and the definition of the word 'occurrence,' when applied to disasters like Hurricane Andrew, Hurricane Katrina, and 9/11 or long-tail exposures like asbestos and environmental litigation."  (Dkt. 198 at 5.)  To plaintiffs' point on the pollution exclusion in many liability policies not at issue in these coverage cases, for example, the California Supreme Court noted, "[t]o say there is a lack of unanimity as to how the clause should be interpreted is an understatement."  *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 641 (2003).[8]

Here, too, plaintiffs have argued that different states' laws could lead courts to differently interpret the same or similar policy terms in different insureds' policies.  (*See* Dkt. 198 at 5, 16.)  Regardless, each claim will need to be analyzed on a state-by-state and policy-by-policy basis, and consolidation would not streamline these cases.  *See In re: Mortgage Indus. Foreclosure Litig.*, 996 F. Supp. 2d 1379, 1379-80 (J.P.M.L. 2014) (denying motion to transfer because

---

[7] Insurers, of course, may disagree with this argument.

[8] Insurance regulations also materially vary across states.  New Jersey, for example, requires insurers to acknowledge claims within 10 working days and report on their investigation 30 days after receiving proof of loss and every 45 days thereafter.  *See* N.J. Admin. Code tit. 11, §§ 2-17.6, 2.17.7.  Massachusetts, on the other hand, requires only that insurers promptly acknowledge claims and report on their investigation within a reasonable time.  *See* Mass. Gen. Laws. ch. 176D, § 3(9).

actions involved "contractual interpretation questions under different state laws"); *In re: Honey Prod. Mktg. and Sales Practices Litig.*, 883 F. Supp. 2d 1333, 1333 (J.P.M.L. 2012) (denying motion to transfer because actions involved "different defendants, marketing different honey products, and involve[d] different state regulations subject to different legal challenges by the defendants").

### 3. Governmental Orders Related to COVID-19—and Their Alleged Impact on Each Policyholder—Differ Significantly

Movants argue that these Actions will require a common determination of "whether the various COVID-19 Governmental Orders trigger coverage under plaintiffs' business interruption policies and if so, whether any exclusions apply." (Dkt. 1-1 at 7.) But the governmental orders vary significantly from state to state, county to county, and city to city, as does their impact on different insureds' different businesses. As a result, "facts relating to regulation . . . and plaintiffs' remediation efforts is [sic] likely to differ significantly." *See In re Monsanto PCB Water Contamination Litig.*, 176 F. Supp. 3d 1379, 1380 (J.P.M.L. 2016) (denying motion to transfer).

Governmental orders during this crisis have been anything but consistently worded and uniformly applied. Even within the same state, orders have varied. And in some cases, the specific orders themselves have required clarification. In Orange County, California, for example, the Board of Supervisors issued a March 17, 2020 order prohibiting all non-essential public and private gatherings outside a household—only to revise it, a day later, specifying that "nothing in this document prohibits businesses and other entities from operating within Orange

County."[9]  Similarly, in an April 1, 2020 order, Texas Gov. Greg Abbott directed residents to "minimize" social gatherings and in-person contact—only to release a follow-up video spelling out that his order "requires" Texans to stay home except to provide essential services or procure essential goods.[10]

Some states (such as Pennsylvania, where sixteen Actions have been filed[11]) have ordered all non-essential businesses to remain closed, while others (such as Ohio, where four Actions have been filed[12]) have permitted non-essential businesses to reopen with reduced capacity, and still others (such as Nebraska and South Dakota) have implemented no restrictions

---

[9] Rob Vardon, "Orange County revises coronavirus order in effort to ease confusion," Daily Pilot, March 18, 2020, *available at* https://www.latimes.com/socal/daily-pilot/news/story/2020-03-18/orange-county-revises-coronavirus-order-in-effort-to-ease-confusion.

