**BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE: | ) | MDL NO. 2942 |
| COVID-19 BUSINESS INTERRUPTION | ) | |
| INSURANCE COVERAGE LITIGATION | ) | |

**LIBERTY MUTUAL'S INTERESTED PARTY RESPONSE IN
<u>OPPOSITION TO PLAINTIFFS' MOTIONS FOR TRANSFER</u>**

Defendants Liberty Mutual Insurance Company, Liberty Mutual Group, Inc., West American Insurance Company, The Ohio Casualty Insurance Company, Ohio Security Insurance Company, and American Fire and Casualty Company (collectively, "Liberty Mutual") hereby file this Interested Party Response in Opposition to Plaintiffs' Motion for Consolidation and Transfer under 28 U.S.C. § 1407 ("Initial Transfer Motion") (Dkt. No. 1) and Plaintiffs' Subsequent Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings ("Second Transfer Motion") (Dkt. No. 4) (collectively with the Initial Transfer Motion, "Transfer Motions"). To-date, fifteen federal cases and three potentially removable state court actions have been filed against Liberty Mutual entities alleging wrongful denial of business interruption claims arising out of the COVID-19 virus pandemic.[1] Because the Transfer Motions seek inclusion of all COVID-19-related coverage cases (the "Actions") regardless of the insurer involved or the specific policy type or policy language at issue, their requested MDL would encompass these cases involving Liberty Mutual.

Liberty Mutual is not aware of *any* instance where the JPML has *ever* ordered an industry-wide insurance coverage MDL, much less one of the scale, scope, and complexity sought by Plaintiffs in their respective Transfer Motions. And this stands to reason—any alleged superficial

---

[1] *See infra* n. 3 and 4 (listing the COVID-19 coverage cases brought against Liberty Mutual entities that are pending in or potentially removable to federal court).

factual commonality alleged here is far outweighed by the unique facts and legal issues presented in each individual insurance claim and lawsuit, something that even a number of plaintiffs opposing the Transfer Motions have acknowledged. *See* Dkts. 19 and 198. Plaintiffs' Transfer Motions fail to address the highly competitive nature of the insurance industry and the wide variety among insurers' products, policy language, and coverages; the differences among the hundreds of state, city, and county executive stay-at-home and re-opening orders regarding COVID-19 ("Executive Orders"); and the unique facts and circumstances surrounding each policyholder's business, permissible operations under Executive Orders, policy, and claim, and the nature of their lawsuit and theories of liability.

On multiple occasions, in insurance coverage matters involving far fewer defendants, insurance products, policy language, coverages, and policyholder claims, the JPML has concluded that individualized factual issues would undermine any alleged efficiencies from centralization, and Plaintiffs' reliance on JPML transfer orders premised upon product liability, conspiracy, and single, mass-disaster claims is misplaced and inapposite. The "common factual question" identified by Plaintiffs—whether Plaintiffs' policies provide business interruption coverage for losses arising out of the COVID-19 virus pandemic or Executive Orders—is not common at all because the litigation sought to be centralized does not involve uniform industry-wide policies and procedures or standardized Executive Orders or sufficient identity and similarity of businesses or industries named as plaintiffs. The Transfer Motions and complaints bear out these differences, with some claiming coverage based on the physical presence of the virus on their property and others claiming coverage due to Executive Orders issued over fear of the virus, and each insured alleging different facts as to how their business was impacted by state and local closure orders. Moreover, these are not pure questions of fact, and the JPML routinely denies consolidation where

actions involve allegedly common questions of law that would not rely upon the same factual discovery.

The industry-wide litigation sought by Plaintiffs does not involve a single, uniform policy form used by all insurers. To the contrary, the insurance industry is highly competitive, with insurers differentiating themselves across and within market segments by offering a variety of insurance products across diverse business lines. Some of the Liberty Mutual policies that would be swept up into an industry-wide MDL would include unique, Liberty-specific manuscript policies, proprietary contract forms, and customized policyholder coverages based upon proprietary endorsements that differ from those of Liberty's competitors. And whether a specific policyholder has suffered a covered loss will turn on each insurer's policy language, the specific circumstances of the claim, and/or the applicable state law.

Because of these vast differences, the creation of an industry-wide, all-insurer COVID-19 coverage MDL does not satisfy the commonality, convenience, and efficiency requirements of 28 U.S. § 1407, and the JPML should deny the Transfer Motions.

## I.      BACKGROUND

To date, at least 135 allegedly related actions have been filed against more than 100 insurance companies seeking business interruption coverage connected to COVID-19. While these lawsuits generally concern coverage disputes arising out of the COVID-19 virus pandemic, that nominal similarity is overwhelmed by significant factual and legal differences among the various complaints. Some insureds have brought individual lawsuits, while others purport to bring class actions with differing and varied proposed class definitions. The theories of liability and coverage vary from plaintiff to plaintiff as do the claims; some suits seek only declaratory relief, while others assert bad faith or unfair trade practices. The plaintiffs vary in significant respects as well. Plaintiffs in these cases are businesses from a variety of different industries, including

restaurants, dental offices, law firms, daycare centers, and retail stores, all of which have been subject to a multitude of differing Executive Orders issued by applicable states and localities.

