**BEFORE THE UNITED STATES**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In re:<br>COVID-19 BUSINESS INTERRUPTION<br>INSURANCE COVERAGE LITIGATION | MDL Docket No. 2942 |

**THE TRUEHAVEN PLAINTIFFS' CONSOLIDATED INTERESTED PARTY**
**RESPONSE TO MOTIONS FOR TRANSFER AND COORDINATION**
**OR CONSOLIDATION UNDER 28 U.S.C. §1407**

The Truehaven Plaintiffs,[1] by and through their undersigned counsel, pursuant to 28

U.S.C. §1407 and Rule 6.2(e) of the Rules of Procedure of the United States Judicial Panel on

---

[1]   The Truehaven Plaintiffs are the following 41 named plaintiffs in their respective related actions: Truhaven Enterprises, Inc. (*Truhaven Enters., Inc. v. Chubb Ltd. et al.*, No. 20-4586(SRC)(CLW) (D.N.J.)); SA Hospitality Group, LLC, 1000 Madison Avenue LLC, Astoria Cakes LLC, Café Focaccia, Inc., Realtek LLC, SA Midtown LLC, Bailey's Restaurant LLC, SA Special Events, Inc., SASE LLC, Eighty Third And First LLC, 265 Lafayette Ristorante LLC, Felice Gold Street LLC, SA 61st Management LLC, SA York Ave LLC, SA Third Ave Café LLC, SABF LLC, Felice Chambers LLC, and Felice Water Street LLC (*SA Hospitality Grp. v. Hartford Fin. Servs. Grp., Inc.*, No. 20-cv-3258 (GHW) (S.D.N.Y.)); Project Lion LLC, Project M LLC and Project W LLC (*Project Lion LLC v. Badger Mut. Ins. Co.*, No. 20-768(JAD)(VCF) (D. Nev.)); Camp 1382 LLC (*Camp 1382 LLC v. Lancer Ins. Co.*, No. 20-cv-3336 (RA) (S.D.N.Y.)); N&S Restaurant LLC (*N&S Rest. LLC v. Cumberland Mut. Fire Ins. Co.*, No. 20-5289(RBK)(KMW) (D.N.J.)); Pigment Inc. (*Pigment Inc. v. The Hartford Fin. Servs. Grp., Inc.*, No. 3:20-cv-00794 (S.D. Cal.)); Biltrite Furniture, Inc. (*Biltrite Furniture, Inc. v. Liberty Mut. Ins. Co.*, No. 2:20-cv-00656 (E.D. Wis.)), Kingray Inc. d/b/a La Quinta Beer Hunter (*Kingray Inc. d/b/a La Quinta Beer Hunter v. Farmers Group Inc., et al.*, No. 5:20-cv-00963 (C.D. Cal.)), Beniak Enterprises, Inc. d/b/a Benito Ristorante (*Beniak Enterprises, Inc. v. Chubb, Ltd., et al.*, 2:20-cv-5536 (D.N.J.)), The Eye Care Center of New Jersey, PA (*The Eye Care Center of New Jersey PA v. The Hartford Financial Services Group, Inc., et al.* No.. 2:20-cv-5743 (D.N.J.)), J.G. Optical, Inc. (*J.G. Optical, Inc. v. The Travelers Companies, Inc., et al.*, No. 20-cv-5744 (D.N.J), The Colby Restaurant Group, Inc., BBR Lauderdale, LLC d/b/a TA Walk On's Bistreaux, and SRG Southcenter, LLC d/b/a Twin Peaks (*Colby Restaurant Group, Inc. et al. v. Utica National Insurance Group, et al.* No. 1:20-cv-5927 (D.N.J)), Starjem Restaurant Corp d/b/a/ Fresco (*Starjem Restaurant Corp d/b/a/ Fresco v. Liberty Mutual Insurance*, 1:20-cv-03672 (S.D.N.Y.), Menns Inc. d/b/a The Tavern on Clark (*Menns Inc. d/b/a The Tavern on Clark v. Erie Insurance `Exchange et al.*, No. 1:20-cv-02895 (N.D. Ill.)), Ital Uomo of New York, Inc. (*Ital Uomo of New York, Inc. v. Starr Indemnity & Liability Company et al.*, No. 2:20-cv-02209 (E.D.N.Y.)); Chief of Staff LLC (*Chief of Staff LLC v. Hiscox Insurance Company, Inc.*, No. 1:20-cv-03169 (N.D.Ill)); The Barn Investment LLC d/b/a The Barn, Found Investment LLC d/b/a Found, Aurora Restaurant LLC d/b/a Stolp Island Social (*The Barn Investment LLC v. Society Insurance, A Mutual Company*, No. 1:20-cv-03142 (N.D. Ill.)) and LJ New Haven LLC

Multidistrict Litigation ("Panel"), respectfully submit the following consolidated interested-party response to movants LH Dining L.L.C. (d/b/a River Twice Restaurant) and Newchops Restaurant Comcast LLC's (d/b/a Chops) (collectively "First Movants") Motion for Transfer and Coordination or Consolidation Under 28 U.S.C. §1407 [ECF No. 1] ("Motion"), and Plaintiffs Christie Jo Berkseth-Rojas DDS, Bridal Expressions LLC, Caribe Restaurant & Nightclub, Inc. (d/b/a Laz Luz Ultralounge), Dakota Ventures, LLC (d/b/a Kokopelli Grill and Coyote BBQ Pub), GIO Pizzeria & Bar Hospitality, LLC, GIO Pizzeria Boca, LLC; Rising Dough, Inc. (d/b/a Madison Sourdough), Willy McCoys of Albertville LLC, Willy McCoys of Shakopee LLC (d/b/a McCoys Copper Pint), Whiskey Jacks of Ramsey, LLC (d/b/a Willy McCoys Ramsey), and Troy Stacy Enterprises Inc.'s (d/b/a/ Craft & Vinyl) (collectively, "Second Movants") Subsequent Motion for Transfer of Actions Pursuant to 28 U.S.C. §1407 for Coordinated or Consolidated Pretrial Proceedings [ECF No. 4] ("Subsequent Motion").  In support hereof, the Truehaven Plaintiffs state as follows:

