BEFORE THE UNITED STATES JUDICIAL
PANEL ON MULTIJURISDICTIONAL LITIGATION

| | |
|---|---|
| IN RE: COVID-19 BUSINESS INTERRUPTION PROTECTION INSURANCE LITIGATION | MDL No. 2942 |

**INTERESTED PARTY RESPONSE IN OPPOSITION TO TRANSFER AND COORDINATION OR CONSOLIDATION OF ACTIONS UNDER 28 U.S.C. § 1407**

Pursuant to 28 U.S.C. § 1407 and Rule 6.2(e) of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, The Dentists Insurance Company (hereinafter "TDIC") respectfully submits this Interested Party Response in Opposition to the Motion for Transfer and Coordination or Consolidation under 28 U.S.C. § 1407.

## I.   INTRODUCTION

So far in this proposed Multidistrict Litigation matter, more than 100 insurance companies have been sued in 134 separate individual and class actions suits in 32 districts throughout the country. The only commonality linking these actions is the general interplay between COVID-19 and "business interruption" insurance coverages. Everything else about these actions is different. They will require unique and individualized discovery, litigation practice and procedure, issue narrowing and judicial analysis. Given the significance and ubiquity of differences between the actions, the concerns raised by the proponents of MDL transfer regarding inconsistent rulings is simply not justified. The outcomes of these actions could, and perhaps should, be different due to the application of different policy language, state laws, factual circumstances, claims handling and other factors. Combining all of these actions into one consolidated litigation will cause extraordinary confusion, inefficiency and injustice. These harms will far outweigh any other benefit that transfer and consolidation could provide.

Because differences amongst facts and issues clearly predominate over any commonality and negate any potential efficiency or convenience that may flow from consolidation, TDIC opposes the Motion to Transfer at ECF No. 1.

## II.     BACKGROUND

TDIC has been named as a defendant by Mark Germack DDS in a class action lawsuit filed in the Western District of Washington on April 30, 2020 (the "Germack Action").[1] *See* Exhibit A. Dr. Germack owns a dentistry practice located in Seattle, Washington. TDIC is an insurance company organized under the laws of the State of California. TDIC's principal offices are located in California.

In the Germack Action, Dr. Germack seeks to represent all similarly situated policyholders in the United States, and separately in the State of Washington, who have had business interruption claims related to the COVID-19 outbreak denied by TDIC. Exhibit A. The Germack Action generally asserts claims for breach of contract and declaratory relief in regard to the business interruption coverages contained within the insurance policies issued by TDIC. *Id*.

The Germack Action was added as a "related action" to this matter, along with six other actions filed against four other insurance companies in the Western District of Washington, on May 1, 2020. ECF No. 28. TDIC is only named in the Germack Action.

## III.    ARGUMENT

Pursuant to 28 U.S.C. § 1407, transfer of actions to one district for coordinated or consolidated pretrial proceedings is appropriate where: (1) actions pending in different districts involve one or more common questions of fact, (2) the transfer of such actions will be for the convenience of the parties and witnesses and (3) transfer will promote the just and efficient

---

[1] *Germack DDS v. The Dentists Insurance Company,* United States District Court for the Western District of Washington, Case No. 2:20-cv-00661-JCC.

conduct of such actions. 28 U.S.C. § 1407(a).

Transfer to Multidistrict Litigation is generally not warranted for insurance coverage actions against different insurance companies involving different policies, even if some common questions of fact exist. *See In re Ins. Cos. "Silent" Preferred Provider Org. (PPO) Litig.*, 517 F. Supp. 2d 1362 (JPML 2007); *In re Florida, Puerto Rico, and U.S. Virgin Inslands 2016 and 2017 Hurricane Seasons Flood Claims Litig.*¸ 325 F. Supp. 3d. 1367 (JPML 2008). This makes sense because the application of insurance coverage will always vary greatly in different states, under different policy forms issued through different insurance companies and based on different claim facts. Because these differences necessarily require individualized discovery and litigation and should yield different results, transfer and consolidation is not appropriate in the insurance coverage context. This is true even for a catastrophic event that has national reach.

