BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: COVID-19 BUSINESS INTERRUPTION PROTECTION INSURANCE LITIGATION | MDL No. 2942 |

**DEFENDANTS AUTO-OWNERS INSURANCE COMPANY'S AND OWNERS
INSURANCE COMPANY'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTIONS
FOR TRANSFER AND COORDINATION OR CONSOLIDATION
<u>UNDER 28 U.S.C. § 1407</u>**

Lori McAllister (P39501)
DYKEMA GOSSETT PLLC
Attorney for Defendants Auto-Owners Ins.
Co. and Owners Ins. Co.
201 Townsend St., Suite 900
Lansing, MI 48933
Telephone: (517) 374-9150
lmcallister@dykema.com

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

I.      CONSOLIDATION IN ONE DISTRICT WOULD BE INEFFICIENT BECAUSE ANY TRANSFEREE COURT WILL BE REQUIRED TO ANALYZE INDIVIDUALLY EACH POLICY, EACH SET OF CLAIM FACTS, AND EACH GOVERNMENTAL ORDER TO REACH ANY MEANINGFUL OUTCOME ON ANY ISSUE OF LAW OR FACT. ....................................................................................................................... 2

      A.      Plaintiffs Do Not Rely on Common Facts or Theories That Can Be Resolved on a Consolidated Basis Through Consolidated Discovery ........................................... 3

      B.      Any Transferee Court Will Be Required to Analyze Each and Every Insurance Policy in Detail to Reach Any Meaningful Outcome on Any Issue, Defeating Any Potential Efficiencies ................................................................................................ 4

      C.      Any Transferee Court Will Be Required to Analyze Each and Every State and Local Government Order Requiring Operations to be Suspended as to Each Business .... 8

      D.      Any Transferee Court Will Be Required to Analyze the Circumstances of Each and Every Instance of Coronavirus Being Present at the Insured Premises ................ 10

      E.      Plaintiffs Assert A Variety Of Tort Claims Which Will Require Different and Individualized Proofs ............................................................................................. 12

      F.      The Need for Individualized Analysis of Facts, Policies, Government Orders, and Claim Elements Makes Centralization *Less*, Not More, Efficient ......................... 13

      G.      The Proposed MDL Will Force All Insurance Companies To Bear the Inefficiencies of an MDL Proceeding ........................................................................................... 16

II.     CONSOLIDATION IS NOT APPROPRIATE IN AN INSURANCE COVERAGE ACTION INVOLVING DIFFERENT CONTROLLING STATE LAWS ...................... 17

CONCLUSION ................................................................................................................. 20

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abex Corp. v. Md. Cas. Co.*,
   790 F.2d 119 (D.C. Cir. 1985) ................................................... 18

*American States Ins. Co. v. Koloms*,
   687 N.E.2d 72 (1997) ............................................................ 20

*Big Onion Tavern Group LLC v. Society Ins., Inc.*,
   Case No. 1:20-cv-02005 (N.D. Ill.) ............................................. 12

*Bituminous Cas. Corp. v. Sand Livestock Sys.*,
   728 N.W.2d 216 (Iowa 2007) ..................................................... 20

*Dianoia's Eatery LLC, d/b/a Deanoia's and Pizzeria De Vide v. Motorists Mut. Ins. Co.*,
   Case No. 20-706 (W.D. Pa. May 19, 2020) ....................................... 18

*Erie R.R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ............................................................. 17

*Florists Mut. Ins. Co. v. Ludy Greenhouse Manufacturing Corp.*,
   521 F. Supp. 2d 661 (S.D. Ohio 2007) .......................................... 19

*Hastings Mut. Ins. Co. v. Mengel Dairy Farms, Inc.*,
   2020 U.S. Dist. LEXIS 87612 (N.D. Ohio May 19, 2020) .......................... 9

*In re: Aegon USA, Inc., Supplemental Cancer Ins. Litig.*,
   571 F. Supp. 2d 1369 (J.P.M.L. 2008) .......................................... 14

*In re: Best Buy Co. Inc., Cal. Song-Beverly Credit Card Act Litig.*,
   804 F. Supp. 2d 1376 (J.P.M.L. 2011) .......................................... 3

*In re Cable Tie Patent Litig.*,
   487 F. Supp. 1351 (J.P.M.L. 1980) ............................................. 2

*In re Cessana Aircraft Distributorship Antitrust Litig.*,
   460 F. Supp. 159 (J.P.M.L. 1978) .............................................. 3

*In re: Chinese-Manufactured Drywall Products Liability Litigation*,
   MDL No. 2047 (J.P.M.L. Feb. 5, 2010) .............................. 2, 4, 14, 15, 16

*In re CleanNet Franchise Agreement Contract Litig.*,
   38 F. Supp. 3d 1382 (J.P.M.L. 2014) ........................................... 16

*In Re CP4 Fuel Pump Mktg. Sales Practices & Prods. Liability Litig.*,
   412 F. Supp. 3d 1365 (J.P.M.L. 2019) .......................................... 17

*In re Florida, Puerto Rico & U.S. Virgin Islands 2016 and 2017 Hurricane Seasons Flood Claims Litig.*,
   325 F. Supp. 3d 1367 (J.P.M.L. 2018) .......................................... 4

*In re: Gerber Probiotic Prods. Mktg. & Sales Practices Litig.*,
   899 F. Supp. 2d 1378 (J.P.M.L. 2012) .......................................... 3

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

*In re Insurance Companies "Silent" Preferred Organization (PPO) Litigation*,
517 F. Supp. 2d 1362 (J.P.M.L. 2007) ................................................................. 13

*In re Invokana Prods. Liability Litig.*,
223 F. Supp. 3d 1345 (J.P.M.L. 2016) ................................................................. 17

*In re Mortgage Industry Foreclosure Litigation*,
996 F. Supp. 2d 1379 (J.P.M.L. 2014) ........................................................... 11, 12

