**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **In re: COVID-19 Business Interruption Insurance Coverage Litigation** | **MDL No.   2942** |

**RESPONSE IN OPPOSITION TO MOTION FOR TRANSFER AND
COORDINATION OR CONSOLIDATION UNDER 28 U.S.C. § 1407**

Certain Underwriters at Lloyd's, London Known as Syndicates HIS 33, AFB 263, MSP 318, HDU 382, KLN 510, AFB 623, SAM 727, TAL 1183, AMA 1200, AXS 1686, DUW 1729, ACS 1856, QBE 1886, WRB 1967, APL 1969, AML 2001, XLC 2003, NVA 2007, MMX 2010, CHN 2015, ARG 2121, NEO 2468, AFB 2623, MAP 2791, BRT 2987, BRT 2988, AGR 3268, XISS H4202, CNP 4444, TRV 5000, WBC 5886, PPP 9981, Axis Specialty Europe SE, and HDI Global Specialty SE (collectively, "Certain London Market Insurers" or "LMI"), pursuant to Rules 6.1(c) and 6.2(e) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation and 28 U.S.C. § 1407, respectfully submit their Response in Opposition to the Motions for Transfer[1] of the Related Actions.[2]

The Motions seek to transfer and consolidate various actions (the "Subject Actions") filed throughout the country involving different insurers, different policies, varying underlying facts, and the insurance common law and regulations of all fifty states.  Instead of promoting the "just

---

[1] LMI respond specifically to the Initial Motion for Transfer and Coordination or Consolidation under 28 U.S.C. § 1407 (D.E. 1) (the "Initial Motion for Transfer"), and the Subsequent Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings (D.E. 4) (the "Subsequent Motion for Transfer"). For brevity, the "Initial Motion for Transfer" and the "Subsequent Motion for Transfer" are collectively referred to as the "Motions."

[2] "Related Actions" and "Subject Actions" refer to the cases identified in the initial Motion to Transfer (D.E. 1), the Subsequent Motion to Transfer (D.E. 4), and the subsequent Notices of Related Actions (D.E. 6; D.E. 10; D.E. 12; D.E. 13; D.E. 26; D.E. 28; D.E. 29; D.E. 38; D.E. 50; D.E. 52; D.E. 58; D.E. 75; D.E. 76; D.E. 86; D.E. 101; D.E. 107; D.E. 114; D.E. 120; D.E. 150; D.E. 162; D.E. 166; D.E. 167; D.E. 177; D.E. 179; D.E. 181; D.E. 185; D.E. 186; D.E. 195, 199, 202, 204, 205; D.E. 234; D.E. 236; D.E. 254; D.E. 258; D.E. 270; D.E. 275; D.E. 298; D.E. 320; D.E. 328; D.E. 329; D.E. 335; D.E. 349; D.E. 374; D.E. 380; D.E. 381; D.E. 385; D.E. 395).

and efficient conduct" (U.S.C. § 1407) of the Subject Actions, the Motions, if granted, would create an unmanageable situation for the transferee court.  That court would need to coordinate suits involving more than a hundred insurers, some national, some regional, and some international (such as LMI), with varying policy terms, and likely varying views on the conduct of this litigation. Given the different policy provisions, variations in wording even within similarly styled provisions, and combined with how each state addresses each policy provision, a virtually endless number of permutations will arise.  And that is even before factoring in the myriad of different business types and underlying facts of each business interruption claim.  As a practical matter, transfer would not achieve the aims of increased efficiency or conservation of resources. Plaintiffs' mere suggestion to the contrary, without support or explanation, is not enough.  The MDL structures provide no sensible mechanism to organize these disputes under a single federal judge.  As such, transfer and coordination or consolidation is not appropriate.

