**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: COVID-19 BUSINESS INTERRUPTION PROTECTION INSURANCE LITIGATION** | MDL No. 2942 |

INTERESTED PARTIES' RESPONSE OF *AMICI CURIAE*
AMERICAN PROPERTY AND CASUALTY INSURANCE ASSOCIATION
AND NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES
IN OPPOSITION TO MOTIONS FOR TRANSFER OF ACTIONS PURSUANT TO
28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

James R. Martin
Jennifer D. Hackett
Zelle LLP
1775 Pennsylvania Avenue, NW
Suite 375
Washington, DC  20006
202-899-4100

Steven J. Badger
Zelle LLP
901 Main Street
Suite 4000
Dallas, TX 75202
214-749-4207

*Attorneys for Interested Parties American Property Casualty Insurance Association
and National Association of Mutual Insurance Companies*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

STATEMENT OF INTEREST ........................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 2

ARGUMENT ...................................................................................................................... 4

    I.    CENTRALIZATION OF COVID-19 BUSINESS INTERRUPTION
          LAWSUITS WOULD BE NEITHER JUST NOR EFFICIENT ............................ 4

          A.    If Centralized, Unique Factual Issues in Each of the Actions
                 Would Give Rise to Substantial Inefficiencies ............................................ 4

                 1.    Numerous Insurers Provide Business Interruption Coverage
                        in a Variety of Policies ...................................................................... 4

                 2.    Each Policy Contains Unique Amendments, Exclusions,
                        and Language .................................................................................... 6

                 3.    Each Action Will Involve Facts Unique to the Insured ................. 7

          B.    Each Individual Action Would Require Analysis of the Proper
                 Choice of Law and Application of the Chosen State's Law ...................... 9

          C.    The Requested MDL Would Last for Several Years ................................ 11

    II.    THE HOME FORUM COURTS ARE BEST SUITED TO
          ADJUDICATE THE CASE-SPECIFIC LEGAL/COVERAGE
          QUESTIONS IMPLICATED IN THE INSTANT ACTIONS ............................ 12

    III.    CENTRALIZATION WOULD BE EXTREMELY INCONVENIENT
          FOR PARTIES AND WITNESSES IN CASES INVOLVING
          REGIONAL AND SINGLE-STATE INSURERS ............................................. 15

CONCLUSION .................................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                          **Page(s)**

*Barnett Bank of Marion County, N.A. v. Nelson*,
    517 U.S. 25 (1996) ...................................................................................................................14

*Dunson v. Home-Owners Ins. Co.*,
    No. 5–09–37, 2010 WL 1740928 (Ohio App. May 3, 2010) ...................................................10

*Ferens v. John Deere Co.*,
    494 U.S. 516 (1990) .................................................................................................................12

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947) .................................................................................................................12

*Heller Financial, Inc. v. Shop–A–Lot, Inc.*,
    680 F. Supp. 292 (N.D. Ill.1988) ...........................................................................................13

*In re Activated Carbon-Based Hunting Clothing Mktg. & Sales Practices Litig.*,
    840 F. Supp. 2d 1193 (D. Minn. 2012) ...................................................................................15

*In re Aegon USA, Inc., Supplemental Cancer Ins. Litig.*,
    571 F. Supp. 2d 1369 (J.P.M.L. 2008) ...................................................................................14

*In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90*,
    81 F.3d 570 (5th Cir. 1996) .......................................................................................................9

*In re Best Buy, Inc., California Song-Beverly Credit Card Act Litig.*,
    804 F. Supp. 2d 1376 (J.P.M.L. 2011) .....................................................................................2

*In re: Children's Pers. Care Prod. Liab. Litig.*,
    655 F. Supp. 2d 1365 (J.P.M.L. 2009) ...................................................................................11

*In re: Chinese-Manufactured Drywall Products Liability Litigation*,
    MDL No. 2047, Order Denying Transfer (Doc. 257) (J.P.M.L. June 15, 2010) ....................14

*In re ClearTalk-ZTE Arbitration Litig.*,
    24 F. Supp. 3d 1374 (J.P.M.L. 2014) .....................................................................................13

*In re: Cordarone (Amiodarone Hydrochloride) Mktg., Sales Practices & Prod.
Liab. Litig.*,
    190 F. Supp. 3d 1346 (J.P.M.L. 2016) ...................................................................................15

*In re: Electrolux Dryer Prod. Liab. Litig.*,
    978 F. Supp. 2d 1376 (J.P.M.L. 2013) .....................................................................................7

*In re Fla., Puerto Rico, & U.S. Virgin Islands 2016 & 2017 Hurricane Seasons*
    *Flood Claims Litig.*,
    325 F. Supp. 3d 1367 (J.P.M.L. 2018)....................................................................13

