## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| | ) | |
| IN RE: | ) | |
| | ) | |
| COVID-19 BUSINESS INTERRUPTION | ) | MDL DOCKET NO. 2942 |
| PROTECTION INSURANCE LITIGATION | ) | |
| | ) | |
| | ) | |

## BRIEF OF INTERESTED PARTY *AMICUS CURIAE* UNITED POLICYHOLDERS IN OPPOSITION TO MOTIONS TO TRANSFER PURSUANT TO 28 U.S.C. § 1407

Allan B. Moore
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
abmoore@cov.com

Rani Gupta
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: (650) 632-4700
rgupta@cov.com

David B. Goodwin
Joan R. Li
COVINGTON & BURLING LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: (415) 591-6000
dgoodwin@cov.com
jli@cov.com

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 4

I.      Common Issues Do Not Exist To Support Creation Of An MDL .................................. 4

      A.     Property Insurance Policies Differ Greatly In Their Terms.................................... 4

      B.     Each Insurance Policy Term Must Be Read In The Context Of Its Own
Policy ................................................................................................................ 5

      C.     Each Property Insurance Policy Must Be Interpreted Under The Law Of
The Applicable State ........................................................................................ 9

      D.     There Is No "Cookie-Cutter" Fact Scenario For These Insurance Claims .......... 12

II.     Transfer Would Inconvenience Insurance Policyholders And Not Promote The
Just And Efficient Conduct Of These Actions ................................................................ 14

      A.     Discovery Will Be Conducted More Efficiently In Individual Courts ................. 14

      B.     An MDL Would Not Provide An Efficient Mechanism For Resolution Of
These Insurance Claims ................................................................................... 17

CONCLUSION................................................................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*AIU Ins. Co. v. Superior Court*,
   751 Cal. 3d 807 (1990) .................................................................................11

*Am. Star Ins. Co. v. Ins. Co. of the West*,
   284 Cal. Rptr. 45 (Ct. App. 1991).................................................................7

*Architex Ass'n v. Scottsdale Ins. Co.*,
   27 So. 3d 1147 (Miss. 2010).........................................................................6

*In re Bank of Am. Home Affordable Modification Program (HAMP) Contract
   Litig.*, 746 F. Supp. 2d 1359 (J.P.M.L. 2010) .............................................8

*Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.*,
   843 A.2d 1094 (N.J. 2004).........................................................................11

*Blalock v. Sutphin*,
   275 So. 3d 519 (Ala. 2018).........................................................................10

*Cedar Bluff Townhome Condo. Ass'n, Inc. v. Am. Family Mut. Ins. Co.*,
   857 N.W.2d 290 (Minn. 2014)......................................................................5

*Certain Underwriters at Lloyd's, London v. Chemtura Corp.*,
   160 A.3d 457 (Del. 2017) ...........................................................................10

*Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*,
   822 N.Y.S.2d 30 (App. Div. 2006)..............................................................10

*Consol. Rail Corp. v. ACE Prop. & Cas. Ins. Co.*,
   182 A.3d 1011 (Pa. Super. Ct. 2018)............................................................5

*Cont'l Ins. Co. v. Honeywell Int'l, Inc.*,
   188 A.3d 297 (N.J. 2018).............................................................................10

*In re Credit Union Checking Account Overdraft Litig.*,
   158 F. Supp. 3d 1363 (J.P.M.L. 2016).........................................................11

*Donabedian v. Mercury Ins. Co.*,
   11 Cal. Rptr. 3d 45 (Ct. App. 2004) ...........................................................11

*In re Enhanced Recovery Co., LLC, Tel. Consumer Prot. Act (TCPA) Litig.*,
   278 F. Supp. 3d 1371 (J.P.M.L. 2017).........................................................15

*In re Fla., P.R., and U.S. V.I. 2016 & 2017 Hurricane Seasons Flood Claims
   Litig.*, 325 F. Supp. 3d 1367 (J.P.M.L. 2018) .........................................2, 3, 13, 15

*In re Fontainebleau Las Vegas Contract Litig.*,
   MDL No. 2106 (J.P.M.L. Aug. 12, 2009) ...............................................................9

*Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co.*,
   629 A.2d 885 (N.J. 1993)......................................................................................11

*Gillin v. Universal Underwriters Ins. Co.*,
   2011 WL 780744 (E.D. Pa. Mar. 4, 2011)............................................................11

*In re Ins. Cos. "Silent" Preferred Provider Org. (PPO) Litig.*,
   517 F. Supp. 2d 1362 (J.P.M.L. 2007)....................................................................8

*Jordan v. Allstate Ins. Co.*,
   11 Cal. Rptr. 3d 169 (Ct. App. 2004) ......................................................................6

*Julian v. Hartford Underwriters Ins. Co.*,
   110 P.3d 903 (Cal. 2005) ......................................................................................11

*Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*,
   655 N.E.2d 842 (Ill. 1995) ....................................................................................10

*Peace ex rel. Lerner v. Nw. Nat. Ins. Co.*,
   596 N.W.2d 429 (Wis. 1999).................................................................................11

*In re Mortgage Lender Force-Placed Ins. Litig.*,
   895 F. Supp. 2d 1352 (J.P.M.L. 2012)....................................................................8

*In re Northstar Educ. Fin., Inc., Contract Litig.*,
   588 F. Supp. 2d 1370 (J.P.M.L. 2008)....................................................................9

*In re Ocala Funding, LLC, Comm. Litig.*,
   867 F. Supp. 2d 1332 (J.P.M.L. 2012)..................................................................13

*Pitzer Coll. v. Indian Harbor Ins. Co.*,
   447 P.3d 669 (Cal. 2019) ......................................................................................10

*In re PrimeVision Health, Inc. Contract Litig.*,
   206 F. Supp. 2d 1369 (J.P.M.L. 2002)....................................................................9

