**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| IN RE: COVID-19 BUSINESS | ) | |
| INTERRUPTION PROTECTION | ) | MDL No. 2942 |
| INSURANCE LITIGATION | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

**RESPONSE IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS PURSUANT
TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED OF PRETRIAL
PROCEEDINGS**

Plaintiffs in *Ronald A. Mikkelson DDS v. Aspen American Insurance Co.*, No. 3:20-cv-05378 (W.D. Wash.); *Ryan M. Fox, DDS v. Travelers Casualty Insurance Co. of America*, No. 2:20-cv-00598 (W.D. Wash.); *Stan's Bar-B-Q LLC v. Charter Oak Fire Insurance Co.*, No. 2:20-cv-00613 (W.D. Wash.); *Jennifer B. Nguyen v. Travelers Casualty Insurance Co. of America*, No. 2:20-cv-00597 (W.D. Wash.); *Pacific Endodontics, P.S. v. Ohio Casualty Insurance Co.*, No. 2:20-cv-00620 (W.D. Wash.); *Wade K. Marler, DDS v. Aspen American Insurance Co.*, No. 2:20-cv-00616 (W.D. Wash.); *Kuzi Hsue, DDS, PS v. Travelers Casualty Insurance Co. of America*, No. 2:20-cv-00622 (W.D. Wash.); *Jeffrey E. Kashner, DDS, MSD v. Travelers Indemnity Co. of America*, No. 2:20-cv-00625 (W.D. Wash.); *Mario D. Chorak, DMD, P.S. v. Hartford Casualty Insurance Co.*, No. 2:20-cv-00627 (W.D. Wash.); *Suneet S. Bath, DMD PS, d/b/a Impressions Dentistry Family Cosmetics v. Travelers Casualty Insurance Co. of America*, No. 3:20-cv-05489-RBL (W.D. Wash.); *Arnell Prato, DDS, PLLC v. Sentinel Insurance Co.*, No. 3:20-cv-05402 (W.D. Wash.); *Lina Kim, DDS, PS v. Sentinel Insurance Co.*, No. 2:20-cv-00657 (W.D. Wash.); *Mark Germack DDS v. Dentists Insurance Co.*, No. 2:20-cv-00661 (W.D. Wash.); *Andrew H. Lee, DDS v. Sentinel Insurance Co.*, No. 3:20-cv-05422 (W.D. Wash.); *Hair Studio 1208, LLC v. Hartford Underwriters Insurance Co.*, No. 2:20-cv-02171

1

(E.D. Pa.); *Nue LLC d/b/a Nue Seattle v. Oregon Mutual Insurance Co.*, No. 2:20-cv-00676

(W.D. Wash.); *Carlos O. Caballero DDS, MS, PS d/b/a Master Orthodontics v. Massachusetts*

*Bay Insurance Co.*, No. 3:20-cv- 05437 (W.D. Wash.); *Glow Medispa, LLC v. Sentinel*

*Insurance Co.*, No. 2:20-cv-00712 (W.D. Wash.); *Karla Aylen, DDS PLLC v. Aspen American*

*Insurance Co.*, No. 2:20-cv-00717 (W.D. Wash.); *Hirbod H. Rowshan DDS, P.S. v. Ohio*

*Security Insurance Co.*, No. 2:20-cv-00730 (W.D. Wash.); *Cascadia Dental Specialists Inc. v.*

*American Fire & Casualty Co.*, No. 2:20-cv-00732 (W.D. Wash.); *Kara McCulloch DMD MSD*

*PLLC v. Valley Forge Insurance Co.*, No. 2:20-cv-00809 (W.D. Wash.), hereinafter the

"*Mikkelson* Plaintiffs," file this response in support of transfer of *In re COVID-19 Business*

*Interruption Protection Insurance Litigation*, MDL No. 2942, to a single court for coordinated or

consolidated pretrial proceedings.

Counsel for the *Mikkelson* Plaintiffs respectfully submit that the actions subject to the

Motions to Transfer should be transferred and assigned to Judge Martinez of the Western District

of Washington for coordinated or consolidated pretrial proceedings.[1] In the alternative, and in

acknowledgement of the size and complexity of the contemplated multidistrict litigation, the

*Mikkelson* Plaintiffs submit that four or more regional MDLs may be appropriate.

