**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: COVID-19 BUSINESS INTERRUPTION PROTECTION INSURANCE LITIGATION | MDL No. 2942 |

## INTERESTED PARTY RESPONSE OF THE NARI, PAKIN, SERO, AND WATER SPORTS KAUAI PLAINTIFFS IN SUPPORT OF TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA

Plaintiffs Nari Suda LLC dba Nari, Pakin Corporation dba Kin Khao, Sero, Inc. dba Beast, and Water Sports Kauai Inc. dba Sand People (collectively herein, "Respondents") respectfully submit this Interested Party Response to the pending motions for transfer and centralization in multi-district litigation of the above-captioned proceedings. As discussed below, Respondents support transfer and centralization, but submit that the cases should be transferred to and coordinated in the Northern District of California.

**I.      Introduction**

These cases arise from a vast but relatively straightforward coverage dispute that warrants multidistrict coordination. Over the past few months, many thousands of restaurants and other small businesses around the country have been forced to shut down or suspend operations as a result of a global pandemic, losing all or nearly all revenue and rendering them unable to meet payroll and expenses. It was for disruptions like this that they purchased "business interruption" insurance, designed to protect them in the unlikely event of disaster. Notwithstanding this, the defendant insurers in Respondents' cases and, it seems, literally every insurance company in the United States that issues business interruption insurance, have *categorically refused to pay any claim* for business interruption arising during the Covid-19

pandemic. These blanket denials raise common questions that are well-suited for coordinated adjudication.

Respondents collectively own and operate three restaurants and a chain of 12 vacation-focused stores. They are similarly situated as thousands of other affected businesses throughout the country, and they request coordination in order to streamline resolution of this dispute for themselves and others. Respondents themselves are all very successful and high-profile businesses: Kin Khao was awarded a Michelin star in its first year of operation;[1] Nari was named as among the Best New Restaurants in America by Esquire Magazine;[2] and Beast received a James Beard Award for Best Chef in the Northwest. Nevertheless, like thousands of small businesses across the country, they have struggled over the past several months after their income fell virtually overnight to basically zero. Most of these businesses have generously sought to keep as many employees furloughed or partially employed, with funded medical benefits, for as long as possible. But without the support they counted on in the event of a crisis, they will not be able to continue to do so.

Because so many businesses were denied coverage, by the same group of insurers, on the basis of the same or very similar policy language, this litigation likely will be dominated by class actions against the relevant insurer defendants. Indeed, scores of class actions have already been filed in federal courts around the country over the past few months. Centralized management of discovery, class certification, and pre-trial issues would eliminate the need for substantial duplicative litigation around the country, and the possibility of inconsistent results. The alternative to centralization is a patchwork of federal judges around the country independently grappling with many identical and virtually identical questions and expending resources ruling

---

[1] Dkt. 120-3 (Nari Complaint) ¶1.
[2] *Id.*

on them independently. A single judge, overseeing all of these related actions could manage this workload more efficiently and help achieve faster and fairer results for the parties, and avoid inconsistent rulings throughout the country.

As discussed below, Respondents submit that that the transferee district should be the Northern District of California, located in a region at the center of this controversy with judges with extensive experience managing MDLs and who are well equipped to manage this potentially large litigation as it develops.

## II. Litigation Concerning the Insurance Industry' Blanket Universal Denials of Business Interruption Coverage Should Be Centralized.

### A. The Coverage Denials Raise Several Common Questions.

The defendant insurers' blanket (or effectively blanket) denials of all claims for business interruption coverage raise questions that are inherently common and well-suited to coordinated resolution. 28 USC § 1407 provides for the transfer of litigation "involving one or more common questions of fact." As this Panel has held numerous times, "[s]ection 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In re Darvocet, Darvon & Propoxyphene Prod. Liab. Litig.*, 939 F. Supp. 2d 1376, 1377 (J.P.M.L. 2013); *accord, In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005); *In re Denture Cream Prod. Liab. Litig.*, 624 F. Supp. 2d 1379, 1381 (J.P.M.L. 2009).

