**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

IN RE: COVID-19 BUSINESS      )
INTERRUPTION PROTECTION )               MDL No. 2942
INSURANCE LITIGATION        )

**PLAINTIFFS' REPLY IN SUPPORT OF SUBSEQUENT MOTION
FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR
<u>COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS</u>**

Plaintiffs Christie Jo Berkseth-Rojas DDS; Bridal Expressions LLC; Caribe Restaurant &

Nightclub, Inc. (d/b/a Laz Luz Ultralounge); Dakota Ventures, LLC (d/b/a Kokopelli Grill and

Coyote BBQ Pub); GIO Pizzeria & Bar Hospitality, LLC; GIO Pizzeria Boca, LLC; Rising

Dough, Inc. (d/b/a Madison Sourdough); Willy McCoys of Albertville LLC; Willy McCoys of

Shakopee LLC (d/b/a McCoys Copper Pint); Whiskey Jacks of Ramsey, LLC (d/b/a Willy

McCoys Ramsey); and Troy Stacy Enterprises Inc. (d/b/a/ Craft & Vinyl) respectfully submit

this reply in support of their Subsequent Motion for Transfer of Actions Pursuant to 28 U.S.C. §

1407 for Coordinated or Consolidated Pretrial Proceedings (Dkt. No. 4.)  Movants are joined in

their original motion and in this reply by Plaintiffs Willy McCoys of Andover LLC; Willy

McCoys Chaska LLC; Green Hills Grille LLC; Cash-McKeown Futures LLC (d/b/a Mere

Bulles); The K's Inc.; Doug Coates and Marcia Hille; JDL Inc. (d/b/a Vegas Image); LC Candy

LLC; Cosmetic Laser Inc.; Dr. Jeffrey Milton, DDS, Inc.; One40 Beauty Lounge, LLC;

Paradigm Care & Enrichment Center, LLC; Paradigm Care & Enrichment Center 2, LLC;

Creative Paths Learning Center, Inc.; Creative Paths Infant Center, Inc.; Byberry Services &

Solutions, LLC (d/b/a Snap Fitness); JA Fitness 1, LLC (d/b/a Snap Fitness); JA Fitness 2, LLC

(d/b/a Snap Fitness); and Crescent Plaza Hotel Owner L.P. (together with the above, "Movants").

Collectively, Movants have filed sixteen of the class actions included among these related

actions.

Movants join the many responses that have been filed in support of transfer of all of these related actions for centralization, particularly those advocating for transfer to the Northern District of Illinois.[1]  In this reply, Movants have endeavored not to repeat these arguments, but, instead, to present several points for the Panel's consideration that have not been extensively discussed thus far, including:  (1) the nature of the law of contract behind the interpretation of insurance policies and its emphasis on the language of the policies itself; (2) the work done by Professor Tom Baker at Penn Law School identifying nearly identical form language across the various defendants' insurance policies; (3) the procedures established in the United Kingdom to resolve the same claims as those at issue here in a centralized, expedited manner; and (4) Movants' proposal for managing these actions to ensure that centralization enhances, rather than impedes, the prospects for expeditiously resolving these claims.

## I.     THE COMMON QUESTIONS IN THESE ACTIONS WARRANT CENTRALIZATION.

The legal questions raised by these related actions center on the contractual interpretation of business interruption insurance policies.  As Professor Farnsworth pointed out in his landmark treatise on Contract Law, "[m]ost of what we usually think of as 'contract law' consists of a legal framework within which parties may create their own rights and duties by agreement."  E. Allan Farnsworth, Farnsworth on Contracts, at 218.  And, "society confers upon contracting parties wide power to shape their relationship.  In this country more than in most, parties tend to take advantage of their power to define their relationships by written agreements that are detailed and prolix."  *Id.*  The various state laws provide the framework for the relationship, governing, for

---

[1] Plaintiffs join in full those responses advocating for transfer and centralization in whole in the Northern District of Illinois, including Dkt. Nos. 184, 189, 396, 424, 439, 442, and 478. Plaintiffs further join those responses advocating for transfer and centralization in whole in other districts, *see* Dkt. Nos. 9, 169, 369, 416, 432, 439, 462, 464, 472, and 481, but respectfully disagree with their preferred choice of transferee venue.

example, what constitutes offer and acceptance in forming the contract or what type of mistake can avoid the contract, but these are not the framework issues that will be litigated in these cases. These cases will be decided by the policies say.