[10] "Gov. Abbott must clarify his coronavirus order to end confusion," Dallas Morning News, April 1, 2020, *available at* https://www.dallasnews.com/opinion/editorials/2020/04/01/gov-abbott-must-clarify-his-coronavirus-order-to-end-confusion/.

[11] *See* (1) *LH Dining L.L.C. v. Admiral Indem. Co.*, No. 2:20-cv-01869 (E.D. Pa.); (2) *Newchops Rest. Comcast LLC v. Admiral Indem. Co.*, No. 2:20-cv-01949 (E.D. Pa.); (3) *Lansdale 329 Prop, LLC et al v. Hartford Underwriters Ins. Co. et al.*, No. 2:20-cv-02034 (E.D. Pa.); (4) *Milkboy Center City LLC v. The Cincinnati Ins. Co. et al.*, No. 2:20-cv-02036 (E.D. Pa.); (5) *C.A Spalding Co. v. Selective Ins. Group, Inc. et al.*, No. 2:20-cv-01967 (E.D. Pa.); (6) *Chester Cnty. Sports Arena v. The Cincinnati Specialty Underwriters Ins. Co.*, No. 2:20-cv-02021 (E.D. Pa.); (7) *Ian McCabe Studio, LLC et al. v. Erie Ins. Exch.*, No. 2:20-cv-01973 (E.D. Pa.); (8) *Jul-Bur Assocs. Inc. et al. v. Selective Ins. Co. of Am. et al.*, No. 2:20-cv-01977 (E.D. Pa.); (9) *Laudenback Periodontics and Dental Implants, Ltd. v. Liberty Mut. Ins. Group et al.*, No. 2:20-cv-02029 (E.D. Pa.); (10) *Big Red Mgmt. Corp. v. Zurich Am. Ins. Co.*, No. 20-cv-2113 (E.D. Pa.); (11) *Hair Studio 1208 LLC v. Hartford Underwriters Ins. Co.*, No. 2:20-cv-02171 (E.D. Pa.); (12) *Eric R. Shantzer, DDS v. Travelers Cas. Ins. Co. of Am., The Travelers Indem. Co.*, No. 2:20-cv-02093 (E.D. Pa.); (13) *Humans & Resources, LLC v. Hartford Mut. Ins. Co.*, No. 2:20-cv-02152 (E.D. Pa.); (14) *Sidkoff, Pincus & Green PC v. Sentinel Ins. Co., Ltd.*, No. 2:20-cv-02083 (E.D. Pa.); (15) *Jabz Chandler II LLC, et al. v. Philadelphia Ins. Cos., et al.*, No. 2:20-cv-02341 (E.D. Pa.); (16) *The Lock Loft, LLC v. Erie Ins. Prop. & Cas. Co.*, No. 1:20-cv-00122 (W.D. Pa.).

[12] *See* (1) *Bridal Expressions LLC v. Owners Ins. Co.*, No. 1:20-cv-00833 (N.D. Ohio); (2) *Troy Stacy Enters. Inc. v. The Cincinnati Ins. Co.*, No. 1:20-cv-00312 (S.D. Ohio); (3) *New Super China Buffet, Inc. v. Grange Mut. Cas. Co.*, No. 2:20-cv-02264 (S.D. Ohio); (4) *Taste of Belgium LLC v. The Cincinnati Ins. Co., et al.*, No. 1:20-cv-00357 (S.D. Ohio).

on non-essential businesses at all.[13] Some states (such as Washington, where twenty Actions have been filed[14]) have prohibited all public gatherings, while others (such as Arizona, where one Action has been filed[15]) permit gatherings of ten people or fewer.[16] Some states (such as California, where six Actions have been filed[17]) have restricted restaurants to takeout and delivery orders only, while others (such as Kansas, where one Action has been filed[18]) permit

---

[13] *See* "State Data and Policy Actions to Address Coronavirus," Kaiser Family Foundation, April 30, 2020, *available at* https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/#note-1-5.