Liberty Mutual, the sixth largest global property and casualty insurer, with its headquarters in Boston, Massachusetts,[2] has been named in fifteen federal cases[3] and three potentially removable state court cases[4] involving business interruption claims related to the COVID-19 virus pandemic (collectively, the "Liberty Mutual Actions"). Liberty Mutual provides both personal and commercial lines of insurance ranging from auto, home, and renters coverage to general commercial liability to commercial property and business owners coverage to workers

---

[2] LIBERTY MUTUAL INSURANCE, *Our Business*, *available at* https://www.libertymutualgroup.com/about-lm/corporate-information/our-business (last accessed May 27, 2020).

[3] *See Pac. Endodontics, P.S. v. The Ohio Cas. Ins. Co.*, No. 2:20-cv-00620-RSM (W.D. Wash., filed Apr. 23, 2020); *Biltrite Furniture, Inc. v. Liberty Mut. Ins. Co.*, No. 2:20-cv-00656 (E.D. Wis., filed Apr. 24, 2020); *Laudenbach Periodontics and Dental Implants, LTD v. Liberty Mut. Ins. Grp., et al.*, No. 20-cv-02029 (E.D. Pa. filed Apr. 27, 2020); *Family Dentistry of Okeechobee, Inc., and Sloan & Riley Holdings, LLC v. W. Am. Ins. Co.*, 2:20-cv-14136 (S.D. Fla., filed May 6, 2020); *Starjem Rest. Corp. d/b/a Fresco v. Liberty Mut. Ins.*, No. 1:20-cv-03672 (S.D.N.Y., filed May 12, 2020); *Hirbod H. Rowshan DDS, P.S., v. Ohio Sec. Ins. Co.*, No. 2:20-cv-00730 (W.D. Wash., filed May 14, 2020); *Cascadia Dental Specialists Inc. v. Am. Fire & Cas. Co.*, No. 2:20-cv-00732 (W.D. Wash., filed May 14, 2020); *Bauer Family Enterprises, Inc. v. Ohio Sec. Ins. Co.*, No. 3:20-cv-00500 (M.D. Fla., filed May 18, 2020); *Torre Rossa v. Liberty Mut. Ins.*, No. 1:20-cv-01095 (N.D. Ohio, removed to federal court on May 19, 2020); *Gaming Ent. Touch Tech v. Ohio Cas. Ins. Co., et al.*, No. 2:20-cv-00908 (D. Nev., filed May, 20, 2020); *Accents in Sterling, Inc. d/b/a Rare Earth Gallery v. Liberty Mut. Ins. Grp., et al.*, No. 1:20-cv-11005 (D. Mass., filed May 26, 2020); *Siren Salon Inc. v. Liberty Mut. Ins. Co.*, No 1:20-cv-03108 (N.D. Ill., filed May 26, 2020); *Park 101 LLC, et al. v. Liberty Mut. Grp. Inc., et al.*, No. 3:20-cv-00972 (S.D. Cal., filed May 26, 2020); *Sultan Hajer DBA Rug Outlet v. Ohio Sec. Ins. Co.*, No. 6:20-cv-00283 (E.D. Tex., removed to federal court on May 27, 2020); *Ascent Hosp. Mgmt. Co., LLC v. Emp'rs Ins. Co. of Wausau, et al..*, No. 2:20-cv-00770 (N.D. Ala., removed to federal court on June 2, 2020).

Eight of these fifteen actions have been noticed as "related actions." *See* Dkts. 12, 28, 167, 199, 202, 234, and 328. While this Opposition is being submitted on behalf of all of the Liberty Mutual entities named as defendants in the cases noticed as related actions, one of these entities—Liberty Mutual Group Inc.— is not an underwriting company and does not issue or sell insurance policies, and therefore has been improperly named as a defendant. Accordingly, this Opposition is without prejudice to Liberty Mutual Group Inc. seeking to dismiss claims against it on this basis or otherwise.

[4] *See Grand Cru, LLC d/b/a Rest. Nicholas v. Liberty Mut. Ins.*, No. 001122-20 (N.J. Super. Ct., filed Apr. 3, 2020); *Dr. Constantine Rossakis MD, PC v. Liberty Mut. Ins. Co.*, No. BER-L-2575-20 (Sup. Ct. of Bergen Cty., NJ, filed April 30, 2020); *Spring House Tavern, Inc. v. Am. Fire & Cas. Co.*, No. 2020-06069 (Ct. of C.P. of Montgomery Cty., Pa., filed May 11, 2020).

compensation insurance.[5]   Some of Liberty Mutual's commercial property insurance policies utilize proprietary or manuscript forms developed by Liberty Mutual for its policyholders exclusively, and then coverages are further tailored to the needs of the specific insured.

## II.   CONSOLIDATION AND TRANSFER OF THE COVID-19 COVERAGE CLAIMS AGAINST ALL INSURERS IS NOT PROPER UNDER SECTION 1407

Transfer of actions to one district for coordinated or consolidated pretrial proceedings is only appropriate where the actions involve one or more common questions of fact and the transfer would serve the convenience of the parties and judicial efficiency.   28 U.S.C. 1407(a).   Here, neither prong is satisfied.   The Transfer Motions seek centralization of all Actions involving business interruption coverage claims related to the COVID-19 pandemic and associated Executive Orders.[6]   At best, the Actions "possess only a superficial factual commonality" rendering an all-insurer MDL improper under Section 1407.   *See In re Fla., P.R., and U.S. V.I. 2016 and 2017 Hurricane Seasons Flood Claims Litig.*, 325 F. Supp. 3d 1367, 1368 (J.P.M.L. 2018).