I.      **PRELIMINARY STATEMENT**

"As of 2018, there are 30.2 million small businesses operating in the United States."[2] Over one million of those small businesses are restaurants.[3]  Government-issued stay-at-home orders in the wake of the COVID-19 pandemic have substantially interrupted these businesses, with hundreds of billions of dollars collectively lost in just a couple of months.  For example,

---

d/b/a Lenny & Joe's Fish Tale (*LJ New Haven LLC v. Amguard Insurance Co.*, No. 3:20-cv-751 (D.Conn.).

[2]    Small Business Statistics, CHAMBER OF COMM., https://www.chamberofcommerce.org/ small-business-statistics/ (last visited Apr. 22, 2020).

[3]    *National Statistics: Restaurant Industry Facts at a Glance*, NAT'L REST. ASS'N, https://www.restaurant.org/research/restaurant-statistics/restaurant-industry-facts-at-a-glance (last visited Apr. 21, 2020).

"[b]y March 18, [2020,] daily restaurant connections were down 54 percent overall[.]"[4] Ultimately, "the [restaurant] industry [alone] will face $240 billion in losses by the end of the year. That includes an estimated $30-plus billion in lost revenue in March and a projected $50-plus billion in lost revenue in April alone."[5] One survey found that "two-thirds of all restaurant employees have lost their jobs[.]"[6] Put simply, the government stay-at-home orders have "decimated the American restaurant industry."[7] Other small businesses, including retail, real state, and professional services, have likewise been hit hard.

Thankfully, for situations like the current one, many small businesses carry business interruption insurance coverage, for which they pay substantial premiums. Yet, the insurance industry, with **trillions of dollars in reserves**, has united to summarily deny coverage for losses directly caused by the government-issued stay-at-home orders. They have denied claims based on interpretations of business interruption insurance policies that find no support in the policies' actual texts or applicable case law. If left undisturbed, a significant segment of small businesses, and the restaurant industry in particular, will vanish.

As a result of these summary (and bad faith) coverage denials, business throughout the country have filed putative class actions seeking coverage for their business losses. Currently, approximately 140 similar "business interruption coverage" cases are pending against 31

---

[4]   Vince Dixon, *By the Numbers: COVID-19's Devastating Effect on the Restaurant Industry*, EATER.COM (Mar. 24, 2020), https://www.eater.com/2020/3/24/21184301/restaurant-industry-data-impact-covid-19-coronavirus (last visited Apr. 22, 2020).

[5]   Mike Pomranz, *Two-Thirds of Restaurant Employees Have Lost Their Jobs Due to COVID-19, National Restaurant Association Says*, FOOD & WINE (Apr. 21, 2020), https://www.foodandwine.com/news/national-restaurant-association-unemployment-statistics-coronavirus (last visited Apr. 22, 2020).

[6]   *Id.*

[7]   *Id.*

insurance companies or groups in 34 different federal district courts (collectively, the "Related Actions"), all raising substantially similar claims of insurance contract interpretation.   The Related Actions easily meet the criteria for centralization under 28 U.S.C. §1407 for coordinated or consolidated pretrial proceedings.   Thus, as to this point, the Truehaven Plaintiffs agree with the First Movants and Second Movants.

However, centralization in the Eastern District of Pennsylvania, First Movants' chosen forum, is inappropriate.   Instead, as explained more fully below, the Northern District of Illinois, which sits squarely in the middle of the country, is clearly the most appropriate forum for this nationwide MDL (as this Panel has repeatedly recognized), and District Judge Matthew F. Kennelly of that Court, who is well versed in MDL practice and procedure as a member of the Panel, an exceptional jurist who has ably steered one prior MDL to conclusion, and currently presides over at least one Related Action, *PGB Rest. v. Erie Ins. Co.*, No. 1:20-cv-02403 (N.D. Ill.), should preside over this critically important MDL.   As such, the Truehaven Plaintiffs fully support Second Movants' Subsequent Motion.   Moreover, the Truehaven Plaintiffs propose that, since policy terms are likely to vary from insurer-to-insurer, the Transferee Court be given the flexibility to create separate "tracks" for each defendant-insurer.

## II.     ARGUMENT IN SUPPORT OF CENTRALIZATION AND TRANSFER

### A.     Centralization Will Promote Section 1407's Goals of Ensuring the Just and Efficient Conduct of the Actions and Avoiding Inconsistent or Conflicting Determinations

28 U.S.C. §1407(a) provides, in relevant part:

When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings.  Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions.

"Centralization under Section 1407 is . . . necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings, especially with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary." *In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 344 F. Supp. 2d 755, 757 (J.P.M.L. 2004). The litmus test of transferability and coordination under Section 1407 is the presence of common questions of fact. *In re Fed. Election Campaign Act Litig.*, 511 F. Supp. 821, 823 (J.P.M.L. 1979); *see also In re Meridia Prod. Liab. Litig.*, 217 F. Supp. 2d 1377, 1378 (J.P.M.L. 2002).