The only insurance-related case allowing transfer to Multidistrict Litigation cited by the proponents of transferring the instant matter is *In re Peanut Crop Ins. Litig.*, 342 F. Supp. 2d 1353 (JPML 2004). In that case, transfer was allowed to consolidate seven actions filed in southern districts against common defendants. The claims in *In re Peanut* all involved the same policy modifications that adversely affected the value of coverage in the same way. They did not address the application of insurance coverage under different policies and state laws to a given set of different losses related to an overarching event. *In re Peanut* does not support transfer of the actions in this matter.

A.   **Differences in Facts and Issues Predominate the Related Actions**

The movants and proponents of transferring the related actions to Multidistrict Litigation for consolidation of pre-trial proceedings are only able to express the purported commonality of facts in general or conclusory terms. When carefully analyzed, it becomes apparent that the only commonality between the actions is the general interplay of the varied governmental response to

COVID-19 and business interruption coverages set forth in insurance policies issued by dozens of insurance companies to businesses. With the exception of this very general commonality, everything else about these actions is different. Because these actions are different, they will require different treatment by the Court and will rightly result in different rulings. Given the predominance of different facts and issues, as demonstrated below, any transfer to Multidistrict Litigation should be denied. *See In re Ambulatory Pain Pump-Chondrolysis Prods. Liab. Litig.*, 709 F. Supp. 2d 1375 (2010) (Motion for Transfer denied when multiple parties opposed transfer, some defendants only named in "handful" of the 102 related actions and differences among the claims predominated).

1. **Different Insurance Companies issue Policies with Different Forms and Different Language**

Contrary to the conclusory assertions of the parties supporting transfer, the insurance policies issued by the approximately 120 insurance companies named in this matter do not all contain standard forms with only slight, non-substantive variations in language. Even the insurance companies that utilize so-called standard forms often include state-specific or proprietary endorsements that substantially modify coverage under the standard forms. *See* Exhibit B, pp. 53-61. Moreover, some insurance companies, including TDIC, issue policies with substantially different main coverage forms depending on the state in which the policy is issued.[2]

As noted by the Big Onion Plaintiffs in their Opposition Brief at ECF No. 198, pages 7 and 13, the insurance policies issued by Society Insurance do not contain standard coverage triggering language or a "virus exclusion." The Society Insurance policy also includes a unique form of "contamination coverage." Id. at 14. Other policies have different non-standard terms

---

[2] The policies issued by TDIC to California insureds provide business interruption-type coverage (described as "Coverage D – Loss of Income" coverage) under wholly different terms than what is contained in the policy issued to Dr. Germack in the State of Washington.

that will need to be addressed separately, including for instance, policies that contain "pandemic" endorsements. *See* ECF No. 4-18.

The insurance policy issued to Dr. Germack by TDIC (the "TDIC Policy") does not utilize "standard" coverage forms. *See* Exhibit B. The TDIC Policy does contain a familiar coverage trigger for business interruption coverages (necessary suspension caused by "direct physical loss of or damage to property"). Exhibit B, pp. 8-10.[3] However, the TDIC Policy also omits certain standard language and adds other non-standard provisions. This includes an additional provision stating that Business Income and Extended Business Income coverage "does not apply to the loss of 'Business Income' incurred as a result of unfavorable business conditions caused by the impact of the 'Covered Cause of Loss.'" Id. at 8-9. Given the widespread impact of COVID-19, the application of this unique provision will likely be a central dispute in the Germack Action.

The TDIC Policy also contains a "virus" exclusion with non-standard language. The TDIC Policy excludes coverage for loss or damage caused by "[t]he presence, growth, proliferation, spread or any activity of a virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Exhibit B, p. 27 (*compare with* ISO Form BP 00 03 01 10, p. 17).[4] Many other policies do not contain any specific virus exclusion.

These non-standard provisions will require a separate plain meaning analysis under Washington law in the Germack Action. Resolving the issues raised by these provisions will be based on the development of the parties' claim-specific arguments and unique evidence through litigation and discovery, including consideration of the business conditions present in the State of

---

[3] *See* footnote 2. The policies issued by TDIC to insureds in California require a "necessary suspension of your dental practice…[which] must be the direct result of a covered loss or damage to insured property" for Loss of Dental Practice Income coverage to apply.

[4] The policies issued by TDIC in California also contain a non-standard virus exclusion with different language than what is set forth in the TDIC Policy issued to Dr. Germack.