*In re: Mortg. Indus. Home Affordable Modification Program (HAMP) Contract Litig.*,
867 F. Supp. 2d 1338 (J.P.M.L. 2012) ................................................................. 14

*In re: Mortg. Lender Force-Placed Ins. Litig.*,
895 F. Supp. 2d 1352 (J.P.M.L. 2012) ................................................................. 14

*In re: The Great West Casualty Insurance Company Litigation*,
176 F. Supp. 3d 1371 (J.P.M.L. 2016) ....................................................... 14, 15, 16

*In re Trilegiant Mbrship Program Mktg. & Sales Practices Litig.*,
828 F. Supp. 2d 1362 (J.P.M.L. 2011) ................................................................. 12

*In re Watson Fentanyl Patch Products Liability Litig.*,
883 F. Supp. 2d 1350 (J.P.M.L. 2012) ................................................................. 17

*In re: Real Estate Transfer Tax Litig.*,
895 F. Supp. 2d 1350 (J.P.M.L. 2009) ................................................................. 16

*Mellin v. Northern Security Ins. Co.*,
167 N.H. 554 (2015) ........................................................................................... 19

*Michigan United for Liberty v. Whitmer*,
an unpublished opinion of the Court of Claims, issued May 19, 2020
(Docket No. 20-000061-MZ) ................................................................................ 9

*Nari Suda LLC v. Oregon Mut. Ins. Co.*,
Case No. 3:20-cv-3057 (N.D. Ca.) ...................................................................... 13

*Sandy Point Dental PC v. Cincinnati Ins. Co.*,
Case No. 1:20-cv-02160 (N.D. Ill.) ...................................................................... 13

*SCGM, Inc. v. Certain Underwriters at Lloyd's*,
Case No. 4:20-cv-001199 (S.D. Tex.) ................................................................. 13

*South Bay United Pentecostal Church v. Newsom*,
No. 19A1044, 590 U.S. ___; 2020 WL 2813056 (May 29, 2020) ............................ 10

*State Farm Ins. Co. v. Peda*,
2005-Ohio-3405 (Ohio Ct. App. 2005) .................................................................. 8

*Uniroyal, Inc. v. Home Ins. Co.*,
707 F. Supp. 1368 (E.D.N.Y. 1988) ..................................................................... 17

*Universal Image Prods, Inc. v. Chubb Corp.*,
703 F. Supp. 2d 705 (E.D. Mich. 2010), *aff'd* 475 F. App'x 569 (6th Cir. 2012) ................... 19

*W. Va. ex. rel. McGraw v. CVS Pharm., Inc.*,
748 F. Supp. 2d 580 (S.D. W. Va. 2010) .............................................................. 18

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

*Watson v. Travelers Indem. Co*.,
  2005 Mich. App. LEXIS 917 (Mich. Ct. App. April 12, 2005) .................................................. 20

*Wilkie v. Auto-Owners Ins. Co*.,
  664 N.W.2d 776 (Mich. 2003) ............................................................................................................ 20

*Wis. Legislature v. Palm*,
  2020 WI 42; 2020 Wisc. LEXIS 121 (May 13, 2020) ....................................................................... 9

**Statutes**

15 U.S.C. § 1012(b) ......................................................................................................................................... 17

28 U.S.C. §1407 ....................................................................................................................................... 1, 2, 13

28 U.S.C. §1407(a) ....................................................................................................................................... 12

**Other Authorities**

Daniel Schwarcz, *Reevaluating Standardized Insurance Policies*,
  78 U. Chi. L. Rev. 1263 (2011) ......................................................................................................... 5

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

Defendants Auto-Owners Insurance Company and Owners Insurance Company (collectively, "Auto-Owners") oppose the requests to consolidate and transfer the so-called business interruption insurance cases to the various venues proposed by plaintiffs.[1] Auto-Owners is named in only one case, *Wagner Shoes LLC v. Auto-Owners Ins. Co.*, Case No. 7:20-cv-00465, pending in the Northern District of Alabama, and the plaintiff in that case has advised Auto-Owners that it also opposes the consolidation and the transfer. Owners Insurance Company, a subsidiary of Auto-Owners, is also named in one case, *Bridal Expressions LLC v Owners Ins. Co.,* Case No. 1:20-cv-00833, pending in the Northern District of Ohio. Plaintiffs' counsel in *Bridal Expressions* represent one of the movants here.[2]

<u>INTRODUCTION</u>

Plaintiffs' petitions pursuant to 28 U.S.C. §1407 seek to shoehorn cases against multiple insurance companies into one MDL proceeding that would dramatically complicate, not simplify the cases. The business of insurance is uniquely governed by state law which will control the outcome of any particular policyholder dispute. There are no common issues of fact or law that span the proposed MDL or govern cases against numerous individual insurance companies, each with their own individual insurance policies, claims handling practices, and policies issued in states

---

[1]  Plaintiffs in *LH Dining L.L.C., doing business as River Twice Restaurant v. Admiral Indemnity Co*, Case No. 2:20-cv-01869 (E.D. Pa.) (hereinafter "*LH Dining*") propose to transfer the case to the Eastern District of Pennsylvania. Plaintiffs in the sole case naming Owners Insurance Company, *Bridal Expressions LLC v. Owners Ins. Co.*, Case No. 1:20-cv-00883 ("*Bridal Expressions*"), propose to transfer the case to the Northern District of Illinois, and plaintiffs in *El Novillo Restaurant d/b/a DJJ Restaurant Corp. and El Novillo Restaurant, d/b/a Triad Restaurant Corp. v. Certain Underwriters at Lloyd's London et al*, Case No. 1:20-cv-21525 (S.D. Fla.) ("*El Novillo*") propose to transfer the case to the Southern District of Florida.

[2]  Owners has learned of two more federal cases against it:  *Blue Springs Dental Care LLC, Green Hills Dental KC LLC, Highland Dental Clinic LLC,* and *Kearney Dental LLC v. Owners Ins. Co.*, Case No. 20-cv-383 (W.D. Mo.); and *KD Unlimited Inc, d/b/a The Artisan Gathering Salon v. Owners Ins. Co.*, Case No. 1:20-mi-99999 (N.D. Ga.).