I.       **INTRODUCTION**

The United States is in the midst of a global pandemic caused by a virus known as "coronavirus" or "SARS-CoV-2" and the disease the virus causes: COVID-19.[3] In the mist of this pandemic, there has been a race to courthouses claiming anticipatory breach and/or incorrectly asserting that coverage has been denied for claims first submitted on the same day as the applicable complaint was filed.  With so many lawsuits filed, the current race is now to transfer the cases to a single court before anyone can realize these cases involve different policy terms and the application of the insurance law of all fifty states. Yes, the applicable insurance law of some states will overlap, but even when that is so, the court will have to conduct a choice of law analysis to determine if there is such overlap on any one of innumerable legal issues that will arise.

---

[3] For simplicity, the virus and the disease it causes will be referred to collectively as "COVID-19."

Consolidating these cases will only create a tangled web of knots that even the most able jurist will struggle to untie.

On March 16, 2020, the White House issued "Coronavirus Guidelines for America," which offered advice to the American public on how to slow the spread of COVID-19.[4] These guidelines were not binding, and the federal government refrained from issuing a nationwide "stay-at-home" order.[5] Instead, the response to COVID-19 was left to the state governments, counties, and municipalities, each issuing its own responsive orders.[6] The resulting regulatory landscape is a patchwork of executive orders affecting the operations of "essential" and "non-essential" businesses across America. Subject to their own limitations and prohibitions, these orders have slowed or halted a wide variety of businesses and substantially contracted each state's economy. As a result, many business owners turned to their commercial property insurance policies in an effort to recover their lost income.

The lawsuits seeking business interruption coverage, of which there are to date over two hundred, span thirty-three states and the District of Columbia and involve both domestic insurers and foreign insurers, such as LMI.[7] The insurance policies across all Subject Actions and the

---

[4] *See The President's Coronavirus Guidelines for America*, https://www.justice.gov/doj/page/file/1258511/download (last visited June 3, 2020).

[5] *See* Aamer Madhani et al., *Trump resists national shutdown, leaving it up to states*, PBS (Apr. 1, 2020, 3:48 PM), https://www.pbs.org/newshour/health/trump-resists-national-shutdown-leaving-it-up-to-states.

[6] *See* Sarah Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html (last visited June 3, 2020).

[7] To date, LMI have been named as defendants in ten of the Subject Actions: (1) *El Novillo Restaurant, et al. v. Certain Underwriters at Lloyd's, London, et al.*, Case No. 1:20-cv-21525 (S.D.Fla); (2) SA *Palm Beach LLC v. Certain Underwriters at Lloyd's, London, et al.*, Case No. 9:20-cv-80677 (S.D.Fla.); (3) *Atma Beauty, Inc. v. HDI Global Specialty SE*, Case No. 1:20-cv-21745 (S.D.Fla.); (4) *Prime Time Sports Grill, Inc., et al. v. DTW 1991 Underwriting Limited*, Case No. 8:20-cv-00771 (M.D. Fla.); (5) *Gio Pizzeria & Bar Hospitality, LLC, et al. v. Certain Underwriters at Lloyd's, London et al.*, Case No. 1:20-cv-03107 (S.D.N.Y.); (6) and *Sun Cuisine, LLC v. Certain Underwriters at Lloyd's London Subscribing to Contract No. B0429BA1900350 Under Collective Certificate Endorsement 350OR100802*, Case No. 1:20-cv-21827 (S.D. Fla.); (7) *Station 6, L.L.C. v. Certain Underwriters at Lloyd's, London*, Case No. 2:20-cv-01371 (E.D. La.); (8) *Metacom, Inc. v. Certain Underwriters at Lloyd's, London Subscribing to Policy No. XSZ146282*, No. 1:20-v-03905 (S.D.N.Y.); (9) *Independence Rest. Grp., LLC v. Certain Underwriters at Lloyd's, London*, No. 2:20-cv-02365-CFK (E.D. Pa.); and (10) *Fire Island Retreat v. Brit Global Specialty USA, Inc. et al.*, No. 2:20-cv-02312-TJS (E.D. Pa.). *SCGM, Inc., et al. v. Certain Underwriters at Lloyd's*, Case No. 4:20-cv-01199 (S.D. Tex.) involves an entirely different type of risk classified as "contingency," meaning the policy