*In re: Healthextras Ins. Mktg. & Sales Practices Litig.*,
    24 F. Supp. 3d 1376 (J.P.M.L. 2014)......................................................................13

*In re Ins. Companies "Silent" Preferred Provider Org. (PPO) Litig.*,
    517 F. Supp. 2d 1362 (J.P.M.L. 2007)..............................................................14, 16

*In re: Mortg. Lender Force-Placed Ins. Litig.*,
    895 F. Supp. 2d 1352 (J.P.M.L. 2012)......................................................................8

*In re Proton-Pump Inhibitor Prod. Liab. Litig.*,
    273 F. Supp. 3d (J.P.M.L. 2017)..............................................................................15

*In re Rolls Royce Corp.*,
    775 F.3d 671 (5th Cir. 2014) .....................................................................................9

*In re: Table Saw Prod. Liab. Litig.*,
    641 F. Supp. 2d 1384 (J.P.M.L. 2009)......................................................................8

*In re Takata Airbag Prod. Liab. Litig.*,
    No. 14-24009-CV, 2020 WL 1057471 (S.D. Fla. Mar. 3, 2020)............................15

*In re: The Great W. Cas. Co. Ins. Litig.*,
    176 F. Supp. 3d 1371 (J.P.M.L. 2016)...........................................................7, 8, 14

*In re Title Ins. Real Estate Settlement Procedures Act (RESPA) & Antitrust Litig.*,
    560 F. Supp. 2d 1374 (J.P.M.L. 2008)....................................................................14

*In re: Tyson Foods, Inc., Meat Processing Facilities Fair Labor Standards Act*
    *(FLSA) Litig.*,
    581 F. Supp. 2d 1374 (J.P.M.L. 2008)......................................................................7

*Jackson v. Transportation Leasing Co.*,
    893 F.2d 794 (5th Cir. 1990) ...................................................................................10

*Larsen v. Citibank FSB*,
    871 F.3d 1295 (11th Cir. 2017) .................................................................................9

*Menowitz v. Brown*,
    991 F.2d 36 (2d Cir. 1993)........................................................................................9

*NCR Credit Corp. v. Ye Seekers Horizon, Inc.*,
    17 F. Supp. 2d 317 (D.N.J. 1998) ...........................................................................13

*Sallyport Glob. Servs., Ltd. v. Arkel Int'l, LLC*,
78 F. Supp. 3d 369 (D.D.C. 2015) ...................................................................................12

*Shell Oil Co. v. Winterthur Swiss Ins. Co.*,
15 Cal. Rptr. 2d 815 (Cal. App. 1993) ...........................................................................10

**Rules**

6.2(e) R.P.J.P.M.L. ...........................................................................................................2

**Statutes**

15 U.S.C. § 1011 *et seq.* ...................................................................................................4

28 U.S.C. § 1407 .......................................................................................................2, 4, 9

**Other Authorities**

11A Couch on Insurance § 167:11 (3d ed. update 2019) .................................................7

11A Couch on Insurance § 167:15 (3d ed. update 2019) .................................................6

11A Couch on Insurance § 2:4 (3d ed. update 2019) .....................................................14

15 Charles W. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice
and Procedure* § 3866 (3d ed. 2007) .............................................................................9

Federal Judicial Center, Research About the Courts: Integrated Database (IDB),
*available at*  https://www.fjc.gov/research/idb......................................................11

Restatement (Second) of Conflict of Laws § 188 (1971) ...............................................9

## STATEMENT OF INTEREST

AMERICAN PROPERTY CASUALTY INSURANCE ASSOCIATION ("APCIA") is a not-for-profit corporation domiciled in the District of Columbia with an executive office in the District of Columbia, a principal place of business in Chicago, Illinois, and offices in other states.  APCIA is the primary national trade association for home, auto, and business insurers.  APCIA promotes and protects the viability of private competition for the benefit of consumers and insurers, with a legacy dating back 150 years.  APCIA members represent all sizes, structures, and regions—protecting families, communities, and businesses in the U.S. and across the globe.

APCIA's member companies write $412 billion in direct written premium and assumed reinsurance premium, representing nearly 60 percent of the U.S. property-casualty insurance market, including 67 percent of the commercial property insurance market.  On issues of importance to the insurance industry and marketplace, APCIA advocates sound public policies on behalf of its members in legislative and regulatory forums at the federal and state levels and regularly submits *amicus curiae* briefs in significant cases before federal and state courts.

NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES ("NAMIC") is a national trade association consisting of more than 1,400 member companies.  NAMIC estimates that 265 of its members wrote property insurance coverage in 2019.  NAMIC supports regional and local mutual insurance companies on main streets across America and many of the country's largest national insurers.  NAMIC member companies write $268 billion in annual premiums.  NAMIC members account for 59 percent of homeowners, 46 percent of automobile, and 29 percent of the business insurance markets.

Through its advocacy programs, NAMIC promotes public policy solutions that benefit NAMIC member companies and the policyholders they serve to foster greater understanding and

recognition of the unique alignment of interests between management and policyholders of mutual companies.

Pursuant to Rule 6.2(e) of the Rules of Procedure for the Judicial Panel on Multidistrict Litigation, APCIA and NAMIC (collectively, "*Amici*") submit this brief as Interested Parties to offer industry perspectives that *Amici* believe will assist the Panel in its consideration of the pending motions for transfer of COVID-19 Business Interruption Protection Insurance Litigation.  *Amici* believe their unique national viewpoint will be useful in highlighting fundamental issues that weigh against granting the requested transfer and consolidation.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Movants' request for centralization would undermine, not promote, the "just and efficient conduct" of what could eventually be hundreds of COVID-19 business interruption lawsuits. 28 U.S.C. § 1407.  A multidistrict litigation ("MDL") under these circumstances would be unmanageable for any one judge and lead to delays that would not benefit any party, the courts, or the public.  For the reasons set forth below, *Amici*[2] respectfully submit that it would be fairer and more efficient to let these state law-based cases be decided in their original forums, rather than to transfer them all to a single district court.  *See In re Best Buy, Inc., California Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011) (centralization under Section 1407 should be the "last solution after considered review of all other options").

---

[1] No party or its counsel (1) authored this brief in whole or in part, or (2) contributed money that was intended to fund preparing or submitting this brief.  No other person contributed money that was intended to fund preparing or submitting this brief other than *Amici* and their counsel.

[2] *Amici's* members include more than 800 companies that wrote property insurance policies, which could be the subject of business interruption actions.  Certain insurers named as Defendants in the actions subject to the motions for transfer are members of APCIA and/or NAMIC and pay dues to support the general operations of those organizations only, and had no role in preparing, submitting, or funding this brief.

First, it would be inefficient and unjust to centralize for coordinated pretrial proceedings individual breach of contract actions asserting "wrongful denial" of coverage for business interruption due to the COVID-19 pandemic because there are hundreds of insurers who write different types of policies that provide different types of business interruption coverage in specifically defined circumstances. While policies that provide business interruption coverage generally require physical loss or damage to property to invoke coverage, each policy contains unique language with different combinations of amendments and exclusions that must be (1) read as a whole, under the relevant state law, and then (2) applied to the specific facts of the policyholder's claim of coverage.

No single federal judge could sensibly manage the anticipated vast array of diverse cases using any type of consolidated approach. Instead, shoehorning all of these cases into a single forum for coordinated pretrial proceedings could delay their ultimate resolution by years, with no corresponding benefits in the form of efficient and effective resolution. *Amici*'s analysis of pending and closed MDLs reveals that MDLs which include more than 100 actions remain active, on average, for more than eight years. In view of the extraordinary circumstances created by the COVID-19 pandemic, the parties, courts, and public would be better served by permitting resolution of these cases in their home courts on their individual merits.

Second, district and appellate courts in the home forums are deeply familiar with the laws of those states, and therefore better positioned to address coverage questions on a state-by-state basis to ensure clear, consistent, and reasoned development of law that affects insurers and insureds alike. Even if an MDL were to be established, state court cases that cannot be consolidated would continue to be filed in those home forums. The requested MDL would impose upon a single judge the task of learning and applying all of the unique aspects of many

3

different state and territorial laws—all while the state cases proceed.  Indeed, insurance disputes are uniquely state-specific because Congress ceded this regulatory field to the states through the McCarran-Ferguson Act of 1945, 15 U.S.C. § 1011 *et seq*.  Directing these cases to a single federal judge would undermine longstanding principles of federalism and state autonomy.

Third, there are hundreds of regional and single-state insurers for whom centralization would present an unreasonable burden.  These insurers confine their writings to a limited geographical area.  Transfer of cases involving those insurers to an MDL in a distant forum would not be "for the convenience of parties and witnesses" in those cases.  28 U.S.C. § 1407.

Accordingly, *Amici* respectfully ask that movants' request be denied.