*Roller v. Stonewall Ins. Co.*,
   801 P.2d 207 (Wash. 1990)....................................................................................6

*U.S. Spec. Ins. Co. v. Estate of Ward*,
   444 P.3d 381 (Mont. 2019) .....................................................................................5

*In re Volkswagen & Audi Warranty Extension Litig.*,
   692 F.3d 4 (1st Cir. 2012)......................................................................................9

*Washington Mut. Bank v. Superior Court*,
   15 P.3d 1071 (Cal. 2001) .................................................................................10

*Westview Assocs. v. Guar. Nat. Ins. Co.*,
   740 N.E.2d 220 (N.Y. 2000) ............................................................................11

*In re Xytex Corp. Sperm Donor Prod. Liab. Litig.*,
   223 F. Supp. 3d 1351, 1352 (J.P.M.L. 2016) ..................................................12

**Statutes**

28 U.S.C. § 1407 ..................................................................................................4, 14

Cal. Code Regs. tit. 10, § 2695.3 .............................................................................16

D.C. Code. § 31-2231.16 ........................................................................................16

D.C. Code. § 31-2231.17 ........................................................................................16

D.C. Code. § 31-2231.18 ........................................................................................16

N.Y. Comp. Codes. R. & Regs. tit. 11, § 216.4 .....................................................16

N.Y. Comp. Codes. R. & Regs. tit. 11, § 216.6 .....................................................16

N.Y. Comp. Codes. R. & Regs. tit. 11, § 216.11 ...................................................16

31 Pa. Code § 146.3 ................................................................................................16

31 Pa. Code § 146.5 ................................................................................................16

31 Pa. Code § 146.7 ................................................................................................16

Rev. Code Wash. 48.18.200......................................................................................9

**Other Authorities**

Hon. J. Walter Croskey, et al., *Cal. Practice Guide: Insurance Litig.* (2020 ed.).........................16

*Couch on Insurance* (3d ed. 2019 update) ..............................................................11

Kelsey Montague, *New Pandemic Protocols for Litigation Will Help Struggling
   Businesses and Their Insurers*, IAALS (May 27, 2020) ..................................17

Allan D. Windt, *Ins. Claims and Disputes: Representation of Ins. Cos. & Insureds*
   (6th ed. 2013) ...............................................................................................7, 16

## INTEREST OF *AMICUS CURIAE*

United Policyholders ("UP") is a non-profit 501(c)(3) organization founded in 1991 whose mission is to serve as an effective voice and a trustworthy and useful information resource for insurance policyholders throughout the United States. UP uniquely speaks to and looks out for the interests of insurance *policyholders*; it is funded by donations and grants and does not sell insurance or accept money from insurance companies. UP's work is divided into three program areas: (1) *Roadmap to Recovery*, which provides disaster recovery and claim help for victims of wildfires, floods, pandemics, and other disasters; (2) *Roadmap to Preparedness*, which provides insurance and financial literacy and disaster preparedness; and (3) *Advocacy and Action*, which advances pro-consumer laws and public policy. Because UP routinely assists and informs individual and commercial policyholders with regard to every type of insurance product and insurance claim, it has a strong interest in the orderly development and understanding of insurance law and has been granted leave to submit *amicus curiae* briefs in more than 400 matters across the country. The undersigned represents UP in this matter on a *pro bono* basis.

## INTRODUCTION

The movants ask this Panel to create the first-ever nationwide insurance coverage MDL in the 52 years since Congress authorized the MDL process. They seek to consolidate *all* lawsuits seeking coverage for losses related to the COVID-19 pandemic into a single MDL proceeding of staggering scope and breadth. But as this Panel has recognized, insurance coverage disputes—even when they result from a common event—are not appropriate for consolidation. Thus, when plaintiffs moved only two years ago to consolidate hurricane-related property insurance claims into an MDL, the Panel denied the motion, finding that each underlying claim involved "different property, different insureds, different witnesses, different

proofs of loss, and different damages" and therefore could not be resolved efficiently in an MDL proceeding.  *In re Fla., P.R., and U.S. V.I. 2016 & 2017 Hurricane Seasons Flood Claims Litig.*, 325 F. Supp. 3d 1367, 1368-69 (J.P.M.L. 2018).[1]

The Panel's reasoning in *Hurricane Seasons* applies even more strongly to the COVID-19-related property insurance coverage actions proposed for transfer and MDL treatment:

*First*, while the cases that are the subject of the pending motions *generally* relate to COVID-19, each involves "different property, different insureds, different witnesses, different proofs of loss, and different damages."

*Second*, the actions proposed for consolidation involve property insurance policies that vary widely in their coverages, conditions, endorsements, exclusions, and limitations.  These significant variations must be addressed on an individual case and claimant basis.

*Third*, the insurance policies would need to be construed under the laws of all 50 states, the District of Columbia, Puerto Rico, and our nation's various territories, each of which has its own insurance laws and rules of insurance policy interpretation, which vary dramatically from jurisdiction to jurisdiction.  The MDL judge would not only need to evaluate conflicts of law and make appropriate choices of law on a *per-issue basis*, but would then need to apply the pertinent jurisdiction's laws to each underlying claim, insurance policy, and loss scenario—a huge task.

*Fourth*, insurance coverage depends on the policy language.  A word can have different meanings under different state laws, and seemingly identical policies can differ in meaning because one policy has a comma or a word or paragraph spacing not found in the other policy.

---

[1]    *Amicus* has been able to identify only two instances in which the Panel created an insurance coverage MDL, Nos. 764 and 996, both of which transferred only two underlying actions.  No MDL court has presided over the hundreds, if not ultimately thousands, of highly individualized underlying insurance actions, as movants contemplate here.