## I.    INTRODUCTION

In the wake of COVID-19, state and local "stay at home" orders (hereinafter the

"Governmental Orders") resulted in the closure of a substantial proportion of small businesses in

the United States. Businesses nationwide remained closed for several weeks—in some cases

---

[1] *See* Plaintiffs LH Dining L.L.C. and Newchops Restaurant Comcast LLC's Mot. for Transfer & Coordination or Consolidation under 28 U.S.C. § 1407, ECF No. 1; Plaintiff Christie Jo Berkseth-Rojas DDS, et al.'s Subsequent Mot. for Transfer of Actions Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings, ECF No. 4 (collectively, the "Motions to Transfer").

months. Suffering losses and fighting for survival, many businesses have turned to their business interruption insurance for coverage. They have, uniformly, been met with denial.

As of June 4, 2020, 137 cases arising from business interruption insurance coverage disputes have been associated with this MDL (hereinafter the "Related Actions"). This does not count the number of actions recently filed in state courts and likely to be removed. And, as the nation has only begun to emerge from the lockdown stemming from the COVID-19 pandemic, it is likely that hundreds—perhaps thousands—more cases will be filed.

All signs point to a coming wave of business interruption insurance coverage litigation. As "stay at home" or other closure orders were issued in forty-two states, this litigation will reach nearly every district in the country. The scope of the requested multi-district proceeding would thus be considerable and, as with any such large proceeding, would present challenges for judicial management. Among other hurdles, there will be a patchwork of applicable state laws regarding insurance, as well as different closure orders across state and local jurisdictions. There will also be many defendants, spread across the country. Some policies will have so-called virus exclusions; some will not. As of this writing, the Related Actions name over 50 different insurer-defendants and have been filed in 32 different districts. Many of the Related Actions, moreover, are brought as putative class actions, pleading overlapping state and/or national classes of similarly-affected policyholders seeking coverage for their losses.

Notwithstanding these challenges, there are substantial efficiencies to be gained from centralization. Initially, all of the Related Actions stem from state and local closure orders that required businesses to shutter in the interests of public safety. Although there are many different defendants, as with any form contracts, the language of the insurance policies at issue will have substantial similarities. This is because, by and large, the policies at issue are standard business

interruption policies. Many insurers use form business interruption policies drafted by the Insurance Service Office ("ISO"),[2] either in whole or in part as a basis to draft their policies. Fundamental questions of coverage and policy interpretation will therefore be substantially similar across the many actions. Many insurers use standard-form policy exclusions as well. The interpretation and applicability of those exclusions will present another common issue running through many of the Related Actions.

Importantly, there will be common fact discovery regarding policy interpretation. The questions of policy interpretation presented in the Related Actions are not purely legal, as some opponents of centralization have posited.[3] Rather, in the interpretation of an insurance policy, most states will consider carriers' own interpretations of their policies, custom and usage evidence, and internal claims guidance. It is likely that plaintiffs in all—or substantially all—of the Related Actions will seek the same or similar discovery of the carrier-defendants to support their coverage position. Further, although questions of policy interpretation will be guided by state law, this fact does not weigh against centralization. Rather, as is common in multidistrict litigation, state laws may be grouped according to similarities. In addition, bellwether motion practice may be appropriate. Centralized discovery with respect to policy interpretation, and centralized resolution of key questions of policy interpretation, will substantially promote and

---

[2] ISO, founded in 1971, provides a broad range of services to the property and casualty insurance industry. In addition to form policies, ISO collects and manages databases containing large amounts of statistical, actuarial, underwriting, and claims information, fraud-identification tools, and other technical services. ISO describes itself as follows: "ISO provides advisory services and information to many insurance companies. … ISO develops and publishes policy language that many insurance companies use as the basis for their products." *ISO General Questions*, Verisk, https://www.verisk.com/insurance/about/faq/ (last visited June 5, 2020); *see also Insurance Services Office (ISO)*, Verisk, https://www.verisk.com/insurance/brands/iso/ (last visited June 5, 2020).

[3] *See, e.g.*, Society Insurance Company's Opp'n to Mot. for Transfer at 5, ECF No. 371.

facilitate the just and efficient resolution of the cases subject to the Motions for Transfer. Early in the litigation, both sides may benefit from exchanging Plaintiff and Defendant Fact Sheets. Indeed, centralized leadership, discovery, and motion practice may promote the prompt and just resolution of thousands of actions.

Other judicial management tools are available for the administration of the Related Actions as well. The creation of one or more litigation tracks will allow the grouping of similarly-situated defendants for discovery and motion practice purposes. And, it should be emphasized, transfer pursuant to 28 U.S.C. § 1407 is for pretrial purposes only. The transferee judge has the option—and the duty—to remand the transferred actions at the appropriate time. Under these circumstances, the time for remand may come at a relatively early point in the litigation. That is, following common discovery relating to policy interpretation, remand may be appropriate for discovery on particular plaintiffs' claims or for motion practice with respect to particular jurisdictions. In short, there are substantial benefits to be gained from centralization of common discovery and, potentially, certain motion practice.