The cases that would be part of the proposed MDL raise at least the following common and foundational questions of fact that, if the cases were litigated separately, would need to be separately resolved, by separate judges, in most or all of the separate actions:[3]

    1. Does the spread of Covid-19 cause physical damage to property?

---

[3] *See also* Dkt. 120-3 (Nari Complaint) ¶ 98.

2. Does the spread of Covid-19 cause physical loss of property?

3. Does a governmental order limiting access to and use of business facilities require a suspension in operations?

4. Is any available business interruption coverage subject to any common policy exclusions?

5. Does immediately denying coverage as part of a blanket rejection of all related insurance claims breach insurance coverage agreements?

6. Is declaratory judgment available to plaintiffs seeking insurance coverage for such losses?

That these questions are predominantly common across the cases is underscored by the fact that the defendant insurers appear to have executed a coordinated strategy to deny all business interruption claims related to the Covid-19 pandemic, and have justified their denials almost uniformly based on their invocation of just a handful of common policy provisions. *See, e.g.,* Brett Emison, May 13, 2020, Kansas City Business Journal, "Who pays for business interruption losses due to Covid-19 ?", https://www.bizjournals.com/kansascity/news/2020/05/13/who-pays-for-business-interruption-losses-due-to-c.html (last accessed June 5, 2020); Dkt. 4-1 (Plaintiff Berkseth-Rojas DDS et al. Brief ISO Motion to Transfer) at 3 (citing insurer statements). The cases also share parallel factual foundations. The coverage disputes all arise from shelter in place orders issued in forty-nine states. *See* KFF, "State Data and Policy Actions to Address Coronavirus," https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/ (last accessed June 1, 2020) (describing orders issued in all states except South Dakota). Each of these orders imposed restrictions on the services which could be provided at restaurants and other activities at essential and non-essential businesses. *See id.*

Moreover, the businesses at issue in these cases are insured by policies that utilize common language, such as that prepared by the Insurance Services Office, known as "ISO." *See, e.g.*, Dkt. 120-3 (Nari Complaint) ¶¶ 69–70; s*ee also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993) (recognizing that "most primary insurers" in the United States use insurance forms from ISO, "an association of approximately 1,400 domestic property and casualty insurers" as the basis for their policies). It has been observed that insurers intentionally use common language in their policies to maximize predictability in coverage disputes by rendering case law resolving one dispute directly applicable to others (with minimal basis for distinguishing based on variation in contract terms). Accordingly, while the cases here involve different states and insurers, they nevertheless arise from a common foundation and will require the resolution of the same foundational questions. Determinations related to the interpretation of these policies, and the discovery necessary to decide those questions, will apply across cases and will benefit greatly from uniformity in judicial interpretation.

      **B.**     **<u>Coordinated Resolution Facilitates Efficiency and Fairness</u>**

Transfer is appropriate under section 1407 where it "promote[s] the just and efficient conduct of such actions."[4] Coordinated proceedings are appropriate and effective where, as here,

---

[4] Section 1407 also provides that transfer should suit the parties and witnesses. *Id.* This issue is considered in detail in § III as it pertains to the venue for the MDL. But with respect to the desirability of transferring generally, centralizing this litigation will reduce the collective costs for the parties by, among other methods, the ability to avoid multiple depositions of the witnesses. Any inconvenience to individual defendants or witnesses will be more than offset by the substantial collective efficiencies that will be gained. It is also possible that proceedings will be handled remotely for some time in any event, perhaps even until there is a vaccine to the Covid-19 virus. But even in normal times, witnesses are typically deposed in their home district and documents are usually produced electronically, making their original location less relevant in modern litigation. *Cf., e.g., In re Tribune Co. Fraudulent Conveyance Litig.*, 831 F. Supp. 2d 1371, 1372 (J.P.M.L. 2011); *see also Tate v. Brinderson Constructors, Inc.*, No. 16-CV-04314-VC, 2016 WL 7387430, at *1 (N.D. Cal. Dec. 21, 2016); *Erb v. Roadway Exp.*, Inc., No. 4:05-CV-0011, 2005 WL 1215955, at *4 (M.D. Pa. Apr. 19, 2005).