The American Law Institute's Restatement of the Law Liability Insurance ("RLLI") is in accord. As it discusses, most states have adopted a standard and uniform approach to interpreting insurance policies. RLLI §§ 2-4. The Reporters' Notes to Sections 2 to 4 of the RLLI provide a useful guide to leading insurance policy interpretation cases in almost every state. *See, e.g.*, Reporters' Note to RLLI § 3 comment a (stating that "courts generally employ the ordinary rules of contract interpretation in insurance cases"). The RLLI notes that state courts begin the interpretation process by analyzing the plain meaning of the relevant insurance policy provisions in the context of the facts of the claim at issue. RLLI § 3. Under most states' laws, this is the end of the analysis, unless the insurance policy provision is somehow ambiguous in that factual context. *Id.*, comment a. And even in those jurisdictions that apply "latent ambiguity" or a "strong form" of the doctrine of reasonable expectations (pursuant to which a court can ignore policy language that conflicts with the expectations of a reasonable policyholder), either doctrine is only rarely employed in a way that produces an outcome that is different than would be reached under the plain meaning rule. *Id.* at Reporters Note to § 3, comment h and § 4, comment d. Thus, it is the insurance policy, and not differences in state insurance law, that practically determines whether there is coverage for a particular claim.

Many of the responses opposing consolidation raise the specter of differences among the state laws applying to the business interruption insurance policies at issue. Significantly, however, not a single one of the responses in opposition has identified any significant differences that would lead to materially different outcomes when applied to the policies at issue here. For

example, the response submitted by defendants Westchester Surplus Lines Insurance Company and Indemnity Insurance Company of North America, with which the responses of many other defendants join,[2] relies on examples that it concedes are "not at issue in these coverage cases." Dkt. No. 376 at 9.   A choice of law analysis is necessary only when there is a conflict between the laws of different forums.   There are no conflicts of laws here because there simply is no law or legal rule anywhere with respect to how the language of the various policies apply to the facts of the COVID-19 pandemic.   For example, there is no established rule, either by case law or statute, about whether the threat or presence of COVID-19 constitutes "physical loss or damage" to the various plaintiffs' properties as that term is used in the various insurance policies. Ultimately, whether a judge sits in federal court in Chicago or in the Alaska Supreme Court, she will be looking to what the parties said in the insurance policies and how the COVID-19 epidemic unfolded to decide the case.

Similarly, although it opposes transfer, United Policyholders aptly sums up the respective roles that state law and policy language play in the interpretation of any given policy:  "It is a nationwide tenet of insurance law that insurance coverage depends not on common law rules, but on the specific language of a specific insurance policy issued to the specific policyholder in the case at bar."   Dkt. 470 at 5.   Thus, the best gauge of whether these actions share sufficient commonality to warrant their centralization is the language of the policies at issue themselves.

To that end, Plaintiffs submit the attached declaration from Professor Tom Baker, William Maul Measey Professor at the University of Pennsylvania Carey School of Law.