[14] *See* (1) *Mikkelson v. Aspen Am. Ins. Co.*, No. 3:20-cv-05378 (W.D. Wash.); (2) *Fox v. Travelers Cas. Ins. Co. of Am.*, No. 2:20-cv-00598 (W.D. Wash.); (3) *Nguyen v. Travelers Cas. Ins. Co. of Am.*, No. 2:20-cv-00597 (W.D. Wash.); (4) *Stan's Bar-B-Q LLC v. The Charter Oak Fire Ins. Co.*, No. 2:20-cv-00613 (W.D. Wash.); (5) *Marler v. Aspen Am. Ins. Co.*, No. 2:20-cv-00616 (W.D. Wash.); (6) *Chorak v. Hartford Cas. Ins. Co.*, No. 2:20-cv-00627 (W.D. Wash.); (7) *Germack v. Dentists Ins. Co.*, No. 2:20-cv-00661 (W.D. Wash.); (8) *Hsue v. Travelers Cas. Ins. Co. of Am.*, No. 2:20-cv-00622 (W.D. Wash.); (9) *Kashner v. Travelers Indem. Co. of Am.*, No. 2:20-cv-00625 (W.D. Wash.); (10) *Kim v. Sentinel Ins. Co. Ltd.*, No. 2:20-cv-00657 (W.D. Wash.); (11) *Pacific Endodontics PS v. Ohio Cas. Ins. Co.*, No. 2:20-cv-00620 (W.D. Wash.); (12) *Prato v. Sentinel Ins. Co. Ltd.*, No. 3:20-cv-05402 (W.D. Wash.); (13) *Andrew Lee, DDS v. Sentinel Ins. Co., Ltd.*, No. 3:20-cv-05422 (W.D. Wash.); (14) *Nue LLC d/b/a/ Nue Seattle v. Oregon Mut. Ins. Co.*, No. 2:20-cv-00676 (W.D. Wash.); (15) *Carlos O. Caballero DDS, MS, PS v. Massachusetts Bay Ins. Co.*, No. 3:20-cv-05437 (W.D. Wash.); (16) *Glow Medispa, LLC v. Sentinel Ins. Co. Ltd.*; No. 2:20-cv-00712 (W.D. Wash.); (17) *Karla Aylen, DDS PLLC v. Aspen Am. Ins. Co.*, No. 2:20-cv-00717 (W.D. Wash.); (18) *Cascadia Dental Specialists Inc. v. Am. Fire and Cas. Co.*; No. 2:20-cv-00732 (W.D. Wash.); (19) *Hirbod H. Rowshan DDS, P.S. v. Ohio Security Ins. Co.*, No. 2:20-cv-00730 (W.D. Wash.); (20) *Bath v. Travelers Cas. Ins. Co. of Am.*, No. 3:20-cv-05489 (W.D. Wash.).

[15] *See Border Chicken AZ LLC v Nationwide Mut. Ins. Co.*, No. 2:20-cv-00785 (D. Ariz.).

[16] *See* "State Data and Policy Actions to Address Coronavirus," Kaiser Family Foundation, *supra*.

[17] *See* (1) *Caribe Rest. and Nightclub, Inc. v. Topa Ins. Co.*, No. 2:20-cv-03570 (C.D. Cal.); (2) *Pigment Inc. v. The Hartford Fin. Servs. Group, Inc. et al.*, No. 3:20-cv-00794 (S.D. Cal.); (3) *Kingray Inc. d/b/a La Quinta Beer Hunter v. Farmers Group Inc. et al.*, No. 5:20-cv-00963 (C.D. Cal.); (4) *Nari Suda LLC et al. v. Oregon Mut. Ins. Co.*, No. 3:20-cv-3057 (N.D. Cal.); (5) *O'Brien Sales and Mktg., Inc. v. Transp. Ins. Co.*, No. 3:20-cv-02951 (N.D. Cal.); (6) *Mortar and Pestle Corp. d/b/a Olea Restaurant v. Atain Specialty Ins. Co. a/k/a Atain Ins. Co.*, No. 3:20-cv-03461 (N.D. Cal.).