As set forth below, any nominal commonalities among the Actions are far outweighed by the unique facts and legal issues presented in each.   Because the Actions involve no common factual issues aside from the broad allegation that each action relates to insurance coverage for losses stemming from the COVID-19 virus pandemic, the criteria of Section 1407 are not met. And, it is not just Liberty Mutual opposing the creation of an industry-wide MDL.   Indeed, ***several***

---

[5]   LIBERTY MUTUAL INSURANCE, *There for all your insurance needs, available at* https://www.libertymutualgroup.com/about-lm/corporate-information/overview (last accessed May 3, 2020).

[6]   The Initial Transfer Motion seeks transfer and consolidation of pending actions "which all seek a finding that the Governmental Orders trigger coverage under the plaintiffs' business interruption insurance policies . . . as well as any actions subsequently filed involving similar facts or claims." (Dkt. 1-1 at 3).   The Second Transfer Motion seeks to transfer and consolidate all pending actions "against those insurers who have wrongfully denied coverage for business interruption due to the COVID-19 pandemic . . . as well as any subsequently filed actions involving similar facts or claims." (Dkt.4-1 at 1).

*plaintiffs also oppose centralization*, pointing out the inefficiencies that would result from consolidating all COVID-19 coverage cases into an industry-wide MDL. *See* Dkt. 19 and 198. That both plaintiffs and defendants[7] oppose the creation of this MDL should be given great weight by the Panel. While not a factor specifically identified in Section 1407, opposition by both plaintiffs and defendants reflects a shared recognition that an industry-wide coverage MDL would not convenience the parties or create efficiencies for the court, making this joint opposition a compelling reason in and of itself to deny the Transfer Motions. In summary, the Panel should reject Plaintiff's request for an industry-wide, all-insurer MDL because (1) the Actions lack sufficient commonality of fact; (2) several of the factual commonalities alleged by Plaintiffs are, at most, an attempt to manufacture common questions of law, which do not justify creation of an MDL; and (3) creation of an all-insurer MDL will not serve the convenience of the parties or increase judicial efficiency, especially given the competitive sensitivities of involving all insurers—who are direct competitors—in a single all-insurer MDL.

### A.   The Actions Lack Sufficient Commonality of Fact to Support Consolidation under Section 1407.

The "core factual question" alleged by Plaintiffs—"do the [Executive Orders] trigger coverage under the business interruption insurance policies and do any exclusions (particularly those related to viruses and pandemics) apply" (Dkt. 1-1 at 5)[8]—does not, and indeed, cannot support consolidation under Section 1407, given the myriad of individualized factual questions

---

[7] The Panel has recognized the significance of defendants opposing centralization given that it is usually the defendants who stand to benefit most from the efficiencies of consolidated pretrial proceedings. *See, e.g., In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, Dkt. No. 257 at 2 (J.P.M.L., June 15, 2010) ("Significantly, the insurance companies that might benefit the most from the efficiencies of centralization, all oppose these motions.").

[8] *See also* Second Transfer Motion, Dkt. 4-1 at 6 (alleging that all of the Actions share a common factual question of "[w]hether COVID-19 causes 'physical damage or loss to property'" and "whether COVID-19 was present on the insured property").

that that not only predominate, but overwhelm any alleged core factual question.[9]  Section 1407 requires the existence of "common questions of fact" because such common questions are typically amenable to resolution through common discovery and common pretrial rulings.  *See In re Ethicon Physiomesh Flexible Composite Hernia Mesh Prods. Liab. Litig.*, 254 F. Supp. 3d 1381, 1382 (J.P.M.L. 2017).  Here, there are no all-insurer, industry-wide common questions of fact amenable to resolution through either common discovery or common pretrial rulings . . . much less both.

As noted above, the Actions assert a wide range of claims and involve more than 100 insurance carriers sued by policyholders across businesses and industries subject to different Executive Orders around the country.  Additional factual differences include, but are not limited to, differences among the various insurance policies at issue, differences in coverage, exclusion, and/or endorsement language of the policies, and different causes of action and theories of liability that will necessarily require different factual inquiries.

Unlike the product defect MDLs cited by Plaintiffs where the question of whether the product is defective could be resolved through common discovery and pre-trial rulings,[10] to the extent discovery is required to determine whether there is coverage under an insured's policy, that question cannot be resolved through common discovery or pre-trial rulings.  *See, e.g., In re Proton-Pump Inhibitor Prods. Liab. Litig.*, 273 F. Supp. 3d 1360, 1361-62 (J.P.M.L. 2017) (denying

---

[9] Despite arguing that the Actions share core common factual issues, Plaintiffs acknowledge the factual differences inherent in the industry-wide MDL they seek.  *See* Initial Transfer Motion at 5 ("some actions may contain various causes of action such as breach of contract or bad faith insurance practices"); *id.* at 8 ("the Actions do, and the tag-along actions will, involve different, geographically dispersed defendants with slightly different policy language in disparate industries"); Second Transfer Motion at 5 ("Numerous insurers have been sued under multiple insurance policies by a great many plaintiffs, including various proposed classes of plaintiffs").