Here, the Related Actions are particularly well suited for MDL treatment because of the common factual and legal questions presented in the individual cases and MDL treatment will preserve judicial resources. *In re S. Pac. Transp. Co. Emp't Practices Litig.*, 429 F. Supp. 529, 531 (J.P.M.L. 1977); *see also In re Terrorist Attacks on Sept. 11, 2001*, 295 F. Supp. 2d 1377, 1378 (J.P.M.L. 2003) (noting that transfer is favored where there are overlapping legal issues among the various cases). Dispositive and other motions filed by the parties in the Related Actions will require the resolution of essentially the same issues of fact and law. *See In re Oil Spill by "Amoco Cadiz" off the Coast of France on Mar. 16, 1978*, 471 F. Supp. 473, 478 (J.P.M.L. 1979) (ordering centralization where actions "involve common questions of fact"). Moreover, centralization will "prevent duplication of discovery and eliminate the possibility of conflicting pretrial rulings concerning the common factual questions." *Id.*; *see also In re Ryder Truck Lines, Inc. Emp't Practices Litig.*, 405 F. Supp. 308, 309 (J.P.M.L. 1975).

The Related Actions assert the same claims: whether business interruption coverage exists for losses sustained as a result of stay-at-home orders pursuant to these policies is a threshold question applicable to all defendant-insurers. All of the defendant-insurers use standard coverage forms for their business interruption coverage, which are substantially the

same or virtually identical with each other.  A quick review of that substantially similar coverage across most of the insurers proves the point.  *See* Appendix A.[8]  The central issue with respect to virtually all of the claims is the legal policy interpretation issue of whether the insured businesses suffered "direct physical loss *or* damage" because they had to close (and had a "physical loss" of the use of their businesses) as a result of stay-at-home orders issued in their respective states and/or counties.  These orders might read differently, and might be of different duration, but their effect was and is identical:  businesses were ordered to close.

Likewise, the bacteria and virus exclusions contained in many policies are standard forms.  Since virtually all insureds had to close because of stay-at-home orders intended to prevent the spread of COVID-19 rather than an infestation of the virus in the insured business' premises, there is the additional common legal policy interpretation issue of whether the insureds' losses were caused by coronavirus or by governmental stay-at-home orders. The law regarding insurance policy interpretation is substantially uniform throughout the country, *i.e.*, insurance policies are to be construed in accordance with the reasonable expectation of the insured based upon the plain meaning of the words in the policy, but any ambiguities are to be resolved in favor of the insured.  *See generally* 2 Couch on Insurance, § 22:14 (collecting cases).  Indeed, as non-profit United Policyholders ("UP") recently explained in its motion for leave to file an *amicus curiae* brief in support of the plaintiff-policyholder in one Related Action:

> Defendant's [Lloyd's of London] motion to dismiss asserts that a party cannot plead in good faith COVID-19 related business interruption coverage because "direct physical loss and damage" cannot exist without structural alteration and/or

---

[8]   Appendix A is not intended to be a complete collection of applicable policy language.  The Truhaven Plaintiffs believe, however, that they are a representative sample of relevant business interruption coverage forms used by most of the insurers.  A review of these policy forms directly contradicts the Big Onion Plaintiffs, Society Insurance, and Cumberland Mutual's contention that "[t]here are no standard or 'near standard' policy terms at issue."  *See* ECF No. 198 at 14; ECF 353 at 7; ECF No. 371 at 7.

visible contamination of property. ***The public at large has a significant interest in this issue, which is being actively litigated throughout the country. This Court's disposition of Defendant's motion has the potential to affect thousands of policyholders, not only in Florida but nationwide***.

*See* United Policyholder's Motion for Leave to Appear as Amicus Curiae in Support of Plaintiffs' Response to Defendant's Motion to Dismiss at 5, *Prime Time Sports Grill, Inc. v. DTW1991 Underwriting Ltd., a Certain Interested Underwriter at Lloyd's London*, No. 8:20-cv-00771-CEH-JSS (M.D. Fla. May 18, 2020), ECF No. 21; *see also* Amicus Brief in Support of Plaintiff and in Opposition to Defendant's Motion to Dismiss at 2, *Prime Time Sports Grill, Inc. v. DTW1991 Underwriting Ltd., a Certain Interested Underwriter at Lloyd's London*, No. 8:20-cv-00771-CEH-JSS (M.D. Fla. May 18, 2020), ECF No. 21-1 ("This issue is at the forefront of COVID-19 related business interruption litigation in Florida and nationwide. While Plaintiff has set forth several reasons why Defendant's motion to dismiss should be denied, this Court's treatment of this issue has the potential to affect a multitude of other claims made by policyholders not only in Florida, but across the nation.").

It would be contrary to the public interest, as well as judicial efficiency, to have the insurance coverage issues raised in the Related Actions decided on a piecemeal basis throughout the country. There are over 100 Related Actions now pending throughout the country. Inevitably, whether the first rulings on the issue is decided in favor of the insured or the insurer, the winning side will cite such a ruling in subsequent motions in other courts, a point that all opponents to centralization ignore.[9] However, the first words on these issues are unlikely to be the final words. If these coverage issues are litigated in multiple courts, just as inevitably, there will be inconsistent rulings with respect to substantially similar policy language. It would also be

---

[9]    The Truehaven Plaintiffs submit that the Panel should question the defendant-insurers' counsel at the Hearing Session as to whether they will represent that, if centralization is denied, they will ***not*** attempt to cite ***any*** out-of-state coverage decisions in their favor in any other case against them.

contrary to judicial efficiency to have each of the judges presiding over the over 100 Related Cases have to all plow the same ground.  The initial decisions are unlikely to ease the burden on judges hearing later-filed motions because those judges will have to consider other applicable law to determine whether the earlier pro-insured or pro-insurance company decisions are correct as far as they are concerned.  It would also be contrary to the public interest for the losses of insureds with the same policy language by covered or not covered based upon the happenstance of which judge issued a binding decision with respect to their policy.