Washington. These potentially determinative efforts will not apply to any other actions implicated here.[5]

### 2. Insurance Coverage Law Differs by State

Insurance coverage is governed by state law and each state treats the insurance coverage issues raised by this matter differently. States have different standards and methods that apply to interpreting an insurance policy in general. *See, e.g., Quadrant Corp v. Am. States Ins. Co.*, 154 Wn.2d 165, 172, 110 P.3d 733 (2005) (rejecting the reasonable expectation doctrine and adopting a plain meaning analysis); *Richards v. Hanover Ins. Co.*, 250 Ga. 613, 615, 299 E.2d 561 (1983) (applying "reasonable expectations of an insured" to interpret policies); *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 175 607 A.2d 1255 (1992) (allowing the insured's objectively reasonable expectations to resolve policy ambiguities); *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 534 and 537, 647 P.2d 1127 (1982) *and First Am. Title Ins. Co. v. Action Acquisitions, Ltd. Liab. Co.*, 218 Ariz. 394, 397 and 401, 187 P.3d 1107 (2008) (Utilizing plain meaning, viewpoint of a layperson, social policy considerations, legislative goals and reasonable expectations of the insured to interpret insurance policies); *Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 299 (Iowa 1994) ("Insurance contracts are construed in the light most favorable to the insured" and reasonable expectations can supersede policy provisions); *Carlyle Inv. Mgmt. L.L.C. v. Ace Am. Ins. Co.*, 131 A.3d 886, 895 (D.C. Ct. App. 2016) (Ambiguities in policy terms are resolved by a jury and extrinsic evidence may be considered).

Many states have conflicting precedents that may directly affect the outcome of the business interruption coverage claims. For example, some state courts have held that an actual and complete cessation of operations is required to trigger business interruption coverage. *See,*

---

[5] For further discussion regarding the problems that would follow from consolidation of business interruption insurance coverage actions with differing policy provisions from a policyholder perspective, see ECF No. 376-1 (United Policyholders' Amicus Brief filed at the Supreme Court of Pennsylvania on May 13, 2020 ) at pp. 9-26.

*e.g., Keetch v. Mut. of Enumclaw Ins. Co.*, 66 Wn. App. 208, 211-212, 831 P.2d 784 (1992) (reduced hotel operations and resulting revenue after eruption of Mount St. Helens did no trigger coverage). However, other courts have been more lenient with regard to the degree of suspension of operations required to trigger coverage. *See, e.g. American Medical Imaging Corp. v. St. Paul Fire & Marine Ins. Co.,* 949 F.2d 690, 692-693 (3rd Cir. 1991) (Court held coverage could be triggered for insured in Pennsylvania that continued reduced operations at alternate site during period of restoration). The requirement of complete cessation of operations could be fatal to the coverage claims of certain businesses. This would include the dentist offices that have been able to maintain emergency operations and restaurants with take-out or delivery capabilities. However, for other industries like non-essential retailers without online operations, this point will be largely unavailing depending on the applicable state order restricting business operations.

States also have varying rules and tests for determining whether an alleged loss was caused by a covered cause of loss. The majority of states apply some form of the efficient proximate cause rule. *See, e.g., McDonald v. State Farm Fire & Cas. Co.,* 119 Wn.2d 724, 731 (1992); *Jussim v. Massachusetts Bay Ins. Co*., 415 Mass. 24, 27, 610 N.E.2d 954, 955-956 (1993). A handful of states have applied what is known as the concurrent cause doctrine. *See Wallach v. Rosenberg,* 527 So. 2d 1386, 1388 (Fla. Ct. App. 1988); *Allison v. Fire Ins. Exch*., 98 S.W.3d 227, 258 (Tx. Ct. App. 2002) ("Under this doctrine, when covered and non-covered perils combine to create a loss, the insured is entitled to recover only that portion of the damage caused solely by the covered peril"). California has codified its own unique set of causation rules. *See* Cal. Ins. Code §§ 530-533.7.