1

with different applicable laws. To further make the case unsuitable for MDL treatment, there are no common issues of law or fact as to even one insurance company, as each company utilizes multiple policy forms, endorsements and exclusions, rather than a standard form used by the entire industry. The types of insureds and businesses to be addressed in these cases also varies widely and would require a panoply of different experts to address the claims unique to each insured's individual business and business environment. As the MDL Panel has held, insurance policy coverage actions are particularly unsuitable for MDL proceedings because they are controlled by state law. *In Re Chinese-Manufactured Drywall Products Liability Litigation*, Order Denying Transfer, MDL-2047 (June 15, 2010), attached as Ex. 1. "Business interruption" insurance coverage cases are even more unsuitable for consolidation than typical coverage actions, because the variation in policy language and claim facts is even wider and less standard than in many other insurance contexts. Centralizing these cases in one district, therefore, would not only create no meaningful efficiencies, it would be far <u>less</u> efficient than permitting federal courts to apply the insurance laws of the states where they sit, with which they are familiar. The petitions seeking a consolidated MDL should be denied.

## **ARGUMENT**

**I.    CONSOLIDATION IN ONE DISTRICT WOULD BE INEFFICIENT BECAUSE ANY TRANSFEREE COURT WILL BE REQUIRED TO ANALYZE INDIVIDUALLY EACH POLICY, EACH SET OF CLAIM FACTS, AND EACH GOVERNMENTAL ORDER TO REACH ANY MEANINGFUL OUTCOME ON ANY ISSUE OF LAW OR FACT.**

Plaintiffs have the burden of proving that transfer under 28 U.S.C. §1407 is appropriate. *See In re Cable Tie Patent Litig.*, 487 F. Supp. 1351, 1354 (J.P.M.L. 1980). That burden is substantial. As the Panel has repeatedly emphasized, centralization under Section 1407 "should be the last solution after considered review of all other options." *In re: Gerber Probiotic Prods. Mktg.*

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

& *Sales Practices Litig.*, 899 F. Supp. 2d 1378, 1379 (J.P.M.L. 2012) (quoting *In re: Best Buy Co.*

*Inc., Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d. 1376 (J.P.M.L. 2011)). A "mere

showing that [common] questions exist is not sufficient, in and of itself, to warrant transfer by the

Panel." *In re Cessana Aircraft Distributorship Antitrust Litig.*, 460 F. Supp. 159, 161-62 (J.P.M.L.

1978). As set forth below, the broad allegations of common issues do not withstand scrutiny.

### A. Plaintiffs Do Not Rely on Common Facts or Theories That Can Be Resolved on a Consolidated Basis Through Consolidated Discovery.

The moving plaintiffs do not agree what the common issues are, let alone make the case

that their particular version of the "common issues" can be resolved in a uniform manner across

50 jurisdictions with differently situated plaintiffs and defendants. While one group of plaintiffs

argues for business interruption damages solely because of a governmental shut down order and

<u>not</u> the actual presence of the virus, another group of moving plaintiffs argues that the presence of

the virus is a common issue that the Court should determine. *Compare LH Dining Brief*, Doc. 1-1

at p. 2 ("The issue – whether business interruption insurance policies will cover losses incurred by

businesses forced to shutter their business as a result of the Government Orders – is one of national

importance and great significance to the ultimate survival of many businesses."), *with Bridal*

*Expressions* Brief, Doc. 3-1, p. 5 (claiming common issues of "(1) Whether COVID-19 causes

"physical damage or loss to property" as that phrase is used in property insurance policies; and (2)

whether COVID-19 was present on the insured property or on property sufficiently connected by

proximity or in other ways to the insured property such that coverage is triggered."). These

conflicting positions demonstrate that neither of these proffered  "common" issues are actually

"common" even among the plaintiffs.

The *El Novillo* Brief asserts that there are common issues but never says specifically what

those issues are. *El Novillo* Brief, Doc. 9, p. 3. It generally defines the common issue to be the

"denial of policy obligations." If denial of coverage is a common issue justifying a MDL proceeding, then consolidation would be appropriate for all insurance coverage actions because they generally involve a claim denial. Of course, this superficial commonality is not enough to justify MDL centralization. Instead, the issue is whether the proofs necessary to evaluate a denial are individualized or common. *In re Florida, Puerto Rico & U.S. Virgin Islands 2016 and 2017 Hurricane Seasons Flood Claims Litig*., 325 F. Supp. 3d 1367 (J.P.M.L. 2018). Indeed, this Panel has found that insurance coverage actions are ill-suited for consolidation precisely because the claims are so individualized:

> The declaratory judgment actions related to the use of the Chinese-manufactured drywall may implicate similar legal issues, but while consistent legal rulings are often a thankful by-product of centralization, <u>Section 1407 does not, as a general rule, empower the Panel to transfer cases solely due to the similarity of legal issues. The insurance coverage questions in these cases are likely to be decided by an application of the complaint to the policy language under the applicable state law, and the insurance company that might benefit the most from the efficiencies of centralization opposes transfer of these cases. In these circumstances, the similarity of legal issues alone is not enough to justify transfer.</u>

*In re Chinese Drywall Litig*., MDL No. 2047, Order dated June 15, 2010, Dkt. 25 (emphasis added).

**B.     Any Transferee Court Will Be Required to Analyze Each and Every Insurance Policy in Detail to Reach Any Meaningful Outcome on Any Issue, Defeating Any Potential Efficiencies.**

No court can reach any result in any of the business interruption cases without first interpreting the underlying insurance policies' operative language. The threshold questions of contractual meaning necessary to these cases, however, are wholly inappropriate for centralization because they will require any court that tackles them to analyze each and every insurance policy individually to determine parties' obligations and the parameters for insurance coverage. These questions include what circumstances could trigger each policy's specific insuring clause, whether the loss comes within the policy period, and whether exclusions may bar coverage.