multitude of forthcoming tag-along actions have varying terms, conditions, limitations, exclusions, and endorsements, which are interpreted through the scope of each individual state's insurance common law and regulatory schemes—schemes that can differ between domestic and foreign insurers and between admitted and surplus lines insurers—and each state's regulations imposed in response to COVID-19.  As a result, there is a virtually unlimited number of variables.  While the Motions argue that there are common questions of fact predominating all the Subject Actions, any actual commonalities are far outweighed by factual differences among the various state and local "stay-at-home" orders, the factual differences among the affected businesses, and the differing policy language. The common questions of fact are too few, and the varying questions of fact are too numerous, to warrant a consolidation of the Subject Actions. Furthermore, COVID-19 is a nationwide event that may elicit insurance claims more numerous and widespread than any hurricane, tornado, or earthquake. Any effort to centralize the actions arising from this pandemic across the entire insurance industry, in one location, would create a Sisyphean task for the unfortunate transferee court. Therefore, LMI oppose Section 1407 transfer and consolidation of the Subject Actions.

## II.    **ARGUMENT**

The Subject Actions do not share sufficient common questions of fact to warrant consolidation. Consolidation will reduce judicial efficiency and delay resolution of the predominately legal issues looming over these actions, at the expense of both policyholders and insurers.

---

specifically provides coverage for specific events, such as cancellation of an event, and does not involve the "property" policies at issue in the other cases identified here.

Under 28 U.S.C. § 1407, the Panel considers three factors when determining whether to transfer and consolidate pretrial proceedings: (1) whether the actions involve "one or more common questions of fact;" (2) whether the transfer would be for "the convenience of parties and witnesses;" and (3) whether the transfer would "promote the just and efficient conduct of such actions." Under § 1407, the moving party has the burden of demonstrating that transfer and consolidation is appropriate. *See In re: Best Buy Co. v. Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1379 (J.P.M.L. 2011) ("[T]he proponents of centralization have not met their burden of demonstrating the need for centralization."). Here, the moving parties have failed to meet their burden to support transfer and consolidation.

### A.   The Few Commonalities Are Far Outweighed by Unique Facts and Legal Issues

The Subject Actions do not contain sufficient common questions of fact; instead, they are dominated by legal issues subject to state common law on insurance coverage and state regulatory laws. Without sufficient common questions of fact, transfer is inappropriate. *See In re Not-For-Profit Hosp./Uninsured Patients Litig.*, 341 F. Supp. 2d 1354, 1356 (J.P.M.L. 2004) ("Notwithstanding the numerosity of actions, movants have failed to persuade us that these actions share sufficient common questions of fact to warrant Section 1407 transfer."). Furthermore, when "questions of law rather than common questions of fact are significantly preponderant," Section 1407 transfer is unwarranted. *In re U.S. Navy Variable Reenlistment Bonus Litig.*, 407 F. Supp. 1405, 1406 (J.P.M.L. 1976); *see also In re: Real Estate Transfer Tax Litig.*, 895 F. Supp. 1350, 1351 (J.P.M.L. 2012) (denying centralization where litigation revolved around "primarily a legal question"). Here, the few commonalities among the Subject Actions are "far outweighed by the unique facts and legal issues presented by each case," making Section 1407 transfer and

consolidation inappropriate. *In re: the Great West Cas. Co. Ins. Litig.*, 176 F. Supp. 3d 1371, 1372 (J.P.M.L. 2016).