## ARGUMENT

### I. CENTRALIZATION OF COVID-19 BUSINESS INTERRUPTION LAWSUITS WOULD BE NEITHER JUST NOR EFFICIENT

#### A. If Centralized, Unique Factual Issues in Each of the Actions Would Give Rise to Substantial Inefficiencies

##### 1. Numerous Insurers Provide Business Interruption Coverage in a Variety of Policies

*Amici*'s members include more than 800 insurers that offer various types of policies providing for business interruption coverage in carefully defined circumstances.  These policy types include, *inter alia*, (1) business owner policies that combine protection for all major property and liability risks in one insurance package, (2) commercial property policies that insure against damage to buildings and contents due to a covered cause of loss, such as a fire, (3) package policies that include multiple coverages, and (4) other specialized and customized policies.  In all instances, the policy language may differ in material ways depending on state-specific contract requirements and the package of endorsements and exclusions agreed to by specific insureds and their insurers.  Moreover, insurers may provide business interruption

protection in a number of different coverages within a policy.  Insurers may or may not include some or all of the possible variations of business interruption coverage in a policy or in an endorsement.

Each policy is a contract that reflects the specific agreement of the contracting parties, who often individually negotiate endorsements and exclusions that modify the primary agreement with additional coverage or limitations.  The "Chicago Movants,"[3] for example, identify numerous endorsements that they claim will be relevant to the question of coverage in business interruption lawsuits, including (1) "civil authority" coverage that may apply when access to the insured property is prohibited by an action of civil authority due to damage to property other than the insured property; (2) "extra expense" coverage that may provide for recovery of expenses beyond normal operating expenses in certain situations; (3) "sue and labor" coverage that may provide for reimbursement of costs incurred to prepare for actual or imminent damage, subject to the terms and conditions of the policy; (4) "ingress and egress" coverage which may allow for recovery caused by a covered peril to a third-party property that prevents or hinders access to the insured's business; and (5) "preservation of property" coverage that may allow for recovery of costs associated with protection and preservation of property in defined circumstances.  *See* Mot. at 5 (ECF No. 4-1).

---

[3] The Chicago Movants are those plaintiffs who moved for centralization in the Northern District of Illinois, Christie Jo Berkseth-Rojas DDS; Bridal Expressions LLC; Caribe Restaurant & Nightclub, Inc. (d/b/a Laz Luz Ultralounge); Dakota Ventures, LLC d/b/a Kokopelli Grill and Coyote BBQ Pub); GIO Pizzeria & Bar Hospitality, LLC; GIO Pizzeria Boca, LLC; Rising Dough, Inc. (d/b/a Madison Sourdough); Willy McCoys of Albertville LLC; Willy McCoys of Shakopee LLC (d/b/a McCoys Copper Pint); Whiskey Jacks of Ramsey, LLC (d/b/a Willy McCoys Ramsey); and Troy Stacy Enterprises Inc. (d/b/a/ Craft & Vinyl).  *See* ECF No. 4-1.

## 2.   Each Policy Contains Unique Amendments, Exclusions, and Language

Unique facts in individual cases may implicate various other coverages depending on the specific policy involved.  As noted above, business interruption coverage generally requires physical damage to the insured's property.  11A Couch on Insurance § 167:15 (3d ed. update 2019).  While it is unlikely under the case law that plaintiffs can demonstrate direct physical loss or damage caused by the novel coronavirus (or the COVID-19 illness or disease that it causes), if a particular district court or state court were to accept the possibility that a virus might cause physical damage, any attempt to prove the existence of such damage would need to be undertaken on a highly individualized, case-by-case basis.  Depending on the terms of each insurance policy, each claim, and the applicable state law, the arguments and evidence supporting and opposing coverage may be radically different.

As noted above, some policies include "Civil Authority" provisions that provide limited coverage, in certain circumstances, for business income losses caused by a ban on access to the insured premises.  Typically, a Civil Authority provision requires a showing that the order was issued due to physical damage to another's property within a certain distance of the insured premises.  In the COVID-19 context, many insured businesses (e.g., restaurants) have been required to limit their operations but have not been required to close.  Therefore, if a court were to conclude that the physical damage requirement for this coverage could be satisfied under the law of a particular state (notwithstanding that case law across the country counsels strongly against such a result), that would not be sufficient to establish that coverage applies.  Even in the absence of an exclusion, the court would still be required to consider whether, based on the specific facts and governmental orders applicable to each individual business, there was a ban on access to the insured premises.  Furthermore, some policies may only provide coverage where there is a total cessation of business, which would require differentiation between policyholders

who have been completely shut down and those able to continue operating on a limited basis. "Depending on the language of a policy, a business 'interruption' or 'suspension' triggering coverage typically involves a total cessation of business, not merely a slowdown or reduction of operations." 11A Couch on Insurance § 167:11 (3d ed. update 2019). These are individualized fact determinations that cannot be addressed in a consolidated MDL proceeding. In addition, some policies include exceptions to coverage that, depending on the particular policy, may be relevant to whether particular contracts provide for coverage in particular cases.