*Fifth*, an MDL cannot be justified on the basis of efficiency.  There would be little, if any, common discovery and to the extent that coordinated discovery is possible, MDL consolidation is not needed to obtain it.  Instead, each insurance claim will require discovery of, for example, the crafting and issuance of each insurance policy; the government orders applicable to each loss; the specific circumstances of each insured business in response to the relevant events and/or government orders; the specific property damage occurring in the vicinity of each insured's premises; and testimony (usually from industry-specific and accounting experts) regarding the losses sustained by that insured, calculated under varying methodologies and formulas differing from policy to policy and business to business, under standards that vary from state to state.  As *Hurricane Seasons* put it, the "very nature of the cases ensures that unique issues concerning each plaintiff's loss, claim, investigation, and claim handling will predominate, and will overwhelm any efficiencies that centralization might achieve."  325 F. Supp. 3d at 1368-69.

*Sixth*, any efficiency justification would be far outbalanced by the necessary delay in resolving meritorious insurance claims while the MDL process focuses first on the massive organizational, discovery, and class certification issues that the proposed MDL presents.

*Seventh*, MDL proceedings are typically managed by a plaintiffs' steering committee consisting of counsel with experience as plaintiffs in MDL proceedings or large class actions.  But as there has been no large insurance coverage MDL and commercial insurance class actions are extremely rare (if they exist at all), the steering committee members would likely be class actions specialists rather than counsel with deep experience in litigating the complex property and business interruption insurance coverage issues that each underlying action will raise, to the potential detriment of the insurance claimants.

*Finally*, to the extent that some coordination is appropriate, district courts can consolidate

cases within their particular district, as has occurred with past insurance litigation.

For all of these reasons, the Panel should deny the motions to transfer.

## ARGUMENT

Federal law permits consolidation of cases into an MDL proceeding only upon a showing that (1) the cases "involv[e] one or more common questions of fact" and (2) transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). The cases proposed for consolidation do not satisfy this standard.

## I.    Common Issues Do Not Exist To Support Creation Of An MDL

The movants acknowledge that the insurance cases at issue concern "geographically dispersed defendants" in "disparate industries" with "different policy language." LH Dining Br. ISO Mot. for Transfer at 8, ECF No. 1-1. They argue, however, that "the central issue—whether business closures resulting from government orders trigger[] coverage under business interruption policies—will be the same across all cases." *Id*. This is a gross oversimplification of the dizzying array of disparate legal and factual issues that these claims present.

Insurance coverage disputes are not tort actions where a common legal ruling can apply to many different claims. They are contract cases, under contracts that are far from uniform and are interpreted differently from state to state, which must be applied to factual scenarios that differ from business to business, where coverage turns on the facts unique to each claim.

### A.    Property Insurance Policies Differ Greatly In Their Terms

While at times acknowledging (as they must) that insurance policy language varies widely, the movants suggest at other times that all plaintiffs have essentially the same policy. That is simply not true. Unlike standard-form commercial general liability policies, which typically use the same form language for large and small businesses around the country, property insurance policies vary immensely. Indeed, while small and medium-sized businesses often

purchase property policies that incorporate provisions drafted by the Insurance Services Offices ("ISO"), even these policies differ widely, such that two policies are never the same.  ISO currently has *200 different types of property policies and coverages*, including *16 different business income coverage policies* and *more than 170 endorsements* that may be added to a basic policy to modify the coverages.  ISO revises its policies periodically, and insurers often do not use current versions of the policy.  In addition, property policies often will have state-specific provisions that are mandated by differing state insurance regulations.

Moreover, scores of property insurance policies do not use ISO language at all.  Some policyholders buy policies that are unique to a particular industry.[2]  Others, especially larger businesses, buy policies that are drafted by specific insurers or brokers, are "manuscripted" (i.e., customized) for an individual insured, or are an amalgam of various (often inconsistent) provisions.  Still other businesses buy complex programs with layers of insurance policies issued by dozens of insurers, each using somewhat different language.  Movants' suggestion that an MDL court could pick up an insurance policy attached to a complaint and resolve the legal issues in the MDL is naïve and misapprehends how insurance coverage litigation is resolved.

### B.   Each Insurance Policy Term Must Be Read In The Context Of Its Own Policy

It is a nationwide tenet of insurance law that insurance coverage depends not on common law rules, but on the specific language of a specific insurance policy issued to the specific policyholder in the case at bar.[3]  Thus, every case must be resolved based on the specific policy

---

[2]   *See, e.g.*, Suppl. to Compl., *Berkseth-Rojas DDS v. Aspen Am.*, No. 3:20-cv-00948 (N.D. Tex. Apr. 29, 2020), ECF No. 5 (dental policy); Compl. Ex. 1, *Newchops Rest. Comcast LLC v. Admiral Ins. Co.*, No. 2:20-cv-01949 (E.D. Pa. Apr. 17, 2020), ECF No. 1-2 (restaurant policy).

[3]   *See, e.g.*, *U.S. Spec. Ins. Co. v. Estate of Ward*, 444 P.3d 381, 385 (Mont. 2019); C*onsol. Rail Corp. v. ACE Prop. & Cas. Ins. Co.*, 182 A.3d 1011, 1026 (Pa. Super. Ct. 2018); *Cedar*

language at issue.  But there are already more than 100 insurance companies named as defendants in the cases proposed for transfer, *each* of which issued policies that differ from insured to insured.  These variances are evident in the policies at issue in the cases proposed for consolidation.

*First*, these policies contain a variety of grants of coverage, which, broadly described, could include coverage for civil authority, ingress/egress, extra expense, protection of property, ordinary payroll, contingent time element, pandemic event, communicable disease, contamination, and, in at least one instance, SARS.[4]  An individual insurance policy may have all of these coverages, none of them, or some combination.