Denial of centralization, on the other hand, risks a patchwork of inconsistent decisions, across untold numbers of cases. As many of the Related Actions are putative class actions, moreover, the risk presented by inconsistent decisions is especially great. The resulting incoherent litigation would burden the dockets of courts nationwide for the foreseeable future. Although centralization will face challenges, it is the best option for management of the coming wave of business interruption litigation.

## II.     ARGUMENT

Pursuant to 28 U.S.C. § 1407(a), transfer of actions pending in different judicial districts for coordinated or consolidated pretrial proceedings is appropriate when the actions involve "common questions of fact" such that transfer for coordinated pretrial proceedings will serve

"the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a).

Although the Panel has expressed that it is "typically hesitant to centralize litigation on an industry-wide basis[,]" in certain circumstances, "it is the best solution." *In re AndroGel Prods. Liab. Litig.*, 24 F. Supp. 3d 1378, 1379 (J.P.M.L. 2014); *see also, e.g.*, *In re Incretin Mimetics Prods. Liab. Litig.*, 968 F. Supp. 2d 1345 (J.P.M.L. 2013) (centralizing actions against competing defendants which manufactured four similar diabetes drugs). This is such a situation. There are four reasons: *first*, there is a unifying core of common facts; *second*, there will be common discovery relating to carriers' interpretation of their policies, custom and usage evidence, and any applicable internal claims guidance; *third*, centralization is necessary to avoid inconsistent rulings, particularly with respect to class certification; and *fourth*, centralization will serve the interests of the parties and, most importantly, the judiciary's interest in seeing these litigations conducted efficiently.

**A.**    **Common Questions of Fact Favor Transfer and Consolidation, Notwithstanding the Presence of Different Defendants and Different Policy Forms**

      **1.**    **The Government Orders Create a Common Core of Fact; This Common Core of Fact is Enhanced by the Similarity of Policies at Issue**

The Related Actions arise from orders of closure, Governmental Orders requiring non-essential business to shutter in wake of the COVID-19 pandemic. As set forth in the Motions to Transfer, the Related Actions share a common core of factual issues. Due to the Governmental Orders, "at least 316 million people in at least 42 states, three counties, 10 cities, the District of

Columbia and Puerto Rico [were] urged to stay home[,]" covering "a stunning 95 percent of the population."[4]

Opponents of centralization have argued that these similarities are "superficial"[5] because the relevant Government Orders differ by jurisdiction, destroying this common core of fact.[6] These differences, however, are well within the range of tolerance for centralization, as "transfer under Section 1407 does not require a complete identity or even majority of common factual issues as a prerequisite to transfer." *In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005); *see also In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 939 F. Supp. 2d 1376, 1377 (J.P.M.L. 2013). Indeed, the content of these orders was similar and their effect the same: "residents in a vast majority of states, the Navajo Nation and many cities and counties are under instructions to stay at home as much as possible[.]"[7]

Opponents of centralization have asserted that the commonality between the Related Actions begins and ends with the Governmental Orders,[8] because the various actions involve different policies of insurance. But the similarity of the insurance policies at issue in the Related Actions is a factor weighing in favor of centralization—not against it. The policies at issue are, by and large, a standard type of commercial policy, with coverage known as a "business interruption" or "business income." These standard-form business owner policies, commonly called "BOP" policies, utilize similar, if not identical, language in their insuring agreements.

---

[4] Sarah Mervosh, Denise Lu & Vanessa Swales, *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. Times (Apr. 20, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html?campaignId=9U99R.

[5] *Cf., e.g.*, Liberty Mutual's Interested Party Resp. in Opp'n to Pls.' Mots. for Transfer at 1, 5, ECF No. 382.

[6] *Cf., e.g.*, Big Onion Plaintiffs' Mem. of Law in Opp'n to Mot. for Transfer & Consolidation Pursuant to 28 U.S.C. § 1407 at 11-13, ECF No. 198.

[7] Mervosh, *supra* note 4 (summarizing orders state-by-state).

[8] *See, e.g.*, Society Insurance Company's Opp'n to Mot. for Transfer at 2, ECF No. 371.

Many insurers utilize the ISO commercial property coverage form CP 00 10—either in whole or in part as a basis to craft their own policies. Many insurers also use the ISO business income coverage forms (CP 00 30 or CP 00 32), with or without extra expense coverage.