numerous defendants collectively engaged in conduct subject to common allegations of fraud and breach of contract. For example, in *In re: Checking Account Overdraft Litig.*, 626 F. Supp. 2d 1333 (U.S. Jud. Pan. Mult. Lit. 2009), the JPML panel considered a request to coordinate cases against multiple defendant banks that involved breach of contract, unjust enrichment, and consumer protection claims based on the banks' alleged charging of improper overdraft fees. *Id.* at 1334–5; *id.*, 694 F. Supp. 2d 1302, 1310 (S.D. Fla. 2010). Even though the banks' practices were not uniform and each bank had different contract language, the panel granted transfer, finding that "[w]hile there will be some unique questions of fact from bank-to-bank, these actions share sufficient factual questions relating to industry-wide bank posting policies and procedures to warrant centralization of all actions in one MDL docket." *In re: Checking Account Overdraft Litig.*, 626 F. Supp. 2d at 1335.

That these cases collectively involve several insurer defendants underscores the importance of centralization. As the Panel has found multiple times, centralizing cases involving multiple defendants often helps to eliminate duplicative litigation. *See, e.g., In re National Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017) (centralizing litigation against hundreds of pharmaceutical manufacturers and distributors, finding that "[a]lthough individualized factual issues may arise in each action, such issues do not – especially at this early stage of litigation – negate the efficiencies to be gained by centralization.");[5] *In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*, 410 F. Supp. 3d 1357, 1360, n.2–4 (U.S. Jud. Pan. Mult. Lit. 2019) (rejecting the argument that variation between common defect claims asserted against all major domestic and foreign auto makers would defeat centralization because "the existence of individual issues, which is relatively commonplace in products liability MDLs, does not negate

---

[5] *See also id.* at https://ecf.ohnd.uscourts.gov/cgi-bin/qryParties.pl?238494 ("Parties") (confirming that this MDL involves more than 600 defendants).

the common ones, which appear to be sufficiently substantial and complex to warrant creation of an MDL").

The number of Defendants potentially involved in this litigation does not alter the relationship between centralization and efficiency. The suggestion made by the Westchester Defendants (Dkt. 376 at 2) that "MDLs involving multiple defendants are rare" is demonstrably false. In addition to the aforementioned *Opiate Litigation*, which involves more than 600 defendants (*supra*, n. 6) and the other matters cited above, this Panel has ordered coordination of cases involving multiple defendants in numerous other circumstances. *See, e.g., In re Asbestos Prod. Liab. Litig.* (No. VI), 771 F. Supp. 415, 416 (J.P.M.L. 1991) (centralizing cases involving nearly 500 defendants). *See also In re Generic Digoxin & Doxycycline Antitrust Litig.*, 222 F. Supp. 3d 1341, 1343 (U.S. Jud. Pan. Mult. Lit. 2017) (centralizing litigation involving more than 50 defendants selling dozens of different products subject to common price fixing allegations);[6] *In re Juul Labs, Inc., Mktg., Sales Practices, & Prod. Liab. Litig.*, 396 F. Supp. 3d 1366, 1367–68 (U.S. Jud. Pan. Mult. Lit. 2019) (centralizing more than 40 actions involving more than 80 defendants);[7] *In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prod. Liab. Litig.*, 363 F. Supp. 3d 1378, 1380–82 (U.S. Jud. Pan. Mult. Lit. 2019) (centralizing claims against more than 90 defendants manufacturing different products in different states).[8]

Here, coordinated proceedings would provide the additional benefit of accelerating potential resolution by streamlining adjudication of the central questions common across cases. Instead of litigating jurisdiction and venue, the scope of discovery, and class certification in

---

[6] *See also id.* MDL No. 2724 2:16-md-02724-CMR, Dkt. 1382 at 2–10, 1394 at 3 (confirming that this MDL involved more than fifty defendants).