---

[2] *See, e.g.*, Dkt. 388 at 1 (Topa); Dkt. 398 at 1 (Cincinnati); Dkt. 413 at 1 (Badger); Dkt. 414 at 1 (Allianz); Dkt. 418 at 1 (Travelers); Dkt. 425 at 2 (Hartford); Dkt. 426 at 1 (Admiral); Dkt. 428 at 1 (Aspen); Dkt. 429 at 1 (Sompo); Dkt. 436 at 1 (Starr Surplus); Dkt. 445 at 1 (Lancer); Dkt. 449 at 2 (Erie); Dkt. 452 at 2 (CNA); Dkt. 455 at 1 (Evanston); Dkt. 459 at 1 (FCCI); Dkt. 465 at 1 (Zurich); Dkt. 467 at 1 (Farmers).

Professor Baker is one of the nation's foremost experts on insurance markets and serves as the Reporter for the RLLI.  (Ex. A, Baker Decl. ¶¶ 2-3.)  Professor Baker's latest research project is the COVID Coverage Litigation Tracker, a database that tracks the business interruption insurance policies at issue in both state and federal COVID-19 insurance coverage cases.  (*Id.* ¶ 4.)  Professor Baker's research has confirmed that the much of the material language in each of the policies at issue in the cases constituting this proposed MDL proceeding are nearly identical:

- Each policy, using nearly uniform language, defines covered business losses as those "caused by direct" loss or damage resulting from "a Covered Cause of Loss";

- A "Covered Cause of Loss" is defined, in turn, as direct loss or damage, unless otherwise excluded or limited in terms, with virtually no variation from policy form to policy form;

- Finally, the policies each further define, using nearly identical language, a covered extra expense as a necessary expense sustained "during the 'period of restoration'" that would not have been incurred without any direct loss or damage to property.

(*Id.* ¶ 9 & at 5.)  This complete absence of significant variation across the insurance policies in question has enabled Professor Baker to group the policies into a small number of categories, each including a set of cases in which the policies incorporate the same form language.  (*Id.* ¶ 5-6.)  While Professor Baker's research is ongoing, he does not, based on his substantial experience with insurance coverage, anticipate that what little variation there may be will significantly expand.  (*Id.* ¶ 10.)

As Professor Baker discusses in his Declaration, the uniformity in the language of these policies is no accident:  Each issued policy is based on a numbered form, typically drafted by an industry service organization (an "ISO") or based on an ISO draft with only minor variations. (*Id.* ¶ 8.)  There are many reasons why the insurance industry relies on standard form policies that vary, if at all, very little from each other.  (*Id.* ¶¶ 11-12.)  By issuing policies with standard form language, insurers can better set prices and reserves, respond to legal developments in the interpretation of their policies, and prepare policies to issue in new markets.  (*Id.*)  Other players in the insurance industry also benefit from uniformity in policy language.  Regulators can more efficiently monitor the industry, policyholders and brokers can more easily compare policies, and underwriters and claims professionals can more easily move from one insurer to another.  (*Id.*) Insurers' present push for a multitude of litigation venues is in irreconcilable tension with their historic concerns for uniformity that pushed them to standardize policy forms in the first place. There simply is no public purpose to be served by having a multitude of courts decide how standard form language responds to a common risk.  It not only thwarts efficient adjudication; it also thwarts the very idea of standardization.

Recognizing the existence of these common questions, a few plaintiffs have proposed "partial consolidation" schemes, centralizing these actions by defendant or by state.  *See, e.g.*, Dkt. No. 474 (advocating for defendant-specific centralization); Dkt. No. 477 (advocating for state-by-state centralization).  However, breaking these cases into regional or defendant-specific tracks will nullify the important benefits of transferring and centralizing these cases before a single judge.  Indeed, the briefing of the motions to transfer in this MDL clearly illustrates the redundancies that would plague a defendant-by-defendant approach.  Despite the limited pool of money available to satisfy judgments in these actions that is far exceeded by the trillions in

business losses, Defendants here have submitted 29 mostly redundant responses, with dozens of law firms doing the work that could have been accomplished by one or two.