[18] *See Promotional Headwear Int'l v. Cincinatti Ins. Co., Inc.*, No. 2:20-cv-02211 (D. Kan.).

limited dine-in services.[19] States even vary on which businesses are considered essential—businesses such as florists, liquor stores, and golf courses are deemed essential in some states and non-essential in others.[20] And how the same types of businesses, even within the same state, interpret and respond to these orders can vary vastly. One business may consider itself essential while a similar business deems itself non-essential. And some businesses have opted to close or declined to reopen even without a closure order or as restrictions are lifted.

Thus, contrary to movants' assertions, the various governmental orders do not create any common issues of fact.

### 4. **Plaintiffs Will Have to Prove Individualized Facts**

Regardless of any allegedly common policy language, a court resolving plaintiffs' coverage claims will be required to apply the policies' specific language to facts unique to each policyholder. As noted, plaintiffs themselves cannot agree on the common facts to which the relevant policy language should be applied. Still, each policyholder bears the burden of establishing coverage, which will necessarily involve individual facts. For example, even apart from whether the mere presence of coronavirus on property can cause physical damage, each policyholder pursuing this theory (as opposed to those claiming a virus did not cause their losses) will have to prove, among other things, the presence of the virus at the business's specific location—an individualized determination. Although one movant has suggested policyholders can establish the presence of the virus through a statistical analysis, that is unlikely to be a viable

---

[19] *See* "State Data and Policy Actions to Address Coronavirus," Kaiser Family Foundation, *supra*.

[20] *See* Scottie Andrew, "What constitutes 'essential businesses'? States seem to have varying standards," CNN, March 26, 2020, *available at* https://www.cnn.com/2020/03/25/business/essential-businesses-states-coronavirus-trnd/index.html.

basis for policyholders to satisfy their burden of proof, and that argument is belied by the widespread lockdown orders and the shortage of available tests. If we could easily determine where the virus is located and who has it with statistics, closures could be limited to impacted premises, quarantine orders directed to infected individuals, and broad closure and stay-at-home orders rendered unnecessary.

Likewise, if courts need to reach the question of whether any of the various (and often contradictory) orders prohibited access to the insured premises, that likely will be an individualized determination that depends on, among other factors, the exact wording of the order in place at each location and its exact effect on each policyholder. If courts need to determine what caused the civil authority to issue the order in applying the policy provision, that also may require individualized determinations and, where necessary, fact-finding. Indeed, one policyholder that supports centralization only if its own localized dispute is not moved from its home district concedes that the cases movants seek to consolidate have "significant differences," including separate insurance policies "which will be worded differently to varying degrees" and different "state's laws governing contracts and insurance policies," and anticipates that "each state's lockdown [will] be[] constructed differently, and impact[] each plaintiff differently." (Dkt. 19 at 3.)[21]

---

[21] Some movants contend that the Panel has previously centralized actions involving insurance disputes, (*see* Dkt. 189 at 3), but the cases they cite involve entirely distinguishable facts. In *In re Peanut Crop Insurance Litigation*, the Panel centralized actions alleging that "common defendants" unlawfully and unilaterally modified a multiple peril crop policy. 342 F. Supp. 2d 1353, 1354 (J.P.M.L. 2004). In *In re Portfolio Recovery Associates, LLC, Telephone Consumer Protection Act Litigation*, the Panel centralized actions alleging that a "common defendant" violated the federal Telephone Consumer Protection Act—actions that did not involve coverage disputes at all. 846 F. Supp. 2d 1380, 1380-81 (J.P.M.L. 2011). Neither case involved coverage actions brought by *different* policyholders seeking to recover individualized losses under policies issued by *different* defendants, as movants seek to centralize here.