[10] *See, e.g., In re Vioxx Prod. Liab. Litig.*, 360 F. Supp. 2d 1353, 1354 (J.P.M.L. 2005) (granting motion to transfer where all actions involved the common question regarding "alleged increased health risks . . . when taking Vioxx . . . and whether Merck knew of these increased risks and failed to disclose them."); *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 793 F. Supp. 1098 (J.P.M.L. 1992); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, 1997 WL 186325, at *1-2 (E.D. Pa., April 16, 1997); *In re A.H. Robbins Co. "Dalkon Shield" IUD Prods. Liab. Litig.*, 406 F. Supp. 540, 542 (J.P.M.L. 1975).

transfer where "the named defendants vary from action to action" and "a significant amount of the discovery in these actions appears almost certain to be defendant-specific").  Discovery here, if any discovery is necessary, would be case-specific, not only as to the particular insurer issuing the policy, but also to the plaintiffs whose policies, coverages, and exclusions vary and business operations differ, and who are subject to Executive Orders that vary by state, county and city.  Similarly, any pre-trial rulings based upon a specific insured's policy language and business operations under a particular state's Executive Order would be limited in scope and application— eliminating the efficiencies ordinarily obtained through multidistrict litigation.

### 1.   *The applicable policies issued by the various insurance companies are not common.*

The insurance policies in each case do not present sufficient commonality of fact for consolidation under Section 1407.  Plaintiffs attempt to get around these differences by suggesting that all insurers "use[] standardized terms."  *See* Second Transfer Motion at 6; *see also id.* at 5 (claiming that "there are great similarities and standard or near-standard terms across all the property insurance policies at issue.").  Plaintiffs are wrong.  Insurers do not use "standardized terms," and there is no single, uniform policy at issue in the Actions.  Indeed, several state insurance authorities have acknowledged that, although business interruption policies are not

typically written to cover viruses or global pandemics,[11] the nature of these claims and *the wording of the policies is highly individualized*.[12]

**Different Policy Forms.**   There is no single standardized policy used by all insurers industry-wide.  Although there are certain standard policy forms available and used by some—though not all—insurers, some insurers, like Liberty Mutual, also use proprietary policy forms that are unique to the particular insurance carrier and used exclusively by them with their insureds to develop customized coverage.  And some insurers also use manuscript policies that are unique to a particular insured.  And even where standard policy forms are used, they often include endorsements tailored to the industry of the policy holder.  A determination of coverage for each business interruption claim will require an individual analysis in light of the particular policy.

**Different Coverages.**  The various policies at issue in the Actions also differ with respect to what constitutes a covered loss and how (and whether) the trigger for loss is defined.[13]  And different policies include various coverage provisions that are potentially implicated (*e.g.,* Income

---

[11]   *See e.g.*, Bulletin 20-EX-3, Letter to Georgia Consumers (Mar. 17, 2020) *available at* https://www.oci.ga.gov/PublicInformation/Bulletins.aspx ("Viruses and disease are typically not an insured peril unless added by endorsement"); COVID-19: Business Insurance FAQs, Dept. Commerce & Cons. Affairs-Hawaii (Apr. 3, 2020) *available at* https://cca.hawaii.gov/ins/covid-19-business-insurance-faqs/ ("it is questionable whether your business interruption or business income policy specifically protects against virus and bacteria losses"); Mike Causey, Letter to Business Owners (April 17, 2020), *available at* https://files.nc.gov/doi/documents/mike-causey-letter-to-business-owners-covid-19.pdf ("We can't legally force insurers to cover a risk which they didn't intend to cover," particularly where that "could cripple the insurance industry causing many companies to fail, which would put the protection of homes, automobiles, and businesses at risk.").

[12]   *See, e.g.,* A.G. Gancarski, *Florida Insurance Commissioner: Business Interruption Insurance May Not Cover COVID-19 Losses*, FLA. POL. (Apr. 24, 2020) ("All business interruption policies are written differently.").

[13]   *Compare, e.g.,* Dkt.1-6 ¶33 (alleging that policy defines "Covered Causes of Loss" as "Direct Physical Loss unless the loss is excluded or limited" under the "Businessowners Special Property Coverage Form," but that neither the Businessowners Special Property Coverage Form nor the Policy define "Direct Physical Loss") *with* Dkt. 1-8 ¶¶31-32 (alleging that policy requires the insurer to "pay for the actual loss of Business Income sustained due to the necessary suspension of [the business's] 'operations'" where the "suspension" is "caused by direct physical loss of or damage to property at premises . . . for which a Business Income Limit of Insurance is shown in the Declaration.") *and* Dkt. 4-5 ¶ 17 (alleging that policy's "'Covered Causes of Loss' includes 'risks of direct physical loss' unless excluded.").

Protection Coverage, Extra Expense Coverage, Civil Authority Coverage), each of which contains different terms and affords different coverages, and therefore must be individually construed in conjunction with other portions of the specific policy.  Further, the specific coverages under which plaintiffs have filed suit vary widely.[14]

**Different Exclusions from Coverage.**  Just as the coverage language varies, so does the language in certain policy exclusions.  For example, plaintiffs in several Actions admit their policy includes an express virus or bacteria exclusion (but allege the exclusion does not apply), while others allege that their policies do not contain an express virus or bacteria exclusion.[15]  Other potentially applicable exclusions include pollution exclusions, ordinance or law exclusions, acts or decisions exclusions, and contamination exclusions.  Different insurers include different exclusions in their policies, and the wording of many of those exclusions varies by policy or insurer.