The Big Onion Plaintiffs, Society Insurance, and Cumberland Mutual oppose transfer and centralization, arguing that centralization would be improper because the various actions involve different insurers, different policies, different claims are asserted and different law would apply.[10] ECF No. 198 at 1.  Indeed, the Big Onion Plaintiffs and Society make it appear that there is a united front opposing transfer and coordination of the suits against Society.  *See* ECF No. 371 at 2, 4.  That is not the case.  The Truhaven Plaintiffs are among the plaintiffs asserting claims against Society and all of them are in favor of transfer and consolidation, to a venue on Society's home turf, the Northern District of Illinois.[11]

The Big Onion Plaintiffs' brief reads more like opposition to a motion for class certification than a brief addressing 28 U.S.C. §1407(a) factors.  Section 1407, unlike Fed. R. Civ. P. 23(b)(3), does not require common issues to predominate.  All it requires is that there be

---

[10]   The Truhaven Plaintiffs' arguments are directed toward the arguments raised by the Big Onion Plaintiffs, Society Insurance, and Cumberland Mutual, but the Truhaven Plaintiffs anticipate that other insurers will raise substantially similar arguments opposing transfer and consolidation.

[11]   Society Insurance complains that it is only a small regional carrier and it should not be burdened with having to litigate in Pennsylvania or Florida.  *See* ECF No. 371 at 2, 6.  It ignores the fact that the Truehaven Plaintiffs' preferred transferee venue is the Northern District of Illinois, where there are six actions already pending and where it is admittedly comfortable to litigate.

"one or more common questions of fact".[12]   Indeed, the Panel frequently centralizes for pretrial

proceedings product liability claims that necessarily involve individual issues of causation and

damages.  *See, e.g.*, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, -- F. Supp. 3d --, 2020 WL

582134 (J.P.M.L. Feb. 2, 2020); *In re Zimmmer M/L Taper Hip Prosthesis Prods. Liab. Litig.*,

340 F. Supp. 3d 1379 (J.P.M.L. 2018).

It is true enough, as the Big Onion Plaintiffs, Society Insurance, and Cumberland Mutual

point out, that the law of the 50 states would apply to insureds' claims; but nowhere do they

identify any material differences among the states' laws regarding rules of insurance policy

---

[12]   In their own case in the Northern District of Illinois, the Big Onion Plaintiffs supported a
motion to coordinate all of the cases that had been filed in that District against Society Insurance.
(*Big Onion Tavern Grp. v. Society Ins.*, No. 20-cv-2005, ECF No. 89 (N.D. Ill. June 1, 2020) (the
"Big Onion Illinois Brief").  The local rules there provide that cases may be related if they
"involve some of the same issues of fact or law" or "grow out of the same transaction or
occurrence." N.D. Ill. LR 40.4(a).   While disclaiming any support for consolidation of all cases
by the Panel, Big Onion Illinois Brief at 3 n.4, the Big Onion Plaintiffs **support** having all of the
cases against Society being treated as "related" because they involve some of the same issues of
fact or law.

> While each plaintiff's damages may be different, Plaintiffs agree with West on
> North that these cases meet the definition of "related" cases under the Local Rules
> because they involve a number of the same issues of fact or law and because they
> grow out of similar transactions and occurrences. Each case involves one or more
> policies issued by Society Insurance, with provisions that appear substantially
> similar. The circumstances of loss for all plaintiffs are related to the COVID-19
> pandemic and orders issued by Governor Pritzker and the State of Illinois. And
> Defendant has categorically denied insurance coverage to all plaintiffs and taken
> other improper actions directed to all plaintiffs.

Big Onion Illinois Brief at 2.  These circumstances apply equally to insureds covered by other
insurance companies, and all of those insureds' losses were caused by stay-at-home orders issued
by their respective state and/or local governments.  Also, notably, while the Big Onion Plaintiffs
argued in Illinois that the claims asserted by the various plaintiffs against Society Insurance
shared common issues of fact and law, it argues here that those very same claims asserted just
against Society Insurance weighs against transfer and consolidation, ECF No. 198, at 13-14 &
n.10.

interpretation.  Indeed, as is set forth above, those laws are substantially alike.[13]  Society Insurance argues that whatever court or courts handle the various business interruption claims going forward should not be burdened by having to interpret or apply the laws of states other than where they sit. ECF No. 371 at 6.  That is no reason to deny coordination.  Except for cases arising solely under federal law, it is a rare MDL that does *not* involve the application of the laws of states other than where the court sits.  Indeed, that is the point of § 1407, to consolidate the proceedings of similar cases that have been filed in different districts.