There are innumerable nuances in how each state applies their chosen causation rule based on the development of case law over the years. *Compare Cornhusker Cas. Co. v. Farmers Mut. Ins. Co.*, 268 Neb. 168, 177, 680 N.W.2d 595 (2004) ("[T]he efficient proximate cause rule

allows recovery for a loss 'caused by a combination of a covered and an excluded risk only if the covered risk was the efficient proximate cause of the loss, meaning that the covered risk set the other causes in motion which, in an unbroken sequence, produced the result for which recovery is sought.'") *with W. Nat'l Mut. Ins. Co. v. Univ. of N.D.*, 643 N.W.2d 4, 14-15 and 18 (N.D. 2002) (approving the following jury instruction: "The efficient proximate cause is a peril or risk that sets other causes in motion. It is not necessarily the last act in a chain of events, nor necessarily is it the triggering cause. To determine the efficient proximate cause you must look to the quality of the links and the chain of causation. The efficient proximate cause is considered the predominating cause of the loss. By definition there can only be one efficient proximate cause; i.e., predominant cause of the loss.") *and Simonetti v. Selective Ins. Co.,* 859 A.2d 694, 700 (N.J. Super. Ct. App. 2004) ("And with regard to sequential causes of loss, our courts have determined that an insured deserves coverage where the included cause of loss is either the first or last step in the chain of causation which leads to the loss," relying in part on 5 Appleman, *Insurance Law & Practice,* § 3083 at 309-11 (1970)); *see also Russell v. NGM Ins. Co.,* 170 N.H. 424, 438-439, 176 A.3d 196 (2017) ("The efficient proximate cause is the risk that sets others in motion…Under the efficient proximate cause doctrine, there is *no coverage* for an insured's loss when the efficient proximate cause of that loss is an excluded peril.").

Moreover, in a handful of jurisdictions Courts have stated they may apply an overriding doctrine of reasonable expectations, which "supplements, but does not replace, traditional principles of policy interpretation." *Coleman-Domanoski v. St. Paul Guardian Ins. Co.*, 2020 U.S. Dist. LEXIS 73027 (D. Colo.); *see also, W. Heritage Ins. Co. v. Coffman Welding & Metal Work*, 2020 Ky. App. Unpub. LEXIS 256; *Montrose Chemical Corp. of California v. Superior Court*, 9 Cal. 5th 215 (2020).

Finally, each state has its own unique set of statutes, public policy considerations and

insurance coverage philosophies. *See, e.g.,* Or. Rev. St. 742.016 (limiting evidence allowed to construe insurance policy); Rev. Code Wash. 48.01.030 (expressing public policy interests in regard to insurance); *Ferguson, supra* (Iowa).

These different laws, standards and tests will necessarily require different discovery, evidence and arguments, and will yield different results. As a result, any consolidation of insurance coverage actions in different states involving different loss facts, insurance companies and policy language would be unavoidably flawed and counterproductive.

### 3. Coverage Trigger Theories May Differ by Plaintiff

In addition to applying different law to different policy provisions, certain plaintiffs may ask the courts to consider differing theories for triggering coverage under the requirement that business interruption losses result from physical loss of or damage to property. Some plaintiffs might argue that mere presence of the virus causing COVID-19 at their premises or other nearby premises may trigger coverage. Other plaintiffs may argue that governmental orders restricting access to or the functionality of the insured premises is enough to trigger coverage. Hybrid or other creative arguments may also develop through the course of discovery and/or based on the unique case law of a given state. Even small variations in coverage triggering language will inevitably lead to more nuanced and distinct arguments as well.

Each of these arguments will require different evidence and expert analysis to support and rebut the competing positions of each party. Depending on the theory advanced, one case might focus on an epidemiological analysis whereas other cases might focus on advanced statistical modeling, business operations or government policy and planning. Without precedents from state courts in place to guide insurance coverage and litigation strategies, the possible variations in how an insured may approach its case and how an insurance company may mount its defense are impossible to quantify or predict at this point.

Given the novelty of the situation and the differing standards and precedents that will apply and/or be developed by state courts, it would be impossible to create any sort of uniform system or set of standards that could justly resolve the procedural and substantives issues raised by these actions.

### 4. Different Coverage Defenses will be Available for Different Claims

In addition to issues regarding how business interruption coverage may or may not be triggered or how a virus exclusion might apply, virtually all policies contain conditions and duties of an insured that must be satisfied for coverage to be owed for any type of loss. Perhaps the two most common general coverage defenses arise from the duty to cooperate in the investigation of a claim and the conditions prohibiting fraud, intentional concealment and/or misrepresentation of material facts. *See, e.g.,* Exhibit B, pp. 29 and 54. Further, in the context of business interruption claims, coverage defenses based on the failure to mitigate losses and other general exclusions, like the exclusion for losses caused by "Acts or Decisions," may also apply in different ways to certain claims. Exhibit B, pp. 25-26.