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

Centralization presents no opportunity for meaningful efficiencies in interpreting any policy language, because these types of policy forms vary significantly. Even in that limited field of insurance that uses the most standardized of all forms --consumer personal lines insurance-- there is little uniformity in supposedly "form" insurance contracts. *See* Daniel Schwarcz, *Reevaluating Standardized Insurance Policies*, 78 U. Chi. L. Rev. 1263, 1264-69 (2011).

By contrast, business interruption insurance is a commercial coverage that is among the least standardized or uniform of commercial insurance products. (Ex. 2, Thomas Decl. ¶ 7.) This is because many of the forms were individually developed and varied from year to year, policy type to policy type. According to Professor Jeffrey Thomas, who is the Editor-in-Chief of the *New Appleman* insurance treatise (*id.* ¶ 2), the most standard business interruption coverage forms used in the industry are developed by the Insurance Services Office ("ISO"). But even those forms are numerous, and present dozens of potential types, permutations, and variations, meaning there are numerous possible combinations of forms that could affect any coverage analysis. (*Id.* ¶¶ 24-45.) Prof. Thomas has analyzed in detail three of the many policies affording business interruption coverage drawn from his experience studying business interruption coverage insurance in the marketplace. (*Id.* ¶¶ 8-24.) Virtually every part of each policy—sold by three different insurers— differs substantially in terms of its coverage grant, exclusions, conditions, and methodology and time periods for calculating benefits. (*Id.*) The same type of variation, which requires individualized analysis, is multiplied for business interruption coverage forms throughout the insurance market. (*Id.*)

By way of illustration, assuming *arguendo* all the other prerequisites are shown, the business interruption insuring clause in Auto-Owners' businessowners policy in *Wagner Shoes* can be triggered by "direct physical loss or damage" to covered property. In contrast, Brotherhood

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

Mutual's business interruption language is not triggered by direct property "damage" but rather may be activated by "direct physical loss to real or personal property," an "infectious disease acquired by your employees or staff," an "order of civil authority," and other kinds of facts. Other policies have different coverage-activating language, as exemplified in Table 1:

| Table 1: Sample Variations in Insuring Clauses in Business Interruption Policies (Source: Ex. 2, Thomas Decl. ¶¶ 18-20, 46) | |
| --- | --- |
| **Insurer** | **Insuring Clause Language for Business Interruption Coverage** |
| Auto-Owners Businessowners Policy | "direct physical loss or ***damage*** to" covered property |
| Brotherhood Mutual Policy | "direct ***physical*** loss to ***real or personal property***"; an "infectious disease ***acquired*** by your employees or staff"; an "order of civil authority," etc. |
| U.S. Specialty Insurance Company Restaurant Recovery Insurance Policy | "caused by or resulting from any of the following ***Insured Events***," including "***accidental or unintentional contamination***" |
| Erie Ultraflex Policy | "direct and ***accidental*** loss of or damage to covered property" |
| State Farm Lloyds Hair Salon, Day Spa and Barber Policy | "damage or ***destruction*** to property covered under this form" <br><br> endorsement language: "***accidental direct physical loss*** to property at the described premises" |
| Cincinnati Commercial Insurance Policy | "***direct 'loss'*** to property at a 'premises' caused by or resulting from any Covered Cause of Loss," where "loss" means "accidental physical loss ***or accidental physical damage***" |

As illustrated above in Table 1, the very first step of any coverage analysis—reviewing the insuring clause's language—is far from uniform across business interruption policies. In light of this inescapable reality, any court that decides these cases will be required to determine how a policy that covers "damage or destruction" interacts with a coronavirus claim differently than a

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

policy that requires "accidental or unintentional contamination." And it will be inevitable that every single insuring clause must be examined individually in the context of an actual claim before a court could reach any conclusion about whether the policy is triggered in the first instance. A more complete table identifying a wider sample of these variations is attached as Exhibit 3.

Similarly, the exclusions in business interruption policies also vary widely. Some policies contain virus exclusions, while others rely on broadly worded pollutions exclusions barring coverage for "contaminants," and still others include other exclusions. Table 2 below provides a sample of exclusions that exist in some policies but not others.

| Table 2: Variation in Exclusions in Business Interruption Policies<br>(Source: Ex. 2, Thomas Decl. ¶¶ 14-17) | |
| --- | --- |
| **Insurer** | **Excluded Losses or Causes of Loss** |
| Mitsui Sumitomo Commercial Insurance Policy | "We will not pay for loss or damage caused by or resulting from any *virus*, *bacterium* or other *microorganism* that induces or is capable of inducing physical distress, illness or disease." |
| Auto-Owners Businessowners Policy | "We will not pay for loss or damage caused by or resulting from the release, discharge or dispersal of '*pollutants*' unless the release, discharge or dispersal is itself caused by any of the 'specified causes of loss'" where "pollutants" includes "any . . . *contaminant*."<br><br>"*Acts* or decisions, including the failure to act or decide, of any person, group, organization or *governmental body*."<br><br>"Delay, loss of use or loss of market" |
| State Farm Businessowners Coverage Form | "The cost of any *testing or monitoring* of air or *property* to confirm the type, absence, presence or level of 'fungi', wet or dry rot, *virus*, bacteria or other *microorganism*"<br><br>"Delay, loss of use or loss of market" |
| Topa Insurance Company Commercial Property Coverage | Activity "*spreading by contagion, inhalation or absorption*" any "substance," including a "virus" or "pathogen" |

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

| U.S. Specialty Insurance Company Restaurant Recovery Insurance Policy | "Any loss caused directly or indirectly, in whole or in part, by 1. Any form of Avian Influenza *Viruses*"<br><br>Bars coverage for loss or damage caused directly or indirectly by "the enforcement of or compliance with any ordinance or law: (1) regulating the . . . use . . . of any property . . ." |
|---|---|
| Westchester Surplus Lines Policy | "Presence, growth, proliferation, spread or activity of 'fungus', wet rot or dry rot or *bacteria*." |
| Brotherhood Mutual Policy | Does not cover loss from "seizure, confiscation, destruction, or *quarantine* of property" |

Just like insuring clauses, the variance in exclusionary language in the policies will require any court that decides these cases to examine each and every relevant exclusion in the context of a specific claim.[3] (Ex. 2, Thomas Decl. ¶ 54.)