The Motions contain failed attempts to bypass the "common questions of fact" hurdle. In the briefs in support of the Motions, movants identify central issues among the Subject Actions, including, "whether business closures resulting from government orders triggers [sic] coverage under business interruption policies," or "[w]hether COVID-19 causes 'physical damage or loss to property' as that phase [sic] is used in property insurance policies." (D.E. 1-1, p. 8; D.E. 4-1, p. 6). These are legal issues. The reason there are few factual commonalities among the claims in all of the Subject Actions is because each plaintiff will have its own insurance policy with different terms, conditions, limitations, exclusions, and endorsements and will have been subject to innumerable variables in state and municipal orders.[8] As a reference, the Subsequent Motion lists some of the many varying policy provisions that each plaintiff's insurance policy may contain. (D.E. 4-1, pp. 5–6). Indeed, the nature of the class members' businesses will vary extremely between essential and non-essential under each local and/or state order, between brick and mortar and teleworking compatible, between those who pre-emptively closed and those whose closure was forced, and between those that simply saw a drop in business due to market conditions. Ultimately, the Subject Actions possess only a "superficial factual commonality," which this Panel has recognized is insufficient to warrant consolidation. *See In re Fla., P.R., & U.S.V.I. 2016 & 2017 Hurricane Seasons Flood Claims Litig.*, 325 F. Supp. 3d 1367, 1368–69 (J.P.M.L. 2018) (denying consolidation for various claims arising out of hurricane damage because each case "necessarily involves a different property, different insureds, different witnesses, different proofs

---

[8] LMI note that even the phrase focused on in the Subsequent Motion, "physical damage or loss to property," is not uniform among insurance policies. *See* 10A Couch on Ins. § 148:46 (3d ed. 2019) ("In modern policies, especially of the all-risk type, this trigger is frequently 'physical loss or damage' but may be any of several variants focusing on 'injury,' 'damage,' and the like.").

of loss, and different damages"). The fact that the underlying claims are tangentially related by virtue of the same worldwide pandemic is simply not enough.

Unquestionably, the factual differences across the Subject Actions are numerous. Still, the core of every action is whether the plaintiff's policy terms, varied as they may be, provide coverage for the plaintiff's business interruption claim. This is an issue of contract interpretation, which is a legal question. *See* 2 Couch on Ins. § 21:3 (3d ed. 2019) ("As a general rule, the construction and effect of a written contract of insurance is a matter of law."). This Panel has previously recognized that when actions revolve around the proper interpretation of a phrase in an insurance policy, such as "physical damage," transfer is inappropriate. *See In re: Aegon USA, Inc. v. Supplemental Cancer Ins. Litig.*, 571 F. Supp. 2d 1369, 1370 (J.P.M.L. 2008) ("The seven actions in this litigation primarily involve the proper interpretation of the term 'actual charges' in certain 'Cancer Only' insurance policies . . . The key issue is thus legal, rather than factual."); *In re: Credit Union Checking Account Overdraft Litig.*, 158 F. Supp. 3d 1363, 1364 (J.P.M.L. 2016) (denying transfer for actions which were "essentially breach of contract cases . . . brought under the laws of at least nine states").

As putative nationwide class actions, movants seek to transfer breach of contract cases under the common laws of each of the fifty states and each territory, which raises an immense number of legal questions.  Movants posit that these legal questions, such as whether SARS-CoV-2 causes "physical damage to loss or property," should "lead to only one answer whether the insured's property is in Bakersfield, California, or Des Moines, Iowa, or Sarasota, Florida." (Doc. 4-1, p. 6). In other words, Movants seek to establish a single federal common law on issues that are, and must remain, decided on state common law—the interpretation of insurance contracts. What movants seek has been impermissible since 1938. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78

(1938) ("There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a state . . .. And no clause in the Constitution purports to confer such a power upon the federal courts."); *see also Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015) ("In diversity cases, we apply federal procedural law and state substantive law. Questions of insurance-policy interpretation are substantive.") (citing *Erie R. Co.*, 304 U.S. at 78). It is also improper, because the states "have assumed primary responsibility for regulating the insurance industry." *Hartford Cas. Ins. Co. v. Borg-Warner Corp.*, 913 F.2d 419, 426 (7th Cir. 1990). For proof of this principle, the Panel need not look any further than the McCarran-Ferguson Act, in which Congress declared "that the continued regulation . . . by the several States of the business of insurance is in the public interest." 15 U.S.C. § 1011.[9] To grant the Motions and subject insurers doing business in each of the fifty states to federal common law would be contrary to the *Erie* Doctrine and an affront to states' rights in regulating the insurance industry inside their own borders, which Congress has expressly recognized as being within the states' domain.