### 3. Each Action Will Involve Facts Unique to the Insured

The Chicago Movants casually assert that one of the core factual questions in each case will be whether "COVID-19 was present on the insured property or on property sufficiently connected by proximity or in other ways to the insured property such that coverage is triggered."[4]  Mot. at 6 (ECF No. 4-1). That assertion alone justifies denial of the motion for centralization because that question must be answered on a property-by-property basis. *See, e.g.*, *In re: Tyson Foods, Inc., Meat Processing Facilities Fair Labor Standards Act (FLSA) Litig.*, 581 F. Supp. 2d 1374, 1375 (J.P.M.L. 2008) (denying transfer where "[d]iscovery is likely to be plant-specific and proceed on a plant-by-plant basis"); *see also In re: Electrolux Dryer Prod. Liab. Litig.*, 978 F. Supp. 2d 1376, 1377 (J.P.M.L. 2013) (denying transfer where "[a]lthough these actions share factual questions arising out of allegations that dryers manufactured by Electrolux have a common design defect that has resulted in fires . . . it appears that individualized facts concerning the circumstances of each fire, including installation, repair, and maintenance, will predominate over the common factual issues alleged by plaintiffs."); *In re:*

---

[4] As shown below, even if one could demonstrate the presence of the virus on an individual property, there will be numerous other individualized questions relevant to determining coverage, such as whether  the presence of the virus can fairly be construed as direct or accidental direct physical loss under the governing state law and the language of the policy.

*The Great W. Cas. Co. Ins. Litig.*, 176 F. Supp. 3d 1371, 1372 (J.P.M.L. 2016) ("[W]hile Mr. Johnson argues that discovery will overlap . . . he fails to specifically identify any discovery that will be common to these actions. The discovery he identifies as common to the actions, such as 'underwriting files' and 'all writing correspondence,' is far too broad to provide a basis for centralization."); *In re: Mortg. Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d 1352, 1353 (J.P.M.L. 2012) (finding that common questions of fact do not predominate because each action involved only one mortgage lender and a different force-placed insurance program governed by a lender-specific agreement negotiated with an insurance company); *In re: Table Saw Prod. Liab. Litig.*, 641 F. Supp. 2d 1384 (J.P.M.L. 2009) (denying centralization where common issues were "overshadowed by the non-common ones," including the fact that "[e]ach action arises from an individual accident that occurred under necessarily unique circumstances."). There will be many other case-specific questions of fact arising from the intersection of each individual policy with the unique facts and circumstances of each loss. By contrast, there are no questions of fact common to all COVID-19 business interruption cases. No single federal judge could sensibly manage these cases under these circumstances.

Ultimately, the fact that the actions generally relate to COVID-19 does not change the terms of the applicable insurance contracts, or give rise to uniform fact patterns on coverage claims. These key factual differences counsel against transfer. *See, e.g., In re: The Great W. Cas. Co. Ins. Litig.*, 176 F. Supp. 3d at 1372 ("We cannot centralize all claims in which a particular insurer denies coverage or all cases involving Medicare. These basic commonalities among the cases are far outweighed by the unique facts and legal issues presented by each case.").

**B.      Each Individual Action Would Require Analysis of the Proper Choice of Law and Application of the Chosen State's Law**

Not only are there scores of policy permutations and individual fact questions in COVID-19 business interruption cases, but each dispute must be resolved under the law of the state or territory that governs the particular policy.  Many policies do not contain choice-of-law clauses, which means that in cases where the applicable law is unclear, such as putative nationwide class actions, the court must first perform a choice-of-law analysis based on the original forum's choice-of-law rules to determine which state law to apply.  *See, e.g., Larsen v. Citibank FSB*, 871 F.3d 1295, 1303 (11th Cir. 2017) ("In a multi-district case transferred under 28 U.S.C. § 1407, the transferee court applies the choice-of-law rules of the state in which the action was filed.") (citing *Menowitz v. Brown*, 991 F.2d 36, 40 (2d Cir. 1993)); *In re Rolls Royce Corp.*, 775 F.3d 671, 683 n.57 (5th Cir. 2014) ("'When a transferee court presides over several diversity actions consolidated under the multidistrict rules, the choice of law rules of each jurisdiction in which the transferred actions were originally filed must be applied.'") (quoting *In re Air Disaster at Ramstein Air Base, Germany, on 8/29/90*, 81 F.3d 570, 576 (5th Cir. 1996)); 15 Charles W. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3866 (3d ed. 2007).  To determine which state's law applies, the parties may need to conduct discovery into case-specific facts such as (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.  Restatement (Second) of Conflict of Laws § 188 (1971).  The court must then apply the appropriate state law to the particular policy and individual facts.  There are no efficiencies to be gained by asking a single judge to determine on a case-by-case basis the relevant choice of law and to then apply the chosen state law on such a large scale.