Even when two insurance policies contain the same general *type* of coverage (such as "civil authority"), those provisions are often worded differently, or may be interpreted differently when read in the context of the entire policy.[5]  An ambiguous term thus may have one meaning

---

*Bluff Townhome Condo. Ass'n, Inc. v. Am. Family Mut. Ins. Co.*, 857 N.W.2d 290, 294 (Minn. 2014); *Architex Ass'n v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1156 (Miss. 2010); *Jordan v. Allstate Ins. Co.*, 11 Cal. Rptr. 3d 169, 174 (Ct. App. 2004); *Roller v. Stonewall Ins. Co*., 801 P.2d 207, 208 (Wash. 1990).

[4]    *See, e.g.*, Compl. ¶ 66, *Rising Dough v. Society Ins. Co.*, JPML ECF No. 1-10 (class action complaint defining subclasses as insureds with Business Income, Civil Authority, Extra Expense, Contamination, and/or Sue and Labor coverages, under Society Insurance policies); Compl. ¶ 28, *Bridal Expressions LLC v. Owens Ins. Co.*, JPML ECF No. 1-11 (class action complaint defining subclasses as insureds with Business Income or Extra Expense coverage under Owners Insurance policies); Compl. Ex. A, *SCGM Inc. v. Certain Underwriters at Lloyd's*, No. 4:20-cv-01199 (S.D. Tex. Apr. 3, 2020), ECF No. 1-1 ("Pandemic Event" endorsement not contained in other policies issued by same insurer); Compl. ¶ 19, *Sidkoff, Pincus, & Green PC v. Sentine*, JPML ECF No. 205-3 (policy contains a specific endorsement for coverage in the event of a virus).  (Citations to filings in MDL No. 2942 are denoted with "JPML ECF" to distinguish from other ECF filings.)

[5]    For example, many civil authority coverages insure against economic losses that a business experiences when it is closed as a result of a government order due to the presence of a covered risk of loss or property damage in the vicinity of the insured's location.  Even then, the language varies as to the requisite orders, their effects, whether the property damage exists or is threatened, whether closure is necessary, the length of time the coverage applies, and so on.

when read in the context of one insurance policy and a different meaning when read in the context of a different insurance policy.  The structure of a policy may also affect coverage arguments because, for instance, an insured that has purchased an insurance policy with the coverage provided in an *endorsement* may have different arguments than an insured with the same coverage in the main body of its policy.  *See, e.g.*, Allan D. Windt, *Ins. Claims and Disputes: Representation of Ins. Cos. & Insureds* § 6:2 (6th ed. 2013) (endorsements take precedence over the body of policy); *Am. Star Ins. Co. v. Ins. Co. of the West*, 284 Cal. Rptr. 45 (Ct. App. 1991) (finding coverage because of the organization of the subparagraphs within the insurance policy).  Regardless of whether such differences are dispositive, each insured and insurer will have different arguments based on the specific language of each policy, and those arguments cannot be resolved in one fell swoop, as movants assume.

*Second*, exclusions and limitations on coverage also differ across insurance policies.  To date, insurers have denied coverage (often wrongly) based on numerous exclusions, including, without limitation, "virus and bacteria" or "communicable disease" or "pollutant and contaminant" exclusions.[6]  But, again, some policies at issue contain all of these exclusions; some contain one but not others; and some contain no such exclusions.  As with the insuring agreements and coverage extensions, exclusions that have similar names may vary greatly in their wording, scope, underwriting history, and purpose.  The same exclusions may also be interpreted in light of the differing coverages described above, other provisions of the policies,

---

*Compare, e.g.*, Compl. Ex. 1, *Prime Time Sports Grill, Inc. v. DTW 1991 Underwriting Ltd.*, No. 8:20-cv-0077 (M.D. Fla. Apr. 8, 2020), ECF No. 6-1 at 39, *with* Suppl. to Compl., *Berkseth-Rojas DDS*, No. 3:20-cv-00948, ECF No. 5 at 56 (differently worded civil authority coverages).

[6]     *See, e.g.*, Compl. ¶ 44, *Project Lion v. Badger Mutual Ins.*, JPML ECF No. 13-5 ("virus and bacteria" exclusion); Compl. ¶ 6, *Bridal Expressions* (alleging "communicable diseases" exclusion that does not apply to property policy); Compl. ¶ 37, *Billy Goat Tavern I, Inc. v. Society Ins.*, JPML ECF No. 4-10 (alleging no virus or communicable diseases exclusion).

and differing state laws.  Determining the effect (if any) of an exclusion or limitation on

coverage is a highly individualized inquiry and cannot be resolved on a centralized basis.

_Third_, as the movants admit, the policyholders in the related cases hail from a wide range

of dissimilar industries "*span[ning] the entire economy*" of the United States, "including not

only businesses in the restaurant and hospitality sector, but also those in retail, manufacturing,

real estate, professional services, and numerous aspects of the gig economy, just to name a few."

LH Dining Mot. at 2 (emphasis added).  Because businesses in disparate industries are subject to

different types of risks, they have different risk profiles and histories, as well as industry-specific

language not included in policies purchased by other types of businesses.  These variations, too,

will present different coverage arguments that cannot be efficiently resolved in an MDL.