Accounting for these common features, the taxonomy of business interruption policies at issue in the Related Actions is relatively simple:



Thus, rather than destroying factual commonality amongst the Related Actions, the language of the insurance policies at issue is a factor unifying them. These are cases about form commercial policies, with standard coverage forms and standard exclusions. To be sure, the carrier defendants did not write a unique policy for every barber shop, dentist's office, and restaurant across the United States.

The differences in policy language, such as they may exist, do not destroy the common core of facts uniting the Related Actions. *See, e.g.*, *In re Checking Account Overdraft Litig.*, 626 F. Supp. 2d 1333, 1335 (J.P.M.L. 2009) (unique "bank-to-bank" issues of fact did not defeat need for centralization in light of "industry-wide" "policies and procedures" favoring centralization); *see also In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1379

(J.P.M.L. 2017) ("Although individualized factual issues may arise in each action, such issues do not—especially at this early stage of litigation—negate the efficiencies to be gained by centralization."). Following common discovery relating to policy interpretation—discussed in greater detail below—rulings with regard to the interpretation of common policy clauses, such as on an exemplar or bellwether basis, will substantially facilitate the resolution of these actions. Thus, the *Mikkelson* Plaintiffs respectfully disagree with the notion that "any pre-trial rulings based upon a specific insured's policy language and business operations under a particular state's Executive Order would be limited in scope and application—eliminating the efficiencies ordinarily obtained through multidistrict litigation."[9] Rather, rulings with respect to language of the ISO form commercial policy, or its variants, under the laws of various states will substantially advance the resolution of these litigations.

The presence of different coverage forms—and exclusions—does not alter this conclusion.[10] In addition to standardized business interruption coverage forms, many of these policies provide other standardized coverages. These standard coverages include so-called "civil authority" coverage (coverage for losses caused by forced closure of property by civil authority), dependent property coverage for losses resulting from interruptions at other properties, sue and labor provisions covering expenses to avoid loss, and/or ingress/egress coverage (coverage for losses caused by a covered peril that inhibits ingress or egress from the covered property). Another unifying feature of these policies will be the presence—or absence—of a "virus

---

[9] Liberty Mutual's Interested Party Resp. in Opp'n to Pls.' Mots. for Transfer at 8, ECF No. 382; *see also* Interested Party Westchester Surplus Lines' Insurance Company & Indemnity Insurance Company of North America's Resp. to Pls.' Mots. for Transfer & Coordination or Consolidation under 28 U.S.C. § 1407 at 5-6, ECF No. 376.
[10] *Contra id.* at 9-10.

exclusion." Again, the ISO has promulgated a standard-form virus exclusion, ISO form CP 01 40 07 06, used in many policies of insurance.

Nor does the presence of several defendants defeat the common core of fact uniting the Related Actions. Again, common policy language is used by many carriers within the industry— indeed, the ISO language is a starting point for many policies. In addition to sharing similar policy language, all of the defendants have uniformly denied coverage for business losses stemming from governmental closure orders. The universality of the defendants' quick denials underscores the commonality of the legal issues. The facts specific to each carrier-defendant's coverage decision are not so unique or substantial as to defeat the benefits to be gained from centralization for pretrial proceedings. *See, e.g.*, *In re Humana Inc. Managed Care Litig.*, Nos. MDL-1334, MDL-1364, MDL-167, MDL-1366, 2000 WL 1925080, at *3 (J.P.M.L. Oct. 23, 2000) (creating one MDL, and rejecting request for defendant-specific MDLs, where common facts predominated). This is particularly so because, as discussed below, common discovery relevant to policy interpretation warrants centralization.

If a carrier's policies deviate from common forms, this issue may be dealt with through the creation of a separate track or tracks and through timely remand.[11] As the Panel has often noted, centralization of actions against several defendants into one MDL will allow a judge to put in place a pretrial program to effectively manage the actions, such as through the creation of separate tracks. *See, e.g.*, *In re Multi-Piece Rim Prods. Liab. Litig.*, 464 F. Supp. 969, 974 (J.P.M.L. 1979).[12] Indeed, the Panel has often created MDLs involving multiple defendants

---

[11] *Cf., e.g.*, FM Global's Interested Party Resp. in Opp'n to Transfer & Coordination or Consolidation under 28 U.S.C. § 1407 at 2, ECF No. 379.