[7] *See also id.* MDL No. 2913, 3:19-md-02913, Dkt. 551 at 19-20 (confirming that this MDL involves more than 70 defendants).

[8] *See also id.* MDL No. 2875 1:19-md-02875, Dkt. 398 (confirming that this MDL involved more than 90 defendants).

dozens of courts around the country, a coordinated proceeding could focus the parties on the litigation that is necessary to begin resolving core questions relevant to coverage (or lack thereof). The arguments against centralization that have been advanced here (*see, e.g.*, Dkt. 198:11-16) fail to account for the flexibility afforded to MDL judges and presume that the existence of select individualized questions would somehow undermine the entire MDL. Even if some discovery and pre-trial questions require a more case-specific approach, that work is best performed (or allocated) by a single judge familiar with all of the issues and parties. *See In re Resource Exploration, Inc. Sec. Litig.*, 483 F. Supp. 817, 821 (J.P.M.L. 1980) (explaining that transfer and centralization can "ensure that the actions are supervised by a single judge who, from day-to-day contact with all aspects of the litigation, will be in the best position to design a pretrial program that will prevent duplicative discovery ... and substantially conserve the time and efforts of the parties, the witnesses and the federal judiciary"). MDL judges are afforded significant flexibility to track, subdivide, transfer, or even remand issues as needed to progress litigation efficiently and fairly. *In re Lehman Bros. Holdings, Inc., Sec. & Employee Ret. Income Sec. Act (ERISA) Litig.*, 598 F. Supp. 2d 1362, 1364 (U.S. Jud. Pan. Mult. Lit. 2009) (finding that a single court is best positioned to formulate a pre-trial program that can streamline the adjudication of multiple related claims against numerous defendants and "leav[ing] the extent of coordination or consolidation of [certain] actions to the discretion of the transferee judge"); *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d at 1378–79 ("[t]he transferee judge might find it useful, for example, to establish different tracks for the different types of parties or claims").

Rejecting centralization (i.e., having dozens or even hundreds of separately litigated federal cases) would result in gross inefficiencies, duplication of effort, and waste of party and judicial resources. Under that suboptimal scenario, the parties and multiple courts would expend

significant resources litigating and adjudicating common elements of the same questions over and over again in different jurisdictions, also raising the possibility (if not inevitability) of inconsistent rulings of all kinds. Such a scattershot approach would not only virtually guarantee divergent rulings on central questions, it could also encourage gamesmanship among the parties to accelerate and decelerate different cases at different times in the hopes of gaining a strategic advantage. In addition to the duplication and delays, such an outcome has the potential to produce disparate and unfair outcomes for different plaintiffs and defendants, depending on when and where their cases were tried.

The very real problems with rejecting centralization are particularly acute here, where the litigation will inevitably involve, and likely be dominated by, numerous class actions. Because the plaintiff businesses were subject to universal denials, most if not all of the policyholders in any given industry in any given state will have a common cause of action against their insurer. Many such cases may well be tried as class actions. In this context, centralization becomes of paramount importance: "It is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest." *In re Plumbing Fixture Cases*, 298 F. Supp. at 493; *accord In re Multidistrict Private Civ. Treble Damage Litig. Involving Plumbing Fixtures*, 308 F. Supp. 242, 244 (J.P.M.L. 1970) ("[A] potential for conflicting or overlapping class actions presents one of the strongest reasons for transferring such related actions to a single district for coordinated or consolidated pretrial proceedings which will include an early resolution of such potential conflicts."). *See also In re CertainTeed Corp. Roofing Shingle Products Liability Litigation*, 474 F. Supp. 2d 1357, 1358 (J.P.M.L. 2007) (centralizing actions that involved "overlapping putative class actions."); *In re*

*Enron Secs. Derivative & ERISA Litig.*, 196 F. Supp. 2d 1375, 1376 (J.P.M.L. 2002) (granting transfer in part to prevent inconsistent pretrial rulings, especially concerning class certification).