In the *Opiate* MDL, which bears several similarities to this MDL in the number of defendants and state laws at issue, this Panel opted for nationwide centralization before a single judge.  In response to arguments similar to those that MDL opponents have advanced here about purported differences among the various parties' claims, this Panel advised that "[t]he transferee judge might find it useful, for example, to establish different tracks for the different types of parties or claims."  *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1378 (J.P.M.L. 2017).  This option would also be available to any transferee judge overseeing these cases, which are even more well-suited for centralization than the opiate actions were:  (1) rather than the complex common-law tort and consumer protection questions raised in the opiate cases, these cases present simple and straightforward issues of contractual interpretation; and (2) rather than presenting significantly different circumstances from plaintiff to plaintiff, the plaintiff businesses here were all harmed in the same manner—the blanket denial of every insurance claim stemming from the same set of circumstances, a major pandemic that prompted civil shutdown orders— leading to the same or similar facts in every single one of these cases.[3]  Thus, this MDL should lend itself even more easily that the *Opiate* MDL to an approach employing sequencing or tracks in such a way that will yield significant and speedy progress towards resolution, as more fully discussed immediately below.

---

[3] This second factor distinguishes this MDL from other insurance coverage cases that many transfer opponents rely upon here.  For example, in *In re Fla., Puerto Rico, & U.S. Virgin Islands 2016 & 2017 Hurricane Seasons Flood Claims Litig.*, 325 F. Supp. 3d 1367 (J.P.M.L. 2018) the defendant insurers were not alleged to have simply denied the claims in full, as here, but, instead, for settling claims at amounts lower than the losses sustained, which necessitated a highly fact-specific inquiry.  *Id.* at 1368; *see also In re The Great W. Cas. Co. Ins. Litig.*, 176 F. Supp. 3d 1371, 1372 (J.P.M.L. 2016) (noting "the unique facts and legal issues presented by each case").

## II.     CENTRALIZATION WILL EXPEDITE THE RESOLUTION OF THESE INSURANCE COVERAGE CLAIMS.

Several plaintiffs object to centralization based on their stated concern that centralization will delay the resolution of their claims.  *See, e.g.*, Dkt. No. 444 at 7-9.  Centralization, however, will actually have the opposite effect:  By placing these actions in the hands of a single jurist empowered to make critical pretrial rulings for every action, the road to resolving each of these actions will be significantly shorter, smoother, and more efficient than permitting the hundreds of constituent cases here to separately proceed.

The United Kingdom's recent experience with resolving the same kind of business interruption insurance coverage claims at issue here is instructive.  The level of uniformity among policy language has enabled the UK to adopt a centralized mechanism for addressing these claims.  Indeed, on June 1, 2020, the Financial Conduct Authority of the UK (the "FCA"), after reviewing policies from eight different insurers, determined that the property insurance policies issued in that jurisdiction fall within no more than seventeen different policy categories. Ex. A, Baker Decl. ¶ 7.  Adjudication of the form policy within each category, when combined with a small set of "questions for determination," enables resolution of thousands of claims, even for insurers beyond the original group of eight.  *Id.*[4]  This program serves as a useful template for how an MDL transferee court could similarly prepare these cases for quick resolution through a series of pivotal pretrial rulings.

Specifically, here, the transferee court will advance these cases by, at an early, post-transfer, stage of the litigation, making dispositive rulings on a small number of threshold issues, including:

---

[4] More information about the FCA's proceedings is available at https://www.fca.org.uk/firms/ business-interruption-insurance#latest-updates.

(1)     What did the parties to the insurance policies mean by the term "direct physical loss or damage" (or language very similar) as it applies to COVID-19?

(2)     Where was COVID-19 and did its presence constitute "direct physical loss or damage"?

(3)     By impairing the business function of property, did the imminent threat of COVID-19 cause "direct physical loss or damage"?

(4)     What is the importance of a policy containing or not containing a virus exclusion?

(5)     In light of express virus exclusions, is it sufficient to bar coverage for an insurer to insert the word "virus" in a pollution exclusion, a contamination exclusion, or a wood disease exclusion?