### B. Transfer Will Not Be More Convenient for the Parties and Witnesses

Different movants contend that the Actions should be transferred to the Eastern District of Pennsylvania (Dkt. 1-1 at 10), the Northern District of Illinois (Dkt. 4 at 11), and the Southern District of Florida (Dkt. 9 at 5), respectively, but none has shown that centralization in any of these districts (or in any other district) would be more convenient for the parties and witnesses.

That is because each of the approximately 116 insurer defendants is involved in a small percentage of the 133 Actions at issue—Westchester and IINA each is a defendant in two—and centralization would be demonstrably *in*convenient for defendants and their witnesses. *In re Proton-Pump Inhibitor Prods. Liab. Litig.*, 273 F. Supp. 3d 1360, 1361-62 (J.P.M.L. 2017) (noting "named defendants vary from action to action" and "centralization thus appears unlikely to serve the convenience of most, if not all, defendants and their witnesses"); *see also In re Ambulatory Pain Pump Chondrolysis Prods. Liab. Litig.*, 709 F. Supp. 2d 1375, 1377 (J.P.M.L. 2010) (denying centralization of 102 actions where "[m]ost, if not all, defendants [were] named in only a minority of actions; and several defendants [were] named in but a handful of actions"); *In re Table Saw Prods. Liab. Litig.*, 641 F.Supp.2d 1384, 1385 (J.P.M.L. 2009) (denying centralization of 42 actions, where "[n]o defendant [was] sued in all actions, and several entities . . . [were] named in, at most, two or three of them").

Centralization would unnecessarily uproot localized disputes. *Truhaven* and *Beniak*, for example, both involve a policy issued in New Jersey to a New Jersey business, and discovery is likely to be concentrated in New Jersey. *Cafe International*, meanwhile, involves a policy issued in Florida to a Florida business, and discovery is likely to be located in Florida. Transferring these actions out of the forum where discovery is localized to another forum such as the Eastern District of Pennsylvania, the Northern District of Illinois or, for actions other than *Cafe International*, the Southern District of Florida, would significantly inconvenience the parties and

witnesses. *See In Re 21st Century Prods. Inc. "Thrilsphere" Contract Litig.*, 448 F. Supp. 271, 272 (J.P.M.L. 1978) (denying motion to transfer New Jersey action against New Jersey defendants for consolidation in the Southern District of Florida because transfer would not serve the convenience of the parties and witnesses or promote the just and efficient conduct of litigation); *In re Monsanto*, 176 F. Supp. 3d at 1380 (denying motion to transfer because centralization was not necessary for the convenience of the parties and witnesses where factual questions relating to alleged contamination of different bodies of water were likely to differ); *In re Rely Tampon Prods. Liab. Litig.*, 533 F. Supp. 1346, 1347 (J.P.M.L. 1982) (denying motion to transfer because centralization would not promote convenience where individual questions of fact predominated over common questions of fact). One plaintiff, Sandy Point Dental, an Illinois dental business, made this point in its Response in Partial Support of the Motions, in which it "objects to changing the venue to the Southern District of Florida, or anywhere outside of the Northern District of Illinois." (Dkt. 19 at 2.) Just as Sandy Point Dental would be inconvenienced by an order moving its coverage case, dozens of other parties with disputes centered elsewhere (including Westchester and IINA), would be inconvenienced by an order displacing theirs.[22]

### C. Transfer for Coordination or Consolidation Will Not Promote Justice and Efficiency

Movants summarily assert that centralization will avoid unspecified duplicative discovery. (*See* Dkt. 1-1 at 10; Dkt. 4-1 at 10; Dkt. 9 at 4-5.) Although movants claim that every case will require similar types of evidence, such as expert testimony about the "likely

---

[22] Though movants' *counsel* may prefer centralization, the Panel does not consider the convenience of counsel unless counsel's preferred district would also serve the interests of the parties and witnesses. *In re Anthracite Coal Antitrust Litig.*, 436 F. Supp. 402, 403 (J.P.M.L. 1977).