All these variations are fatal to any effort to create an all-insurer, industry-wide MDL.  *See, e.g., In re Ins. Cos. "Silent" Preferred Provider Org. (PPO) Litig*., 517 F. Supp. 2d 1362, 1363 (J.P.M.L. 2007) (denying the motion to transfer where the "four actions before us are against different defendant insurance companies and involve different contracts"); *In re Mortg. Lender Force-Placed Ins. Litig*., 895 F. Supp. 2d 1352, 1353 (J.P.M.L. 2012) (denying the motion to transfer where "mortgage contracts at issue vary widely as to key matters such as the amount of insurance coverage required, the payment of commissions, and other rights of the borrower and lender.").

---

[14] *Compare* Dkt. 1-6 ¶¶55-58 (business income coverage) *with* Dkt. 1-13 ¶¶ 52-93 (business income, civil authority, extra expense, ingress and egress, and sued and labor coverage) *and* Dkt. 1-14  ¶¶ 60-93(practice income coverage, civil authority coverage, extra expense coverage, and sue and labor coverage).

[15] *Compare* Dkt 1-4 ¶ 19 (alleging that the virus and bacteria exclusion contained in the policy does not apply) *with* Dkt. 4-9 ¶ 9 (alleging that the policy does not contain a virus or bacteria exclusion).

### 2. *Differences among the insureds far outstrip any common questions of fact.*

One of the most obvious—and fundamental—factual distinctions across the Actions are the nature of Plaintiffs' businesses and the industries in which they operate. Thus far, the purported related actions include both high-end and casual restaurants, bars and pubs, bakeries, salons and barber shops, a bridal dress shop, dental practices, daycare centers, law firms, and arts venues, among countless others. *See, e.g.* Dkts. 1-9, 1-10, 1-11, 4-6, 4-19, 6-2, 10-3, 12-3, 101-1, and 179-6. These differences are relevant because the various policies issued by the defendant insurers vary by line of business and industry in terms of the types of policies offered and the coverages and exclusions included in those policies. Policies issued to dental offices differ from policies issued to restaurants, because the risks being insured against differ. Moreover, various Executive Orders impact different businesses to different degrees. Some of Plaintiffs' businesses were allegedly forced to shut down entirely. *See, e.g.* Dkts. 1-4, 1-5, 150-5, and 177-5. Other businesses have continued or instituted alternative business operations (*e.g.*, curbside pickup, delivery, etc.). And Plaintiffs' businesses are in several different states and municipalities, each of which were impacted differently and at different times by COVID-19, and each of which will have their own applicable Executive Orders. Thus, the type of business and its location will be relevant both to future analysis of liability and any calculation of potential damages.

### 3. *The 400+ Executive Orders potentially applicable to the Actions present further individualized questions of fact.*

As has been well-publicized, states and local governments have taken vastly different approaches to closure and other orders related to Covid-19. They differ in the types of business they apply to and what is required to comply with the Orders, with some Orders requiring some, but not all, businesses to close altogether, and some permitting businesses to remain open subject to modification of their operations to abide by social distancing guidelines. *See, e.g.*, Dkt. 1-8 ¶

27 (noting differences in Executive Orders issued by the Florida Governor and the Mayor of Miami-Dade County); Dkt. 1-14 ¶ 8 (citing Executive Order issued by Governor of Minnesota requiring postponement of elective dental procedures requiring PPE). These Executive Orders were also implemented on different dates and for varying periods of time, *see, e.g.* Dkts. 1-5 ¶¶ 25-30, 1-6 ¶¶ 22-23, 4-8 ¶¶ 39-40, 13-3 ¶¶ 34-35. And now some are being lifted for certain types of businesses, as governments undertake a phased approach to re-opening.[16]

Plaintiffs' assertion that whether Executive Orders trigger coverage under business interruption policies will be the same across all cases is a gross over-simplification. While the existence of an Executive Order is insufficient to trigger coverage under most policies absent direct physical loss to a covered property (a question that will depend upon the specific policy language at issue and the specific circumstances of the insured's property), even if coverage were triggered, a determination as to whether an Executive Order issued by one state's governor will trigger coverage under a particular policy will not necessarily resolve the issue as to an Executive Order issued by another governmental entity (whether from a county or city within that state or from a different state entirely), nor can these determinations be made in one fell swoop for all insurers or all insureds. Each of these determinations will depend upon the terms of the insurance policy, the facts and circumstances of each claim, the operational circumstances of each business, and the language of the Executive Order at issue.[17] These individualized issues of fact undermine any

---

[16] *See, e.g.*, *Stay Home except for essential needs*, CALIFORNIA CORONAVIRUS (COVID-19) RESPONSE (last updated May 13, 2020), available at https://covid19.ca.gov/stay-home-except-for-essential-needs/ (noting that as of May 8, gyms, hair and nail salons, and fitness studios are to remain entirely closed, but retail stores may resume curbside pick-up and delivery operations); *April 23, 2020 Executive Order*, THE STATE OF GEORGIA *available at* https://gov.georgia.gov/executive-action/executive-orders/2020-executive-orders (permitting all businesses to reopen, provided that they implement sanitation and social-distancing guidelines).

[17] Moreover, as will be discussed below, whether the express terms used in any given Executive Order trigger coverage under a given policy ultimately constitutes a legal—not factual—question. *See infra* Section II.B.

alleged efficiencies to be gained from centralization and make consolidation under Section 1407 inappropriate.