At the same time, Society Insurance opposes coordination arguing that cases having common issues of law are inappropriate for centralization.  ECF No. 371 at 4-6  However, in the cases cited by Society Insurance, *In re Real Estate Transfer Tax Litig.*, 895 F.Supp.2d 1350 (J.P,M.L. 2012) and *In re Envt'l Protection Agency Pesticide Listing Confidentialty Litig.*, 434 F. Supp. 1235 (J.P.M.L. 1977), after consideration of all the relevant factors, the Panel determined that centralization would not generate the case management efficiencies expected under § 1407. *Real Estate Transfer*, 895 F. Supp. 2d at 1351; *EPA*, 434 F. Supp. at 1236. Here, there are significant common **factual** issues, that all of the plaintiffs purchased business interruption insurance, their policies are substantially alike, their businesses were interrupted by state and county stay-at-home orders, and the defendant insurers have uniformly denied their business interruption claims. The fact that there are common legal issues is an additional factor weighing

---

[13]     The Big Onion Plaintiffs would have the Panel believe that the rule of insurance policy construction in Illinois that policies should be read in accordance with the insured's reasonable expectations is somehow unique to Illinois.  ECF No. 198 at 16.  It is not.  *See Max True Plastering Co. v. Bob H. Hohnson Ag.*, 912 P.2d 861, 863 n.5  (Okla. 1996) (surveying cases).  "Of the thirty-six jurisdictions which have addressed the reasonable expectations doctrine, our research reveals only four courts which have rejected the rule."  *Id.* at 866.  One of the states noted as **not** following the reasonable-expectations rule was Illinois, based upon a decision that predated the opinion cited by the Big Onion Plaintiffs, *Safeway Ins. Co. v. Hadary*, 48 N.E.3d 732, 737 (Ill. App. Ct. 1st Dist. 2016).  *See Max True Plastering*, 912 P.2d at 866, n.28.

in favor of centralization, not a reason to deny centralization.  *See* 2 Newberg on Class Actions, § 6:50 ("common legal issues may amplify the argument for consolidation to the extent that they give rise to the need for common relevant discovery or create the risk of inconsistent pretrial rulings")  This is not an instance, as the Panel observed in *In re Medi-Cal Reimbursement Rate Reduction Litig.*, 652 F. Supp. 2d 138 (J.P.M.L. 2009), that "**[m]erely** to avoid two federal courts having to decide the same issue is, ***by itself, usually*** not sufficient to justify Section 1407 centralization." (emphasis added).  Centralization here involves much more than trying to avoid two federal courts having to decide the same issue.

The Big Onion Plaintiffs and Cumberland Mutual oppose centralization because they contend their policies are materially different from other policies.  However, saying the policies are different does not make it so.  In fact, there is nothing unique or extraordinary about the Big Onion Plaintiffs' Society policies.[14]  Set forth below is a side-by-side comparison of Society's business interruption coverage with a business interruption form commonly used by many other insurers.[15]

| Society | Form 00 30 10 12 |
|---|---|
| **Business Income Coverage** | **Business Income Coverage** |
| We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or | We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or |

---

[14]   Concededly, there are variations among policies as to whether they contain a virus exclusion; but, contrary to the Big Onion Plaintiffs' and Cumberland Mutual's contention, the virus exclusions that exist are materially alike.  *See* Appendix A.

[15]   These policy forms are found in the Truhaven Plaintiffs' Appendix A. To the best of the Truehaven Plaintiffs' knowledge, Form 00 30 10 12 is used by AXA, Chubb, Hartford, Liberty Mutual, Utica, and Zurich.

| | |
|---|---|
| damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause Of Loss. With respect to loss of or damage to business personal property in the open or business personal property in a vehicle, the described premises includes the area within 100 feet of the described premises. | physical damage to property at the premises which are described in the Declarations and for which Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from of a Covered Cause of Loss. With respect to loss or damage to personal property in a vehicle, the described premises include the area within 100 feet of such premises. |

**Definition of Business Income**

| | |
|---|---|
| (i)    Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage has occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause Of Loss on customers or on other businesses; and<br><br>(ii)   Continuing normal operating expenses incurred. | a.    Net Income (Net Profit or Net Loss before income taxes), including Income and Royalties, that would have been earned or incurred; and<br><br>b.    Continuing normal operating expenses incurred, including payroll. |

**Definition of Business Income**

**Extra Expense Coverage**

| | |
|---|---|
| (1)    We will pay necessary Extra Expense you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause Of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle or in a temporary | Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property resulting from a Covered Cause of Loss.<br><br>We will pay Extra Expense (other than the expense to repair or replace property) to:<br><br>(1)    avoid or minimize the |

**Extra Expense Coverage**

storage unit, the described premises includes the area within 100 feet of the described premises.

(2)     For the purposes of this Additional Coverage – Extra Expense, Extra Expense means expense incurred:

    (a)     To avoid or to minimize the suspension of business and to continue "operations":

        (i)     At the described premises; or

        (ii)     At replacement premises or at temporary locations, including relocation expenses, and costs to equip and operate the replacement or temporary locations;

    (b)     To minimize the suspension of business if you cannot continue "operations";

    (c)     To:

        (i)     Repair or replace any property; or

        (ii)     Research, replace or restore the lost information on damaged "valuable papers and records";

"suspension" of business and to continue "operations" at the described premises or replacement premises or at temporary locations, including: relocation expenses, and costs to equip and operate the replacement location.

(2)     minimize the "suspension" of business if you cannot continue "operations".