The availability of these coverage defenses will be sporadic as they depend on how each individual insured business conducted itself in responding to the loss and submitting its claim to the insurance company. Accordingly, applying these various coverage defenses will require an individualized evaluation of each insured's acts and omissions following the start of the COVID-19 pandemic. Given the inherently fact-intensive nature of these issues, there is no way to streamline the necessary gathering of evidence needed to support or rebut these defenses or the judicial resolution of these defenses amongst different cases.

### 5. COVID-19 has Impacted Each Region, State, County and Locality Differently

The virus itself has caused wide-ranging impacts that vary greatly depending on location

and/or type of physical setting. Urban population centers, like New York City, have been hit especially hard by the COVID-19 crisis. The first COVID-19 case in New York City was identified on March 1, 2020.[6] By late March, New York had become the epicenter of the crisis in the United States.[7] More rural parts of the country have been less affected by COVID-19. West Virginia did not identify its first COVID-19 case until March 17, 2020.[8]

As of May 19, 2020, New York State has reported 315,371 cases and 28,339 deaths. Vermont, Wyoming, Hawaii, Montana and Alaska each reported less than 1,000 cases and less than 60 deaths as of May 19, 2020.[9] Every other state in the country falls somewhere in between.

The notion that the presence and impact of the virus is similar across the country or even the 32 jurisdictions implicated in this matter so far is simply not supported by the data.

**6.   State Governors have Issued Different Stay Home and Reopening Orders**

Given the disparate impact of COVID-19 between states and regions, it is not surprising that State Governors have issued Orders with varying degrees of restrictions on business operations ("Stay Home Orders"). As of March 23, 2020 only eight states, including New York, California and Oregon, were subject to Stay Home Orders issued by Governors.[10] By April 7, 2020, only eight states had not issued Stay Home Orders, including Oklahoma, Nebraska, Iowa and Utah.[11]

Most states have started some form of reopening, but as of May 20, 2020, some states had not.[12] These reopening plans are universally different between states in terms of application to businesses, scope and timing, and often vary within a given state by county or other regional

---

[6] https://www.nytimes.com/2020/03/01/nyregion/new-york-coronvirus-confirmed.html
[7] https://www.npr.org/2020/03/24/820610818/new-york-city-u-s-epicenter-braces-for-peak
[8] https://pittsburgh.cbslocal.com/2020/03/17/coronavirus-in-west-virginia-state-reports-first-positive-covid-19-case/
[9] https://www.cnn.com/interactive/2020/health/coronavirus-us-maps-and-cases/ (visited May 19, 2020)
[10] https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html
[11] Id.
[12] Id.

boundary.[13]

The degree to which the original Stay Home Orders restricted business operations also varied by state and by industry. In Washington, dentists could only perform urgent/emergency procedures, only essential retail outlets could operate, restaurants could only provide take-out and delivery services and hair salons could not operate at all.[14] In New Jersey, a different subset of retail stores were allowed to operate.[15] In Virginia, dental and other professional offices were allowed to remain in operation, nonessential brick-and-mortar retailers could continue to operate with 10 patrons or less and barbers/cosmetologists could provide one-on-one in-home services.[16] Six states did not mandate any restrictions on dental operations other than recommended limitations and/or adherence to public health guidelines.[17]

This matter involves businesses in several different industries ranging from dentistry to restaurants and nonessential retail to professional services. These businesses are located in 21 states and the District of Columbia. Given that the treatment of businesses under Stay Home Orders varied significantly by both state and industry, crafting a uniform set of standards and rules that would apply to the business interruption insurance coverage claims brought by these businesses would be unworkable and likely unjust.