> **C.    Any Transferee Court Will Be Required to Analyze Each and Every State and Local Government Order Requiring Operations to be Suspended as to Each Business.**

The individualized issues continue with respect to the governmental orders which allegedly give rise to many of the claims. The business owners policies at issue in *Bridal Expressions* and *Wagner Shoes* do not even provide coverage for a governmental shut down, yet this is a central issue in other cases that plaintiffs seek to consolidate with those against Auto-Owners. Nor does either plaintiff in those cases allege that they have a civil authority coverage provision in the policy. Combining the cases for the purpose of determining the effective date of the governmental orders will not determine or facilitate the resolution of any pending case against these defendants.

---

[3] Defendants believe that the decisions on the applicability and meaning of the exclusions will be decided by the Court as a matter of law, and not fact. That is the law of Ohio where *Bridal Expressions* is pending. *See State Farm Ins. Co. v. Peda*, 2005-Ohio-3405, ¶ 30 (Ohio Ct. App. 2005) ("'the interpretation of a contract term, such as an exclusion clause is . . . a question of law reserved for the court'") (citation omitted and ellipses added in *State Farm*).

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

For those policies allegedly affording such coverage, each individual plaintiff will be required to show that it is in a jurisdiction where an order was issued requiring it to stop operating. At least seven states never issued an order requiring businesses to shut down.[4] Furthermore, even in those states which required businesses to shut down, there were variations between the orders requiring the examination of individual questions such as (1) was the plaintiff deemed an "essential business" and therefore permitted to keep operating, (2) even if the business was not designated as "essential," did the state or local jurisdiction permit the business to stay partially open (such as restaurants which were permitted to sell carry out food or do drive-through service),[5] (3) what date(s) was a particular plaintiff subject to a closure order(s) and what did it do in response (some localities have refused to enforce stay-at-home and closure orders and filed lawsuits to avoid the orders), and (4) why did the plaintiff stop doing business–because the government required it, or because, for example, the business is dependent on the tourism industry and suffered because people stopped travelling when news of COVID-19 became public? Most states issued multiple orders, and local health departments often issued a separate order with restrictions. *See e.g.*, Ex. 4 (table collecting sample orders). Whether these orders are constitutional has also been subject to litigation in individual states, with differing results.  *Cf*, *Wis. Legislature v. Palm*, 2020 WI 42; 2020 Wisc. LEXIS 121 (May 13, 2020)(Executive Order unconstitutional) and *Michigan United for Liberty v. Whitmer*, an unpublished opinion of the Court of Claims, issued May 19, 2020 (Docket No. 20-000061-MZ) (constitutional use of Executive Powers). Resolution of each of these

---

[4]  Iowa, Nebraska, North Dakota, South Dakota, Utah, Wyoming and Arkansas never issued stay-at-home orders.

[5]  This is relevant when interpreting whether a governmental order has resulted in a "necessary suspension" of business. Court have held that the term requires a complete cessation of business, even if temporary, as opposed to a mere slowing of business before coverage is triggered. *Hastings Mut. Ins. Co. v. Mengel Dairy Farms, Inc*., 2020 U.S. Dist. LEXIS 87612 (N.D. Ohio May 19, 2020).

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

individual issues will be necessary before a plaintiff can attempt to pursue litigation based on a theory of governmental orders triggering coverage. These issues are individualized, but not sufficiently complex such that a consolidated proceeding is necessary to determine what governmental orders were issued, and whether a particular plaintiff was subject to the orders.

Indeed, as Chief Justice Roberts recently noted, local and state orders governing COVID-19 closures are individualized and state-focused:

> Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." ... When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." ... Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. ... That is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground.

*South Bay United Pentecostal Church v. Newsom*, No. 19A1044, 590 U.S. __; 2020 WL 2813056, at *1-2 (May 29, 2020) (citations omitted)(Roberts, C.J., concurring). Given the nature of the governmental orders, they cannot be interpreted for each jurisdiction without extensive analysis.

### D. Any Transferee Court Will Be Required to Analyze the Circumstances of Each and Every Instance of Coronavirus Being Present at the Insured Premises.

For those plaintiffs arguing that the coronavirus was actually present in their facility and that it caused physical damage or loss, the issue cannot be resolved globally. *See* Ex. 5, Declaration of Robert D. Strode. Proving that a restaurant at the heart of New York City had coronavirus exposure will not establish that the virus was present at a hotel in southwest Michigan. Further, establishing the presence of the virus for either the restaurant or the hotel will not establish that the virus caused physical damage to either location. As explained in the attached declaration of certified industrial hygienist, Robert D. Strode, "investigations and impact determinations involving COVID-19 will necessarily require specific assessments for individual businesses and

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

situations." (Ex. 5, Strode Decl. ¶ 9.)  Because "there will be inherent variabilities between even apparently similar types of businesses (e.g., healthcare) due to differences in facility age, construction, layout, ventilation, number of infected individuals, distance between occupants, and number and type(s) of occupancy," it is inevitable that "investigations, impact determinations, and responses, will require different evaluation methods and approaches tailored to the specific location and situation." (*Id.* ¶ 9.) Individualized analysis will also be required to determine the cause of business suspension and the resumption of operations. (*Id.* ¶¶ 11-12.)