Consolidation of insurance disputes is particularly inappropriate when the disputes involve the interpretation of insurance policies under various state laws and regulatory schemes. *See In re Healthextras Ins. Mktg. & Sales Practices Litig.*, 24 F. Supp. 3d 1376, 1377 (J.P.M.L. 2014) (denying consolidation when the key issue in all cases was legal in nature and insurance policies were "defined by the laws and regulations of the relevant state"); *In re Title Ins. Real Estate*

---

[9] Shortly after this Act was passed, the Supreme Court stated: "Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429 (1946). One of the ways Congress sought to achieve this purpose was by "declaring expressly and affirmatively that continued state regulation . . . of [the insurance] business is in the public interest and that the businesses and all who engaged in it shall be subject to the laws of the several states in these respects." *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 500 (1993) (quoting *Prudential*, 328 U.S. at 430)); *see also Marks v. Snedeker*, 612 F. Supp. 1158, 1161 (D.N.J. 1985) (noting that insurance is "typically left to the states to regulate," and thus resolving any "significant questions of public policy" in the insurance context "is typically best left to state entities").

*Settlement Procedures Act (RESPA) & Antitrust Litig.*, 560 F. Supp. 2d 1374, 1376 (J.P.M.L. 2008) (denying consolidation of multiple antitrust actions pertaining to the title insurance industry because the actions "encompass different regulatory regimes in the states in which actions are pending along with variances in insurance regulation and law in each state.").

In fact, consolidation of such varied insurance coverage disputes would be unprecedented, as noted by policyholder advocacy group United Policyholders.[10] As United Policyholders noted in their amicus brief opposing state-wide consolidation of similar COVID-19 cases in Pennsylvania: "[I]ndividual insurance claims involving individual fact patterns under often-bespoke insurance policy words should be resolved individually." (Exhibit A, p. 12).[11] Indeed, consolidation of the Subject Actions is opposed by both sides of the "v." The *Big Onion* Plaintiffs succinctly stated, "There is no reason for a single federal court in one part of the country to interfere with the process of policy interpretation here on a state-by-state basis, especially given the lack of uniformity among the policies in question and the differing circumstances surrounding each policyholder's loss." (D.E. 198, p. 5).

The Subject Actions are lawsuits founded first and foremost on the interpretation of insurance contracts. Not only do the terms and language of each insurance policy differ, but the policies are subject to their respective states' laws, interpretation, and regulatory schemes. Moreover, there are very few common questions of fact among the plaintiffs in the Subject Actions, who are subject to different state orders and operated different businesses of various types

---

[10] "UP was formed to help level the playing field between insurers and insureds . . . . No insurance companies underwrite or fund our programs." *Our Mission*, UNITED POLICYHOLDERS, https://www.uphelp.org/about/mission (last visited June 3, 2020),

[11] Brief of Amicus Curiae United Policyholders in Opposition to the Emergency Application for Extraordinary Relief, 12, *Joseph Tambellini, Inc. v. Erie Ins. Exch.*, No. 52 WM 2020 (Pa. filed May 15, 2020).

under those orders. As such, the facts of the policyholders' claims, as applied to their policies will vary as well.

The differences in policy wording are going to be significant and must be determined on a case-by-case basis.  These differences are evident from just the few policies that were attached to the complaints against LMI.  For example, the policies at issue in *El Novillo Restaurant*, *Atma Beauty, Inc*., and *Zest Restaurant* contain a "Microorganism Exclusion,"[12] which is absent from the *Gio Pizzeria & Bar Hospitality, LLC* policy.  Meanwhile, the *SA Palm Beach, LLC* policy has an exclusion for "organic pathogens,"[13] which is not found in the other at-issue policies. *Fire Island Retreat* involves a homeowners policy with significantly different terms, including the absence of a "Pollution and/or Contamination and/or Seepage" exclusion that is present in the other at-issue policies.[14]   Such exclusions could affect coverage for these plaintiffs and are illustrative of just a few of the significant differences that exist by policyholder before considering the variation on how individual states will interpret those provisions under the common law. Without further detailing the differences between these policies, LMI urge the Panel to recognize that the policies at the core of the Subject Actions contain varying terms, conditions, exclusions, and endorsements, and therefore, the Subject Actions contain very few factual commonalities.