9

These tests vary by state and there is a considerable amount of case law on the subject. A court would have to review each state's law to determine whether certain critical policy language could be deemed ambiguous. States have adopted a variety of tests to determine whether a policy provision is ambiguous or not. For instance, a number of states may not allow discovery into the kinds of extrinsic evidence that Chicago Movants seek (Doc. 4-1 at 7) unless they can first show that relevant policy language is ambiguous under the law of the state in which the case was originally filed. *See e.g.*, *Dunson v. Home-Owners Ins. Co.*, No. 5–09–37, 2010 WL 1740928 *4 (Ohio App. May 3, 2010) (affirming trial court's refusal to allow discovery into meaning of policy language because the "policy was not ambiguous and, therefore, the court had no need to resort to extrinsic evidence"). States also differ as to the standard applied to defenses regarding notice, which will also affect the scope of discovery in different cases. *Compare Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 15 Cal. Rptr. 2d 815, 845 (Cal. App. 1993) ("California law is settled that a defense based on an insured's failure to give timely notice requires the insurer to prove that it suffered substantial prejudice."), *with Jackson v. Transportation Leasing Co.*, 893 F.2d 794, 795 (5th Cir. 1990) ("[U]nder Louisiana law, the insurer need not show prejudice where an insurance policy makes timely notice an express condition precedent to coverage.").

Taken together, the vast panoply of state laws, the different categories of policies, groups of endorsements, exceptions, and unique language specific to each policy could result in a vast number of different permutations that must be considered on a case-by-case basis to determine whether, and to what extent, coverage might exist for business interruption.

None of these issues present a common question of fact, nor would they be more efficiently addressed in a single MDL. And the scope of the differences between these matters will make it impossible for a single federal judge to sensibly manage these cases. In light of the

highly individualized factual and legal issues in the various actions, consolidation would only serve to complicate and further delay the efficient litigation of the underlying matters. *See, e.g.*, *In re: Children's Pers. Care Prod. Liab. Litig.*, 655 F. Supp. 2d 1365, 1366 (J.P.M.L. 2009) ("Any common issues, however, are overshadowed by the non-common ones. Only J & J is named as a defendant in all actions. Only two other defendants are named in two of the four actions; remaining defendants are named in one action each. More than ten different baby products with differing formulations are involved in these actions").

### C.   The Requested MDL Would Last for Several Years

*Amici's* analysis of statistics regarding the length of MDLs that were closed during the period 2011-2020 reveals that an MDL in the instant matter is likely to last for many years. Among the 460 such MDLs identified by *Amici*,[5] the average time from transfer to closure was more than five-and-a-half years (68 months). Critically, for MDLs exceeding more than 100 consolidated cases,[6] the average time was more than eight-and-a-half years (107 months). Thus, were the Panel to centralize these hundreds of matters, the MDL might not resolve until approximately 2029. By comparison, the average length of a civil case filed in federal district courts across the country is 10 months -- more than 8 years, or 90%, faster.[7]

---

[5] *Amici* identified these cases by analyzing various reports on the Panel's website and/or generated through the Panel's CM/ECF system.

[6] Reports were missing information as to the number of actions that were closed for 13 of the 460 MDLs closed during this period. *Amici* did not include those 13 MDLs in this calculation.

[7] *Amici* calculated this average using the datasets and research tools made available by the Federal Judicial Center. *See* Federal Judicial Center, Research About the Courts: Integrated Database (IDB), *available at* https://www.fjc.gov/research/idb. This average is based on the length of time (in months) between the filing and termination dates of 2,066,971 civil cases that were terminated during the period 2011–2019 across all federal district courts. No MDL litigation cases are included in the 2,066,971 cases analyzed.

These statistics, coupled with the significant number of individual issues and state law-specific questions detailed above, provide strong indicators that the requested MDL would likely result in years of delays to the administration and resolution of each action.  Of course, closure of the MDL would only mark the end of the pretrial proceedings, and unresolved individual actions would still need to be remanded for trial.  *Amici* respectfully submit that such delays would be inefficient and benefit no one.