The huge variety of insurance policy wordings presented by the cases in the proposed

MDL, in potentially thousands of differing contracts entered into with multiple defendants, is the

classic instance of litigation that is not appropriate for consolidation.  *See In re Ins. Cos. "Silent"*

*Preferred Provider Org. (PPO) Litig.*, 517 F. Supp. 2d 1362, 1363 (J.P.M.L. 2007) (finding no

common questions of fact as actions were "against different defendant insurance companies and

involve different contracts between those insurers" and a preferred provider organization); *In re*

*Mortgage Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d 1352, 1353 (J.P.M.L. 2012)

(common questions of fact did not predominate as mortgage contracts were "lender-specific

agreement[s]" that "vary widely as to key matters such as the amount of insurance coverage

required, the payment of commissions, and other rights of the borrower and lender").[7]

---

[7]     In contrast, the rare instances in which the Panel has centralized contract cases involved
essentially the same contract and/or the same defendant.  *See In re Bank of Am. Home Affordable*
*Modification Program (HAMP) Contract Litig.*, 746 F. Supp. 2d 1359 (J.P.M.L. 2010) (contracts
all made with same defendant; case concerned whether the defendant complied with federal

### C. Each Property Insurance Policy Must Be Interpreted Under The Law Of The Applicable State

Further complicating the task of resolving these insurance coverage lawsuits is the overarching fact that each of the scores of insurance policy wordings must be interpreted under the laws of the pertinent state, and state law differs widely on insurance law issues.  Thus, even if an MDL court were to determine that a given policyholder in a given state was (or was not) entitled to insurance coverage, that would not necessarily mean that a different policyholder from a different state would be entitled to the same result, *even if the second policyholder had identical insurance policy language*.

Insurance coverage is a matter of state law; there is no federal common law of insurance.  Thus, as an initial matter, for each issue, an MDL court would need to determine the law of each potentially interested state, and then perform a conflict-of-laws analysis to determine, for each issue, which law governs.  That, in turn, would require the MDL court to apply the choice-of-law principles of the transferor court.  *In re Volkswagen & Audi Warranty Extension Litig.*, 692 F.3d 4, 17 (1st Cir. 2012).  That task is not straightforward:  the court would need to examine whether each insurance policy has a choice-of-law provision, then assess whether any such provision is enforceable under the transferor court's laws.

The case law on enforceability of choice-of-law provisions in insurance policies varies from state to state and requires a fact-specific analysis.  *See, e.g.*, Rev. Code Wash. 48.18.200 (choice-of-law clauses in insurance policies covering Washington State risks are unenforceable);

---

program); *In re Northstar Educ. Fin., Inc., Contract Litig.*, 588 F. Supp. 2d 1370 (J.P.M.L. 2008) (same defendant); *In re PrimeVision Health, Inc. Contract Litig.*, 206 F. Supp. 2d 1369 (J.P.M.L. 2002) (same defendant); Mot. to Transfer at 3-4, *In re Fontainebleau Las Vegas Contract Litig.*, MDL No. 2106 (J.P.M.L. Aug. 12, 2009), ECF No. 1 (one set of lending agreements, all governed by same state's law, involving a single Las Vegas hotel and casino project).

*Pitzer Coll. v. Indian Harbor Ins. Co.*, 447 P.3d 669, 676 (Cal. 2019) (New York choice-of-law clause unenforceable in policy issued to a California-based insured).

If a choice-of-law provision is unenforceable or a policy contains no such provision—and most policies do not—the MDL court would then need to employ the choice-of-law test of the original court.  That too is no easy task.  The states employ a variety of choice-of-law tests in insurance litigation.  *See, e.g., Lapham-Hickey Steel Corp. v. Protection Mut. Ins. Co.*, 655 N.E.2d 842 (Ill. 1995) (most significant contacts analysis based on the Second Restatement of Conflict of Laws); *Washington Mut. Bank v. Superior Court*, 15 P.3d 1071 (Cal. 2001) (governmental interests analysis); *Blalock v. Sutphin*, 275 So. 3d 519, 523 (Ala. 2018) (*lex loci contractus* analysis).  Further, the Second Restatement analysis used by many states is factor-based; the various states that follow that approach focus on different factors or articulate the factors differently[8]; those factors in turn depend on underlying facts, such as the place of contracting, which is a state law question that varies from jurisdiction to jurisdiction; and each factor must be determined individually for each insured.

Further complicating the analysis, some insureds do business in one place, but many do not.  As to the latter, an MDL court may need to apply these different choice-of-law tests to each location or individual claim.  For example, a New Jersey-based business with 50 sites across the country, each with a COVID-19 loss, may require the application of 50 different laws to the

---

[8]    *Compare Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.,* 822 N.Y.S.2d 30 (App. Div. 2006), *aff'd*, 876 N.E.2d 500 (N.Y. 2007) (under New York choice-of-law principles, state of domicile is source of applicable law when insurance policy covers risks in multiple states), *with Cont'l Ins. Co. v. Honeywell Int'l, Inc.,* 188 A.3d 297, 318 (N.J. 2018) (under New Jersey choice-of-law principles, state of domicile is just one factor to consider when insurance policy covers risks in multiple states), *and Certain Underwriters at Lloyd's, London v. Chemtura Corp.,* 160 A.3d 457, 470-71 (Del. 2017) (cautioning against the use of the insured's headquarters in the choice-of-law analysis).

same insurance policy. *See Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 629 A.2d 885 (N.J. 1993). For many insureds, just figuring out which law applies to each issue is no simple task.