[12] That some actions also assert bad faith claims does not vary this conclusion. These claims can likewise be dealt with in appropriate pretrial management. *See, e.g.*, *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 793 F. Supp. 1098, 1100 (J.P.M.L. 1992) (rejecting request for

where warranted by the factual circumstances and necessary for the efficient management of a controversy. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d at 1379; *In re Gadolinium Contrast Dyes Prods. Liab. Litig.*, 536 F. Supp. 2d 1380, 1382 (J.P.M.L. 2008); *In re Asbestos Prods. Liab. Litig. (No. VI)*, 771 F. Supp. 415, 416-17 (J.P.M.L. 1991).

## 2.     Common Discovery Warrants Centralization

Centralization of the Related Actions is also necessary to eliminate duplicative discovery. Centralization is appropriate when it "will eliminate duplicative discovery . . . and conserve the resources of the parties, their counsel and the judiciary." *In re: Treasury Sec. Auction Antitrust Litig.*, 148 F. Supp. 3d 1360, 1362 (J.P.M.L. 2015); *see also Manual for Complex Litigation (Fourth)* § 20.131 (2004) (listing four factors governing whether transfer will facilitate the convenience of the parties and promote the just and efficient conduct of the transferred cases: 1. The elimination of duplicative discovery; 2. The avoidance of conflicting rules and schedules; 3. The reduction of litigation cost; and 4. The conservation of the time and effort of the parties, attorneys, witnesses, and courts (citing *In re Plumbing Fixture Cases*, 298 F. Supp. 484 (J.P.M.L. 1968)). Common discovery concerning carriers' interpretation of their policies, custom and usage evidence, and any applicable internal claims guidance will be appropriate for each defendant and will be identical for all claims.

Discovery will be necessary because, among other reasons, an insurance contract that is subject to more than one reasonable interpretation must be interpreted in favor of coverage. *Aschenbrenner v. U.S. Fid. & Guar. Co.*, 292 U.S. 80, 84-85 (1934) ("The phraseology of contracts of insurance is that chosen by the insurer …. if its language is reasonably open to two constructions, that more favorable to the insured will be adopted[.]"). Statements by an insurance

separate MDL for medical monitoring claims and exclusion of certain claims and actions from centralization).

company—for example in one case that use of certain terminology in an insurance policy was "error"—may constitute evidence in support of a conclusion of ambiguity. *Ames Const., Inc. v. Intermountain Indus., Inc.*, 712 F. Supp. 2d 1160, 1166-67 (D. Mont. 2010).

Accordingly, many courts allow evidence of an insurer's or others' interpretations of policy terms as bearing on whether the terms are ambiguous, and whether any ambiguity can be dispelled. This discovery routinely includes internal insurer claims guidance on the interpretation of insurance policies. *See also Certain Underwriters at Lloyd's v. Nat'l R.R. Passenger Corp.*, No. 14-CV-4717 (FB), 2016 WL 2858815, at *11 (E.D.N.Y. May 16, 2016) (allowing discovery of claims manuals that "discuss[ ] the disputed policy provisions for the time period of coverage") (citation omitted); *Cummins, Inc. v. Ace Am. Ins. Co.*, No. 1:09-CV-00738-JMS-DML, 2011 WL 130158, at *5 (S.D. Ind. Jan. 14, 2011) (allowing discovery of claims-handling manuals "that may tend to lead to admissible evidence regarding the meaning of the [p]olicy"); *U.S. Fire Ins. Co. v. Bunge N. Am. Inc.*, 244 F.R.D. 638, 646 (D. Kan. 2007) (concluding internal manuals could be probative of insurer's policy interpretation); *Champion Int'l Corp. v. Liberty Mut. Ins. Co.*, 129 F.R.D. 63, 67-68 (S.D.N.Y. 1989) (finding that claims manuals are "germane to the interpretation of [insurance] policies"); *Stonewall Ins. Co. v. Nat'l Gypsum Co.*, No. 86 CIV 9671 (SWK), 1988 WL 96159, at *3-4 (S.D.N.Y. Sept. 6, 1988) (affirming order to produce claims and underwriting manuals and guidelines, which found them relevant to interpretation and application of standard industry-wide terms for asbestos coverage).

Many courts also look to extrinsic evidence to determine the appropriate meaning of insurance policy terms. *See, e.g.*, *McGrew v. Farm Bureau Mut. Ins. Co. of Arkansas, Inc.*, 268 S.W.3d 890, 896 (Ark. 2007); *Holden v. Farmers Ins. Co. of Wash.*, 239 P.3d 344, 347 (Wash. 2010); *Glenfed Dev. Corp. v. Superior Court of L.A. Cty.*, 62 Cal. Rptr. 2d 195, 198 (Ct. App.