The suggestion (Dkt. 198:6, Plaintiff Big Onion Response in Opposition to Motion to Transfer 19-20) that the parties and courts could instead rely on "informal coordination" and "cooperation between the parties" to ostensibly provide some of the benefits of centralization, while optimistic, fails to present a valid basis for denying coordination.[9] *In re Generic Digoxin & Doxycycline Antitrust Litig.*, 222 F. Supp. 3d at 1343 (rejecting the argument that "[i]nformal coordination and cooperation among the involved parties and courts" could substitute for an MDL and transferring additional cases into existing MDL that already included dozens of defendants selling dozens of different pharmaceutical products alleged to be involved in parallel price fixing schemes); *see also In re Capacitors Antitrust Litig.* (No. III), 285 F. Supp. 3d 1353, 1355 (U.S. Jud. Pan. Mult. Lit. 2017). Given the centrality of common facts and questions, and the strong chance that cases here will in substantial part proceed on a class action basis, there is every reason to expect that pre-trial proceedings will be more efficient if this litigation is coordinated.

### III. The Northern District of California is the Ideal Venue for this MDL.

The Northern District of California is the most appropriate venue because it has a strong connection to the harm and relevant facts. MDLs are often coordinated in the district at the

---

[9] The Big Onion Plaintiffs also suggest that 1404(a) transfer or the dismissal of duplicative actions under the first to file rule could obviate the need for a coordinated proceeding. *Id.* at 19-20. But even setting aside the costs of litigating those motions, it is difficult to understand how such motions could reduce the total nationwide caseload by a significant amount. *See In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prod. Liab. Litig.*, 363 F. Supp. 3d 1378, 1382 (U.S. Jud. Pan. Mult. Lit. 2019) (rejecting the 1404(a) argument Big Onion advances here in a case involving more than 90 defendants). It would do little to streamline, for example, the management of different classes of restaurants bringing class actions against different insurers using the same policy language.

center of the harm. *In re Deepwater Horizon*, 731 F. Supp. 2d at 1355 (centralizing cases arising from an oil spill impacting multiple states in the district where the oil caused the most harm). While this litigation is unquestionably national in scope, to the extent any region here can be characterized at the center of harm given the national nature of this global pandemic, it is the San Francisco Bay Area. First, this region, including its six major counties, issued the first shelter in place orders in the country, meaning that its restaurants and other businesses have been suffering (and denied business interruption coverage) the longest.[10] *See, e.g.,* John Woolfolk and Harriet Blair Rowan, April 8, 2020, San Jose Mercury News, "How California has contained coronavirus — and New York has not," www.mercurynews.com/ 2020/04/08/how-california-has-contained-coronavirus-and-new-york-has-not/ (last accessed June 1, 2020).

Second, as other parties seeking to transfer to their preferred venue have acknowledged, California has the highest concentration of hospitality jobs in the country. Dkt. 9 (El Novillo Response ISO Motion to Transfer) at 6, n. 9. This is particularly relevant in the context of restaurants, which are at the center of most of the cases and briefing at issue. California has at least 60% more restaurants than New York, Texas, and Florida, and more than triple the number of restaurants of each of the other 46 states. Statista, June 2018, "Number of restaurants and eating places in the United States in 2017, by state," https://www.statista.com/statistics/800737/number-of-restaurants-and-eating-places-in-the-us-by-state/ (last accessed June 1, 2020).

This is not simply a matter of population. The city of San Francisco has the highest per capita number of restaurants of any city in the United States. Paula Forbes, Aug 1, 2012, "Here Are the Most Restaurant- and Bar-Dense US Cities," https://www.eater.com/2012/8/1/6559451/

---

[10] In proposed venues like Florida and Pennsylvania, by contrast, restrictions started later and have been lifted to a greater extent, earlier, than in the San Francisco Bay Area. *See* Dkt. 198 (Plaintiff Big Onion Response in Opposition to Motion to Transfer) at 12, n. 9.