(6)     How is it to be determined how many "per occurrence" limits in an insurance policy are triggered by the facts surrounding the COVID-19 pandemic's impact on a particular business' operations?

Answers to this small number of questions would dispose of most, if not all, of the disputed issues in these actions.  This would only be possible, however, where a single transferee court could make such rulings without the risk of parallel, inconsistent rulings being made by other federal courts.

## III.     THE NORTHERN DISTRICT OF ILLINOIS IS THE BEST FORUM FOR THIS MULTIDISTRICT LITIGATION.

Not including Movants, at least 59 other plaintiffs in 31 actions filed in seventeen separate districts have expressed their support for transfer to the Northern District of Illinois; with most of these plaintiffs also echoing Movants' support for assignment to the Honorable Matthew F. Kennelly.  *See* Dkt. No. 19 at 5 (one plaintiff stating "Chicago, centrally located as it is, is a better venue for consolidating these matters"); Dkt. No. 184 at 1 (two plaintiffs stating

"the centrally-located Northern District of Illinois is the ideal forum for this nationwide proceeding"); Dkt. No. 189 at 5 (two plaintiffs stating "Chicago is the logical choice for centralization"); Dkt. No. 396 at 21 (41 plaintiffs noting "centralization in the Northern District of Illinois satisfies every relevant factor"); Dkt. No. 424 at 2 (five plaintiffs noting "the nonpareil suitability of Judge Matthew F. Kennelly as a shepherd of complex consolidated litigation"); Dkt. No. 439 at 6 (one plaintiff stating "the Northern District of Illinois is an easily accessible and central location"); Dkt. No. 442 at 1 (two plaintiffs requesting transfer to the Northern District of Illinois); Dkt. No. 461 at 6 (two plaintiffs stating "the Northern District of Illinois is the most appropriate forum because many large insurer defendants are headquartered in Illinois, the district is geographically central, and the district has able and experienced jurists."); Dkt. No. 478 at 1 (three plaintiffs stating "the Eastern Division of the Northern District of Illinois' central geographic location and accessibility render it the best forum to host this MDL").

Thus, the Northern District of Illinois enjoys, by far, the broadest support among the various groups of plaintiffs supporting transfer, with ten independent plaintiff groups each filing responses in support.  *See* Dkt. Nos. 4, 19, 184, 189, 396, 424, 439, 442, 461, 478.  By comparison, the Eastern District of Pennsylvania is supported by only half as many plaintiff groups, with five independent plaintiff groups advocating transfer to that forum.  *See* Dkt. Nos. 1, 369, and 532 (all filed by the same plaintiffs' counsel); *see also* Dkt. Nos. 169, 391, 416, 462. Furthermore, while the other set of movants tout the support of plaintiffs in 58 of these related actions for transfer to the Eastern District of Pennsylvania, *see* Dkt. No. 543 at 9, *plaintiffs in 50 of those 58 actions are all represented by the same movants' counsel*.  Dkt. Nos. 1 (two actions), 369 (thirty actions), and 532 (eighteen actions).  The support for the Eastern District of Pennsylvania by any other plaintiffs' counsel is tepid, with plaintiffs in only eight other actions

joining the request for transfer to the Eastern District of Pennsylvania.  By contrast, Movants here, plaintiffs in sixteen actions, are joined by plaintiffs in 31 other actions.  *See* Dkt. Nos. 19 (one action), 184 (one action), 189 (two actions), 396 (eighteen actions), 424 (three actions), 439 (one action), 442 (two actions), 461 (two actions), 478 (one action).  Thus, the Northern District of Illinois has almost ***four times*** the support of non-moving plaintiffs that the Eastern District of Pennsylvania has.