16

presence and impact" of the virus, (Dkt. 4-1 at 6-7), to the extent any claims survive Rule 12 motions, resolving those claims will, as explained above, necessarily implicate the particular circumstances in each case—such as the details of the relevant civil authority and the type of business making the claim.  Since each insurer issued different policies to different insureds, if any discovery is necessary in these cases, discovery directed to one insurance company will have no relevance to the cases against other insurance companies.  *See In re: Healthextras Ins. Mktg. and Sales Practices Litig.*, 24 F. Supp. 3d 1376, 1377 (J.P.M.L. 2014) (centralization would not promote convenience and efficiency because issues pertaining to certain New Jersey policies would have no bearing on issues pertaining to certain Texas policies); *In re Proton-Pump Inhibitor Prods. Liab. Litig.*, 273 F. Supp. 3d at 1362 (denying initial motion for centralization of actions against multiple defendants because "a significant amount of the discovery in these actions appears almost certain to be defendant-specific"); *In re: Great West*, 176 F. Supp. 3d at 1372 (denying motion to transfer actions alleging that insurance company denied coverage of claims because the only potentially overlapping duplicative discovery was "underwriting files" and "all writing correspondence").

If any potentially "overlapping" discovery arises, it can be addressed through alternative means and does not warrant centralization.  Litigants have many mechanisms available to coordinate without transferring cases.  For example, the parties could agree to share discovery requests and responses through stipulations under Federal Rule of Civil Procedure 29 and informal discovery procedures as necessary and appropriate.  *See* Manual for Complex Litigation § 11.423 (4th ed. 2004).  The parties could also agree to use master interrogatories or agree that no party is required to answer duplicative requests.  *See id.* at § 11.464; *see also In re Ins. Cos. "Silent" Preferred Provider Org. (PPO) Litig.*, 517 F. Supp. 2d at 1363 (denying motion to

17

transfer actions "against different defendant insurance companies [involving] different contracts" where "[a]lternatives to transfer exist that may minimize whatever possibilities there might be of duplicative discovery and/or inconsistent pretrial rulings").  Defendants facing costly litigation across the country will have every incentive to achieve efficiencies through discovery wherever possible.  But movants' speculation that efficiencies can be achieved only through transfer and coordination or consolidation is baseless and cannot overcome the many other reasons transfer is clearly inappropriate here.

Finally, movants ignore the inefficiency that would result from an MDL involving more than 100 insurers from approximately 36 insurance groups.  Every insurer would need (and have a right) to be heard on every issue—including discovery and other pretrial rulings—affecting it.  The transferee court could not effectively implement a bellwether process, given the lack of overlapping parties among the cases.  Resolution of one case would not resolve any other.  The resulting proceeding would be unmanageable and delay would be inevitable.  It is easy to see why there is no precedent for an MDL like the one movants seek to create here.

## IV.     CONCLUSION

For all the foregoing reasons, the Panel should deny transfer of these Actions.

Dated:  June 3, 2020

O'MELVENY & MYERS LLP
DANIEL M. PETROCELLI
RICHARD B. GOETZ
AMY J. LAURENDEAU
ALLEN W. BURTON
ZOHEB P. NOORANI


By: /s/ Richard B. Goetz
Richard B. Goetz
Amy J. Laurendeau
Zoheb P. Noorani
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
rgoetz@omm.com
alaurendeau@omm.com
znoorani@omm.com

Daniel M. Petrocelli
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com

Allen W. Burton
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (213) 430-6407
aburton@omm.com


*Attorneys for Defendants* WESTCHESTER SURPLUS LINES INSURANCE COMPANY and INDEMNITY INSURANCE COMPANY OF NORTH AMERICA