### 4. *Differences among the causes of action and theories of liability advanced by Plaintiffs defeat any superficial commonality.*

Contrary to Plaintiffs' assertions, there is significant variation among the causes of actions and theories of liability alleged in the various complaints. *Compare* Dkt. 4-5, ¶¶ 22, 24--26 (seeking only a declaratory judgment that plaintiff's losses are covered by either business interruption or civil authority provisions) *with* Dkt. 4-9 ¶¶ 62-74 (seeking damages for breach of contract and statutory bad faith denial of an insurance claim, in addition to a declaration that plaintiff is entitled to business income coverage). These differences make transfer and consolidation inappropriate.

The presence of bad faith claims alone undermines any alleged efficiencies to be gained through transfer and consolidation as they are inherently individualized fact-intensive claims.[18] The allegations relevant to whether the lawsuit was the first notice of claim demonstrate but one example of these differences.[19] Moreover, claims for bad faith denial of insurance require more than proof that the insurer denied the claim for coverage; in addition, and depending on the state law at issue, Plaintiffs must also demonstrate that "the refusal [was] accompanied by 'vexatious, unreasonable, outrageous conduct.'" *Emerson v. Am. Bankers Ins. Co. of Fla.*, 585 N.E.2d 1315, 1321 (Ill. App. Ct. 1992) (validity questioned on other grounds). Whether an insurer engaged in

---

[18] *See, e.g., Briggs v. State Farm Fire & Cas. Co.*, 2015 U.S. Dist. LEXIS 35121 at *3 (S.D. Miss. Mar. 20, 2015) ("[P]laintiff bears a heavy burden of proving that the denial of an insurance claim was in bad faith . . . the question whether [plaintiff] acted reasonably . . . is fact intensive.") (internal citations omitted); *Inman v. State Farm Mut. Auto. Ins. Co.*, 981 N.E.2d 1202, 1207 (Ind. 2012) ("There is little question that it is difficult for the insured plaintiff to prove bad faith. It is a fact-intensive inquiry providing little certainty as to a plaintiff's probability of success.").

[19] *Compare, e.g.,* Dkt. 4-18 ¶¶ 20-22 (alleging that they filed claims for coverage that were denied) *with* Dkt. 1-13 ¶¶ 37-39 (alleging that they spoke with a representative of the insurer but did not actually file a claim) *and* Dkt. 1-8 (filing their complaint, apparently, as the first notice of their loss to the insurer).

"vexatious, unreasonable, [or] outrageous conduct" will be an individualized inquiry because the facts of each Plaintiff's claim submission and each insurer's handling of the submitted claims will vary as a direct result of differences among insurers' claims investigation processes and procedures. These differences will bear directly on the allegations of bad faith levied by some—but not all—of the Plaintiffs in the Actions and are not common to all of the Actions.

Setting aside the obvious differences between complaints that allege bad faith and those that do not, there remain significant differences between Plaintiffs' theories of coverage and liability. Indeed, the Transfer Motions themselves demonstrate the wide variety of legal theories at play. In the Initial Transfer Motion, Plaintiffs argue that the "central issue" in each of the actions is "whether business closures resulting from government orders triggers coverage under business interruption policies." Dkt. 1-1 at 8. By contrast, Plaintiffs in the Second Transfer Motion contend that each of the cases turn on "two basic questions . . . (1) Whether COVID-19 causes 'physical damage or loss to property' as that phase [sic] is used in property insurance policies; and (2) whether COVID-19 was present on the insured property or on property sufficiently connected by proximity or in other ways to the insured property such that coverage is triggered." Dkt. 4-1 at 6. Thus, even in their motions advocating transfer and consolidation, Plaintiffs have identified distinctly and substantively different theories of liability—not common issues of fact.

These differences are further borne out by the complaints the Transfer Motions reference as related actions, which include a variety of theories as to how "covered property" has been subject to "direct physical loss or damage." *Compare* Dkt. 4-6 ¶31 (alleging that "presence of COVID-19 caused direct physical loss . . .by denying use of and damaging the covered property") *with* Dkt. 4-7 ¶ 6 (alleging that the "governmental suspension of business" harmed Plaintiff's business); *and* Dkt. 4-8 ¶ 76(alleging that "forced closures of their premises . . . is a prohibition of

access" resulting in loss of use damage); *and* Dkt. 4-9 ¶ 49 (alleging that the "continuous presence of the coronavirus on or around Plaintiff's premises has rendered the premises unsafe and unfit for their intended use and therefore caused physical property damage or loss under the Policies").

In addition, some plaintiffs bring individual claims, while others seek to represent classes of other insureds. *See, e.g.,* Dkt. 4-5 ¶ 1; Dkt. 4-14 ¶ 35. In the putative class actions, the class definitions vary significantly from one complaint to the next. *See, e.g.,* Dkt. 1-6 ¶ 41 (alleging an Illinois only class); Dkt. 1-13 ¶ 41 (alleging a nationwide class); Dkt. 10-3 ¶ 53 (alleging both a nationwide and Florida class); Dkt. 1-12 ¶¶ 36 (alleging both declaratory relief and damages classes by coverage type). Discovery and pretrial motions in these cases will also differ significantly based on whether a lawsuit is pled as an individual action or a putative class action—to say nothing of the variations in proposed class definitions—making centralization inappropriate.