We will also pay Extra Expense to repair or replace any property, but only to the extent that it reduces the amount of loss that otherwise would have been payable under this Coverage Form.

| Civil Authority Coverage | Civil Authority Coverage |
|---|---|
| When a Covered Cause Of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply: | When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply: |
| (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not outside a one mile radius from the damaged property; and | (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and |
| (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause Of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property. | (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property. |

As the Panel can plainly see, while there are some minor variations in the wording and typographical arrangement between these two policy forms, there is no material difference between the coverage provided. It would hardly promote judicial efficiency or the public

welfare to have the meaning of substantially identical policy language be interpreted by different courts across the country because, inevitably, different courts will come to different conclusions. Notwithstanding this fact, the Big Onion Plaintiffs contend that it would be more efficient to have an every-insured-for-itself scrum while the various state and federal courts sort out coverage issues based upon policies that are demonstrably substantially similar and laws that are demonstrably substantially similar. ECF No. 198 at 5. The Big Onion Plaintiffs appear to believe that it is somehow "unjust" for similarly situated insureds to be treated the same, and that multiple courts, rather than a single court, should decide coverage issues relating to substantially similar policy language.[16]

Cumberland contends that centralization is inappropriate because, unlike other insurers, its virus exclusion contains an anti-concurrent cause clause. (ECF No. 353, at 3-5)  While the anti-concurrent cause clause might be uncommon, wording of the virus exclusion itself is virtually identical to that of other insurers.  *Compare* ECF No. 353, at 3 *with e.g.*, Appendix A, AXA, Badger Mutual, Hanover, Hartford, Liberty Mutual, Selective, Utica, Zurich Bacteria and Virus Exclusion Endorsement, Form CP 01 40 07 06.  One does not get to Cumberland's anti-concurrent cause clause until a court determines what the exclusion of losses from "any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness

---

[16]   *But see* Big Onion Illinois Brief at 9 ("Further, with respect to motion practice, reassignment will permit overlapping issues to be "briefed and determined once," which will avoid a patchwork of decisions on factual, legal, and procedural issues and "result in a substantial saving of judicial time and effort—not to mention a substantial saving of the parties' and their counsels' time and effort." For instance, Plaintiffs expect that Defendant will move to dismiss most or all of the actions filed against it. The Court can establish a uniform briefing schedule for Defendant to file its motions to dismiss, which are likely to raise similar issues across cases, and the Court can then rule on them concurrently. Such an approach would "enhance" the "overall administration of justice," and "guarantee consistency and promote efficiency") (internal citations omitted).

or disease" means in the first instance and whether coronavirus is somewhere in the chain of causation of between the stay-at-home orders and plaintiffs' business losses.

The Big Onion Plaintiffs also express concern of potential delays in their recovery because they are struggling small businesses that might not survive the COVID-19 crisis. ECF No. 198 at 6, 15. Most, if not all, of the the insureds in the Related Actions are in the same boat, and are equally in need of payment of their business interruption claims. Just as it would be contrary to the public interest for an insureds recover depend upon the happenstance of which judge decides whether there is coverage under their policy, it would likewise be contrary to the public interest for an insured's recover to turn upon which court's docket is faster and/or whether they can elbow their way to the front of the judgment line.

The Big Onion Plaintiffs suggest "case management" by transferring actions pursuant to 28 U.S.C. §1404, or dismissing or staying duplicative actions under the first-filed rule. Motions to transfer under §1404 would add an unnecessary round of motion practice, which the Big Onion Plaintiffs say they want to avoid. Further, assuming that all of the actions against each insurer could be transferred to the same district under §1404, that would still not address the likelihood of conflicting decisions with respect to identical or substantially identical policy provisions.

Dismissing or staying duplicative actions under the first-filed rule, as the Big Onion Plaintiffs suggest, is a non-starter. The first-filed rule requires that different actions be pending in different courts between the same parties and relating to the same issues. *See, e.g.*, *Clark v. Lacy*, 376 F.3d 682, 686 (7th Cir 2004); *Doutt v. Ford Motor Co.*, 276 Ill. App. 3d 785, 788 (1995). While the issues raised in the various pending actions are the same, the parties are not, since there are different plaintiffs suing the various insurance companies. The Truhaven

Plaintiffs are not aware of any plaintiff asserting the same claim against the same insurance company in different actions in different fora.  Further, among the factors to be considered in the application of the first filed rule is the *res judicata* effect of a foreign judgment in the local forum.  *Vill. of Mapleton v. Cathys Tap, Inc.*, 313 Ill. App. 3d 264, 268 (2000).  While an adverse judgment against an insurer would be binding on the insurer under collateral estoppel or *res judicata*, an adverse judgment against an insured would not be, since they would not be parties to the first judgment.  *See, e.g.*, *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 480 (1982) ("We have previously recognized that the judicially created doctrine of collateral estoppel does not apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate the claim or issue.")  Consequently, staying later-filed actions would not advance the goal of the first-filed rule of avoiding duplicative litigation.  *See Vill. of Mapleton*, 313 Ill. App. 3d at 268.

If the Big Onion Plaintiffs honestly believe they can use the first-filed rule to stay all of the later-filed cases against Society Insurance, they should think again.  First, the Big Onion Plaintiffs cannot do an end run around Fed. R. Civ. P. 23(g) to make themselves the self-appointed representatives of all other insureds of Society Insurance simply because they filed the first case.  More importantly, however, to invoke the first-filed rule, the Big Onion Plaintiffs would have to make a 180-degree shift from the position they are taking here.  Here, they oppose centralization because they argue that everyone's policies are different, their claims are different, and their damages are different.  In order for the first-filed rule to apply, the parties and the claims would have to be the same.  The Big Onion Plaintiffs cannot have it both ways.

Unlike in a motion for class certification, centralization by the JPML does not turn on whether the plaintiffs can present a classwide theory of damages.  *Compare Comcast Corp. v.*

*Behrend*, 569 U.S. 27, 35-36 (2013).  The length of the stay-at-home orders in the various states, whether in insured can offer take-out, whether bad faith claims have been asserted, how much an insured is allowed to recover under their policy, are all damages issues; but those issues are secondary to the issue of whether there is coverage for being shut down as a result of stay-at-home orders in the first instance.  If there is no coverage, the amount of harm is a moot point.  Likewise, if there is no coverage, the bad faith claims would fall by the wayside since, by definition, the insurer would have had a reasonable basis to deny the claim.  That initial issue is certainly a common issue among all of the Related Actions based upon substantially similar insurance policies and substantially similar facts.