7.   **The Impact of COVID-19 Differs by Business Model**

The related actions named in this matter include claims by dentistry practices, restaurants, clothing retailers, beauty salons, fitness facilities, real estate firms and other business. Due to the

---

[13] https://www.cnn.com/interactive/2020/us/states-reopen-coronavirus-trnd/ (visited May 21, 2020)
[14] https://www.governor.wa.gov/office-governor/official-actions/proclamations;
https://www.governor.wa.gov/sites/default/files/WA%20Essential%20Critical%20Infrastructure%20Workers%20%28Final%29.pdf
[15] https://www.nj.gov/governor/news/news/562020/20200320j.shtml
[16] https://www.virginia.gov/coronavirus/faq/ (visited May 19, 2020);
https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-53-Temporary-Restrictions-Due-To-Novel-Coronavirus-(COVID-19).pdf
[17] Hawaii, Massachusetts, North Dakota, South Carolina, South Dakota and Wyoming.

inherent nature of viruses, the measures required to protect the health of the public in a particular business setting will vary greatly between diverse business operation models. Some businesses, like technology-based companies, are able to easily adapt to allow for remote operations without face-to-face interaction with the public. Other businesses can only operate through direct physical contact (e.g. barbers and cosmetic services). Many other businesses, including some of the business involved in this matter, require at least some close physical interaction with the public to perform all of their operations.

The availability of adaptations to allow at least some continuation of operations will differ by the capabilities of individual businesses within the same industry. For instance, some restaurants already had or could easily implement take-out and delivery operations. Other restaurants operate more like bars or nightclubs that depend on in-person experiences or performances amongst a group of people. Many dental and optometric practices provide emergency services and have protective procedures in place that can be enhanced to protect the public in the midst of a pandemic. Some retailers can seamlessly shift to online sales, but others may not be able to succeed in that forum due to the lack of differentiated in-person experiences.

Attempting to evaluate and determine coverage for business income losses related to COVID-19 amongst different industries and businesses with a uniform set of discovery and other rules or guidelines would be an impossible task where the exceptions to the general rule would inevitably overtake any efficiency that might be intended.

**8.     The Damages Claimed by Plaintiffs will be Calculated Differently**

Similarly, calculating alleged income losses amongst businesses with diverse operating models, sizes, resources, sophistication levels and accounting practices will prevent the application of standard discovery tools or other uniform guidelines. Unlike most professional service firms, restaurants and small brick-and-mortar retailers often deal in cash. In contrast,

most dentistry and other healthcare practices are paid by dental plans and other third party payers pursuant to complex provider agreements that require navigation of a complex web of health/dental insurance protocols in order to collect revenue. Most other businesses do not deal with third-party payers.

Moreover, some of the plaintiffs in this matter are sophisticated companies with comprehensive records displaying strict adherence to generally accepted accounting practices. Other businesses, like Sandy Point Dental, PC, are "small, struggling" firms, which may have only the most basic standard financial records, if any at all. *See* ECF No. 19, page 2.

To ensure transparency and full disclosure of relevant evidence, the proper scope and methods for discovery will need to account for these differences amongst the insured businesses on a case-by-case basis. Multidistrict litigation is not well-equipped to handle these logistical issues. Rather, they are best handled through the cooperation of counsel and application of the proportionality requirement in Fed. R. Civ. P. 26(b)(1) in each given case. Federal courts are well-versed in handling these types of discovery issues justly and fairly under the Federal Rules of Civil Procedure. Attempting to "streamline" discovery amongst these vastly different businesses and claims will cause more confusion and inefficiency, not less.

### 9. The Related Actions Involve Different Claims and Causes of Action

As noted by the Big Onion Plaintiffs at ECF No. 198, pages 2-3 and 10, some of the related actions identified here assert claims for extra-contractual damages under various legal theories. The availability and application of extra-contractual or bad faith claims vary greatly by state. Accordingly, consolidation of these claims would be untenable.

In the State of Washington, plaintiffs can assert, inter alia, claims of common law insurance bad faith and/or seek treble damages and attorney fees for unreasonable denial of coverage by statute. *Overton v. Consol. Ins. Co.*, 145 Wn.2d 417, 433, 38 P.3d 322, 329 (2002);

Rev. Code Wash. 48.30.015. In Florida, bad faith is exclusively proscribed by statute. *QBE Ins. Corp. v. Chalfonte Condo. Apt. Ass'n*, 94 So. 3d 541, 546-547 (Fla. 2012) (discussing Fla. Stat. § 624.155). Many other states have declined to recognize tortious bad faith liability for first-party insurance claims and/or provide only limited statutory remedies based on unique factors and elements. *See, e.g., Strader v. Grange Mut. Ins. Co.*, 179 Or App 329, 335 (2002); *Marquis v. Farm Family Mut. Ins. Co.*, 628 A.2d 644, 652 (Me. 1993); *but see* Me. Rev. Stat. 24-A §2463-A); *see also* Mo. Stat. §375.420.