The *LH Dining* plaintiffs do not even try to argue that causation is a common issue, admitting it "does not seek any determination of whether the Coronavirus is physically in or at the insured Property."  *LH Dining* Compl. ¶ 45, Doc. 1-4. Thus, it seeks to avoid showing either property damage or loss and causation, both of which are required under the form of policy it purchased.  When the fact of coverage cannot be determined based on global rulings, where the issue of whether damage was caused from a covered cause of loss cannot be determined based on global findings, and where each individual policyholder had their own unique policy with its own endorsements and exclusions, consolidation is inappropriate.[6]

This Panel has denied consolidation under similar circumstances. For example, in *In re Mortgage Industry Foreclosure Litigation*, 996 F. Supp. 2d 1379 (J.P.M.L. 2014), the Panel noted that the actions involved in each case were predicated on the same theory of contractual interpretation. Nonetheless, the Panel found that the cases had "different defendants, different plaintiffs, different mortgage loans at different stages of the foreclosure process, different

---

[6]  While the *Bridal Expressions*' counsel did file cookie-cutter complaints that are devoid of any specifics of the individual plaintiff's claims, the use of generic pleading allegations does not suddenly convert claims for insurance coverage which present myriad claims into one monolithic conglomeration of cases.

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

securitized trusts involving different contractual trust arrangements and different trustees and mortgage servicers, different state laws, and different putative classes." *Id*. at 1379. The Panel therefore rejected consolidation as the "'common questions of fact' required for centralization simply are not present in this litigation." *Id*. (citing 28 U.S.C. §1407(a)); see also *In re Trilegiant Mbrship Program Mktg. & Sales Practices Litig.*, 828 F. Supp. 2d 1362 (J.P.M.L. 2011) (denying centralization where cases involved different defendants with variances across the cases). The same result is appropriate here.

> **E.    Plaintiffs Assert A Variety Of Tort Claims Which Will Require Different and Individualized Proofs.**

The two cases involving Auto-Owners which are proposed to be transferred demonstrate that the theories asserted by plaintiffs are not common and will require individualized proofs. In *Wagner Shoes*, plaintiff asserts claims of bad faith, institutional bad faith, and negligence/wantonness under Alabama state law in addition to breach of contract. These allegations are based on the specifics of the claim presented to the insurer and how the insurer allegedly responded. In contrast, the *Bridal Expressions* case asserts breach of contract and declaratory judgments on two different coverages:  business interruption and "extra expense" coverage offered on some policies. Plaintiffs' counsel sees these coverages as sufficiently different that they propose that two different classes be established by the Court, one for each type of coverage. There are no claims handling claims made in *Bridal Expressions* because Bridal Expressions never submitted an actual claim to Owners before filing suit.

The divergence of claims asserted by the moving plaintiffs is repeated generally throughout the complaints that have been filed in the various jurisdictions. For example, a number of the cases assert state specific bad faith claims. *See, e.g., Big Onion Tavern Group LLC v. Society Ins., Inc.,* Case No. 1:20-cv-02005 (N.D. Ill.); *Sandy Point Dental PC v. Cincinnati Ins. Co*., Case No. 1:20-

cv-02160 (N.D. Ill.); and *SCGM, Inc. v. Certain Underwriters at Lloyd's*, Case No. 4:20-cv-001199 (S.D. Tex.) (asserting breach of good faith and fair dealing); *Nari Suda LLC v. Oregon Mut. Ins. Co.*, Case No. 3:20-cv-3057 (N.D. Ca.)(asserting bad faith). Nothing decided in the MDL will be dispositive of these cases or promote a quick disposition. Notably, counsel for both *Wagner Shoes* and *Sandy Point Dental* also oppose consolidation. The existence of these tort claims in addition to differing contract theories highlights why there is no common issue that will dispose of any particular case or make the path forward less complicated through pretrial consolidation.

Another factor that demonstrates how individualized the claims-handling cases are involve regulatory Bulletins issued by a number of states' Insurance Departments which provide guidance to insurers as to how the Departments interpret the insurers' obligations and how individual claims must be individually addressed.  *See* samples attached as Ex. 6.  A brief review of these Bulletins illustrates why each state's regulatory and case law will guide the outcome of the bad faith claims.

### F.   The Need for Individualized Analysis of Facts, Policies, Government Orders, and Claim Elements Makes Centralization *Less*, Not More, Efficient.

Centralizing all coronavirus coverage litigation in the U.S. in one federal district will result in massive *in*efficiencies because each insurance policy and each claim file for each case will need to be analyzed seriatim—gutting the primary purpose of multidistrict litigation recognized in 28 U.S.C. § 1407. It is for this precise reason that the Panel has generally denied requests to centralize insurance-coverage litigation.

For example, in *In re Insurance Companies "Silent" Preferred Organization (PPO) Litigation*, the MDL Panel denied transfer where "[t]he four actions before us are against different defendant insurance companies and involve different contracts between those insurers and First Health Corp." 517 F. Supp. 2d 1362, 1363 (J.P.M.L. 2007). Similarly, in *In re: Chinese-Manufactured Drywall Products Liability Litigation*, the MDL Panel again denied transfer of an

13

insurance coverage action, finding that "[r]esolution of this action will require interpretation and construction of multiple contracts of insurance issued by different insurance carriers." MDL No. 2047 (J.P.M.L. Feb. 5, 2010) (Order Denying Transfer) (Ex. 7).

Many other decisions agree. *See In re: Aegon USA, Inc., Supplemental Cancer Ins. Litig.*, 571 F. Supp. 2d 1369, 1370 (J.P.M.L. 2008) (denying transfer where the seven actions "primarily involve[d] interpretation of the term 'actual charges' in certain 'Cancer Only' insurance policies issued by defendants," and that the "key issue is thus legal rather than factual, and the need for extensive overlapping discovery appears unlikely"); *see also In re: Mortg. Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d 1352, 1353-54 (J.P.M.L. 2012) ("The cases before us now involve not only different defendants but different lender agreements with insurers, different alleged abuses, and different mortgage loan documents. Thus, the conduct is not sufficiently uniform to justify industry-wide centralization."); *In re: Mortg. Indus. Home Affordable Modification Program (HAMP) Contract Litig.*, 867 F. Supp. 2d 1338, 1338 (J.P.M.L. 2012) (recognizing that the plaintiffs "alleged similar industry-wide misconduct" but that the "nature of plaintiffs' allegations and the involvement of many different non-overlapping defendants make the existence of common questions of fact unlikely").