Ultimately, the few commonalities among the Subject Actions are outweighed by the unique facts and predominate legal issues, making the Subject Actions unfit for Section 1407 transfer and consolidation.

---

[12] See Exhibits B, C & D, LMA 5018.
[13] See Exhibit E.
[14] See Exhibit F.

**B.** **Transfer and Consolidation Would Be Inconvenient and Hamper Judicial Proficiency**

Transfer of all the Subject Actions to one venue would not be convenient for the parties or promote judicial proficiency. In making such a determination, the Panel looks to whether a Section 1407 transfer would satisfy four objectives: (1) the elimination of duplicative discovery; (2) the avoidance of conflicting rules and schedules; (3) the reduction of litigation costs; and (4) the conservation of the time and effort of the parties, attorneys, witnesses, and courts. *See In re AOL Time Warner, Inc.*, 235 F. Supp. 2d 1380, 1381 (J.P.M.L. 2002); *see generally In re Plumbing Fixture* Cases, 298 F. Supp. 484 (J.P.M.L. 1968). Even a cursory examination demonstrates that consolidation of the Subject Actions and subsequent tag-along actions would not serve these interests but instead would exacerbate the very problems movants purport to try and solve.

The Subject Actions involve a variety of insurers who are often competing in overlapping insurance markets. The Panel has stated that it disfavors consolidation in such situations. *See In re Proton-Pump Inhibitor Prod. Liab. Litig.*, 273 F. Supp. 3d 1360, 1362 (J.P.M.L. 2017) ("Centralizing competing defendants in the same MDL likely would complicate case management due to the need to protect trade secret and confidential information."); *In re Power Morcellator Prod. Liab. Litig.*, 140 F. Supp. 3d 1351, 1353 (J.P.M.L. 2015) ("We have held that we are typically hesitant to centralize litigation against multiple, competing defendants which marketed, manufactured, and sold [allegedly] similar products.") (internal quotations omitted). This Panel has also generally recognized that overbroad consolidation is inappropriate in insurance litigation matters. *See, e.g.*, *In re: The Great West Cas. Co. Ins. Litig.*, 176 F. Supp. 3d 1371, 1372 (J.P.M.L. 2016) ("We cannot centralize all claims in which a particular insurer denies coverage or all cases involving Medicare.").

Yet, the movants seek exactly that: industry-wide centralization, including subsequent tag-along actions along with their proposed nationwide classes. On numerous occasions, this Panel has held that such industry-wide centralization is inappropriate. *See In re: Mortgage Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d 1352, 1354 (J.P.M.L. 2012) (denying industry-wide centralization because cases involved "not only different defendants but different lender agreements with insurers, different alleged abuses, and different mortgage loan documents"); *In re: Tropicana Orange Juice Marketing & Sales Practices Litig.*, 867 F. Supp. 2d 1341 (J.P.M.L. 2012); *In re: Yellow Brass Plumbing Component Prod. Liab. Litig.*, 844 F. Supp. 2d 1377, 1379 (J.P.M.L. 2012) (denying centralization of cases against competing manufacturers of plumbing products); *In re Credit Card Payment Protection Mktg. & Sales Practices Litig.*, 753 F. Supp. 2d 1375 (J.P.M.L. 2010) (denying centralization of cases against competing credit card companies). In the absence of allegations of conspiracy, industry-wide consolidation "will inject additional and unnecessary complexity into . . . already complex litigation." *In re Prescription Drug Co-Pay Subsidy Antitrust Litigation*, 883 F. Supp. 2d. 1334, 1335 (J.P.M.L. 2012); *see In re Brazilian Prosthetic Device Bribery Litigation*, 283 F. Supp. 3d 1381, 1382 (J.P.M.L. 2017) ("Different defendants are sued in each action, and there is no allegation that these defendants conspired or coordinated with one another."). Importantly, allegations of an industry-wide conspiracy are not present here.