## II.   THE HOME FORUM COURTS ARE BEST SUITED TO ADJUDICATE THE CASE-SPECIFIC LEGAL/COVERAGE QUESTIONS IMPLICATED IN THE INSTANT ACTIONS

As noted above, the requested MDL would require the transferee court, and likely the appellate court with jurisdiction in that circuit, to interpret and apply the laws of dozens of states and districts.  Resolution of these legal issues would not only impose an unnecessary burden if centralized before a single district court, but they would also undermine the efficient development of state-specific case law because the original districts are far better acquainted with the laws of the states in which they sit.

Due to the original districts' in-depth experience with their respective local laws, they will be much more familiar with important nuances and subtleties than the transferee court.  The more just and efficient course would be to allow the district courts in the home forums to decide those cases in order to promote a clear, consistent, and reasoned development of law in those jurisdictions.  *See*, *e.g.*, *Ferens v. John Deere Co.*, 494 U.S. 516, 530 (1990) ("'There is a local interest in having localized controversies decided at home.  There is an appropriateness too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflicts of laws, and in law foreign to itself.'") (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–509 (1947)); *see also Sallyport Glob. Servs., Ltd. v. Arkel Int'l, LLC*, 78 F. Supp. 3d 369, 375

(D.D.C. 2015) (collecting cases standing for the proposition that "district courts often transfer cases to the forum with the most familiarity with the state laws applicable to the parties' dispute."); *NCR Credit Corp. v. Ye Seekers Horizon, Inc.*, 17 F. Supp. 2d 317, 323 (D.N.J. 1998) ("'[J]ustice requires that, whenever possible, a diversity case should be decided by the court most familiar with the applicable state law.'") (alteration in original) (quoting *Heller Financial, Inc. v. Shop–A–Lot, Inc.*, 680 F. Supp. 292, 296 (N.D. Ill.1988)).

Indeed, by permitting centralization only for common issues of ***fact***, not law, the MDL statute implicitly assumes that legal issues are better addressed in the original forum.  *See*, *e.g.*, *In re: Healthextras Ins. Mktg. & Sales Practices Litig.*, 24 F. Supp. 3d 1376, 1377 (J.P.M.L. 2014) (denying centralization because "the key issue in all cases is legal in nature," i.e., whether the subject policies were issued in compliance with the law of the state in which that particular case was brought.  "Whether the subject policies in the District of New Jersey action were issued in conformance with New Jersey law, for example, has no bearing on whether the subject policies in the Northern District of Texas action were issued in conformance with Texas law."); *In re ClearTalk-ZTE Arbitration Litig.*, 24 F. Supp. 3d 1374, 1375 (J.P.M.L. 2014) ("[T]he resolution of purely a legal issue or issues is generally insufficient to warrant centralization.").

The history of insurance coverage litigation arising from large-scale events further demonstrates that such actions are inappropriate for MDL treatment.  For example, insurance coverage disputes in the aftermath of the September 11th attacks, Hurricane Katrina, and Hurricane Sandy were managed by the home forum federal and state courts.  Indeed, this Panel has repeatedly recognized that insurance coverage lawsuits, by their very nature, are typically inappropriate for MDL treatment.  *See, e.g.*, *In re Fla., Puerto Rico, & U.S. Virgin Islands 2016 & 2017 Hurricane Seasons Flood Claims Litig.*, 325 F. Supp. 3d 1367, 1368–69 (J.P.M.L. 2018)

13

(denying centralization of actions alleging that plaintiffs' respective insurance companies breached the terms of their policies upon a finding that "each case will necessarily involve different property, different insureds, different witnesses, different proofs of loss, and different damages" and thus, the "very nature of the cases ensures that unique issues concerning each plaintiff's loss, claim, investigation, and claim handling will predominate").[8]

Importantly, the structure and history of insurance regulation confirm that such disputes have a uniquely local character that makes them poor candidates for centralization under federal law. From the beginning, the business of insurance in this country was subject to virtually no federal regulation, and Congress definitively ceded this regulatory field to the states in the McCarran-Ferguson Act. *See also generally,* 11A Couch on Insurance § 2:4 (3d ed. update 2019) ("The purpose of the McCarran-Ferguson Act was 'to restore the supremacy of the states in the realm of insurance regulation.'") (quoting *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 39 (1996)). Underlying this regulatory regime is a recognition that questions of