Once an MDL court determines which state's substantive insurance law applies to each issue in each case, the court then must apply that law to each insurance policy and claim. State courts often reach conflicting interpretations of key insurance policy terms.[9] State law also varies widely as to claims that insureds may bring, such as for breach of the implied covenant of good faith and fair dealing ("bad faith" claims) and violations of unfair claims practices (either non-insurance specific or insurance-specific), as well as to the defenses that insurers may raise.[10]

The daunting task of understanding all 50 states' insurance coverage laws and applying those laws to multiple issues in countless insurance policies—not to mention various additional claims and defenses—powerfully demonstrates why these cases should not be centralized.[11]

---

[9]     *Compare, e.g.*, *Julian v. Hartford Underwriters Ins. Co.*, 110 P.3d 903, 905 (Cal. 2005) (provision of property policy attempting to narrow efficient proximate cause doctrine is unenforceable under California law), *with Gillin v. Universal Underwriters Ins. Co.*, 2011 WL 780744, at *7 (E.D. Pa. Mar. 4, 2011) (enforcing similar position, predicting Pennsylvania law); *compare Westview Assocs. v. Guar. Nat. Ins. Co.*, 740 N.E.2d 220, 223 (N.Y. 2000) (lead paint ingestion not barred under pollution exclusion under New York law), *with Peace ex rel. Lerner v. Nw. Nat. Ins. Co.,* 596 N.W.2d 429, 448 (Wis. 1999) (pollution exclusion barred coverage for lead paint ingestion under Wisconsin law); *compare AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 821 (1990) (applying the same rules of insurance policy interpretation to all insureds), *with Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.*, 843 A.2d 1094, 1104 (N.J. 2004) (so-called "sophisticated insureds" not entitled to *contra proferentem* construction).

[10]    *See, e.g., Couch on Insurance* §§ 204:14-19 (3d ed. 2019 update) (discussing differences in state insurance bad faith law); *id.* § 190.4 (states differ regarding notice-prejudice rule); *Donabedian v. Mercury Ins. Co.*, 11 Cal. Rptr. 3d 45, 50-51 (Ct. App. 2004) (insurers subject to liability for state statutory unfair business practices claims); Compl. ¶¶ 148-156, *Rinnigade Art Works v. Hartford Fin. Servs. Grp., Inc.*, JPML ECF No. 300-4 (alleging violation of Massachusetts unfair and deceptive business acts); Compl. ¶¶ 48-53, *Graileys, Inc. v. Hartford Fire Ins. Co.*, JPML ECF No. 204-3 (alleging violation of Texas unfair insurance settlement practices law).

[11]    *See, e.g., In re Credit Union Checking Account Overdraft Litig.*, 158 F. Supp. 3d 1363, 1364-65 (J.P.M.L. 2016) (denying centralization for "breach of contract cases" brought "under the laws of at least nine states" because the "scope and complexity of this proposed MDL could

**D.      There Is No "Cookie-Cutter" Fact Scenario For These Insurance Claims**

Not only do insurance policies and governing insurance law vary widely, but each case is premised upon the divergent facts of each insured's claims and losses.  Whether a particular insurance policy covers a particular claim necessarily depends upon the application of the policy language to specific factual scenarios.  That the factual scenarios are far from uniform from insured to insured forecloses common discovery and motion practice on the specific claims.

Movants acknowledge that there are "various orders" at the national, state, county, and local level—now numbering in the thousands across the country.  LH Dining Mot. at 2.  Those orders differ in ways that will affect arguments for and against coverage, and even the same order may apply in different ways to different plaintiffs.  For example, some restaurant policyholders may have been allowed to open for takeout or curbside pick-up or delivery, whereas others were forced to cease operations completely.  Still other businesses may have been permitted to remain open (or re-open) with restrictions but determined it was not financially feasible to do so.  Some may have attempted to stay open but could not find suppliers, or the customers were required to shelter in place.  Some insureds may have been subject to competing state and local government orders.  Others policyholders may have relied upon industry guidance for what was prohibited and allowed.  *See, e.g.*, Compl. ¶¶ 10-16, *Sandy Point Dental PC v. Cincinnati Ins. Co.*, JPML ECF No. 4-11 (looking to guidelines from the American Dental Association, the Center for Disease Control and Prevention, and the Illinois State Dental Society).  A single judge cannot be expected to master the evolving orders for every jurisdiction

---

expand beyond the bounds of manageability"); *In re Xytex Corp. Sperm Donor Prod. Liab. Litig.*, 223 F. Supp. 3d 1351, 1352 (J.P.M.L. 2016) (denying centralization of actions with "differing state law claims, limiting the potential efficiency and convenience benefits to be gained through centralization").

from Spokane to Jacksonville.

In addition to factual differences in the various shut-down (and emerging re-opening) orders, there are critical differences in each insured's factual situation. Some insureds may have a confirmed case of COVID-19 on the premises; some may have a suspected case; others may be within a short distance of a confirmed case; and still others may know of no COVID-19 infections on-site or nearby. Each of these scenarios raises different arguments that would need to be addressed under the specific policy language and governing law.

Losses would also need to be proven on a plaintiff-by-plaintiff basis under the policy language, governing law, and factual circumstances. Complicating the analysis further is the fact that there is no uniform type of covered loss. Property insurance policies insure varying types of losses ("business income"; "business interruption"; "extra expense"; "expense to reduce loss"; "Ordinary Payroll"; and so on), each of which must be calculated and submitted under oath in a proof of loss and eventually established in litigation. The length of time for which the insured is able to recover its losses also will vary, in part because of the insurance policy language, which is far from uniform, or because of sublimits in the policies, and in part because the loss period will vary depending on whether the insured restores its operations (in which case the period should be based on the insured's actual experience) or goes out of business (in which case the period will depend on how long a reasonable business would have taken). Moreover, any business income or business interruption loss will depend on what the business would have earned absent the loss, which, in turn, involves a business-specific forecast of sales, variable costs, profit margins, competition, price fluctuation, product demand, and the like. The variations on the amount of the covered loss makes MDL treatment highly problematic at best. *See Hurricane Seasons*, 325 F. Supp. 3d at 1368 (denying centralization for this reason); *In re*

13

*Ocala Funding, LLC, Comm. Litig.*, 867 F. Supp. 2d 1332 (J.P.M.L. 2012) ("Individualized issues concerning each party's rights and duties under separate set of contracts, and with different contracting parties, appear to predominate among the actions.").

Finally, some policyholders also have raised fact-specific non-coverage causes of action, such as bad faith claims.[12]  Insurers in turn will raise individual defenses.  All of these claims and defenses will need to be resolved under different state laws and applied to different facts.