1997); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Stauffer Chem. Co.*, 558 A.2d 1091, 1095 (Del. Super. Ct. 1989). To this end, discovery is typically permitted regarding custom and usage of terms. *See, e.g.*, *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 87 (2d Cir. 2002). Courts also routinely permit discovery relevant to drafting history. *See, e.g.*, *Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*, 387 F. Supp. 2d 175, 182 (E.D.N.Y. 2005), *aff'd*, 199 F. App'x 29 (2d Cir. 2006) ("The usual practice of the district courts in the Second Circuit does appear to be to allow documents pertaining to drafting history to be discovered in coverage disputes by parties adverse to insurance companies.").

Common discovery will be necessary in the Related Actions on questions of policy interpretation. Among other discovery regarding policy interpretation, plaintiffs in the Related Actions will likely all seek the following:

- Internal documents and memoranda regarding the insurer's policy interpretation and past positions with respect to policy interpretation, including, e.g., internal interpretations in any analogous circumstances;

- Correspondence with insureds and regulators regarding similar coverage questions and conditions;

- Internal claims guidance, such as claims handling manuals, internal alerts, training materials, and other internal documents providing guidance to claims personnel;

- Documents relating to custom and usage within the industry; this is particularly trenchant for all policies utilizing, or based upon, ISO form business interruption policies;

- Documents relating to drafting history;

- Documents in the same categories relating to interpretation of common exclusions, most notably any form virus exclusion.

This discovery will be the same, or at least very similar, across all claims. An MDL is therefore appropriate to eliminate duplicative discovery on these common issues. *See, e.g.*, *In re Treasury Sec. Auction Antitrust Litig.*, 148 F. Supp. 3d at 1362; *In re Plumbing Fixture Cases*, 298 F. Supp. 484 (J.P.M.L. 1968); *Manual for Complex Litigation (Fourth)* § 20.131 (2004).

Opponents of centralization, for their part, have emphasized that plaintiff-specific discovery will be unique in each action—this is a common position taken by parties opposing centralization or, later, class certification. To be sure, there will be relevant individualized discovery, including generally claim and underwriting files applicable to an insured's policy. Plaintiff-specific discovery might also relate to the plaintiffs' particular industry, location, or business (such as income information for purposes of proving a loss of business income claim).[13] But, as discussed in more detail below, the transferee judge has tools to manage such discovery. Centralization will aid in fixing reasonable and consistent standards for the nature and extent of the individualized discovery to be allowed. The transferee judge may also approve Plaintiff Fact Sheets or remand actions at the appropriate time for plaintiff-specific discovery.

The Panel has declined to order centralization where the primary issues for decision are legal and not factual.[14] Indeed, the Panel has declined to transfer declaratory judgment insurance cases to pending MDLs where those coverage actions present "strictly legal questions ... requir[ing] little or no discovery." *In re Oil Spill by Oil Rig "Deepwater Horizon" in Gulf of*

---

[13] *See, e.g.*, Interested Party Westchester Surplus Lines' Insurance Company & Indemnity Insurance Company of North America's Resp. to Pls.' Mots. for Transfer & Coordination or Consolidation under 28 U.S.C. § 1407 at 13-14, ECF No. 376.
[14] *See, e.g.*, Society Insurance Company's Opp'n to Mot. for Transfer at 5, ECF No. 371.

*Mexico, on Apr. 20, 2010*, 764 F. Supp. 2d 1352, 1353 (J.P.M.L. 2011) (alteration in original) (citation omitted); *see also, e.g.*, *In re Teamster Car Hauler Prods. Liab. Litig.*, 856 F. Supp. 2d 1343 (J.P.M.L. 2012).

That principle, however, is not applicable here. The Related Actions do not present "strictly legal questions," nor do "the legal aspects of these questions clearly predominate." *In re Okla. Ins. Holding Co. Act Litig.*, 464 F. Supp. 961, 965 (J.P.M.L. 1979). Rather, important issues relating to policy interpretation will require discovery, as described above. This common discovery warrants centralization in the interests of efficiency for both the judiciary and the parties; the risk of burdensome duplicative discovery is substantial. Centralization is therefore necessary to avoid duplicative discovery and, as detailed in the next section, conflicting pretrial rulings on a host of critical issues. *Cf. In re Peanut Crop Ins. Litig.*, 342 F. Supp. 2d 1353, 1354 (J.P.M.L. 2004).