here-are-the-most-restaurant-and-bar-dense-us-cities (last accessed June 1, 2020). In this case, where the closure orders significantly depressed the income of virtually every restaurant in America, these statistics provide a direct window into the harm at issue. California businesses suffered more harm from coverage denials than any other state because of the state's size and population, *and* because its economy is characterized by strong restaurant and hospitality sectors. In normal times, California's restaurant industry provides 1.8 million jobs and $97 billion in annual sales revenue. National Restaurant Association, 2019, "California: Restaurant Industry at a Glance," https://restaurant.org/downloads/pdfs/state-statistics/california.pdf (last accessed June 1, 2020). Although the total impact of the closures has yet to be measured, with so many restaurants operating at a loss for months (and with the longer-running restrictions in the Northern California counties as compared to other parts of the country), the harm to California businesses and to Northern California business in particular, is likely to be proportionately greater still. Simply put, if there is any state at the center of this national issue, whose law is most relevant to the most businesses being denied insurance coverage, it is California.

California is also a venue where most large insurance carriers are at home. Defendant Fireman's Fund has been based in the proposed transferee district since 1863, and other large insurers like Farmer's are also based in California as well. "Farmers Insurance Group," https://www.bloomberg.com/profile/company/ 0542370D:US (last accessed June 1, 2020). Most of the other large insurers in the United States have offices in and do business in California. California Department of Insurance, 2019, Market share Report, http://www.insurance.ca.gov/ 01-consumers/120-company/04-mrktshare/2019/upload/ MktShrDataPC2019WA_Apr3020.xlsx (last accessed May 28, 2020). More policy holders are located in California as compared to any other state. California thus has a strong connection to both sides of the case.

The Northern District of California is particularly well equipped to manage this MDL. For example, its judges have been quick to adopt technological methods of keeping cases, including other MDLs, moving notwithstanding Covid-19. *See, e.g., In Re Juul Labs,* 3:19-md-0291,3 Dkt. 572–3 (Case Management Order No. 9, Deposition Protocol Order) (scheduling numerous electronic hearings and depositions). It is also one of the few districts in the country, and the only one proposed to the Panel as of this writing, with no judicial vacancies. https://www.uscourts.gov/ judges-judgeships/judicial-vacancies/current-judicial-vacancies.[11]

Moreover the four District Judges in the Northern District of California assigned to cases that are proposed to be coordinated have experience managing MDLs. *See* www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-May-15-2019.pdf; MDL No. 1486, 3:07-CV-01200. At the same time, none of those MDLs are presently active, so Judge Tigar, Judge Chesney, Judge Hamilton, and Judge White may be available to manage this one. The Panel should also note that Judge Chesney previously managed an MDL involving a disease outbreak that implicated hotels and restaurants. *See In Re: Yosemite National Park Hantavirus Litigation*, MDL 2532. Her expertise in those areas could militate in favor of a transfer to her court. *See In re Automated Transactions LLC Patent Litig.*, 938 F. Supp. 2d 1353 (J.P.M.L. 2013). Of course, there are also many other outstanding jurists in the District who are not yet attached to this litigation but capable of effectively managing this matter.

IV.    **Conclusion**

For the forgoing reasons, we respectfully request that the Panel coordinate these actions, transfer them to the Northern District of California, and assign them to a Transferee Judge in that district pursuant to 28 U. S.C. Section 1407.

---

[11] Its judges tend to resolve cases efficiently, in 9 months on average, and to trial in 22. https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2019.pdf.

Respectfully submitted,

Dated: June 5, 2020

           */s/ Robert J. Nelson*
Robert J. Nelson

Elizabeth J. Cabraser (No. 83151)
Robert J. Nelson (State Bar No. 132797)
Fabrice N. Vincent (State Bar No. 160780)
Jacob H. Polin (State Bar No. 311203)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

Alexandra L. Foote (State Bar No. 225695)
LAW OFFICE OF ALEXANDRA L. FOOTE, P.C.
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 786.408.8083
Facsimile: 415.956.0561

*Attorneys for Plaintiffs*
Nari Suda LLC, Pakin Corporation Sero, Inc., and Water Sports Kauai Inc.