Of course, the choice of forum is not simply up for the convenience of plaintiffs, but, as 28 U.S.C. § 1407 provides, for the convenience of all "parties and witnesses."  The convenience of the defendant insurers and their employee witnesses is much better served by transfer to the Northern District of Illinois.  As has already been discussed in Movants' opening brief and other responses, many defendant insurers have their headquarters—or, at the very least a significant presence, in the Chicago area.  *See, e.g.*, Dkt. No. 4-1 at 12-15; Dkt. No. 396 at 22-23. The other movants have failed completely, in any of their four briefs, to identify any presence in the Eastern District of Pennsylvania that would further the convenience of defendants and witnesses. This factor weighs strongly in favor transferring these actions to the Northern District of Illinois. *See, e.g.*, *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 410 F. Supp. 3d 1357, 1360 (J.P.M.L. 2019) ("select[ing] the Central District of California as the transferee district" because "[s]everal defendants are headquartered in that district, and relevant documents and witnesses likely will be found there"); *In re Ford Motor Co. F-150 and Ranger Truck Fuel Economy Mktg. and Sales Practices Litig.*, 412 F. Supp. 3d 1355, 1356 (J.P.M.L. 2019) ("conclud[ing] that the Eastern District of Michigan is an appropriate transferee forum" because "Ford, the sole defendant in all actions, has its headquarters in this district, and thus relevant documents and witnesses will be located in this district").

In light of this substantial support, as well as the other factors already discussed in favor of the Northern District of Illinois, including its geographic centrality and the District's experience in multidistrict litigation, the Northern District of Illinois is the optimal transferee forum for this MDL.

## IV.   CONCLUSION

For the above-stated reasons, as well as those stated in the responses that Movants have joined and in Movants' original motion, Movants respectfully request that the Panel grant their subsequent motion to transfer and transfer the related actions for coordinated or consolidated pretrial proceedings before the Honorable Matthew F. Kennelly in the United States District Court for the Northern District of Illinois.

Dated:  June 15, 2020                      Respectfully submitted,


                                           /s/ *Adam J. Levitt*
                                           Adam J. Levitt
                                           John E. Tangren
                                           Amy E. Keller
                                           Daniel R. Ferri
                                           Mark Hamill
                                           Laura E. Reasons
                                           **DiCELLO LEVITT GUTZLER LLC**
                                           Ten North Dearborn Street, Sixth Floor
                                           Chicago, Illinois  60602
                                           Telephone:  312-214-7900
                                           alevitt@dicellolevitt.com
                                           jtangren@dicellolevitt.com
                                           akeller@dicellolevitt.com
                                           dferri@dicellolevitt.com
                                           mhamill@dicellolevitt.com
                                           lreasons@dicellolevitt.com

Mark A. DiCello
Kenneth P. Abbarno
Mark Abramowitz
**DICELLO LEVITT GUTZLER LLC**
7556 Mentor Avenue
Mentor, Ohio  44060
Telephone:  440-953-8888
madicello@dicellolevitt.com
kabbarno@dicellolevitt.com
mabramowitz@dicellolevitt.com

Mark Lanier
Alex Brown
Ralph (Skip) McBride
**THE LANIER LAW FIRM PC**
10940 West Sam Houston Parkway North
Suite 100
Houston, Texas  77064
Telephone:  713-659-5200
WML@lanierlawfirm.com
alex.brown@lanierlawfirm.com
Skip.McBride@lanierlawfirm.com

Timothy W. Burns
Jeff J. Bowen
Jesse J. Bair
Freya K. Bowen
**BURNS BOWEN BAIR LLP**
One South Pinckney Street, Suite 930
Madison, Wisconsin 53703
Telephone: 608-286-2302
tburns@bbblawllp.com
jbowen@bbblawllp.com
jbair@bbblawllp.com
fbowen@bbblawllp.com

Douglas Daniels
**DANIELS & TREDENNICK**
6363 Woodway, Suite 700
Houston, Texas  77057
Telephone:  713-917-0024
douglas.daniels@dtlawyers.com

*Counsel for Plaintiffs*