### B.   Plaintiffs' Alleged Common Questions of Law Cannot Support Consolidation under Section 1407.

Plaintiffs' contention that consolidation is warranted because it would be efficient to resolve "common legal issues" on an industry-wide basis is not only wrong but does not present a valid basis for consolidation. "Section 1407 does not, as a general rule, empower the Panel to transfer cases involving only common legal issues." *In re Teamster Car Hauler Prods. Liab. Litig.*, 856 F. Supp. 2d 1343 (J.P.M.L. 2012). Even if Plaintiffs contend they have presented purported mixed issues of law and fact (in fact there are none), the Panel has denied motions to transfer where, as here, "the legal aspects of these questions clearly predominate." *In re Okla. Ins. Holding Co. Act Litig.*, 464 F. Supp. 961, 965 (J.P.M.L. 1979).[20]

---

[20] *See also In re Fed. Hous. Fin. Agency*, 190 F. Supp.3d 1356 (J.P.M.L. 2016) (denying centralization where defendants alleged primarily common legal rather than factual issues); *In re Hurricane Seasons Flood Claims*, 325 F. Supp. 3d at 1368 (denying transfer of "actions [that] possess only a superficial factual commonality"); *In re Envtl. Prot. Agency Pesticide Listing Confidentiality Litig.*, 434 F. Supp. 1235, 1236 (J.P.M.L. 1977) ("Since these actions

Purported common legal issues do not justify transfer into an MDL where the actions do not rely on the same factual discovery. *See, e.g., In re: Oil Spill by Oil Rig "DEEPWATER HORIZON" in The Gulf of Mex., on Apr. 20, 2010,* 764 F. Supp. 2d 1352, 1353 (J.P.M.L. 2011) (noting that the Panel, as a general rule, declines to transfer insurance actions "if they appear to present 'strictly legal questions' . . . require[ing] little or no discovery" except where "such actions require and rely on the same factual discovery.").[21]   Unlike the conspiracy cases cited by Plaintiffs,[22] discovery in the Actions, to the extent necessary, would be fact-specific as to the particular insurer issuing the policy, as well as to the plaintiffs whose policies, coverages, and exclusions vary and business operations differ, and who are subject to Executive Orders that vary from state to state and potentially within states depending upon whether city and county orders apply.

**C.    An All-Insurer MDL Would Not Serve the Convenience of the Parties or Increase Judicial Efficiency.**

Because the convenience of the parties and judicial efficiency would not be served by the creation of an industry-wide MDL, Liberty Mutual, many insurer-defendants, and some plaintiffs

---

involve a common question of law and share few, if any, questions of fact, transfer under Section 1407 is inappropriate."); *In re Sears, Roebuck & Co. Emp 't Practices Litig.,* 487 F. Supp. 1362, 1364 (J.P.M.L. 1980) (denying transfer of actions involving mixed questions of fact and law with legal issues predominating over factual issues).

[21] *In re Chinese-Manufactured Drywall Prods. Liab. Litig.,* MDL No. 2047, Dkt. No. 257 (JPML, June 15, 2010) ("Section 1407 does not, as a general rule, empower the Panel to transfer cases solely due to the similarity of legal issues"); *In re HealthExtras Ins. Mktg. & Sales Practices Litig.,* 24 F. Supp. 3d 1376, 1376-77 (J.P.M.L. 2014) (denying transfer where "the key issue in all cases is legal in nature" and "[m]oreover, that legal issue itself is not a common one."); *In re Aegon USA, Inc., Supplemental Cancer Ins. Litig.,* 571 F. Supp. 2d 1369, 1370 (J.P.M.L. 2008) (denying transfer because the key issue—the interpretation of language in insurance policies—was legal rather than factual).

[22] *See, e.g., In re Humana Inc. Managed Care Litig.,* Nos. MDL 1334, 1364, 1367, 1366, 2000 WL 1925080, at *2 (J.P.M.L. Oct. 23, 2000) (consolidating cases where "all actions . . . involve common questions of fact concerning whether defendants—either singly or as part of a conspiracy—implemented certain policies"); *In re Ins. Brokerage Antitrust Litig.,* 360 F. Supp. 2d 1371 (J.P.M.L. 2005) (consolidating actions involving common allegations of antitrust conspiracy between and among the different defendants); *In re Sugar Indus. Antitrust Litig.,* 427 F. Supp. 1018 (J.P.M.L. 1977) (same); *In re Amino Acid Lysine Antitrust Litig.,* 910 F. Supp. 696, 698 (J.P.M.L. 1995 ) (same); *In re Auto Body Shop Antitrust Litig.,* 37 F. Supp. 3d 1388 (J.P.M.L. 2014) (same).

vehemently oppose the Transfer Motions.  Those plaintiffs opposing centralization recognize that "transfer and consolidation [would] promote *in*efficiency" given the factual differences among the Actions.  Dkt. 198 at 19 (explaining that "the varying factual circumstances . . . [including] individual issues of contract interpretation and liability—which again would vary from state to state, and by individual insureds' circumstances, policy language, and other variables—would overwhelm any common issues, making consolidation significantly *less* efficient.").[23]  The Actions "involve[] . . . different insureds, different witnesses, different proofs of loss and different damages" rendering an industry-wide MDL consisting of all Actions against all insurers inappropriate.  *See In re Hurricane Seasons Flood Claims*, 325 F. Supp. 3d at 1368..