Based upon the foregoing, the transfer of the Related Actions to a single forum will eliminate duplicative discovery; prevent inconsistent pretrial rulings regarding coverage; conserve the resources of the parties, counsel, and the judiciary; and promote the just and efficient conduct and resolution of the Related Actions.  Simply put, centralization will promote efficiency by allowing these common disputes to be argued before and resolved by a single Transferee Court.

Moreover, consolidating these identical insurance coverage disputes before a single Transferee Court aligns the Panel's prior practice.  The Panel has on multiple occasions centralized both related actions brought against different defendants in **one** MDL, **and** actions against different defendants in **separate** MDLs, but before the same Transferee Court.  As to the former, the Panel created MDL No. 2036, *In re Checking Account Overdraft Litig.*, a case brought against multiple defendant banking institutions arising out the same pattern of conduct charging illegal bank overdraft charges, *see In re Checking Account Overdraft Litig.*, 626 F. Supp. 2d 1333, 1335 (J.P.M.L. 2009); MDL No. 1334, *In re Managed Care Litig.*, a case brought

against multiple different health insurers arising out of a common pattern of conduct in underpaying physicians, *see In re Managed Care Litig.*, 2000 WL 1925080, at *2 (J.P.M.L. Oct. 23, 2000); and, more recently, MDL No. 2804, *In re Nat'l Prescription Opiate Litig.*, the largest and most complex MDL in history against numerous separate defendants all allegedly responsible for the national opioid epidemic. *See In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017).

As to the latter, the Panel has created separate MDLs before the same Transferee Judge for different defendants who manufactured different brands of the same defective medical devices, in MDL No. 2325, *In re Am. Med. Sys., Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2326, *In re Boston Scientific Corp. Pelvic Repair Sys. Prods. Liab. Litig.*, and MDL No. 2327, *In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig. See In re: Am. Med. Sys., Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, 844 F. Supp. 2d 1359, 1361 (J.P.M.L. 2012) ("Centralization of the three MDLs in one court will allow for coordination of any overlapping issues of fact in such multi-product, multi-defendant actions.").

The foregoing cases raise far more diverse factual and legal issues than are presented here. Given the common and summary denials by defendants, the Truehaven Plaintiffs believe that it is appropriate to create one MDL and give the Transferee Court "the flexibility to structure the proceedings most efficiently," *In re: Auto. Wire Harness Sys. Antitrust Litig.*, 867 F. Supp. 2d 1349, 1351 (J.P.M.L. 2012), by, for example, creating separate "tracks" for each defendant-insurer. *See, e.g., In re: Frito-Lay N. Am., Inc. All Nat. Litig.*, 908 F. Supp. 2d 1379, 1380 (J.P.M.L. 2012) ("As with any MDL, the transferee judge may account, at her discretion, for any differences among the actions through the use of appropriate pretrial devices, such as separate tracks for discovery or motion practice.").

**B.      The Northern District of Illinois Is the Most Appropriate Forum**

Under 28 U.S.C. §1407(a), the Panel may transfer actions to "any district" and has wide discretion to choose the transferee court.  *See*, *e.g.*, *In re New York City Mun. Sec. Litig.*, 572 F.2d 49, 51 (2d Cir. 1978).   The Panel generally considers a variety of factors in selecting the transferee court, including, but not limited to, the following: (1) the procedural advancement of an action; (2) the familiarity of a judge with the proceedings; (3) the efficiency of a court's civil docket; and (4) a central location for national litigation.  Given that all the Related Actions are at a similar procedural posture (*i.e.*, their infancy), and no judge has particular experience with the Related Actions, transfer analysis must turn on the efficiency and convenience of the litigation.

**1.      The Northern District of Illinois Has Significant Experience with Complex MDL Litigation, Is Centrally Located, and Is Well-Equipped to Manage This MDL Proceeding**

In deciding where to centralize related actions, the Panel often considers, among other factors, the location of the defendants' headquarters, the location of relevant documents and witnesses, and the number of related actions pending in a particular district at the time of transfer.  *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 148 F. Supp. 3d 1367 (J.P.M.L. 2015).  However, where there are multiple defendants, each headquartered in different states across the nation, and the MDL is "truly a nationwide litigation in which no particular district or region emerges as the geographic center of gravity[,]" the Panel "direct[s] [its] attention to meeting the obvious need for a transferee judge with the ability and temperament to manage this large and growing litigation in an efficient and expeditious manner."  *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 990 F. Supp. 834, 836 (J.P.M.L. 1998); *see also In re Petroleum Prod. Antitrust Litig.*, 407 F. Supp. 249, 252 (J.P.M.L. 1976) (where there is no "center of gravity" because

"defendants' headquarters [and] their documents and their witnesses . . . are scattered throughout the country," the Panel selected a District where its "experience and resources will be put to good use regardless of the location of the transferee district.").