In addition to the different elements and standards that apply to these various remedies, resolution of each bad faith claim will require an individualized evaluation of how the insurance company handled the particular claim submitted by the insured as well as the factual circumstances surrounding the reporting of each individual claim by the insured. As recognized by the Big Onion Plaintiffs, consolidation of these highly fact-intensive causes of action would be impossible.

10. **The Related Actions Include Both Class Action and Individual Claims**

The suit filed by Dr. Germack against TDIC is pled as a class action lawsuit. Exhibit A. TDIC understands that many of the 134 lawsuits added as related actions are individual actions against one insurance company. *See* ECF No. 198. The class action suits and individual suits will necessarily require different pre-trial discovery and procedures due to the application of Fed. R. Civ. P. 23. Litigation in the Germack Action will undoubtedly focus on the viability of the class claims and discovery disputes related to the same. These efforts have only just begun in the Germack Action.

Forcing individual and class actions into one consolidated pre-trial process would likely result in undue delay and waste for the individual actions. It might also inhibit a just and thorough scrutiny of the class claims asserted by the purported representative plaintiffs. This

further illustrates why transfer and consolidation of this matter is inappropriate.

**B.     Transferring these Actions will not be Efficient or Convenient**

As discussed above, the pervasiveness and depth of the differences between the business interruption claims related to COVID-19 will substantially overwhelm any possibility for efficiency that could normally be gained by transfer or consolidation of pre-trial proceedings. All of the District Courts proposed so far as the venue for Multidistrict Litigation so far (Eastern Pennsylvania, Northern Illinois and Southern Florida) are objectively inconvenient for actions based on the West Coast, including the Germack Action. The reality is that no District would be convenient for litigating these matters given the need for individualized litigation of novel state-law issues and spread of COVID-19 throughout the country. For this reason, transfer and/or consolidation to Multidistrict Litigation should be denied.

**C.     Justice will not be served by Transfer to Multidistrict Litigation**

The proponents of transfer to Multidistrict Litigation seemingly base their position on the premise that inconsistent rulings regarding coverage for business interruption claims related to COVID-19 would be unjust. That is a false premise. The claims for insurance coverage in this matter involve different factual circumstances, different policy language and different controlling law. Many of these actions should result in a ruling that no coverage is available to the plaintiff under the policy terms and applicable state law. In other cases, with different policy terms or applicable law, the court should rule that coverage claims were improperly handled, or even wrongfully denied, and perhaps award both contractual and bad faith damages.

Transferring and consolidating the actions implicated in this matter in the name of achieving "consistent" rulings would stifle justice by hindering individual consideration of these insurance claims on their unique factual and legal merits. Because transfer and consolidation will not result in greater justice, as compared to the alternative, the Panel should deny the Motion to

Transfer and Consolidate.

**D.     Alternatives to MDL Transfer Should Prevail**

Given the differences between insurance coverage claims amongst several insurance companies in states throughout the country demonstrated above, alternatives to Multidistrict Litigation should be favored for the actions implicated in this matter. As more actions are filed against the same insurance company in the same jurisdiction, those actions can and should be considered for consolidation by the applicable District Court under Fed. R. Civ. P. 42(a). That would allow for streamlined discovery for issues that pertain to an insurance company under the applicable state law and policy terms. Forcing multidistrict litigation in this matter would, at best, be unwieldly and time-consuming given the wide assortment of issues and standards involved. A less ambitious form of consolidation on a state-by-state and company-by-company basis, on the other hand, would actually have a chance to achieve the shared goal of avoiding duplicative discovery, conserving resources and increasing efficiency.

**IV.     CONCLUSION**

For the foregoing reasons, TDIC respectfully requests that the Motion for Transfer and Coordination or Consolidation under 28 U.S.C. § 1407 be denied by the Panel.

DATED this 4th day of June, 2020.

LETHER LAW GROUP

*/s/ Eric J. Neal*
Eric J. Neal, WSBA # 31863
1848 Westlake Ave N., Suite 100
Seattle, WA 98109
P: (206) 467-5444/F: (206) 467-5544
eneal@letherlaw.com
*Counsel for Defendant The Dentists Insurance Company*