Indeed, the Panel has found multiple insurance coverage cases against the same insurer too inefficient to grant a request for transfer. In *In re: The Great West Casualty Insurance Company Litigation*, plaintiff argued that the insurance actions "share[d] factual questions regarding Great West's 'post-claim underwriting' and rescission of insurance, and that all actions share[d] factual questions arising from allegations that defendants violated antitrust laws" and that all the actions involved "issues related to Medicare." 176 F. Supp. 3d 1371, 1372 (J.P.M.L. 2016). The MDL Panel denied transfer: "We cannot centralize all claims in which a particular insurer denies

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

14

coverage or all cases involving Medicare. These basic commonalities are far outweighed by the unique facts and legal issues presented in each case." *Id.* (further finding that the purported common discovery of "underwriting files" and written correspondence as "too broad to provide a basis for centralization").

Here, the transfer motions come within the principles enforced by the Panel in *Chinese-Manufactured Drywall Products*, *Insurance Companies "Silent" Preferred Program*, *Aegon USA*, and *Great West Casualty* when it denied centralization. Each case requires separate judicial inquiry into (i) the specific facts each claim, (ii) the operative provisions of each insurance policy, (iii) the effect of each applicable government order to the unique circumstances of each insured business, and (iv) application of each state's unique substantive law to each insured's individualized facts. (Ex. 2, Thomas Decl. ¶¶ 49-54.) All four of these steps must be performed for each case to reach any meaningful conclusion of fact or law in any case. *Id.* As of the date of this filing, plaintiffs' request to transfer would likely encompass over 100 actions with over 80 different insurance companies, over 100 plaintiffs, different insurance policies, and thousands of different claim files. One judge in a single transferee court would be forced to undertake each of these steps for every case *seriatim*. Creating a single-file queue for all coronavirus litigation in the courtroom of one judge would delay, rather than expedite, these cases.

Instead, multiple judges performing these tasks at the same time is far more efficient, easier, and quicker than one judge performing each of these tasks for each case. This is particularly true here, where the judges performing these tasks will have greater familiarity with their states' laws governing insurance policy interpretation and coverage determinations.[7] From January to

---

[7] Plaintiffs' argument that determination of alleged "common issues in a single District will promote uniform resolution of these key questions" and provide "more consistent decisions that society as a whole may use to structure the economy and the insurance market" (ECF No. 4-1 at

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

April 2019, federal district judges presided over new insurance cases ranging from 822 to 896 per month.[8] The coronavirus insurance cases represent a marginal percentage increase spread out over many district courts' dockets, but nothing that any district cannot handle as it normally would in the absence of MDL centralization. In fact, insurance case filings between January 1, 2020 to May 25, 2020, as compared to insurance case filings for the January 1, 2019 to May 25, 2019, show an increase of only 3.7%, indicating that the coronavirus insurance filings are not increasing as rapidly as plaintiffs expected. *Id*.

As it did in *Great West*, the Panel should find that it "cannot centralize all claims" simply because coverage is denied or all the cases involve coronavirus allegations in the abstract. 176 F. Supp. 3d at 1372. The "basic commonalities are far outweighed by the unique facts and legal issues presented in each case." *Id.*

### G. The Proposed MDL Will Force All Insurance Companies To Bear the Inefficiencies of an MDL Proceeding.

Plaintiffs propose to have every insurance company, large or small, placed into the MDL. The insurers, however, are not similarly situated. For example, some of the insurers write insurance coverage throughout the United States, often specializing in commercial insurance policies purchased by large and sophisticated companies. Resolution of issues pertaining to these large carriers may require analysis of the law of all 50 jurisdictions. In contrast, some of the insurers, like Auto-Owners, are regional companies, writing much different and smaller risks and providing

---

8-9) is a red herring. *See In re CleanNet Franchise Agreement Contract Litig.*, 38 F. Supp. 3d 1382, 1383 (J.P.M.L. 2014) ("Seeking a uniform *legal* determination, though, generally is not a sufficient basis for centralization."); *In re: Real Estate Transfer Tax Litig.*, 895 F. Supp. 2d 1350, 1351 (J.P.M.L. 2009) (noting conflicting summary judgment decisions already issued in multiple districts but, nevertheless, finding that seeking "efficiencies through centralized treatment of this legal question, '[m]erely to avoid two federal district courts having to decide the same issue is, by itself, usually not sufficient to justify Section 1407 centralization'").

[8] This information was obtained through PACER searches for insurance cases.

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933

different types of coverage more appropriate to the size of the insured. Auto-Owners does not offer "ingress and egress" coverage, or civil authority coverage on its business owners policies. Notwithstanding this, it will be forced to fully participate in any MDL proceedings to ensure that its rights are protected. If the cases against the small and medium companies stay where they are filed, they will almost certainly proceed through the court system much more efficiently and quickly than will result from MDL proceedings, which frequently last years.

The Panel should also not lose sight of the fact that the numerous insurance company defendants named in these cases aggressively compete with each other. Centralization of cases involving multiple competing defendants is particularly problematic from the perspective of a MDL, as the significant inefficiencies overwhelm any perceived benefits.  As the Panel explained in *In Re CP4 Fuel Pump Mktg. Sales Practices & Prods. Liability Litig*., 412 F. Supp. 3d 1365 (J.P.M.L. 2019), it "is typically hesitant to centralize litigation against multiple, competing defendants which marketed, manufactured and sold similar products." *Id.* at 1367; See also, *In re Invokana Prods. Liability Litig.*, 223 F. Supp. 3d 1345, (J.P.M.L. 2016) (same); and *In re Watson Fentanyl Patch Products Liability Litig.*, 883 F. Supp. 2d 1350, 1351 (J.P.M.L. 2012) ("Moreover, centralization could complicate these matters, as defendants may need to erect complicated confidentiality barriers, since they are business competitors.").  The same is true here.