In one opinion, in which the Panel decided that industry-wide centralization was inappropriate in the context of litigation arising from the marketing of not-from-concentrate orange juice, the Panel stated:

> We do not agree with [tag-along movant] that industry-wide centralization would produce the efficiencies that he claims. The actions involve different products, subject to potentially different methods of pasteurizing and processing . . . and different putative classes of consumers who purchased each product. . .  Separate

discovery would be necessary as to each defendant's products and processes. Further, the introduction of competing defendants into the litigation, and the need to protect trade secrets and confidential information from full disclosure to the parties, would complicate case management. Because industry-wide centralization likely will result in inefficiencies and delay, it is not appropriate in this instance.

*Tropicana Orange Juice Marketing & Sales Practices Litig.*, 867 F. Supp. 2d at 1342

The current litigation is factually analogous to *Tropicana*. The Subject Actions involve different insurance policies, with different terms, conditions, exclusions, and endorsements. Separate discovery may be necessary as to each of the dozens, or more, insurer defendants, and as to each individual plaintiff.  Generally, discovery taken of one insurer will not be relevant to other insurers.   Industry-wide centralization would involve competing insurers, which will complicate case management. Unlike other actions warranting industry-wide centralization, the Subject Actions do not involve any sort of anticompetitive conspiracy. Thus, if the Panel seeks to promote efficiency and convenience, it should refrain from transferring and consolidating these actions, which would only increase litigation costs and require parties, attorneys, witnesses, and courts to exert needless effort. [15]

Any concern about overlapping discovery, such as the availability of epidemiological expert witnesses, is also not sufficient to warrant consolidation. Instead, there are suitable alternatives to Section 1407 transfer that are available to resolve these concerns. For instance, notices for the depositions of such experts could be filed in multiple relevant actions, making the deposition applicable across all of these actions, or parties could stipulate that certain discovery

---

[15] The lack of commonality across insurers is yet another of the many factual disparities among the Subject Actions that would cause procedural inefficiencies. As recognized by United Policyholders: "Both MDL and class actions have existing, time-tested rules and procedures, none of which is appropriate for [consolidation of COVID-19 insurance disputes] for a number of reasons, including the lack of commonality." (Exhibit. A, p. 9 (Brief of Amicus Curiae United Policyholders in Opposition to the Emergency Application for Extraordinary Relief, 9, *Joseph Tambellini, Inc. v. Erie Ins. Exch.*, No. 52 WM 2020 (Pa. filed May 15, 2020)). To this point, United Policyholders argued that consolidation would unfairly disregard policyholders' strategic preferences. Essentially, consolidation would "discount the uniqueness of each policy's contractual language to the detriment of policyholders and insurance companies." (*Id.* at p. 12).

relevant to multiple actions may be used in all such actions. *See In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*, 446 F. Supp. 242, 244 (J.P.M.L. 1978). Since the Subject Actions concern questions of law particular to each state, insurance policy, and industry, consultation and cooperation among federal district courts in each state "would be sufficient to minimize the possibility of conflicting pretrial rulings." *Id.*

## III.    CONCLUSION

The Motions for Transfer are unsupported by law and, if granted, would inhibit, rather than promote, the "just and efficient conduct" of the Subject Actions and subsequent tag-along actions. Transfer and consolidation of all the Subject Actions and subsequent tag-along actions to one venue is impractical and would accomplish nothing more than creating a judicial logjam, preventing the resolution of actions that deserve and require timely resolution. As such, Section 1407 transfer and consolidation is inappropriate and should not be granted.

Dated: June 5, 2020                                    Respectfully submitted,

                                                       */s/ Paul L. Fields, Jr.*
**FIELDS HOWELL LLP**                                  Paul L. Fields, Jr.
1180 W. Peachtree Street NE,  Suite 1600
Atlanta, Georgia  30309
Telephone:  (404) 214-1250