---

[8] *See also In re: The Great W. Cas. Co. Ins. Litig.*, 176 F. Supp. 3d at 1372 ("We cannot centralize all claims in which a particular insurer denies coverage or all cases involving Medicare. These basic commonalities among the cases are far outweighed by the unique facts and legal issues presented by each case."); *In re: Chinese-Manufactured Drywall Products Liability Litigation*, MDL No. 2047, Order Denying Transfer (Doc. 257) at 2 (J.P.M.L. June 15, 2010) ("Each of the insurance coverage questions in these cases is likely to be decided by an application of the complaint to the policy language under the applicable state law" despite the "common factual backdrop involving the general circumstances of imported Chinese drywall and the damage it is alleged to have caused."); *In re Aegon USA, Inc., Supplemental Cancer Ins. Litig.*, 571 F. Supp. 2d 1369, 1370 (J.P.M.L. 2008) (denying centralization of seven actions where the key issue—the proper interpretation of insurance policies—was "legal rather than factual"); *In re Title Ins. Real Estate Settlement Procedures Act (RESPA) & Antitrust Litig.*, 560 F. Supp. 2d 1374, 1376 (J.P.M.L. 2008) (denying transfer and centralization of actions asserting claims under different state laws which "encompassed different regulatory regimes in the states in which actions are pending along with variances in insurance regulation and law in each state"); *In re Ins. Companies "Silent" Preferred Provider Org. (PPO) Litig.*, 517 F. Supp. 2d 1362, 1363 (J.P.M.L. 2007) (denying consolidation of cases involving "different defendant insurance companies" and "different contracts").

insurance law frequently implicate issues that are peculiar to a particular jurisdiction or locality—questions that can best be decided under our federal system in the states where they arise. *See, e.g.*, *In re Takata Airbag Prod. Liab. Litig.*, No. 14-24009-CV, 2020 WL 1057471, at *4 (S.D. Fla. Mar. 3, 2020) (remanding certain actions because "nearly all the claims in each group action complaint are state specific" and "transferor courts are 'familiar with the state law of their respective jurisdictions' and thus 'are in a better position to assess' state claims.") (quoting *In re Activated Carbon-Based Hunting Clothing Mktg. & Sales Practices Litig.*, 840 F. Supp. 2d 1193, 1199, 1201 (D. Minn. 2012)). When the cases currently before the Panel are viewed against this backdrop of federalism and longstanding state autonomy, it becomes clear that they should not be decided by a single federal judge sitting thousands of miles from where many of the disputes arose.

## III. CENTRALIZATION WOULD BE EXTREMELY INCONVENIENT FOR PARTIES AND WITNESSES IN CASES INVOLVING REGIONAL AND SINGLE-STATE INSURERS

In circumstances where the named defendants vary among the cases, centralization is unlikely to serve the convenience of a substantial number of the parties involved. *See, e.g.*, *In re Proton-Pump Inhibitor Prod. Liab. Litig.*, 273 F. Supp. 3d at 1361–62 (J.P.M.L. 2017) (where multiple different defendants were sued and none were defendants in the same action, centralization was "unlikely to serve the convenience of most, if not all, defendants and their witnesses"); *In re: Cordarone (Amiodarone Hydrochloride) Mktg., Sales Practices & Prod. Liab. Litig.*, 190 F. Supp. 3d 1346, 1347 (J.P.M.L. 2016) (denying centralization where "the named defendants var[ied] widely among the cases" and finding that "[g]iven the different defendants sued in these actions, centralization appears unlikely to serve the convenience of a substantial number of parties and their witnesses.").

Here, these concerns are compounded for regional and single-state insurers who, if centralization is ordered, would be forced to litigate in faraway locations—regardless of the lack of meaningful common questions of fact between the cases.  Centralizing claims in any of the requested locations (Illinois, Pennsylvania, and Florida) would be more than simply "inconvenient" for regional or single-state insurers located in the western half of the United States.  Similarly, for each proposed location, there would be additional regional or single-state insurers for which the designated forum would be inconvenient.  These concerns present yet another basis for denying the motions.  *See*, *e.g., In re Ins. Companies "Silent" Preferred Provider Org. (PPO) Litig.*, 517 F. Supp. 2d at 1363 (Denying centralization because the four actions at issue were "against different defendant insurance companies and involve different contracts".)

## <u>CONCLUSION</u>

For the forgoing reasons, *Amici* respectfully urge this Court deny the motions to transfer and consolidate the actions.

Dated:  June 5, 2020

Respectfully submitted,

By: */s/ James R. Martin*

| | |
|---|---|
| James R. Martin | Steven J. Badger |
| Jennifer D. Hackett | Zelle LLP |
| Zelle LLP | 901 Main Street |
| 1775 Pennsylvania Avenue, NW | Suite 4000 |
| Suite 375 | Dallas, TX 75202 |
| Washington, DC  20006 | 214-749-4207 |
| 202-899-4100 | |

*Attorneys for Interested Parties American Property Casualty Insurance Association and National Association of Mutual Insurance Companies*