The bottom line is that resolution of these cases requires case-specific applications of different state laws to different policy language, issues, and factual scenarios.  These are not cases with global common issues that can be resolved efficiently by an MDL court.

## II.  Transfer Would Inconvenience Insurance Policyholders And Not Promote The Just And Efficient Conduct Of These Actions

Even putting aside the plethora of legal and factual issues that the proposed MDL would need to address, the actions at issue would involve case-specific discovery and motion practice that far exceeds any common discovery or motions and thus would not promote "the convenience of parties and witnesses" or "the just and efficient conduct of such actions."  28 U.S.C. § 1407(a).  Further, hundreds, and perhaps thousands, of policyholders would be disadvantaged by discovery and class certification processes that could benefit only a small segment of the affected insureds.

### A.  Discovery Will Be Conducted More Efficiently In Individual Courts

Discovery in these cases would not involve common discovery that militates in favor of centralization but, instead, would be overwhelmingly claim- and case-specific.  Witnesses likely would include representatives of the relevant businesses who would need to testify about the

---

[12]     *See* Compl. ¶¶ 67-74, *Big Onion Tavern Grp. v. Society Ins., Inc.*, JPML ECF No. 3-9; Compl. ¶¶ 59-64, *Sandy Point Dental*, JPML ECF No. 4-11; Compl. ¶¶ 31-39, *Odyssey Imports Inc. v. Charter Oak Fire Ins. Co.*, JPML ECF No. 26-3 (all alleging bad faith claims).

bases of the claims, the losses suffered, and communications with the insurer representatives; experts to testify to the conditions at the insured locations; forensic accountants to document and testify to the amount of the loss; experts on the length of the loss period; and insurer representatives responsible for the policyholder's account.  There also would need to be significant discovery of the insurers' factual defenses (such as challenges to the notice given to the insurer, claimed failures to cooperate, or alleged failures to mitigate damages) and the insureds' non-coverage claims, such as bad faith claims.  These case-specific differences would defeat, not promote, efficiencies.  *See Hurricane Seasons*, 325 F. Supp. 3d at 1368 (recognizing the case-specific discovery in property insurance cases); *In re Enhanced Recovery Co., LLC, Tel. Consumer Prot. Act (TCPA) Litig.*, 278 F. Supp. 3d 1371, 1372 (J.P.M.L. 2017) (actions involving a "significant" amount of "individualized discovery" should not be centralized).

One movant suggests that an MDL is necessary because of common scientific or epidemiological testimony regarding the "spread of the virus in order to ascertain its likely presence and impact."  Second Mot. to Transfer at 7, JPML ECF No. 4-1.  But, as evidenced by the fact that the other movants do not make any such argument for centralization, such expert testimony may be unnecessary in many cases depending on policy language, governing state law, and relevant facts.  And even in cases where scientific or epidemiological evidence is presented, the pandemic's spread and response efforts have differed so dramatically by jurisdiction such that modeling the spread of the virus would likely be a highly localized effort not susceptible to centralized treatment.  Moreover, rejection of the MDL will not result in a shortage of experts; the firms bringing class actions have retained (or will retain) experts expecting that they will testify in multiple cases, as experts often do.

As for non-scientific evidence, there is likely to be little common discovery because

15

discovery in insurance coverage cases is typically conducted according to the individual insurance policy and claim.  Insurance regulations impose file-keeping and claims-handling obligations on the insurer that are documented in individual claims files.  *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 11, §§ 216.4, 216.6, 216.11; 31 Pa. Code §§ 146.3, 146.5, 146.7; Cal. Code Regs. tit. 10, § 2695.3; D.C. Code. §§ 31-2231.16, 31-2231.17, 31-2231.18.  Thus, insurers maintain "claims" and "underwriting" files according to the specific policy and insured.  *See, e.g.*, Windt, *Ins. Claims and Disputes* § 9:19 (claim file is the repository of insurer's analysis of the "insured's claim" and is "focal point of the insured's discovery"); Hon. J. Walter Croskey, et al., *Cal. Practice Guide: Insurance Litig.* ¶ 15:770 (2020 ed.) ("As a general rule, insurers maintain an underwriting file with respect to each of their insureds or each insurance policy issued.").  Policyholders would also seek discovery of their individual communications with insurers—for instance, if an insurer made a representation to an insured about a whether a particular type of claim would be covered, or if a provision were added, deleted, or changed at the policyholder's request in the course of issuing the policy, those communications could be relevant extrinsic evidence.  That evidence is not susceptible to common discovery.

To the extent there is discoverable evidence that is common to multiple insureds, there is no reason to believe it would be extensive or cannot be efficiently discovered absent an MDL. Insurance policy interpretation materials such as evidence of the drafting history of a particular insurance policy do not necessarily play a role in resolving each issue, and when they do, such materials can be produced in multiple cases.  Moreover, any common discoverable material will already be subject to discovery in the dozens of pending *state court* insurance coverage cases

16

related to COVID-19 and efforts to coordinate discovery there are already under way.[13]

Furthermore, unnecessary centralization of the discovery process will delay, not expedite, the resolution of claims that need little or no discovery. While many cases will involve significant case-specific discovery, some policyholders—particularly those with the most favorable policy wording—may seek (and deserve) relatively rapid relief based on the plain language of their insurance contracts. In many instances, an insured may seek summary judgment on coverage based on the policy language and undisputed facts, and the insurer may not contend that additional discovery is needed. Such cases can be quickly resolved in a district court familiar with the governing law and convenient to the litigating policyholder. But in an MDL, dispositive rulings on those cases would be stalled to a later phase while the court and the parties devote the early phases of the case to basic case management and the discovery process. This would delay much-needed payments to policyholders while forcing them to monitor or participate in an unnecessary and expensive discovery process overseen by a distant court.