### 3.    Centralization is Necessary to Eliminate the Potential for Conflicting Pre-Trial Rulings

Multidistrict litigation is appropriate to "eliminate the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in multidistrict related civil actions." *In re Plumbing Fixture Cases*, 298 F. Supp. at 491-92. The potential for conflicting rulings, absent centralization, is great here. As explained above, the Related Actions arise from similar policies, with similar coverage forms. The relevant policy language spans many insurer-defendants. Similar discovery will be sought across many actions, including discovery relating to the interpretation and application of the policy language at issue.

The potential for conflicting rulings is enhanced by the large number of class actions. Of the 137 actions associated with this MDL as of June 4, 2020, 84 are putative class actions. Those class actions—the number of which will surely grow—plead a panoply of overlapping state and

national classes. The presence of these class actions favors centralization. "It is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest." *Id.* at 493. Given the large number of overlapping class actions, centralization is necessary to protect against disorderly and chaotic litigation, and is regularly granted in such circumstances. *See id.*; *see also, e.g.*, *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002) (granting centralization to protect against, in particular, inconsistent rulings regarding class certification).

> **4.      Although the Related Actions Arise Under the Laws of Many States, Judicial Management Tools Will Allow for the Efficient Conduct of the Contemplated MDL Proceedings**

It should also be acknowledged that the claims appear to arise principally under state law. The differences among state law, however, can be managed by a single judge. It is axiomatic that "a transferee judge can employ any number of techniques, such as establishing separate discovery and motion tracks, to manage pretrial proceedings efficiently." *In re Proton-Pump Inhibitor Prods. Liab. Litig. (No. II)*, 261 F. Supp. 3d 1351, 1354-55 (J.P.M.L. 2017); *see also, e.g.*, *In re Epipen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 268 F. Supp. 3d 1356, 1359 (J.P.M.L. 2017).

Of the many tools available to a transferee judge, one is the grouping of states according to legal similarities, combined with the appropriate sequential legal analysis. By grouping states according to their legal similarities, the transferee judge will be able to address the differences in applicable law effectively and efficiently. [15] In addition, bellwether motion practice may be

---

[15] These grouping may address the precepts of insurance policy interpretation by similarities. With respect to the enforceability of exclusions, a key legal difference across jurisdictions will center on the causation doctrines and whether so-called "anti-concurrent cause" clauses are enforceable. Form policies now typically include so-called "anti-concurrent cause" clauses (or "ACC" clauses). ACC clauses typically provide that where an excluded peril contributes

appropriate. These state-law groupings or bellwethers may be overlaid with the relevant steps of

legal analysis. That is, the first step in any analysis of an insurance policy is that of coverage

itself; whether there is coverage under the relevant insuring clause must be determined prior to

analyzing the application and/or enforceability of any exclusions. The effect of any exclusions—

most notably a virus exclusion, where present—comes after the initial coverage determination.

To provide an illustrative example:



Thus, while several opponents point to the presence or absence of a virus exclusion in the

various policies as a key difference undermining the efficiencies to be gained from

centralization, that is not so. Rather, the transferee judge may set up an efficient process that

appropriately addresses the questions of coverage prior to the questions presented by virus

exclusions. In short, judicial management tools allow for the creation of a process for the logical

and efficient management of the various legal and factual questions presented.

Another tool available to the transferee judge will be remand of claims or actions at the

appropriate time. *See* 28 U.S.C. § 1407(a). To the extent that any action, or group of actions,

directly or indirectly to cause a loss, then coverage is excluded even if a covered peril also
contributes to the loss. ACC clauses are unenforceable in a minority of jurisdictions.

involve unique legal or factual issues, the transferee judge can address those issues through separate tracks, motion practice, and/or remand. *See, e.g.*, *In re McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Practices Litig.*, 148 F. Supp. 3d 1364, 1366 (J.P.M.L. 2015); *see also, e.g.*, *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 812 F. Supp. 2d 1380, 1383 (J.P.M.L. 2011); *In re ClassicStar Mare Lease Litig.,* 528 F. Supp. 2d 1345, 1347 (J.P.M.L. 2007). Through tracking and/or remand, the transferee court may effectively manage unique claims (such as bad faith) and/or policies (such as those with contamination coverage).[16]

### III.     TRANSFER TO THE WESTERN DISTRICT OF WASHINGTON OR, IN THE ALTERNATIVE, THE CREATION OF FOUR OR MORE REGIONAL MDLS WOULD BE APPROPRIATE

The *Mikkelson* Plaintiffs respectfully request transfer of the Related Actions to the Western District of Washington for coordinated or consolidated pretrial proceedings. The *Mikkelson* Plaintiffs submit, furthermore, that the Related Actions should be assigned to Chief Judge Martinez of that district.