Plaintiffs rightly point out that the purpose of centralization is to "eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel, and the judiciary."  Dkt. 1-1 at 6-7 (quoting *In re Ethicon Physiomesh Flexible Composite Hernia Mesh Prods. Liab. Litig.*, 254 F. Supp. 3d 1381, 1382 (J.P.M.L. 2017)).  But none of these purposes would be served by the creation of an all-insurer MDL.  Because these Actions involve different insurers, discovery (to the extent any is needed) would necessarily be state, insured, claim, policy, and defendant specific.  Further, creation of an all-insurer MDL would not increase judicial efficiency because meaningful pretrial orders—including class certification decisions— will also be defendant-specific.[24]

Even if the Panel accepts Plaintiffs' allegation that there are superficial "similarities" between policies used by different insurers (Dkt. 4-1 at 5), they do not, and cannot, allege that

---

[23] *See also* Dkt. 19 at 3 (explaining that "[t]he matters before this panel have significant differences that may impact the efficiency of consolidation," including "separate insurance polic[ies], most of which will be worded differently," differences in state laws, and differences in "each state's lockdown [which] impact[] each plaintiff differently.").

[24] Although an industry-wide MDL is inappropriate for all of the reasons set forth herein, some manner of coordination may be appropriate—whether through negotiated agreements of the parties across cases or pursuant to Rule 29 of the Federal Rules of Civil Procedure—in order to achieve efficiencies in discovery.

there are any industry-wide policies or procedures that would give rise to common issues of fact that would not be entirely overwhelmed by insurer- and insured-specific factual determinations. *Cf. In re Checking Acct. Overdraft Litig.*, 626 F. Supp. 2d 1333, 1335 (J.P.M.L. 2009) (holding that consolidation was appropriate because there were significant common issues of fact, namely "industry-wide bank posting policies and procedures"); *In re Air Crash at Dallas/Fort Worth Airport*, 623 F. Supp. 634 (J.P.M.L. 1985) (ordering consolidation where all actions involved overlapping defendants and concerned liability for a single factual event—an air crash). One insurer's decision to deny a claim under the specific terms of its policy, and discovery pertaining thereto, would likely be of no relevance to disputes between a different insurer and its insureds. The witnesses and documents subject to discovery will be different for each insurer. The fact that a claims handling professional employed by one insurer has already been deposed would not eliminate the need to depose a claims handling professional employed by a different insurer. [25] Similarly, the fact that one insurer has already collected and reviewed documents for production will not eliminate or even reduce the need for another insurer to engage in the same process.

What is more, consolidating cases involving multiple competing defendants into a single MDL would introduce unnecessary complication and inefficiency into this litigation. Because insurers are direct competitors with each other, "placing them into the same action would complicate case management due to the need to protect trade secret and confidential information from full disclosure to the parties." *In re Mortg. Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d at 1354; *see also In re Proton-Pump*, 273 F. Supp. 3d at 1361-62 (denying transfer in part because "the named defendants vary from action to action" and the panel is "typically hesitant to centralize

---

[25] Further, even as to a single insurer, the specific facts regarding the handling of a claim as to one insured will not obviate the need for discovery relating to the claim of a different insured as the claims may involve different documents and different witnesses.

litigation against multiple, competing defendants"). This situation stands in stark contrast to that in Plaintiffs' cited authority, *In re Nat'l Prescription Opiate Litig.*, where competitive sensitivities were not at issue because the decision to consolidate turned on *public* advertising and marketing of opiate drugs rather than confidential and proprietary materials, and the Court noted that transfer and consolidation would substantially reduce the risk of "duplicative discovery" and "conflicting rulings on pretrial motions." 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017).

Finally, the creation of an all-insurer MDL will not increase judicial efficiency even if class certification were appropriate in any particular lawsuit. From the outset, there is powerful reason to doubt whether certification is permissible in coverage cases that necessarily involve claim-specific individualized issues. And those doubts are multiplied in the business interruption context where—at a bare minimum—each insured's financials and circumstances will need to be examined individually to assess liability and damages (if any). Furthermore, any decisions a court might issue regarding class certification would necessarily be specific to the particular insurer and particular class definition. A court's decision regarding whether to certify a proposed class insured by one defendant would have little, if any, bearing on the decision of whether to certify a class as to a different insurer.

**III.   CONCLUSION**

Contrary to Plaintiffs' assertions, the Actions lack sufficient factual commonality to warrant creation of an all-insurer MDL, nor would consolidation convenience the parties or the courts. The complications and myriad problems with an industry-wide MDL far outweigh any potential benefits. Plaintiffs have cited to no authority that would support transfer and consolidation of more than a hundred actions against as many defendants, involving individualized allegations concerning dozens of different insurance policies, businesses, industries, and Executive Orders. Accordingly, where, as here, other defendants and certain plaintiffs also strenuously object

to the creation of an all insurer, industry-wide COVID-19 business interruption coverage MDL, the Panel should find that centralization is improper under Section 1407 and deny Plaintiff's Transfer Motions.

This the 4th day of June, 2020.

/s/ Cari K. Dawson_____
Cari K. Dawson
Georgia Bar No. 213490
Alston & Bird LLP
1201 West Peachtree St.
Atlanta, GA 30309
Telephone: (404) 881-7766
Fax: (404) 253-8567
Cari.Dawson@alston.com

*Counsel for Defendants Liberty Mutual Insurance Company, Liberty Mutual Group, Inc., West American Insurance Company, The Ohio Casualty Insurance Company, Ohio Security Insurance Company, and American Fire and Casualty Company*