Here, there is no "center of gravity," and this MDL is "truly a nationwide litigation." Both plaintiffs and defendants are scattered throughout the country. Accordingly, centralization in the Northern District of Illinois satisfies every relevant factor. ***First***, the city of Chicago, Illinois, is centrally located and would be more convenient for all parties and witnesses than, for example, a city on the western or eastern edge of the country. *See, e.g.*, *In re Delta Dental Antitrust Litig.*, 2020 WL 1503254, at *2 (J.P.M.L. Mar. 27, 2020) ("the Northern District of Illinois . . . is a geographically central and accessible forum for this nationwide litigation."); *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 201 F. Supp. 3d 1375, 1378 (J.P.M.L. 2016) (finding that the Northern District of Illinois "provides a convenient and accessible forum for actions filed throughout the country regarding products sold nationwide."); *In re McDonald's French Fries Litig.*, 444 F. Supp. 2d 1342, 1343 (J.P.M.L. 2006), *adhered to*, 545 F. Supp. 2d 1356 (J.P.M.L. 2008) ("given the geographic dispersal of the constituent actions, the Northern District of Illinois offers a relatively geographically central and accessible forum for this litigation."); *In re Ocwen Fed. Bank FSB Mortg. Servicing Litig.*, 314 F. Supp. 2d 1376, 1379 (J.P.M.L. 2004) ("Given the geographic dispersal of constituent actions and potential tag-along actions, no district stands out as the focal point for this nationwide litigation. We are persuaded that the Northern District of Illinois is an appropriate transferee district for this litigation. We note that i) three actions and one potentially related action are pending there, and ii) the Illinois district is geographically centrally located for these actions which are pending throughout the United States."); *In re African-Am. Slave Descendants Litig.*, 231 F. Supp. 2d

1357, 1358 (J.P.M.L. 2002) ("In concluding that the Northern District of Illinois is an appropriate forum for this docket, we note that this geographically central district will be a convenient location for a litigation becoming nationwide in scope."); *see also In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Practices Litig.*, 190 F. Supp. 3d 1361, 1363 (J.P.M.L. 2016) (where MDL was "nationwide in scope," the Panel transferred related cases to the Western District of Missouri because it "provides a geographically central forum for this litigation that is both convenient and accessible to the parties and witnesses.");

**Second**, as the Panel is aware, the Northern District of Illinois has more than the requisite resources and capacity to manage this MDL proceeding.  The fact that the Northern District of Illinois is currently handling ten MDL cases demonstrates that the staff and Clerk's office are well equipped and have the experience to provide the necessary support services for managing multidistrict litigation.  *See In re: Navistar Maxxforce Engines Mktg., Sales Practices & Prod. Liab. Litig.*, 67 F. Supp. 3d 1382, 1384 (J.P.M.L. 2014) (explaining that the Northern District of Illinois possesses "the resources to devote to this litigation.").

**Finally**, the Northern District of Illinois, which currently has four of the 73 total Related Actions as of the date of this filing, and as explained by the Second Movants, is home to many of the nation's largest property and casualty insurers who either are or may become defendants in this MDL, including, among others, Allstate, State Farm, CAN, Zurich, Allianz, and Illinois Casualty.  Even the defendant-insurers headquartered elsewhere have substantial presences in Chicago, including The Hartford (200 W. Madison St., Suite 501, Chicago, IL 60606); Lloyd's of London (181 W. Madison St., Suite 3870, Chicago, IL 60602); and Chubb (525 W. Monroe St., Chicago, IL 60661).  Thus, if the Panel were to consider the locations of the various

defendants' headquarters, the Northern District of Illinois would be near the top of the Districts with the largest number.

### 2.      Honorable Matthew F. Kennelly Is Amply Qualified to Manage This MDL

The Truehaven Plaintiffs respectfully submit that the Panel should designate the Honorable Matthew F. Kennelly of the Northern District of Illinois, a highly experienced and capable jurist, to preside over this litigation.

With no intent of pandering to the Panel of which Judge Kennelly is a member, Judge Kennelly's tenure on the federal bench has been impressive.   Judge Kennelly received his commission for appointment to the Northern District of Illinois in 1999.  Since that time, Judge Kennelly has obtained considerable MDL experience, as this Panel appointed Judge Kennelly as transferee judge *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, MDL No. 2545. Due to Judge Kennelly's efficient management and able steerage of that MDL, the case, involving nearly 8,000 individual actions, has settled with all four defendants, and is currently in the claims-processing phase.   MDL experience is an important factor in deciding upon a transferee court.  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 626 F. Supp. 2d 1346, 1347 (J.P.M.L. 2009) (finding that centralization in the chosen district permits the Panel to "effect the Section 1407 assignment to a judge who has extensive experience in multidistrict litigation as well as the ability and temperament to steer this complex litigation on a steady and expeditious course.").  In sum, Judge Kennelly's MDL experience, coupled with his experience addressing complex insurance contract interpretation issues, makes him perfectly suited to oversee this MDL.

## III.    CONCLUSION

For the foregoing reasons, the Truehaven Plaintiffs respectfully request that the Panel enter an Order pursuant to 28 U.S.C. §1407 centralizing for coordinated or consolidated pretrial proceedings all related and tag-along Related Actions in the Northern District of Illinois, before the Honorable Matthew F. Kennelly.

DATED:  June 4, 2020

CARELLA, BYRNE, CECCHI,
  OLSTEIN, BRODY & AGNELLO, P.C.
JAMES E. CECCHI
LINDSEY H. TAYLOR


_____
/s/ James E. Cecchi
James E. Cecchi

5 Becker Farm Road
Roseland, NJ  07068
Telephone:  973/994-1700
973/994-1744 (fax)
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
STUART A. DAVIDSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
sdavidson@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
rachelj@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
STEPHEN A. WEISS
77 Water Street, 8th Floor
New York, NY  10005
Telephone:  212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com
sweiss@seegerweiss.com

ZWERLING, SCHACHTER &
  ZWERLING, LLP
ROBERT SCHACHTER
41 Madison Avenue
New York, NY 10010
Telephone:  212/223-3900
212/371-5969 (fax)
rschachter@zsz.com

Attorneys for the Truehaven Plaintiffs