## II.    CONSOLIDATION IS NOT APPROPRIATE IN AN INSURANCE COVERAGE ACTION INVOLVING DIFFERENT CONTROLLING STATE LAWS.

Following the adoption of the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), the business of insurance has been regulated at the state level.  Because insurance policies are unique creatures of state law, "insurance contracts in diversity actions must be interpreted under the applicable state law." *Uniroyal, Inc. v. Home Ins. Co*., 707 F. Supp. 1368, 1372 (E.D.N.Y. 1988) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)); *see also Abex Corp. v. Md. Cas. Co.*, 790 F.2d 119, 124

17

(D.C. Cir. 1985)(state law applies to interpret insurance policy in diversity action). The *Wagner Shoes* case was filed in federal court on the basis of diversity jurisdiction. *Bridal Expressions* was filed in federal court on the basis of the Class Action Fairness Act, which is an extension of the Court's diversity jurisdiction, so state law will also govern. *W. Va. ex. rel. McGraw v. CVS Pharm., Inc*., 748 F. Supp. 2d 580, 588 (S.D. W. Va. 2010) (CAFA represents a "Congressional extension of diversity-based subject matter jurisdiction").

In addition to reviewing the laws of each individual state if the matters are consolidated, the result of the application of state law is unlikely to be clear in all the jurisdictions. No Supreme Court of any state has issued an opinion on whether the coronavirus is covered by commercial property insurance policies. As a result, the MDL Judge would be required to determine its best prediction of what the Supreme Court of any individual state will hold if faced with the myriad of facts and law presented by a nationwide consolidation. These legal determinations will be of questionable value and will be entitled to no weight as to the state court cases which are already on file. As Senior U.S. District Judge Fischer recently noted when remanding a coronavirus case to state court: "Therefore, 'serious consideration' must be given to the facts that any declaration issued by this Court as to the parties' rights under the insurance policy would be merely predicting how Pennsylvania courts would decides these novel issues arising from the COVID-19 pandemic, a matter of great public concern, with little persuasive authority from state courts on these issues." *Dianoia's Eatery LLC, d/b/a Deanoia's and Pizzeria De Vide v. Motorists Mut. Ins. Co.*, Case No. 20-706 (W.D. Pa. May 19, 2020).

Auto-Owners and Owners currently write business in 26 states. The law in each of these 26 states will need to be considered when interpreting the policies issued not only to current claimants (Wagner Shoes and Bridal Expressions), but also to every person in the alleged

18

"nationwide" class action that *Bridal Expressions* seeks to bring. In those 26 states, Auto-Owners utilizes different policy forms which provide different coverages and exclusions, depending on a variety of factors, including competitive needs and the regulatory jurisdiction in which it is operating. For example, many of the commercial property policies issued by Auto-Owners have specific exclusions applicable to damages arising from a virus. Policy forms vary from state to state, as do contract interpretation rules applied by the various states. Having one federal court determine how to interpret the Ohio policy issued to Bridal Expressions, or the Alabama policy issued to Wagner Shoes, will not resolve any other case brought against Auto-Owners or Owners, even in the same jurisdiction. Further, multiplying the task of reviewing even one state's law by 26 different jurisdictions, multiplied further by different policy forms and different exclusions, would render this case completely unmanageable as a MDL proceeding.

A few examples illustrate the significance of differing state laws applied to these cases. First, for those policies requiring physical damage or loss, there is case law establishing that an economic loss does not qualify for coverage, but that there must be a tangible loss to the property which causes the loss. *See e.g.*, *Universal Image Prods, Inc. v. Chubb* Corp., 703 F. Supp. 2d 705, 709 (E.D. Mich. 2010), *aff'd* 475 F. App'x 569 (6th Cir. 2012)(property damage means physical damage or destruction of tangible property); *Florists Mut. Ins. Co. v. Ludy Greenhouse Manufacturing Corp.*, 521 F. Supp. 2d 661 (S.D. Ohio 2007) (must be a tangible loss to the property). Other states interpret the requirement more broadly and include things like gas smells as causing physical damage or loss in some circumstances.  *See e.g.*, *Mellin v. Northern Security Ins. Co*., 167 N.H. 554 (2015). Other states, such as Nebraska, Arkansas, South Dakota, and others, have not yet interpreted the terms.

Second, the validity of certain exclusions also differs between jurisdictions. For example, states interpret the pollution exclusion differently.  Cf, *Watson v. Travelers Indem. Co*., 2005 Mich. App. LEXIS 917 (Mich. Ct. App. April 12, 2005)(claim for bodily injury resulting from inhalation of fumes barred by absolute pollution exclusion); and *American States Ins. Co. v. Koloms*, 687 N.E.2d 72 (1997)(exclusion is ambiguous). Some states consider the reasonable expectations of the insured under some circumstances when interpreting an insurance policy. *See e.g.*, *Bituminous Cas. Corp. v. Sand Livestock Sys.*, 728 N.W.2d 216 (Iowa 2007). Other states reject the doctrine completely. *See e.g*., *Wilkie v. Auto-Owners Ins. Co*., 664 N.W.2d 776 (Mich. 2003).

There is no escape from applying differing state laws to decide this case.

## <u>CONCLUSION</u>

This case is not appropriate for a MDL proceeding. The motions to transfer and consolidate should be denied.

Dated:  June 5, 2020

/s/ *Lori McAllister*
Lori McAllister (P39501)
DYKEMA GOSSETT PLLC
Attorney for Defendants Auto-Owners Ins. Co. and Owners Ins. Co.
201 Townsend St., Suite 900
Lansing, MI 48933
Telephone: (517) 374-9150
lmcallister@dykema.com

076799.000121  4815-8068-8573.5

DYKEMA GOSSETT PLLC • Capitol View, 201 Townsend Street, Suite 900, Lansing, Michigan 48933