### B.    An MDL Would Not Provide An Efficient Mechanism For Resolution Of These Insurance Claims

The movants have not demonstrated that any other factor would promote the just and efficient resolution of claims or be convenient to parties and witnesses.

*First*, the movants' proposal of an MDL consisting of both putative class action lawsuits and dozens of non-class action lawsuits brought by individual insureds would be cumbersome and prejudicial to insureds that seek case-specific, individual relief. The putative class action lawsuits are filed against individual insurers and often propose subclasses based on whether a policyholder has purchased a policy with a specific type of coverage and is located in a particular

---

[13]    *See* Kelsey Montague, *New Pandemic Protocols for Litigation Will Help Struggling Businesses and Their Insurers*, IAALS (May 27, 2020), https://iaals.du.edu/blog/new-pandemic-protocols-litigation-will-help-struggling-businesses-and-their-insurers.

geographic region.  *See, e.g.*, Compl. ¶ 30, *Cascadia Dental Specialists Inc. v. Am. Fire & Cas. Co.*, JPML ECF No. 202-3 (Washington classes); Compl. ¶ 58, *Project Lion*, JPML ECF No. 13-5 (Nevada subclasses).  Many insureds will not fit within any of the class definitions or will not want to be part of any class.  Those insureds would see their individual cases languish while an MDL court adjudicates lengthy class certification proceedings against multiple insurers for discrete geographic regions.  If a relevant class is not certified, a policyholder does not fit within the definition of any certified class, or the insured opts out of any such class (which is likely for policyholders that have already brought individual actions), the insureds who are not part of any certified class will *only then* be able to litigate their individual claims—and only after a years-long detour into irrelevant class certification proceedings.  Policyholders who have filed—or who will soon file—litigation to obtain much-needed relief should not be mired in expensive and extensive class certification proceedings that will not benefit them.

*Second*, an MDL is unnecessary to avoid conflicting legal rulings.  To the extent there are novel legal issues, that is not a task for the federal courts, as insurance coverage is a state law issue.  Indeed, given the number of COVID-19 insurance coverage lawsuits that have been filed (or will be filed) in state courts, state appellate courts are likely to reach binding decisions that must be followed by federal district courts applying state law.  The number of cases in state court will likely dwarf those in federal court, as federal judges will remand declaratory relief actions. *See* Order at 5, *Dianoia's Eatery, LLC v. Motorists Mut. Ins. Co.*, No. 2:20-cv-706-NBF (W.D. Pa. May 19, 2020) (remanding COVID-19 case "rais[ing] novel insurance coverage issues under Pennsylvania law which are best reserved for the state court to resolve in the first instance").

*Third*, common motion practice (such as summary judgment) is not feasible because insurance coverage must be determined according to the individual policyholder and claim.

18

Even when a similar or identical term appears in multiple insurance policies, there will be differences in other portions of the policies, governing state law, and factual circumstances, and extrinsic evidence on each claim that a court (or jury) must consider in determining coverage. Those insurance questions cannot be resolved effectively in a mass motion practice that would gloss over differences that, under governing state law, must be considered individually and contextually.  *See* above Section I.

*Fourth*, mass settlements are extremely unlikely.  Insurers have established processes and requirements for resolving individual claims (sometimes dictated by reinsurers).  They often are reluctant to settle a particular claim lest the fact of the settlement be used by other policyholders as evidence of coverage.  Therefore, the dynamics that might promote settlement in an antitrust MDL or a products liability MDL (such as bellwether trials that may help guide settlement ranges) will not translate to insurance coverage disputes where each claim must be valued (and settled, if appropriate) based on the policy language, governing law, and facts.

*Fifth*, litigating in a distant court would be cost-prohibitive for many insureds that would be subject to transfer, such as small businesses on the brink of financial insolvency.  They need compensation right away.  But in an MDL, they must wait while the MDL is organized and litigated in phases.  Insureds represented by small law firms that lack the resources of the class action firms advocating centralization cannot attend hearings and participate in discovery for years on end in a far-away location.  *See, e.g.,* Sandy Point Dental Response at 2, JPML ECF No. 19 (noting the difficulty of a "small, struggling dental practice" in Illinois to participate in an MDL in Florida).  Some policyholders may be forced to abandon or forego filing meritorious lawsuits simply because they cannot afford to participate in the MDL process.

*Finally*, to the extent that there may be benefits from consolidating groups of similar cases, individual district courts can consolidate cases before a single judge, as has occurred in insurance coverage lawsuits arising out of the September 11 terrorist attacks and from Hurricane Sandy.  Individual district courts across the nation, with more granular understandings of the cases in their respective districts, are better equipped to make the decision about whether, and to what extent, such coordination is appropriate.

If those courts deem local consolidation appropriate, this is a far more sensible alternative to a nationwide MDL as it would permit policyholders to litigate their claims in a convenient location.  The district courts also will be more experienced with applying the insurance laws of their home states, as will the federal courts of appeal that will hear appeals of those district court decisions.  These courts will also be more familiar with the local government orders that are central to many insureds' claims, and how they have evolved over time.  Such a process would ensure more consistent legal rulings on multiple cases and also permit for coordinated discovery if appropriate, while facilitating more expedited and appropriately individualized case treatment.

## CONCLUSION

For the foregoing reasons, the Panel should deny the motions to transfer.

Dated:  June 5, 2020

Allan B. Moore
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Fax: (202) 778-5575
abmoore@cov.com

Respectfully submitted,

COVINGTON & BURLING LLP

By:  /s/  David B. Goodwin
David B. Goodwin
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: (415) 591-6000
Fax: (415) 591-6091
dgoodwin@cov.com

*Counsel for Amicus Curiae*
*United Policyholders*

20