The Western District of Washington is a well-suited venue for the contemplated MDL. This controversy is not centered in any one district, state, or region. The 35 current defendants are likewise geographically dispersed, with headquarters spanning from coast to coast. Presently, the Western District of Washington does not have a single MDL. For year-end 2019, the median time for disposition of a civil action in the district (7.1 months) is well below the national median (9.9 months).[17] Compared to the venues proposed by movants, the Western District of

---

[16] *Cf., e.g.*, Big Onion Plaintiffs' Mem. of Law in Opp'n to Mot. for Transfer and Consolidation Pursuant to 28 U.S.C. § 1407 at 13-16, ECF No. 198.

[17] Federal Judicial Center, Federal Court Management Statistics for the Period Ending December 31, 2019, https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2019.pdf (last visited June 5, 2020).

Washington has favorable case-disposition times. Only 2.9% of civil cases in the Western District of Washington are over 3 years old, as compared to 20.7% in the Eastern District of Pennsylvania and 36.9% in the Northern District of Illinois, the venues proposed by movants.[18]

Chief Judge Martinez is an able jurist who has been on the federal bench for more than 20 years, first as a federal magistrate judge then a district court judge beginning in 2004. As Chief of the Western District of Washington since 2016, Judge Martinez has more resources and staff to handle these matters relative to other judges in the district, and has presided over several high-profile cases, including issuing one of the first dispositive rulings in the opioid litigation before the national opioid MDL was created. *See City of Everett v. Purdue Pharma L.P.*, No. C17-209 RSM, 2017 WL 4236062 (W.D. Wash. Sept. 25, 2017).

The *Mikkelson* Plaintiffs acknowledge, however, that the scope of the proposed multi-district litigation is likely to be substantial. Given that the regulation of insurance is left to state purview, and the law applicable here will be state law, an alternative approach would be to divide the Related Actions into four or more geographically-based MDLs, with actions assigned to each MDL according to the state of principal place of business of the primary carrier defendant. *See, e.g.*, *In re Sugar Indus. Antitrust Litig.*, 427 F. Supp. 1018, 1027 (J.P.M.L. 1977) (east and west MDLs).

Grouping by defendant and by region would simplify certain management issues, most notably issues presented by the many overlapping classes that have been pleaded in the Related Actions. It would also centralize discovery by defendant in one forum. This approach would also place state law-issues into the hands of jurists who are more likely to have familiarity with the precepts of the applicable state insurance law. Although an imperfect solution, moreover,

---

[18] *Id.*

regionally-based MDLs would address concerns raised by certain defendants that they will be placed into an MDL far from their home base, such as those regional insurers who object to centralization far from the states in which they do business.[19]

## IV.    CONCLUSION

For the foregoing reasons, the *Mikkelson* Plaintiffs request that the Related Actions be transferred to Chief Judge Martinez of the Western District of Washington for coordinated or consolidated pretrial proceedings.

RESPECTFULLY SUBMITTED this 5th day of June, 2020.

KELLER ROHRBACK L.L.P.

By: *s/ Lynn Lincoln Sarko*
Lynn Lincoln Sarko, WSBA #16569
Ian S. Birk, WSBA #31431
Gretchen Freeman Cappio, WSBA #29576
Amy Williams-Derry, WSBA #28711
Irene M. Hecht, WSBA #11063
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384
Email: lsarko@kellerrohrback.com
Email: ibirk@kellerrohrback.com
Email: gcappio@kellerrohrback.com
Email: awilliams-derry@kellerrohrback.com
Email: ihecht@kellerrohrback.com

Alison Chase, #226976
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Fax: (805) 456-1497
Email: achase@kellerrohrback.com

*Attorneys for Plaintiffs*

---

[19] *See, e.g.*, Society Insurance Company's Opp'n to Mot. for Transfer at 3, ECF No. 371.

**PROOF OF SERVICE**

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, I hereby certify that I caused the foregoing Response in Support of Motion for Transfer of Actions pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated of Pretrial Proceedings to be filed with the Court's CM/ECF system, which sends a service copy to all registered parties in the action at their associated email addresses.

Dated: June 5, 2020

By: *s/ Lynn Lincoln Sarko*
Lynn Lincoln Sarko, WSBA #16569
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384
Email: lsarko@kellerrohrback.com

*Attorneys for Plaintiffs*