HARJANI

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.3.3 (Chicago)
### CIVIL DOCKET FOR CASE #: 1:20-cv-03249

| | |
|---|---|
| Jerry's Sandwiches AV, LLC et al v. Erie Insurance Company | Date Filed: 06/02/2020 |
| Assigned to: Honorable John J. Tharp, Jr | Jury Demand: Plaintiff |
| Demand: $75,000 | Nature of Suit: 110 Contract: Insurance |
| Cause: 12:635 Breach of Insurance Contract | Jurisdiction: Diversity |

**Plaintiff**

**Jerry's Sandwiches AV, LLC**
*a citizen of Illinois*

represented by **Michael S. Agruss**
Agruss Law Firm LLC
4809 N. Ravenswood Ave, Suite 419
Chicago, IL 60640
312 224 4695
Email: michael@agrusslawfirm.com
*ATTORNEY TO BE NOTICED*

**Taylor Leigh Kosla**
Agruss Law Firm, Llc
4809 N. Ravenswood Ave.
Suite 419
Chicago, IL 60640
(312) 224-4695
Email: taylor@agrusslawfirm.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Jerry's Sandwiches LS, LLC**
*a citizen of Illinois*

represented by **Michael S. Agruss**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Taylor Leigh Kosla**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Erie Insurance Company**
*a citizen of the Commonwealth of Pennsylvania*

represented by **Bruce Michael Lichtcsien**
Hinkhouse Williams Walsh
180 N. Stetson Avenue
Suite 3400
Chicago, IL 60601
(312) 784-5431

Email: blichtcsien@hww-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan Robert Puskar**
Hinkhouse Williams Walsh LLP
180 North Stetson
Suite 3400
Chicago, IL 60601
(312) 784-5400
Email: jpuskar@hww-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/26/2020 | 4 | ORDER: Fourth Amended General Order 20-0012 IN RE: CORONAVIRUS COVID-19 PUBLIC EMERGENCY Signed by the Chief Judge Rebecca R. Pallmeyer on May 26, 2020. This Order does not extend or modify any deadlines set in civil cases. For non-emergency motions, no motion may be noticed for presentment on a date earlier than July 15, 2020. See attached Order. Signed by the Honorable Rebecca R. Pallmeyer on 5/26/2020: Mailed notice. (rc, ) (Entered: 06/02/2020) |
| 06/02/2020 | 1 | COMPLAINT filed by Jerry's Sandwiches AV, LLC, Jerry's Sandwiches LS, LLC; Jury Demand. Filing fee $ 400, receipt number 0752-17072419. (Attachments: # 1 Civil Cover Sheet)(Kosla, Taylor) (Entered: 06/02/2020) |
| 06/02/2020 | 2 | ATTORNEY Appearance for Plaintiffs Jerry's Sandwiches AV, LLC, Jerry's Sandwiches LS, LLC by Taylor Leigh Kosla (Kosla, Taylor) (Entered: 06/02/2020) |
| 06/02/2020 | | CASE ASSIGNED to the Honorable John J. Tharp, Jr. Designated as Magistrate Judge the Honorable Sunil R. Harjani. Case assignment: Random assignment. (txl, ) (Entered: 06/02/2020) |
| 06/02/2020 | 3 | ATTORNEY Appearance for Plaintiffs Jerry's Sandwiches AV, LLC, Jerry's Sandwiches LS, LLC by Michael S. Agruss (Agruss, Michael) (Entered: 06/02/2020) |
| 06/02/2020 | | SUMMONS Issued as to Defendant Erie Insurance Company. (ng, ) (Entered: 06/02/2020) |
| 06/03/2020 | 5 | NOTICE TO THE PARTIES - The Court is participating in the Mandatory Initial Discovery Pilot (MIDP). The key features and deadlines are set forth in this Notice which includes a link to the (MIDP) Standing Order and a Checklist for use by the parties. In cases subject to the pilot, all parties must respond to the mandatory initial discovery requests set forth in the Standing Order before initiating any further discovery in this case. Please note: The discovery obligations in the Standing Order supersede the disclosures required by Rule 26 (a)(1). Any party seeking affirmative relief must serve a copy of the following |

| | | documents (Notice of Mandatory Initial Discovery and the Standing Order) on each new party when the Complaint, Counterclaim, Crossclaim, or Third-Party Complaint is served. (mc, ) (Entered: 06/03/2020) |
|---|---|---|
| 06/03/2020 | 6 | NOTICE of Correction 5 (mc, ) (Entered: 06/03/2020) |
| 06/11/2020 | 7 | SUMMONS Returned Executed by Jerry's Sandwiches AV, LLC, Jerry's Sandwiches LS, LLC as to Erie Insurance Company on 6/3/2020, answer due 6/24/2020. (Kosla, Taylor) (Entered: 06/11/2020) |
| 06/12/2020 | 8 | MINUTE entry before the Honorable John J. Tharp, Jr: The parties are directed to review the procedures for initial status conferences, located at [https://www.ilnd.uscourts.gov/judge-info.aspx?79eF+7uiX7ewBj/ITKrjoA==], and to submit the required initial status report no later than 7/1/20. The report should include a proposed case management schedule reflecting any disputes between the parties as to the proposed schedule.Mailed notice (air, ) (Entered: 06/12/2020) |
| 06/24/2020 | 9 | ATTORNEY Appearance for Defendant Erie Insurance Company by Bruce Michael Lichtcsien (Lichtcsien, Bruce) (Entered: 06/24/2020) |
| 06/24/2020 | 10 | ANSWER to Complaint by Erie Insurance Company(Lichtcsien, Bruce) (Entered: 06/24/2020) |
| 06/24/2020 | 11 | ATTORNEY Appearance for Defendant Erie Insurance Company by Jonathan Robert Puskar (Puskar, Jonathan) (Entered: 06/24/2020) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/29/2020 09:12:23 | | |
| **PACER Login:** | jp7331:4273107:4267881 | **Client Code:** |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-03249 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

**PACER fee: Exempt**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JERRY'S SANDWICHES AV, LLC, a )
citizen of Illinois, and JERRY'S )
SANDWICHES LS, LLC, a citizen of )
Illinois, )
        )
           Plaintiffs, )
        )
        v. )        Case No.:  1:20-cv-3249
        )
ERIE INSURANCE COMPANY, a citizen )
of the Commonwealth of Pennsylvania, )
        )        **JURY TRIAL DEMANDED**
        )
           Defendant. )

---

## COMPLAINT AT LAW

NOW COME Plaintiffs, JERRY'S SANDWICHES AV, LLC and JERRY'S SANDWICHES LV, LLC (hereinafter "Plaintiffs"), by and through their attorneys, Agruss Law Firm, LLC, and complaining of Defendant, ERIE INSURANCE COMPANY ("Defendant"), respectfully state unto this Honorable Court as follows:

### PARTIES

1. Plaintiff JERRY'S SANDWICHES AV, LLC is an Illinois Limited Liability Company with its principal place of business at 5419 N. Clark Street, City of Chicago, Cook County, State of Illinois.

2. Plaintiff JERRY'S SANDWICHES AV, LLC's members are Mark Bires and Mindy Friedler – both of whom are Illinois citizens.

1

3. Plaintiff JERRY'S SANDWICHES AV, LLC owns, operates, manages, and/or controls the business known as Jerry's Sandwiches at the premises it owns, rents or occupies located at 5419 N. Clark Street, City of Chicago, Cook County, State of Illinois.

4. Plaintiff JERRY'S SANDWICHES LS, LLC is an Illinois Limited Liability Company with its principal place of business at 4739 N. Lincoln Avenue, City of Chicago, Cook County, State of Illinois.

5. Plaintiff JERRY'S SANDWICHES LS, LLC's members are Mark Bires and Mindy Friedler – both of whom are Illinois citizens.

6. Plaintiff JERRY'S SANDWICHES LS, LLC owns, operates, manages, and/or controls the business known as Jerry's Sandwiches at the premises it owns, rents or occupies located at 4739 N. Lincoln Avenue, City of Chicago, Cook County, State of Illinois.

7. Plaintiffs' businesses located at 5419 N. Clark Street, Chicago, Illinois and 4739 N. Lincoln Avenue, Chicago, Illinois are insured properties (collectively "Insured Properties").

8. Defendant is a citizen of the Commonwealth of Pennsylvania, as it is a reciprocal insurance exchange organized and existing in the Commonwealth of Pennsylvania and maintains its principal place of business in the Commonwealth of Pennsylvania.

9. At all times relevant Defendant was licensed to do business in the State of Illinois, selling property and casualty insurance policies to restaurants, restaurants, and other hospitality businesses.

10. Defendant is transacting the business of insurance in the State of Illinois and the basis of this suit arises out of such conduct.

2

## JURISDICTION AND VENUE

11. This court has diversity subject-matter jurisdiction over the instant case pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

12. This court has personal jurisdiction over the Defendant pursuant to Federal Rule of Civil Procedure 4(k) as it is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.

13. This court has personal jurisdiction over Defendant pursuant to Illinois' long-arm statute, 735 ILCS 5/2-209, because this matter concerns: (1) one or more contracts made to insure property and/or risk in Illinois, (2) business that Defendant transacted within Illinois, and (3) one or more contracts and/or promises Defendant made that are substantially connected with Illinois. 735 ILCS 5/2-209(a)(1), (4), (7). In addition, Defendant exercises systematic and continuous contacts with Illinois by doing business in Illinois, serving insureds in Illinois, and seeking additional business in Illinois.

14. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2) as it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## COVID-19 PANDEMIC

15. As the Court is undoubtedly aware, SARS-CoV-2, the novel coronavirus that causes the COVID-19 disease, has caused a global pandemic.

## EXECUTIVE ORDERS

16. On March 16, 2020, Illinois Governor J.B. Pritzker issued Executive Order No. 7. A copy of which is attached hereto as Exhibit A.

3

17. Executive Order No. 7 specifically suspended service for and may not permit on-premises consumption for all business offering food or beverages (Ex. A).

18. Executive Order No. 7 went into effect on March 16, 2020 at 9:00 p.m. and was set to expire on March 30, 2020 (Ex. A).

19. On March 20, 2020, Illinois Governor J.B. Pritzker issued Executive Order No. 10 also known as the Stay at Home order. A copy of which is attached hereto as Exhibit B.

20. Executive Order No. 10 specifically ordered that all non-essential businesses and operations must cease all activities. Dine-in restaurants and bars were not defined as essential businesses (Ex. B).

21. On April 1, 2020, Illinois Governor J.B. Pritzker issued Executive Order No. 18. A copy of which is attached hereto as Exhibit C.

22. Executive Order No. 18 extended the March 20, 2020 Stay at Home order through April 30, 2020 (Ex. C).

23. On April 30, 2020, Illinois Governor J.B. Pritzker issued Executive Order No. 33. A copy of which is attached hereto as Exhibit D.

24. Executive Order No. 33 extended most provisions of the Stay at Home order through May 29, 2020 (Ex. D).

25. Executive Order No. 33 extended the suspension of dine-in restaurants and bars through May 29, 2020 (Ex. D).

26. Plaintiffs are restaurant/bar businesses, and were ordered closed and out of business since March 16, 2020 at 9:00 p.m. by the Executive Orders.

27. Due to the existence of the Executive Orders issued by Illinois Governor J.B. Pritzker that ordered the closing of non-essential businesses, including restaurants, the Insured

Properties are not able to function as intended by Plaintiffs and Defendant. Plaintiffs lost the use of the Insured Properties for dine-in services and as a result, Plaintiffs are not able to provide dine-in services at the Insured Properties, and has necessarily had to suspend business activities occurring at the Insured Properties.

28. Plaintiff's loss of use of the Insured Properties and Insured Properties' inability to function as intended by Plaintiffs and Defendant is a direct physical loss. As a result of this direct physical loss, Plaintiffs suffered loss of business income, incurred extra expense to minimize the suspension of business and continue their operations, and suffered other losses and damages.

## POLICY

29. In or around June 2019, Defendant entered into a contract of insurance with Plaintiffs in the event of a covered loss or damage.

30. On or about July 1, 2019, Defendant issued Plaintiffs a Ultrapack Policy ("Policy") bearing policy number Q97 1607426. The Policy has an effective date of July 1, 2019 to July 1, 2020. A copy of the Policy in Plaintiffs' possession is attached hereto as Exhibit E. A certified copy of the Policy is in the exclusive control of Defendant, and Plaintiffs expect Defendant will produce the certified copy in discovery.

31. Under the Policy, Plaintiffs agreed to make payments to Defendant in exchange for the Defendant's promise to indemnify Plaintiffs for losses including, but not limited to, business income losses at the Insured Properties.

32. At all times material the Policy was in full force and effect and provided coverage to Plaintiffs.

33. Under the heading Insuring Agreement, the Policy provides that "[w]e will pay for direct physical 'loss' of or damage to Covered Property at the premises described in the 'Declarations' caused by or resulting from a peril insured against." (Ex. E at 1).

34. The Policy contains an Income Protection Coverage Form. (Ex. E at 3).

35. The Income Protection Coverage Form of the Policy provides, in part, that:

> Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against. "Loss" or damage also includes covered property in the open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

(Ex. E at 3).

36. The Income Protection Coverage Form of the Policy also provides, in part, the following as to Extra Expense:

> We will pay for necessary actual and necessary "extra expenses" (other than the expense to repair or replace property) sustained by you to:
>
> 1. Avoid or minimize the "interruption of business" and to continue your business operations:
>     a. At the premises described in the "Declarations"; or
>     b. At replacement premises or at temporary locations, including:
>         1) Relocation expenses; and
>         2) Costs to equip and operate the replacement or temporary locations.
>
> 2. Minimize the "interruption of business" if you cannot continue your business operations to the extent it re-duces the amount of loss that would have been payable under loss of "income" and/or "rental income".

(Ex. E at 3).

37. The Policy defines "Extra Expense" in part as:

> "Extra expense" means necessary expenses you incur due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril

insured against. "Loss" or damage also includes property in the open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

(Ex. E at 3).

38. The Policy applies to the actual loss of business income sustained and necessary extra expenses incurred when the operations of the business are suspended due to the physical loss or damage to the Insured Properties.

39. The Policy also provides additional coverage for Civil Authority and provides, in part, that:

> When a peril insured against causes damage to property other than property at the premises described in the "Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" provided that both of the following apply:
>
> > a. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" are within that area but are not more than one mile from the damaged property; and
> >
> > b. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Ex. E at 3).

40. Plaintiffs faithfully paid policy premiums to Defendant to specifically provide all risk coverage, including the actual loss of business income due to the necessary interruption of business operations due to direct physical loss of or direct physical damage to property as well as a civil authority prohibition.

41. Pursuant to the terms of the Policy, Defendant agreed to pay for direct physical loss of or damage to the Insured Properties caused by or resulting from any covered cause of loss.

42. The actions and prohibitions by Illinois Governor J.B. Pritzker, and his Executive Orders, are actions and prohibitions by a civil authority.

43. The Executive Orders constitute a prohibition of access to the Insured Properties.

44. The Executive Orders trigger coverage under the terms of the Policy.

45. The Policy provides coverage to Plaintiffs for any current and future civil authority closure of its business due to physical loss or damage directly or indirectly from the COVID-19 pandemic under the civil authority coverage parameters.

46. The Policy provides business income coverage in the event that the COVID-19 pandemic directly or indirectly causes a loss or damage at the insured premises or immediate area of the Insured Properties.

47. Pursuant to the terms of the Policy, Defendant agreed to pay Plaintiff for Plaintiff's losses detailed herein.

48. Plaintiffs duly submitted a claim, Number A00002506683, to Defendant.

49. May 11, 2020, Defendant denied Plaintiffs' claim as not being covered by the Policy.

50. Although requested to do so, to date, Defendant has and continues to fail and refuse to pay Plaintiffs for the full amount due and owing under the Policy for all of their losses and damages.

**BREACH OF CONTRACT**

51. During the Policy period of July 1, 2019 to July 1, 2020, Plaintiffs sustained direct physical loss to Insured Properties from a covered cause of loss. Plaintiffs also sustained a covered cause of loss resulting from an act or decision of a person or governmental

body, and Plaintiffs' loss is therefore a covered ensuing loss. Plaintiffs also sustained a covered cause of loss resulting from an act or prohibition of a civil authority, and Plaintiffs' loss is therefore a covered ensuing loss. Plaintiffs also suffered loss of business income and extra expense, in addition to other losses and damages.

52. Plaintiffs notified Defendant of their losses.

53. Plaintiffs complied with all conditions precedent to entitle Plaintiffs to recover under the Policy, or Defendant waived compliance with such conditions.

54. Defendant has failed to provide the coverages for Plaintiffs' losses and has failed to pay for all of Plaintiffs' losses. Defendant has denied all coverage for Plaintiffs' claim. A copy of Defendant's denial letter of May 11, 2020 is attached as Exhibit F.

55. Defendant's failure to pay for Plaintiffs' covered losses is a material breach of contract.

56. Defendant further breached its contract with Plaintiffs by:

    a. Failing to fully investigate the loss;

    b. Conducting a biased and outcome-oriented investigation of the loss;

    c. Not promptly paying Plaintiffs all benefits owed as a result of the covered loss;

    d. Failing to pay for all consequential damage; and

    e. Not putting Plaintiffs in the position they would have been in had Defendant timely performed all of its contractual duties.

57. As a direct and proximate result of Defendant's breach of contract, Plaintiffs:

    a. Suffered and will continue to suffer loss of business income and extra expenses;

    b. Incurred and will incur in the future loss of business income and extra expenses;

    c. Suffered and will continue to suffer consequential damages;

d. Are entitled to an award of prejudgment interest, taxable costs, and investigatory fees; and

e. Incurred other expenses as a result of Defendant's breach of contract.

WHEREFORE, Plaintiffs, JERRY'S SANDWICHES AV, LLC and JERRY'S SANDWICHES LV, LLC, pray for judgment against Defendant, ERIE INSURANCE COMPANY, for:

a. Actual damages;

b. Attorney's fees and costs;

c. Prejudgment and postjudgment interest; and

d. Any further and additional relief as the Court may deem to be appropriate.

Respectfully submitted,
AGRUSS LAW FIRM, LLC

By: /s/ Taylor L. Kosla
Taylor L. Kosla
ARDC No. 6327180
AGRUSS LAW FIRM, LLC
4809 N. Ravenswood Avenue, Suite 419
Chicago, IL 60640
312-224-4695 – office
312-253-4451 – facsimile
taylor@agrusslawfirm.com
Attorneys for Plaintiff

# <u>EXHIBIT A</u>



FILED
INDEX DEPARTMENT
MAR 16 2020
IN THE OFFICE OF
SECRETARY OF STATE

March 16, 2020                                    Executive Order 2020 – 07

## EXECUTIVE ORDER IN RESPONSE TO COVID-19
## (COVID-19 EXECUTIVE ORDER NO. 5)

**WHEREAS,** in late 2019, a new and significant outbreak of Coronavirus Disease 2019 (COVID-19) emerged; and,

**WHEREAS,** COVID-19 is a novel severe acute respiratory illness that can spread among people through respiratory transmissions and present with symptoms similar to those of influenza; and,

**WHEREAS,** certain populations are at higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic medical conditions such as heart disease, diabetes, or lung disease; and,

**WHEREAS,** despite efforts to contain COVID-19, the World Health Organization and the Centers for Disease Control (CDC) indicate that it is expected to spread; and,

**WHEREAS,** in communities with confirmed COVID-19 cases, the CDC currently recommends mitigation measures, including practicing social distancing, staying at home when sick, staying home when a household member is sick with respiratory disease symptoms or when instructed to do so by public health officials or a health care provider, and keeping away from others who are sick; and,

**WHEREAS,** the CDC currently recommends the cancellation or postponement of in-person events that consist of 50 people or more; and,

**WHEREAS,** social distancing, which consists of maintain at least a six-foot distance between people, is the paramount strategy for minimizing the spread of COVID-19 in our communities; and,

**WHEREAS**, current testing availability has identified further spread of confirmed cases throughout the State of Illinois, and it is expected that increased testing capacity would demonstrate that COVID-19 is circulating in communities across Illinois that currently have not identified a confirmed case; and,

**WHEREAS**, the number of suspected COVID-19 cases in Illinois is increasing exponentially and across more locations in Illinois, indicating that drastic social distancing measures are needed, even in communities where confirmed cases have not yet been identified, to reduce the number of people who become sick at any given time and the possibility of exhausting our health care resources; and,

**WHEREAS**, the ongoing spread of COVID-19 and the danger the virus poses to the public's health and wellness require the reduction of on-premises consumption of food and beverages; and

**WHEREAS**, State agencies have been directed to temporarily reduce activities and workforce to core mission functions and essential operations, encouraging working remotely where possible; and,

**WHEREAS**, the Liquor Control Act of 1934, 235 ILCS 5, "shall be liberally construed, to the end that the health, safety, and welfare of the People of the State of Illinois shall be protected"; and,

**WHEREAS**, I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 ("Gubernatorial Disaster Proclamation"); and,

**WHEREAS,** on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic; and,

**WHEREAS**, it is necessary and appropriate for the State of Illinois to immediately take measures to protect the public's health in response to this COVID-19 outbreak;

**THEREFORE**, by the powers vested in me as the Governor of the State of Illinois, and pursuant to Sections 7(1), 7(2), 7(3), and 7(8) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, I hereby order the following:

Section 1. Beginning March 16, 2020 at 9 p.m. through March 30, 2020, all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores, and food halls—must suspend service for and may not permit on-premises consumption. Such businesses are permitted and encouraged to serve food and beverages so that they may be consumed off-premises, as currently permitted by law, through means such as in-house delivery, third-party delivery, drive-through, and curbside pick-up. In addition, customers may enter the premises to purchase food or beverages for carry-out However, establishments offering food or beverages for carry-out, including food trucks, must ensure that they have an environment where patrons maintain adequate social distancing. Businesses located in airports, hospitals, and dining halls in colleges and universities are exempt from the requirements of this Executive Order. Hotel restaurants may continue to provide room service and carry-out. Catering services may continue.

Section 2. Beginning March 18, 2020, all public and private gatherings in the State of Illinois of 50 people or more are prohibited for the duration of the Gubernatorial Disaster Proclamation. A public or private gathering includes community, civic, public leisure, faith-based events, sporting events with spectators, concerts, conventions, and any similar event or activity that brings

Section 3. Pursuant to Sections 7(2) and 7(3) of the Illinois Emergency Management Act, the Illinois State Police, the Illinois Department of Public Health, the State Fire Marshal, and the Illinois Liquor Control Commission are directed to cooperate with one another and to use available resources to enforce the provisions of this Executive Order with respect to entities under their jurisdiction under Illinois law.

Section 4. Nothing in this Executive Order shall amend or supersede the authority of the Illinois Department of Public Health pursuant to Section 2310-15 of the Department of Public Health Powers and Duties Law, 20 ILCS 2310/2310-15.

Section 5. During the duration of the Gubernatorial Disaster Proclamation, the provision of the Unemployment Insurance Act, 820 ILCS 405/500(D), requiring a one-week waiting period for unemployment insurance claims is suspended for claimants who are unemployed and who are otherwise eligible for unemployment insurance benefits.

Section 6. During the duration of the Gubernatorial Disaster Proclamation, the provisions of the Open Meetings Act, 5 ILCS 120, requiring or relating to in-person attendance by members of a public body are suspended. Specifically, (1) the requirement in 5 ILCS 120/2.01 that "members of a public body must be physically present" is suspended; and (2) the conditions in 5 ILCS 120/7 limiting when remote participation is permitted are suspended. Public bodies are encouraged to postpone consideration of public business where possible. When a meeting is necessary, public bodies are encouraged to provide video, audio, and/or telephonic access to meetings to ensure members of the public may monitor the meeting, and to update their websites and social media feeds to keep the public fully apprised of any modifications to their meeting schedules or the format of their meetings due to COVID-19, as well their activities relating to COVID-19.

_____
JB Pritzker, Governor

Issued by the Governor March 16, 2020
Filed by the Secretary of State March 16, 2020

FILED
INDEX DEPARTMENT
MAR 16 2020
IN THE OFFICE OF
SECRETARY OF STATE

# EXHIBIT B



March 20, 2020                                      Executive Order 2020-10

## EXECUTIVE ORDER IN RESPONSE TO COVID-19
### (COVID-19 EXECUTIVE ORDER NO. 8)

**WHEREAS,** I, JB Pritzker, Governor of Illinois, declared all counties in the State of Illinois as a disaster area on March 9, 2020 (Gubernatorial Disaster Proclamation) in response to the outbreak of Coronavirus Disease 2019 (COVID-19); and,

**WHEREAS,** in a short period of time, COVID-19 has rapidly spread throughout Illinois, necessitating updated and more stringent guidance from federal, state, and local public health officials; and,

**WHEREAS,** for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take additional measures consistent with public health guidance to slow and stop the spread of COVID-19;

**WHEREAS,** COVID-19 has resulted in significant economic impact, including loss of income and wages, that threaten to undermine housing security and stability;

**WHEREAS,** the enforcement of eviction orders for residential premises is contrary to the interest of preserving public health and ensuring that individuals remain in their homes during this public health emergency;

**THEREFORE,** by the powers vested in me as the Governor of the State of Illinois, and pursuant to Sections 7(1), 7(2), 7(8), 7(10), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following, effective March 21, 2020 at 5:00 pm and for the remainder of the duration of the Gubernatorial Disaster Proclamation, which currently extends through April 7, 2020:

**Section 1. Stay at Home; Social Distancing Requirements; and Essential Businesses and Operations**

1. **Stay at home or place of residence.** With exceptions as outlined below, all individuals currently living within the State of Illinois are ordered to stay at home or at their place of

such shelter available as soon as possible and to the maximum extent practicable (and to use in their operation COVID-19 risk mitigation practices recommended by the U.S. Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public Health (IDPH)). Individuals whose residences are unsafe or become unsafe, such as victims of domestic violence, are permitted and urged to leave their home and stay at a safe alternative location. For purposes of this Executive Order, homes or residences include hotels, motels, shared rental units, shelters, and similar facilities.

2. **Non-essential business and operations must cease.** All businesses and operations in the State, except Essential Businesses and Operations as defined below, are required to cease all activities within the State except Minimum Basic Operations, as defined below. For clarity, businesses may also continue operations consisting exclusively of employees or contractors performing activities at their own residences (i.e., working from home).

   All Essential Businesses and Operations are encouraged to remain open. To the greatest extent feasible, Essential Businesses and Operations shall comply with Social Distancing Requirements as defined in this Executive Order, including by maintaining six-foot social distancing for both employees and members of the public at all times, including, but not limited to, when any customers are standing in line.

3. **Prohibited activities.** All public and private gatherings of any number of people occurring outside a single household or living unit are prohibited, except for the limited purposes permitted by this Executive Order. Pursuant to current guidance from the CDC, any gathering of more than **ten** people is prohibited unless exempted by this Executive Order. Nothing in this Executive Order prohibits the gathering of members of a household or residence.

   All places of public amusement, whether indoors or outdoors, including but not limited to, locations with amusement rides, carnivals, amusement parks, water parks, aquariums, zoos, museums, arcades, fairs, children's play centers, playgrounds, funplexes, theme parks, bowling alleys, movie and other theaters, concert and music halls, and country clubs or social clubs shall be closed to the public.

   This Executive Order supersedes Section 2 of Executive Order 2020-07 (COVID-19 Executive Order No. 5), which prohibited gatherings of 50 people or more.

4. **Prohibited and permitted travel.** All travel, including, but not limited to, travel by automobile, motorcycle, scooter, bicycle, train, plane, or public transit, except Essential Travel and Essential Activities as defined herein, is prohibited. People riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible. This Executive Order allows travel into or out of the State to maintain Essential Businesses and Operations and Minimum Basic Operations.

5. **Leaving the home for essential activities is permitted.** For purposes of this Executive Order, individuals may leave their residence only to perform any of the following Essential Activities:

   a. **For health and safety.** To engage in activities or perform tasks essential to their

to work from home, and products necessary to maintain the safety, sanitation, and essential operation of residences.

c. **For outdoor activity**. To engage in outdoor activity, provided the individuals comply with Social Distancing Requirements, as defined below, such as, by way of example and without limitation, walking, hiking, running, or biking. Individuals may go to public parks and open outdoor recreation areas. However, playgrounds may increase spread of COVID-19, and therefore shall be closed.

d. **For certain types of work**. To perform work providing essential products and services at Essential Businesses or Operations (which, as defined below, includes Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure) or to otherwise carry out activities specifically permitted in this Executive Order, including Minimum Basic Operations.

e. **To take care of others**. To care for a family member, friend, or pet in another household, and to transport family members, friends, or pets as allowed by this Executive Order.

6. **Elderly people and those who are vulnerable as a result of illness should take additional precautions.** People at high risk of severe illness from COVID-19, including elderly people and those who are sick, are urged to stay in their residence to the extent possible except as necessary to seek medical care. Nothing in this Executive Order prevents the Illinois Department of Public Health or local public health departments from issuing and enforcing isolation and quarantine orders pursuant to the Department of Public Health Act, 20 ILCS 2305.

7. **Healthcare and Public Health Operations.** For purposes of this Executive Order, individuals may leave their residence to work for or obtain services through Healthcare and Public Health Operations.

Healthcare and Public Health Operations includes, but is not limited to: hospitals; clinics; dental offices; pharmacies; public health entities, including those that compile, model, analyze and communicate public health information; pharmaceutical, pharmacy, medical device and equipment, and biotechnology companies (including operations, research and development, manufacture, and supply chain); organizations collecting blood, platelets, plasma, and other necessary materials; licensed medical cannabis dispensaries and licensed cannabis cultivation centers; reproductive health care providers; eye care centers, including those that sell glasses and contact lenses; home healthcare services providers; mental health and substance use providers; other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services; and entities that transport and dispose of medical materials and remains.

Specifically included in Healthcare and Public Health Operations are manufacturers, technicians, logistics, and warehouse operators and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing,

8. **Human Services Operations.**  For purposes of this Executive Order, individuals may leave their residence to work for or obtain services at any Human Services Operations, including any provider funded by the Illinois Department of Human Services, Illinois Department of Children and Family Services, or Medicaid that is providing services to the public and including state-operated, institutional, or community-based settings providing human services to the public.

Human Services Operations includes, but is not limited to: long-term care facilities; all entities licensed pursuant to the Child Care Act, 225 ILCS 10, except for day care centers, day care homes, group day care homes, and day care centers licensed as specified in Section 12(s) of this Executive Order; residential settings and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness; transitional facilities; home-based settings to provide services to individuals with physical, intellectual, and/or developmental disabilities, seniors, adults, and children; field offices that provide and help to determine eligibility for basic needs including food, cash assistance, medical coverage, child care, vocational services, rehabilitation services; developmental centers; adoption agencies; businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged individuals, individuals with physical, intellectual, and/or developmental disabilities, or otherwise needy individuals.

Human Services Operations shall be construed broadly to avoid any impacts to the delivery of human services, broadly defined.

9. **Essential Infrastructure.**  For purposes of this Executive Order, individuals may leave their residence to provide any services or perform any work necessary to offer, provision, operate, maintain and repair Essential Infrastructure.

Essential Infrastructure includes, but is not limited to: food production, distribution, and sale; construction (including, but not limited to, construction required in response to this public health emergency, hospital construction, construction of long-term care facilities, public works construction, and housing construction); building management and maintenance; airport operations; operation and maintenance of utilities, including water, sewer, and gas; electrical (including power generation, distribution, and production of raw materials); distribution centers; oil and biofuel refining; roads, highways, railroads, and public transportation; ports; cybersecurity operations; flood control; solid waste and recycling collection and removal; and internet, video, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services).

Essential Infrastructure shall be construed broadly to avoid any impacts to essential infrastructure, broadly defined.

10. **Essential Governmental Functions.**  For purposes of this Executive Order, all first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement and corrections personnel, hazardous materials responders, child protection and child welfare personnel, housing and shelter personnel, military, and other governmental employees working for or to support Essential Businesses and Operations

This Executive Order does not apply to the United States government. Nothing in this Executive Order shall prohibit any individual from performing or accessing Essential Governmental Functions.

11. **Businesses covered by this Executive Order**. For the purposes of this Executive Order, covered businesses include any for-profit, non-profit, or educational entities, regardless of the nature of the service, the function it performs, or its corporate or entity structure.

12. **Essential Businesses and Operations**. For the purposes of this Executive Order, Essential Businesses and Operations means Healthcare and Public Health Operations, Human Services Operations, Essential Governmental Functions, and Essential Infrastructure, and the following:[1]

    a. **Stores that sell groceries and medicine.** Grocery stores, pharmacies, certified farmers' markets, farm and produce stands, supermarkets, convenience stores, and other establishments engaged in the retail sale of groceries, canned food, dry goods, frozen foods, fresh fruits and vegetables, pet supplies, fresh meats, fish, and poultry, alcoholic and non-alcoholic beverages, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries, medicine, including medication not requiring a medical prescription, and also that sell other non-grocery products, and products necessary to maintaining the safety, sanitation, and essential operation of residences and Essential Businesses and Operations;

    b. **Food, beverage, and cannabis production and agriculture.** Food and beverage manufacturing, production, processing, and cultivation, including farming, livestock, fishing, baking, and other production agriculture, including cultivation, marketing, production, and distribution of animals and goods for consumption; licensed medical and adult use cannabis dispensaries and licensed cannabis cultivation centers; and businesses that provide food, shelter, and other necessities of life for animals, including animal shelters, rescues, shelters, kennels, and adoption facilities;

    c. **Organizations that provide charitable and social services.** Businesses and religious and secular nonprofit organizations, including food banks, when providing food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, individuals who need assistance as a result of this emergency, and people with disabilities;

    d. **Media.** Newspapers, television, radio, and other media services;

    e. **Gas stations and businesses needed for transportation.** Gas stations and auto-supply, auto-repair, and related facilities and bicycle shops and related facilities;

    f. **Financial institutions.** Banks, currency exchanges, consumer lenders, including but not limited, to payday lenders, pawnbrokers, consumer installment lenders and sales finance lenders, credit unions, appraisers, title companies, financial markets, trading and futures exchanges, affiliates of financial institutions, entities

h. **Critical trades.**  Building and Construction Tradesmen and Tradeswomen, and other trades including but not limited to plumbers, electricians, exterminators, cleaning and janitorial staff for commercial and governmental properties, security staff, operating engineers, HVAC, painting, moving and relocation services, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, Essential Activities, and Essential Businesses and Operations;

i. **Mail, post, shipping, logistics, delivery, and pick-up services.**  Post offices and other businesses that provide shipping and delivery services, and businesses that ship or deliver groceries, food, alcoholic and non-alcoholic beverages, goods or services to end users or through commercial channels;

j. **Educational institutions**.  Educational institutions—including public and private pre-K-12 schools, colleges, and universities—for purposes of facilitating distance learning, performing critical research, or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible.  This Executive Order is consistent with and does not amend or supersede Executive Order 2020-05 (COVID-19 Executive Order No. 3) or Executive Order 2020-06 (COVID-19 Executive Order No. 4) except that affected schools are ordered closed through April 7, 2020;

k. **Laundry services**.  Laundromats, dry cleaners, industrial laundry services, and laundry service providers;

l. **Restaurants for consumption off-premises.**  Restaurants and other facilities that prepare and serve food, but only for consumption off-premises, through such means as in-house delivery, third-party delivery, drive-through, curbside pick-up, and carry-out.  Schools and other entities that typically provide food services to students or members of the public may continue to do so under this Executive Order on the condition that the food is provided to students or members of the public on a pick-up and takeaway basis only.  Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site due to the virus's propensity to physically impact surfaces and personal property.  This Executive Order is consistent with and does not amend or supersede Section 1 of Executive Order 2020-07 (COVID-19 Executive Order No. 5) except that Section 1 is ordered to be extended through April 7, 2020;

m. **Supplies to work from home**.  Businesses that sell, manufacture, or supply products needed for people to work from home;

n. **Supplies for Essential Businesses and Operations**.  Businesses that sell, manufacture, or supply other Essential Businesses and Operations with the support or materials necessary to operate, including computers, audio and video electronics, household appliances; IT and telecommunication equipment; hardware, paint, flat glass; electrical, plumbing and heating material; sanitary

Case 1:20-cv-00349 Document #: 1 Filed 06/02/20 Page 25 of 81 PageID #:22

    p. **Home-based care and services**. Home-based care for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness, including caregivers such as nannies who may travel to the child's home to provide care, and other in-home services including meal delivery;

    q. **Residential facilities and shelters**. Residential facilities and shelters for adults, seniors, children, and/or people with developmental disabilities, intellectual disabilities, substance use disorders, and/or mental illness;

    r. **Professional services**. Professional services, such as legal services, accounting services, insurance services, real estate services (including appraisal and title services);

    s. **Day care centers for employees exempted by this Executive Order**. Day care centers granted an emergency license pursuant to Title 89, Section 407.400 of the Illinois Administrative Code, governing Emergency Day Care Programs for children of employees exempted by this Executive Order to work as permitted. The licensing requirements for day care homes pursuant to Section 4 of the Child Care Act, 225 ILCS 10/4, are hereby suspended for family homes that receive up to 6 children for the duration of the Gubernatorial Disaster Proclamation.

    t. **Manufacture, distribution, and supply chain for critical products and industries**. Manufacturing companies, distributors, and supply chain companies producing and supplying essential products and services in and for industries such as pharmaceutical, technology, biotechnology, healthcare, chemicals and sanitization, waste pickup and disposal, agriculture, food and beverage, transportation, energy, steel and steel products, petroleum and fuel, mining, construction, national defense, communications, as well as products used by other Essential Businesses and Operations.

    u. **Critical labor union functions**. Labor Union essential activities including the administration of health and welfare funds and personnel checking on the well-being and safety of members providing services in Essential Businesses and Operations – provided that these checks should be done by telephone or remotely where possible.

    v. **Hotels and motels**. Hotels and motels, to the extent used for lodging and delivery or carry-out food services.

    w. **Funeral services**. Funeral, mortuary, cremation, burial, cemetery, and related services.

13. **Minimum Basic Operations**. For the purposes of this Executive Order, Minimum Basic Operations include the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

a. Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions, Essential Businesses and Operations, or Minimum Basic Operations.

b. Travel to care for elderly, minors, dependents, persons with disabilities, or other vulnerable persons.

c. Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

d. Travel to return to a place of residence from outside the jurisdiction.

e. Travel required by law enforcement or court order, including to transport children pursuant to a custody agreement.

f. Travel required for non-residents to return to their place of residence outside the State. Individuals are strongly encouraged to verify that their transportation out of the State remains available and functional prior to commencing such travel.

15. **Social Distancing Requirements**. For purposes of this Executive Order, Social Distancing Requirements includes maintaining at least six-foot social distancing from other individuals, washing hands with soap and water for at least twenty seconds as frequently as possible or using hand sanitizer, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

a. **Required measures.** Essential Businesses and Operations and businesses engaged in Minimum Basic Operations must take proactive measures to ensure compliance with Social Distancing Requirements, including where possible:

i. **Designate six-foot distances.** Designating with signage, tape, or by other means six-foot spacing for employees and customers in line to maintain appropriate distance;

ii. **Hand sanitizer and sanitizing products.** Having hand sanitizer and sanitizing products readily available for employees and customers;

iii. **Separate operating hours for vulnerable populations**. Implementing separate operating hours for elderly and vulnerable customers; and

iv. **Online and remote access.** Posting online whether a facility is open and how best to reach the facility and continue services by phone or remotely.

16. **Intent of this Executive Order**. The intent of this Executive Order is to ensure that the maximum number of people self-isolate in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the greatest extent possible. When people need to leave their places of residence, whether to perform Essential Activities, or to otherwise facilitate authorized

body from ordering (1) any quarantine or isolation that may require an individual to remain inside a particular residential property or medical facility for a limited period of time, including the duration of this public health emergency, or (2) any closer of a specific location for a limited period of time, including the duration of this public health emergency. Nothing in this Executive Order shall, in any way, alter or modify any existing legal authority allowing a county or local government body to enact provisions that are stricter than those in this Executive Order.

## Section 2. Order ceasing evictions.

Pursuant to the Illinois Emergency Management Agency Act, 20 ILCS 3305/7(2), (8), and (10), all state, county, and local law enforcement officers in the State of Illinois are instructed to cease enforcement of orders of eviction for residential premises for the duration of the Gubernatorial Disaster Proclamation. No provision contained in this Executive Order shall be construed as relieving any individual of the obligation to pay rent, to make mortgage payments, or to comply with any other obligation that an individual may have under tenancy or mortgage.

## Section 3. Savings clause.

If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

JB Pritzker, Governor

Issued by the Governor March 20, 2020
Filed by the Secretary of State March 20, 2020

FILED
INDEX DEPARTMENT

MAR 2 0 2020

IN THE OFFICE OF
SECRETARY OF STATE

# **EXHIBIT C**



April 1, 2020                                        Executive Order 2020-18

## EXECUTIVE ORDER IN RESPONSE TO COVID-19
## (COVID-19 EXECUTIVE ORDER NO. 16)

**WHEREAS**, Coronavirus 2019 (COVID-19) is a novel severe acute respiratory illness that can spread among people through respiratory transmissions and present with symptoms similar to those of influenza; and,

**WHEREAS**, on March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic; and,

**WHEREAS**, despite efforts to contain COVID-19, the World Health Organization (WHO) and the federal Centers for Disease Control and Prevention (CDC) have declared that it is expected to spread; and,

**WHEREAS**, certain populations are at higher risk of experiencing more severe illness as a result of COVID-19, including older adults and people who have serious chronic medical conditions such as heart disease, diabetes, or lung disease; and,

**WHEREAS**, in a short period of time, COVID-19 has rapidly spread throughout Illinois, necessitating updated and more stringent guidance from federal, state, and local public health officials; and,

**WHEREAS**, social distancing, which requires maintaining at least a six-foot distance between people, is a paramount strategy for minimizing the spread of COVID-19 in our communities; and,

**WHEREAS**, current testing availability has identified further spread of confirmed cases throughout the State of Illinois, and it is expected that increased testing capacity would demonstrate that COVID-19 is circulating in communities across Illinois that currently have not identified a confirmed case; and,

**WHEREAS**, the number of suspected COVID-19 cases in Illinois is increasing exponentially and across more locations in Illinois, indicating that drastic social distancing measures are needed, even in communities where confirmed cases have not yet been identified, to reduce the number of people who become sick at any given time and the possibility of exhausting our health

**WHEREAS,** for the preservation of public health and safety throughout the entire State of Illinois, and to ensure that our healthcare delivery system is capable of serving those who are sick, I find it necessary to take additional measures consistent with public health guidance to slow and stop the spread of COVID-19; and,

**WHEREAS,** I find it necessary to continue and extend the Executive Orders issued to date in response to the outbreak of COVID-19, Executive Orders 2020-03, 2020-04, 2020-05, 2020-06, 2020-07, 2020-08, 2020-09, 2020-10, 2020-11, 2020-12, 2020-13, 2020-14, 2020-15, 2020-16, and 2020-17, and hereby incorporate the WHEREAS clauses of those Executive Orders;

**THEREFORE,** by the powers vested in me as the Governor of the State of Illinois, pursuant to Sections 7(1), 7(2), 7(3), 7(8), 7(9), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public health laws, I hereby order the following:

**Part 1: Continuing and Extending Prior Executive Orders.**

Executive Orders 2020-03, 2020-04, 2020-05, 2020-06, 2020-07, 2020-08, 2020-09, 2020-10, 2020-11, 2020-12, 2020-13, 2020-14, 2020-15, 2020-16, and 2020-17 hereby are continued and extended by this Executive Order 2020-18 as follows:

**Executive Order 2020-04 (Closure of James R. Thompson Center; Waiver of Sick Leave Requirement for State Employees):**

Section 1.  Beginning March 16, 2020, the James R. Thompson Center located at 100 W. Randolph Street, Chicago, Illinois, is closed for the duration of the Gubernational Disaster Proclamations to members of the public, except as necessary for the conduct of state business, to obtain services from a state agency or constitutional office, or to operate a business located in the James R. Thompson Center. This closure does not affect public access to businesses located on the ground floor in the James R. Thompson Center through exterior entrances, except as otherwise specified in this Order.

Section 2.  Beginning March 13, 2020, the two-year continuous service requirement for state employees to receive advancement of sick leave pursuant to Title 80, Section 303.110 of the Illinois Administrative Code Personnel Rules, is suspended during the duration of the Gubernational Disaster Proclamations.

**Executive Orders 2020-05 and 2020-06 (School Closures):**

Executive Orders 2020-05 and 2020-06 are continued and extended in their entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-07 (Suspension of on-premises consumption at restaurants and bars; Unemployment insurance; Open Meetings Act):**

Section 1.  Beginning March 16, 2020 at 9 p.m. through **April 30, 2020**, all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores, and food halls—must suspend service for and may not permit on-premises consumption. Such businesses are permitted and encouraged to serve food and beverages so that they may be consumed off-premises, as currently permitted by law, through means such as in-house delivery, third-party delivery, drive-through, and

Marshal, and the Illinois Liquor Control Commission are directed to cooperate with one another and to use available resources to enforce the provisions of this Executive Order with respect to entities under their jurisdiction under Illinois law.

Section 3. Nothing in this Executive Order shall amend or supersede the authority of the Illinois Department of Public Health pursuant to Section 2310-15 of the Department of Public Health Powers and Duties Law, 20 ILCS 2310/2310-15.

Section 4. During the duration of the Gubernatorial Disaster Proclamations, the provision of the Unemployment Insurance Act, 820 ILCS 405/500(D), requiring a one-week waiting period for unemployment insurance claims is suspended for claimants who are unemployed and who are otherwise eligible for unemployment insurance benefits.

Section 5. During the duration of the Gubernatorial Disaster Proclamations, the provisions of the Open Meetings Act, 5 ILCS 120, requiring or relating to in-person attendance by members of a public body are suspended. Specifically, (1) the requirement in 5 ILCS 120/2.01 that "members of a public body must be physically present" is suspended; and (2) the conditions in 5 ILCS 120/7 limiting when remote participation is permitted are suspended. Public bodies are encouraged to postpone consideration of public business where possible. When a meeting is necessary, public bodies are encouraged to provide video, audio, and/or telephonic access to meetings to ensure members of the public may monitor the meeting, and to update their websites and social media feeds to keep the public fully apprised of any modifications to their meeting schedules or the format of their meetings due to COVID-19, as well their activities relating to COVID-19.

**Executive Order 2020-08 (Secretary of State Operations):**

Executive Order 2020-08 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-09 (Telehealth):**

Executive Order 2020-09 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-10 (Stay at Home; Social distancing; Evictions ceased):**

Executive Order 2020-10 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-11 (Revisions to Executive Orders 2020-05 and 2020-10; Department of Corrections notification period):**

Executive Order 2020-11 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

**Executive Order 2020-12 (Health care worker background checks; Department of Juvenile Justice notification period; Coal Mining Act):**

Executive Order 2020-12 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through **April 30, 2020**.

Executive Order 2020-14 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through April 30, 2020.

Executive Order 2020-14, Section 2, Paragraphs (h) and (i) hereby are amended and revised as follows:

h. The signatory must transmit by overnight mail, fax, or electronic means a legible copy of the entire signed document directly to the witness no later than the day after the document is signed;

i. The witness must sign the transmitted copy of the document as a witness and transmit the signed copy of the document back via overnight mail, fax, or electronic means to the signatory within 24 hours of receipt; and

**Executive Order 2020-15 (Suspending provisions of the Illinois School Code):**

Executive Order 2020-15 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through April 30, 2020.

**Executive Order 2020-16 (Repossession of vehicles; suspension of classroom training requirement for security services):**

Executive Order 2020-16 is continued and extended in its entirety for the duration of the Gubernatorial Disaster Proclamations, which currently extends through April 30, 2020.

**Executive Orders 2020-03 and 2020-17 (Cannabis deadlines and applications):**

Section 1. The application submission deadlines in the Cannabis Regulation and Tax Act and implementing regulations for submitting applications by March 16, 2020, which previously were suspended pursuant to Executive Order 2020-03 and extended through March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, hereby are suspended as follows:

a. The March 16, 2020, deadline for submission of craft grower license applications pursuant to Title 8, Section 1300.300(b) of the Illinois Administrative Code, which was extended through Executive Order 2020-03 to March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, is extended to April 30, 2020; and

b. The March 16, 2020, deadline for submission of infuser license applications pursuant to Section 35-5(b) of the Cannabis Regulation and Tax Act, 410 ILCS 705/35-5(b) and Title 8, Section 1300.400(b) of the Illinois Administrative Code, which was extended through Executive Order 2020-03 to March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, is extended to April 30, 2020; and

c. The March 16, 2020, deadline for submission of transporter license applications pursuant to Section 40-5(b) of the cannabis Regulation and Tax Act, 40 ILCS 705/40-5(b) and Title 8, Section 1300.510(b)(1)(A) of the Illinois Administrative Code, which was extended through Executive Order 2020-03 to March 30, 2020, and extended through Executive Order 2020-17 to April 7, 2020, is extended to April 30, 2020.

Illinois Department of Agriculture
c/o Bureau of Medicinal Plants
P.O. Box 19281
Springfield, IL 62794-9281 USA

**Part 2: Savings Clause.** If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

_____
JB Pritzker, Governor

Issued by the Governor April 1, 2020
Filed by the Secretary of State April 1, 2020

FILED
INDEX DEPARTMENT
APR 01 2020
IN THE OFFICE OF
SECRETARY OF STATE

# EXHIBIT D

Case 1:20-cv-03349   Document #: 1 Filed: 06/02/20 Page 35 of 81 PageID #:32



# STATE OF ILLINOIS

## EXECUTIVE DEPARTMENT

### SPRINGFIELD, ILLINOIS

FILED
INDEX DEPARTMENT

MAY 0 6 2020

IN THE OFFICE OF
SECRETARY OF STATE

April 30, 2020

CORRECTED
Executive Order 2020-33

## EXECUTIVE ORDER IN RESPONSE TO COVID-19
## (COVID-19 EXECUTIVE ORDER NO. 31)

**WHEREAS**, protecting the health and safety of Illinoisans is among the most important functions of State government; and,

**WHEREAS,** Coronavirus Disease 2019 (COVID-19) is a novel severe acute respiratory illness that has spread among people through respiratory transmissions, the World Health Organization declared COVID-19 a Public Health Emergency of International Concern on January 30, 2020, and the United States Secretary of Health and Human Services declared that COVID-19 presents a public health emergency on January 27, 2020; and,

**WHEREAS,** as the virus has progressed through Illinois, the crisis facing the State has developed and now requires an evolving response to ensure hospitals, health care professionals and first responders are able to meet the health care needs of all Illinoisans and in a manner consistent with CDC guidance that continues to be updated; and,

**WHEREAS,** I declared all counties in the State of Illinois as a disaster area on April 30, 2020 because the current circumstances in Illinois surrounding the spread of COVID-19, including the devasting impacts to the health and lives of people throughout the State, the threatened shortages of hospital beds, ICU beds, ventilators, and PPE, and the critical need for increased COVID-19 testing capacity, constitute an epidemic emergency and a public health emergency; and,

**WHEREAS,** in response to the epidemic emergency and public health emergency described above, I find it necessary to re-issue Executive Orders 2020-03, 2020-04, 2020-05, 2020-06, 2020-07, 2020-08, 2020-09, 2020-11, 2020-12, 2020-13, 2020-14, 2020-15, 2020-16, 2020-17, 2020-19, 2020-20, 2020-21, 2020-22, 2020-23, 2020-24, 2020-25, 2020-26, 2020-27, 2020-28, 2020-29, 2020-30, and 2020-31, and hereby incorporate the WHEREAS clauses of those Executive Orders;

**THEREFORE,** by the powers vested in me as the Governor of the State of Illinois, pursuant to the Illinois Constitution and Sections 7(1), 7(2), 7(3), 7(8), 7(9), and 7(12) of the Illinois Emergency Management Agency Act, 20 ILCS 3305, and consistent with the powers in public

**Executive Order 2020-04 (Closure of James R. Thompson Center; Waiver of Sick Leave Requirement for State Employees):**

Sections 2 and 3 of Executive Order 2020-04 are re-issued and extended through **May 29, 2020**.

**Executive Orders 2020-05 and 2020-06 (School Closures):**

Executive Orders 2020-05 and 2020-06 are re-issued in their entirety and extended through **May 29, 2020**.

**Executive Order 2020-07 (Suspension of on-premises consumption at restaurants and bars; Unemployment insurance; Open Meetings Act):**

Sections 1, 3, 4, 5, and 6, as amended below, of Executive Order 2020-07 are re-issued and extended through **May 29, 2020**.

Section 6. During the duration of the Gubernatorial Disaster Proclamation and through May 29, 2020, the provisions of the Open Meetings Act, 5 ILCS 120, requiring or relating to in-person attendance by members of a public body are suspended. Specifically, (1) the requirement in 5 ILCS 120/2.01 that "members of a public body must be physically present" is suspended; and (2) the conditions in 5 ILCS 120/7 limiting when remote participation is permitted are suspended. The provision of the Illinois Finance Authority Act that "[a]ll meetings shall be conducted at a single location within the State with a quorum of members physically present at this location," 20 ILCS 3501/801-25, is suspended through May 29, 2020. The provision of the Illinois Administrative Code that a meeting of the Concealed Carry Licensing Review Board that requires a "quorum is in attendance at a meeting" as a condition for when "Commissioners may attend telephonically or electronically," 20 Ill. Admin. Code 2900.110(c), is suspended through May 29, 2020.

Public bodies, including those listed specifically above, are encouraged to postpone consideration of public business where possible. When a meeting is necessary, public bodies are encouraged to provide video, audio, and/or telephonic access to meetings to ensure members of the public may monitor the meeting, and to update their websites and social media feeds to keep the public fully apprised of any modifications to their meeting schedules or the format of their meetings due to COVID-19, as well their activities relating to COVID-19.

**Executive Order 2020-08 (Secretary of State Operations):**

Executive Order 2020-08 is re-issued in its entirety and extended through **May 29, 2020**.

**Executive Order 2020-09 (Telehealth):**

Executive Order 2020-09 is re-issued in its entirety and extended through **May 29, 2020**.

**Executive Order 2020-11 (Revisions to prior Executive Orders; Department of Corrections notification period):**

Sections 3 and 4 of Executive Order 2020-11 are re-issued and extended through **May 29, 2020**.

**Executive Order 2020-14 (Notary and witness guidelines):**

Executive Order 2020-14, as amended below, is re-issued in its entirety and extended through **May 29, 2020.**

Section 2. During the duration of the Gubernatorial Disaster Proclamation related to the outbreak of COVID-19, any act of witnessing required by Illinois law may be completed remotely by via two-way audio-video communication technology, provided that:

    a. The two-way audio-video communication technology must allow for direct, contemporaneous interaction between the individual signing the document ("the signatory") and the witness by sight and sound;

    b. The two-way audio-video communication technology must be recorded and preserved by the signatory or the signatory's designee for a period of at least three years;

    c. The signatory must attest to being physically located in Illinois during the two-way audio-video communication;

    d. The witness must attest to being physically located in Illinois during the two-way audio-video communication;

    e. The signatory must affirmatively state on the two-way audio-video communication what document the signatory is signing;

    f. Each page of the document being witnessed must be shown to the witness on the two-way audio-video communication technology in a means clearly legible to the witness and initialed by the signatory in the presence of the witness;

    g. The act of signing must be captured sufficiently up close on the two-way audio-video communication for the witness to observe;

    h. The signatory must transmit by <u>overnight mail</u>, fax, or electronic means a legible copy of the entire signed document directly to the witness no later than the day after the document is signed;

    i. The witness must sign the transmitted copy of the document as a witness and transmit the signed copy of the document back via <u>overnight mail</u>, fax, or electronic means to the signatory within 24 hours of receipt; and,

    j. If necessary, the witness may sign the original signed document as of the date of the original execution by the signatory provided that the witness receives the original signed document together with the electronically witnessed copy within thirty days from the date of the remote witnessing.

**Executive Order 2020-15 (Suspending provisions of the Illinois School Code):**

Executive Order 2020-15 is re-issued in its entirety and extended through **May 29, 2020.**

**Executive Order 2020-16 (Repossession of vehicles; suspension of classroom training requirement for security services):**

Executive Order 2020-16 is re-issued in its entirety and extended through **May 29, 2020.**

**Executive Orders 2020-03 and 2020-17 (Cannabis deadlines and applications):**

Executive Orders 2020-03 and 2020-17, as modified by Executive Order 2020-18, are re-issued and shall remain in effect as specified by Executive Order 2020-18.

    i.    Facilities licensed, certified, or approved by any State agency and covered by the following: 77 Ill. Admin. Section 1130.215(a)-(f); University of Illinois Hospital Act, 110 ILCS 330; Alternative Health Care Delivery Act, 210 ILCS 3/35(2)-(4); Emergency Medical Services (EMS) Systems Act, 210 ILCS 50; or Department of Veterans' Affairs Act, 20 ILCS 2805;

    ii.    State-operated Developmental Centers certified by the federal Centers for Medicare and Medicaid Services and licensed State-operated Mental Health Centers created pursuant to the Mental Health and Developmental Disabilities Administrative Act, 20 ILCS 1705/4;

    iii.    Licensed community-integrated living arrangements as defined by the Community-Integrated Living Arrangements Licensing and Certification Act, 210 ILCS 135/2;

    iv.    Licensed Community Mental Health Centers as defined in the Community Services Act, 405 ILCS 30;

    v.    Federally qualified health centers under the Social Security Act, 42 U.S.C. § 1396d(l)(2)(B); ~~and~~

    vi.    Any government-operated site providing health care services established for the purpose of responding to the COVID-19 outbreak;

    vii.    <u>Supportive living facilities certified by the Illinois Department of Healthcare and Family Services pursuant to the Illinois Public Aid Code, 305 ILCS 5/5-5.01(a); and,</u>

    viii.    <u>Assisted living establishments and shared housing establishments licensed by the DPH pursuant to the Assisted Living and Shared Housing Act, 210 ILCS 9.</u>

"Health Care Facility" is the singular form of the plural "Health Care Facilities."

b.    "Health Care Professional" means all licensed or certified health care or emergency medical services workers who (i) are providing health care services at a Health Care Facility in response to the COVID-19 outbreak and are authorized to do so; or (ii) are working under the direction of the Illinois Emergency Management Agency (IEMA) or DPH in response to the Gubernatorial Disaster Proclamations.

c.    "Health Care Volunteer" means all volunteers or medical or nursing students who do not have licensure who (i) are providing services, assistance, or support at a Health Care Facility in response to the COVID-19 outbreak and are authorized to do so; or (ii) are working under the direction of IEMA or DPH in response to the Gubernatorial Disaster Proclamations.

<u>Section 8. For purposes of Section 2, rendering assistance by hospitals licensed pursuant to the Illinois Hospital Licensing Act, 210 ILCS 85, must also include accepting a transfer of a COVID-19 patient from another hospital, including hospital inpatients, and state-operated entities (collectively, "transferring entities") that do not have the capacity and capability necessary to provide treatment for a COVID-19 patient. The receiving hospital shall accept such transfer of a COVID-19 patient if it has sufficient capacity and capability necessary to provide treatment for the COVID-19 patient. In determining whether a hospital has sufficient capacity and capability necessary to provide treatment for a COVID-19 patient, the hospital shall consider, at a minimum, its ability to provide safe and effective treatment consistent with current public health recommendations and available supplies, staffing, and medical bed capacity.</u>

<u>**Executive Order 2020-20 (Public assistance requirements):**</u>

Executive Order 2020-22 is re-issued in its entirety and extended through **May 29, 2020**.

**Executive Order 2020-23 (Actions by the Illinois Department of Financial and Professional Regulation for licensed professionals engaged in disaster response):**

Executive Order 2020-23 is re-issued in its entirety and extended through **May 29, 2020**.

**Executive Order 2020-24 (Illinois Department of Human Services Forensic Treatment Program; investigations of Illinois Department of Human Services employees):**

Executive Order 2020-24 is re-issued in its entirety and extended through **May 29, 2020**.

**Executive Order 2020-25 (Garnishment and wage deductions):**

Executive Order 2020-25 is re-issued in its entirety and extended through **May 29, 2020**.

**Executive Order 2020-26 (Hospital capacity):**

Executive Order 2020-26 is re-issued in its entirety and extended through **May 29, 2020**.

**Executive Order 2020-27 (Cadavers testing positive for COVID-19):**

Executive Order 2020-27 is re-issued in its entirety and extended through **May 29, 2020**.

**Executive Order 2020-28 (Industrial radiography certifications):**

Executive Order 2020-28 is re-issued in its entirety and extended through **May 29, 2020**.

**Executive Order 2020-29 (In-person education or exams for professional insurance licenses):**

Executive Order 2020-29 is re-issued in its entirety and extended through **May 29, 2020**.

**Executive Order 2020-30 (Filing of residential eviction actions; enforcement of non-residential eviction orders; expired consular identification documents; electronic filings for the Illinois Human Rights Commission):**

Executive Order 2020-30, as amended below, is re-issued in its entirety and extended through **May 29, 2020**.

Section 3. All state, county, and local law enforcement officers in the State of Illinois are instructed to cease enforcement of orders of eviction for residential and non-residential premises, unless the tenant has been found to pose a direct threat to the health and safety of other tenants, an immediate and severe risk to property, or a violation of any applicable building code, health ordinance, or similar regulation. Nothing in this Executive Order shall be construed as relieving any individual or entity of the obligation to pay rent, to make mortgage payments, or comply with any other obligation that an individual or entity may have pursuant to a lease, or rental agreement, or mortgage. The continued need for this directive shall be evaluated upon issuance of any new Gubernatorial Disaster Proclamation.

**Part 2: Savings Clause.** If any provision of this Executive Order or its application to any person or circumstance is held invalid by any court of competent jurisdiction, this invalidity does not affect any other provision or application of this Executive Order, which can be given effect without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are declared to be severable.

JB Pritzker, Governor

Issued by the Governor April 30, 2020
Filed by the Secretary of State April 30, 2020

FILED
INDEX DEPARTMENT

MAY 0 6 2020

IN THE OFFICE OF
SECRETARY OF STATE

# <u>EXHIBIT E</u>

ERIE INSURANCE
ULTRAPACK PLUS
PK-00-01 (Ed. 2/17) CL-0001

# ULTRAPACK PLUS COMMERCIAL PROPERTY COVERAGE PART

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the "Declarations". The words "we", "us", and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **Section XI – Definitions** and **Section VIII – Extensions of Coverage**.

## SECTION I - COVERAGES

### INSURING AGREEMENT

We will pay for direct physical "loss" of or damage to Covered Property at the premises described in the "Declarations" caused by or resulting from a peril insured against.

### BUILDING(S) - COVERAGE 1

**A. Covered Property**

Building(s) means buildings described in the "Declarations" and anything permanently attached. It also includes:

1. Building equipment and fixtures servicing the premises;

2. Personal property you have for the service and maintenance of the buildings and premises including, but not limited to the following:

   a. Fire extinguishing equipment;

   b. Outdoor furniture;

   c. Floor coverings;

   d. Appliances used for refrigerating, ventilating, cooking, dishwashing, or laundering; and

   e. Flag poles and outdoor lights;

3. Vegetated roofs, including lawns, trees, shrubs, and plants which are part of a vegetated roof;

4. Glass which you own. The glass must be part of the building or in the building described in the "Declarations", including glass in wall cases.

   Our payment for "loss" to glass will also include:

   a. Replacement of building glass with safety glazing materials when made necessary by an ordinance or building code;

   b. Replacement of lettering, ornamentation, or burglar alarm foil;

   c. Repair or replacement of frames;

   d. Installation of temporary coverings; and

   e. Removal of obstructions;

5. Exterior signs, lights, and clocks which you own. Exterior signs, lights, and clocks must be permanently attached to buildings on the premises described in the "Declarations" or if unattached to the building, must be permanently mounted on the premises described in the "Declarations".

**B. Property Not Covered**

Building(s) does not apply to:

1. Fences, walks, and unattached outbuildings not described in the "Declarations", except as provided in Extensions of Coverage - **A.2.**;

2. Outdoor swimming pools and equipment pertaining thereto not described in the "Declarations", except as provided in Extensions of Coverage - **A.2.**;

3. Bulkheads, pilings, piers, wharves, or docks not described in the "Declarations";

4. Bridges, roadways, patios, or other paved surfaces;

5. Retaining walls that are not part of a building, or not described in the "Declarations";

6. The cost of excavations, grading, backfilling, or filling;

7. Trees, shrubs, lawns, and plants (other than trees, shrubs, lawns, and plants which are part of a vegetated roof), except as provided in Extensions of Coverage - **A.7.**;

8. Underground pipes, flues, or drains;

9. Land (including land on which covered property is located) or water; and

10. Property specifically insured in whole or in part by this or any other insurance.

**C. Amount of Insurance**

The most we will pay for "loss" or damage to any building described in the "Declarations" in any one occurrence is the applicable amount of insurance shown in the "Declarations" for that building subject to the applicable Automatic Adjustment of Coverage Amounts.

**D. Automatic Adjustment of Coverage Amounts**

This policy provides you with a guard against the effect of inflation on construction costs for Building(s) - Coverage 1.

We will keep track of costs and at the next policy period we will adjust the amount of your building coverage, if necessary. Your premium will be adjusted at each policy period to reflect any change in the amount of insurance.

During the policy period, if there is an increase in construction costs and a "loss" occurs, we will reflect the increase in the amount of insurance for Building(s) - Coverage 1 before making payment. The amount of increase in the amount of insurance will be:

1

1. The amount of insurance that applied to your covered building(s) on the most recent of: the policy inception date, the policy anniversary date, or any other policy change amending the amount of insurance, times;

2. The percentage of annual increase shown in the "Declarations", expressed as a decimal (example: 8% is .08), times;

3. The number of days since the beginning of the current policy period or the effective date of the most recent policy change amending the amount of insurance to your covered building(s), divided by 365.

There will be no charge for this additional coverage.

If the amount of insurance shown in the "Declarations" for Building(s) - Coverage 1 is inadequate, these adjustments may not be sufficient to provide full recovery should a "loss" occur.

## BUSINESS PERSONAL PROPERTY AND PERSONAL PROPERTY OF OTHERS - COVERAGE 2

**A. Covered Property**

Business Personal Property and Personal Property of Others means:

1. Personal property pertaining to your business, professional or institutional activities, including leased-property for which you are contractually responsible;

2. Personal property of others that is in your care, custody, or control;

3. Labor, materials, or services furnished or arranged by you on personal property of others;

4. Your use interest as a tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations, or additions:

   a. Made a part of the building or structure you occupy but do not own; and

   b. You acquired or made at your expense but cannot legally remove;

5. Exterior signs, lights, and clocks which you own or which are in your care, custody, or control and for which you are contractually responsible. Exterior signs, lights, and clocks must be permanently attached to the building on the premises described in the "Declarations" or if unattached to the building, must be permanently mounted on the premises described in the "Declarations";

6. Glass which is in your care, custody, or control and for which you are contractually responsible. The glass must be part of the building described in the "Declarations", including glass in wall cases.

   Our payment for "loss" to glass will also include:

   a. Replacement of building glass with safety glazing materials when made necessary by an ordinance or building code;

   b. Replacement of lettering, ornamentation, or burglar alarm foil;

   c. Repair or replacement of frames;

   d. Installation of temporary coverings; and

   e. Removal of obstructions;

   while in or on the described buildings, or in the open, or in a vehicle on the premises described in the "Declarations" or within 1,500 feet thereof.

   Our payment for "loss" of or damage to personal property of others will only be made to the owner of the property.

**B. Property Not Covered**

Business Personal Property and Personal Property of Others does not apply to:

1. "Automobiles" held for sale;

2. Vehicles or self-propelled machines (including "aircraft" or watercraft) that:

   a. Can be licensed for use on public roads, except vehicles that are solely used to service the premises described in the "Declarations"; or

   b. Are operated principally away from the premises described in the "Declarations".

   This paragraph does not apply to:

   a. Vehicles or self-propelled machines or "automobiles" you manufacture, process, or warehouse;

   b. Vehicles or self-propelled machines, other than "automobiles", you hold for sale;

   c. Rowboats or canoes out of water at the premises described in the "Declarations"; or

   d. Trailers, but only to the extent provided for in the Extensions of Coverage - **B.21.;**

3. "Money" and "securities", except as provided in Extensions of Coverage - **B.4., B.6., B.9.,** and **B.19.;**

4. Your property sold on installment or deferred payment plans after delivery to customers;

5. Household and personal articles of the insured, the insured's partners, members or managers of a limited liability company, the insured's officers, or the insured's employees, except as provided in Extensions of Coverage - **B.23.;**

6. Trees, shrubs, lawns, and plants, except as provided in Extensions of Coverage - **A.7.;**

7. Crops and growing crops while outside of buildings;

8. Contraband or property in the course of illegal transportation or trade;

9. "Electronic data" including the cost to research, replace, or restore the information on "electronic data" or magnetic media, except as provided in **Section IV - Additional Coverages - C.2.;**

2

We will cover "electronic data" which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning, or security systems.

10. The cost to research, replace, or restore the information on valuable papers and records, except as provided in Extensions of Coverage - **B.29.** Valuable papers and records include proprietary information; written, printed, or inscribed documents and records; including books, maps, films, abstracts, drawings, deeds, mortgages, card index systems, and manuscripts;

11. Fine arts, except as provided in Extensions of Coverage - **B.13.** Fine arts include paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; porcelains; and similar property of rarity, historic value, or artistic merit;

12. Animals, unless owned by others and boarded by you or if owned by you as stock while inside the building described in the "Declarations";

13. "Mobile equipment":

    a. While being used or stored away from the premises described in the "Declarations"; or

    b. While at or being transported to or from job sites away from the premises described in the "Declarations"; and

14. Property specifically insured in whole or in part by this or any other insurance.

**C. Amount of Insurance**

The most we will pay for "loss" or damage to business personal property and personal property of others on the premises described in the "Declarations" in any one occurrence is the applicable amount of insurance shown in the "Declarations" for Business Personal Property and Personal Property of Others on that premises.

**D. Automatic Adjustment of Coverage Amounts**

This policy provides you with a guard against the effect of inflation on costs for Business Personal Property and Personal Property of Others - Coverage 2.

We will keep track of costs and at the next policy period we will adjust the amount of your business personal property and personal property of others coverage, if necessary. Your premium will be adjusted at each policy period to reflect any change in the amount of insurance.

There will be no charge for this additional coverage.

If the amount of insurance shown in the "Declarations" for Business Personal Property and Personal Property of Others - Coverage 2 is inadequate, these adjustments may not be sufficient to provide full recovery should a "loss" occur.

**INCOME PROTECTION - COVERAGE 3**

**A. Income Protection Coverage**

Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss"  or damage to property on the premises described in the "Declarations" from a peril insured against. "Loss" or damage also includes covered property in the open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

If you are a tenant, your premises are the portion of the building described in the "Declarations" which:

1. You rent, lease, or occupy;

2. All routes within the building that service or are used to gain access to the described premises; and

3. The area within 1,500 feet of the premises described in the "Declarations" (with respect to "loss" or damage to covered property in the open or in a vehicle).

You are required to resume normal business operations as promptly as possible and shall use all available means to eliminate any unnecessary delay.

**B. Extra Expense Coverage**

"Extra expense" coverage is provided at the premises described in the "Declarations".

"Extra expense" means necessary expenses you incur due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against. "Loss" or damage also includes property in the open, or in a vehicle, on the premises described in the "Declarations" or within 1,500 feet thereof.

We will pay necessary actual and necessary "extra expenses" (other than the expense to repair or replace property) sustained by you to:

1. Avoid or minimize the "interruption of business" and to continue your business operations:

    a. At the premises described in the "Declarations"; or

    b. At replacement premises or at temporary locations, including:

        1) Relocation expenses; and

        2) Costs to equip and operate the replacement or temporary locations.

2. Minimize the "interruption of business" if you cannot continue your business operations to the extent it reduces the amount of loss that would have been payable under loss of "income" and/or "rental income".

We will not pay any "loss" or damage to your Building(s) or Business Personal Property and Personal Property of Others. We also will not pay the cost of research or any other expense to replace or restore your valuable papers and records or "electronic data". We will pay the cost to

repair or replace your covered property and the amount to research, replace, or restore the lost information on damaged valuable papers and records or "electronic data" to the extent it reduces the amount of loss that would have been payable under loss of "income" and/or "rental income".

C. **Additional Coverages**

1. **Civil Authority**

When a peril insured against causes damage to property other than property at the premises described in the "Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" provided that both of the following apply:

a. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" are within that area but are not more than one mile from the damaged property; and

b. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority coverage for "income" and/or "rental income" will begin 72 hours after the time of the first action of civil authority that prohibits access to the premises described in the "Declarations" and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

Civil Authority coverage for "extra expense" will begin immediately after the time of the first action of civil authority that prohibits access to the premises described in the "Declarations" and will end:

a. Four consecutive weeks after the date of that action; or

b. When your Civil Authority coverage for "income" and/or "rental income" ends;

whichever is later.

2. **Full Resumption of Operations**

We will also pay your actual loss of "income" and/or "rental income" for an additional 60 days if your "income" and/or "rental income" after operations are resumed is less than your "income" and/or "rental income" before the loss. The additional amount we will pay will start after the later of the following times:

a. The date on which the liability for **Income Protection - Coverage 3** would terminate if this clause had not been included; or

b. The date on which repair, replacement, or rebuilding of such part of the damaged and destroyed property described in the "Declarations" is actually completed.

D. **Amount of Insurance**

We will pay the actual loss of "income" and/or "rental income" sustained by you.

The "income" and/or "rental income" loss sustained by you shall not exceed:

1. The actual reduction of "income" and/or "rental income" during the "interruption of business"; and

2. The reduction in rents received less charges and expenses which do not necessarily continue during the "interruption of business" or during the period when the tenant cannot inhabit the premises.

We will pay up to $100 a day, for seven days, after your business is suspended to cover loss of "income" and/or "rental income" sustained by you while you are determining your actual income protection loss. The amount paid will be subtracted from your actual loss of "income" and/or "rental income".

We will pay the actual income protection loss for only such length of time as would be required to resume normal business operations. We will limit the time period to the shorter of the following periods:

1. The time period required to rebuild, repair, or replace such part of the Building or Business Personal Property that has been damaged or destroyed as a direct result of an insured peril; or

2. Twelve (12) consecutive months from the date of loss.

Payment of loss of "income" and/or "rental income" is not limited by the end of the policy period.

## SECTION II - PERILS INSURED AGAINST

## BUILDING(S) - COVERAGE 1

## BUSINESS PERSONAL PROPERTY AND PERSONAL PROPERTY OF OTHERS - COVERAGE 2

## INCOME PROTECTION - COVERAGE 3

**Covered Cause of Loss**

This policy insures against direct physical "loss", except "loss" as excluded or limited in this policy.

## SECTION III - EXCLUSIONS

A. **Coverages 1, 2, and 3**

We do not cover under Building(s) - Coverage 1; Business Personal Property and Personal Property of Others - Coverage 2; and Income Protection - Coverage 3 "loss" or damage caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss":

4

1. Deterioration or depreciation.

2. Intentional loss, meaning any "loss" arising from an act committed by or at the direction of the insured with the intent to cause a "loss".

3. "Loss" or damage caused by or resulting from any of the following:

   a. By weather conditions, but only if weather conditions contribute in any way with a peril excluded in Part **A.** of **Section III - Exclusions** to produce the "loss";

   b. By acts or decisions, including the failure to act or decide, of anyone;

   c. By faulty, inadequate, or defective:

      1) Planning, zoning, development, surveying;

      2) Design, specifications, workmanship, repair, construction, renovating, remodeling, grading, or compaction;

      3) Materials used in repair, construction, renovation, remodeling; or

      4) Maintenance;

   of property whether on or off the insured premises by anyone, but if "loss" by a peril insured against results, we will pay for the ensuing "loss".

4. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of "loss".

5. Earth Movement

   a. Earthquake, including tremors and aftershocks, and any earth sinking, rising, or shifting related to such event;

   b. Landslide, including any earth sinking, rising, or shifting related to such event;

   c. Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased; or

   d. Earth sinking (other than sinkhole collapse), rising, or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations, or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil, and the action of water under the ground surface.

   This exclusion applies regardless of whether any of the above, in Paragraphs **5.a.** through **5.d.**, is caused by an act of nature or is otherwise caused.

   But if Earth Movement, as described in **5.a.** through **5.d.** above, results in fire, explosion, sprinkler leakage, volcanic action, or building glass breakage, we will pay for the "loss" or damage caused by such perils.

Volcanic action means direct "loss" resulting from the eruption of a volcano when the "loss" or damage is caused by:

a. Airborne volcanic blast or airborne shock waves;

b. Ash, dust, or particulate matter; or

c. Lava flow.

All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

This does not include the cost to remove ash, dust, or particulate matter that does not cause direct "loss" to the covered property.

This exclusion does not apply to property being transported.

6. Water

   a. Flood, surface water, waves (including tidal water and tsunami), tides, tidal wave, or overflow of any body of water, or spray from any of these, all whether or not driven by wind (including storm surge);

   b. Mudslide or mudflow;

   c. By water or sewage which backs up through sewers or drains or which enters into and overflows or is otherwise discharged from a sewer, drain, sump pump, sump pump well, or any other system designed to remove subsurface water which is drained from the foundation area;

   d. Water under the ground surface pressing on, flowing, or seeping through:

      1) Foundations, walls, floors, or paved surfaces;

      2) Sidewalks or driveways;

      3) Basements, whether paved or not; or

      4) Doors, windows, or other openings.

   e. Water from a broken water main. However, this exclusion does not apply to water flowing or seeping from a broken water main where the break occurs on the premises described in the "Declarations".

   f. Waterborne material carried or otherwise moved by any of the water referred to in Paragraphs **6.a., 6.c., 6.d.,** or **6.e.** or material carried or otherwise moved by mudslide or mudflow.

This exclusion applies regardless of whether any of the above, in Paragraphs **6.a.** through **6.f.,** is caused by an act of nature or is otherwise caused. An example of a situation to which this exclusion applies is the situation where a dam levee, seawall, or other boundary or containment system fails in whole or in part, for any reason, to contain the water.

But if Water, as described in **6.a.** through **6.f.** results in fire, explosion, sprinkler leakage, volcanic action,

or building glass breakage, we will pay for the "loss" or damage caused by such perils.

If covered electrical equipment requires drying out as a result of a flood, we will pay for the direct expenses of such drying out.

This exclusion does not apply to property being transported.

7. War

a.  War including undeclared or civil war;

b.  Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign, or other authority using military personnel or other agents; or

c.  Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

With respect to any action that comes within the terms of this exclusion and involves nuclear reaction or radiation, or radioactive contamination, this War exclusion supersedes Paragraph **A.9.** of **Section III – Exclusions**, the nuclear hazard exclusion.

8. Seizure or destruction of covered property by order of governmental authority, except as provided in Extensions of Coverage - **B.3.** and **Income Protection – Coverage 3, C. Additional Coverages.**

We will also cover "loss" caused by acts of destruction ordered by governmental authority to prevent the spread of a fire.

9. Nuclear reaction or radiation or radioactive contamination unless fire ensues, and then only for ensuing "loss".

10. By the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair of any property, or requiring the tearing down of any property, including the cost of removing its debris, except as provided in Extensions of Coverage - **B.3., B.7.,** and **B.8**.

11. The failure of power, communication, water, or other utility service supplied to the insured premises, however caused, if the failure originates away from the insured premises, except as provided in Extensions of Coverage - **A.5.** and **B.16.,** unless a covered "loss" ensues, and then only for ensuing "loss". Failure of any utility service includes lack of sufficient capacity and reduction in supply. However, we will pay for "loss" resulting from an "accident" to any transformer, electrical apparatus, or any "covered equipment" that is:

a.  Located on or within 1,500 feet of the insured premises;

b.  Owned by the building owner at your premises or owned by a public utility company; and

c.  Used to supply telephone, electricity, air conditioning, heating, gas, water, or steam to the insured premises.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular, or satellite network.

Exclusions **A.5.** through **A.11.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**B.  Coverages 1, 2, and 3**

We do not cover under Building(s) - Coverage 1, Business Personal Property and Personal Property of Others - Coverage 2, and Income Protection - Coverage 3 "loss" or damage caused:

1. By:

a.  Wear and tear, rust, or corrosion;

b.  Change in flavor, color, texture, or finish;

c.  Damp or dry air;

d.  Inherent vice;

e.  Smog;

f.  Latent or hidden defect;

g.  Marring or scratching;

h.  Smoke, vapor, or gases from agricultural or industrial operations;

i.  Settling, cracking, shrinking, bulging or expansion of pavements, foundations, walls, floors, roofs, or ceilings; or

j.  Termites, vermin, insects, rodents, birds, skunks, raccoons, spiders, or reptiles;

unless a covered "loss" ensues, and then only for ensuing "loss".

2. By discharge, dispersal, seepage, migration, release, or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release, or escape is itself caused by a peril insured against. But if "loss" or damage by a peril insured against results from the discharge, dispersal, seepage, migration, release, or escape of "pollutants", we will pay for the resulting damage caused by the peril insured against.

3. By mysterious disappearance, unexplained loss, or inventory shortage. We will accept inventory records as a means of proving the amount of a covered "loss".

4. By the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot, or bacteria.

But, if "fungus", wet or dry rot, or bacteria results in a covered loss from a peril insured against, we will pay for the "loss" or damage caused by that peril insured against.

This exclusion does not apply:

a.  When "fungus", wet or dry rot, or bacteria results from fire or lightning; or

b. To the extent that coverage is provided in **Section IV - Additional Coverages - B. Limited Coverage For "Fungus", Wet Rot, Dry Rot, And Bacteria**, with respect to "loss" or damage caused by a peril insured against other than fire or lightning.

5. By continuous or repeated seepage or leakage of water or the presence or condensation of humidity, moisture, or vapor, that occurs over a period of 14 days or more.

6. By freezing by temperature reduction to plumbing, heating, air conditioning or other equipment or appliances (except fire protective systems) or by water, other liquids, powder or molten material that leaks or flows from such items while the described building is vacant for more than 60 consecutive days, unless you have exercised reasonable care to:

a. Maintain heat in the building; or

b. Shut off the water supply and drain the system or appliance of water.

We will pay the cost to tear out and replace any part of the building described in the "Declarations" to repair damage to the system or appliance from which the water, other liquids, powder or molten material escapes.

We will not pay for the cost to repair or replace any defect in the system or appliance that caused the "loss" or damage.

7. By collapse, including any of the following conditions of property or any part of the property:

a. An abrupt falling down or caving in;

b. Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

c. Any cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion as such condition relates to **a.** or **b.** above.

But if collapse results in a peril insured against at the premises described in the "Declarations", we will pay for the "loss" or damage caused by the peril insured against.

**Exclusion B.7.** does not apply:

a. To the extent that coverage is provided in **Section IV - Additional Coverages**, **A. Collapse**; or

b. To collapse caused by one or more of the following:

1) Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism or malicious mischief; breakage of building glass; falling objects; weight of snow, ice, or sleet; sinkhole collapse; or volcanic action.

Sinkhole collapse means "loss" caused by sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite.

This peril does not include:

a) The cost of filling sinkholes, except to the extent that coverage is provided in **Section IV – Additional Coverages, A. Collapse**; or

b) "Loss" or damage to property caused by or resulting from the sinking or collapse of land into man-made underground cavities.

2) Water damage resulting from the accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of plumbing, heating, air conditioning, or other equipment or appliances, but does not include damage from a sump pump, sump pump well, or any other system designed to remove subsurface water which is drained from the foundation areas;

3) Breakage of building glass;

4) Weight of rain that collects on a roof; or

5) Weight of people or personal property.

8. To the interior of the building or the contents by rain, snow, sand, or dust, whether driven by wind or not, unless the exterior of the building first sustains damage to its roof or walls by a peril insured against. We will pay for "loss" caused by or resulting from the thawing of snow, sleet, or ice on the building.

9. To outdoor radio or television antennas (including satellite dishes) and its lead-in wiring, masts, or towers by windstorm or hail.

10. By dishonest or criminal acts (including theft) committed by you, or any of your members of a limited liability company, or any of your employees (including temporary or leased employees), directors, officers, trustees, or authorized representatives:

a. Acting alone or in collusion with other persons; or

b. While performing services for you or otherwise.

We will cover acts of destruction by your employees (including temporary or leased employees) but only for ensuing "loss", but there is no coverage for "loss" or damage:

a. By theft by your employees (including temporary or leased employees) or any person to whom you entrust property for any purpose, whether acting alone or in collusion with any other party; or

b. Caused by or resulting from manipulation, including the introduction or enaction of any virus,

harmful code or similar instruction, of a computer system (including "electronic data") by your employees.

11. From any defect, programming error, programming limitation, computer virus, malicious code, loss of "electronic data", loss of access, loss of use, loss of functionality, or other condition within or involving "electronic data" or "media" of any kind, except as provided in **Section IV - Additional Coverages – C.1., C.2.,** and **C.3.**

12. To unattached exterior signs that will be permanently mounted caused by breakage during installation, repairing or dismantling, or by breakage during transportation, unless caused by fire, lightning, collision, derailment or overturn of vehicle.

**C. Coverage 1**

We do not cover under **Building(s) - Coverage 1** "loss" or damage caused:

1. To fences, pavements, outdoor swimming pools and related equipment, retaining walls, bulkheads, piers, wharves or docks, when covered under the policy, by freezing or thawing, impact of watercraft, or by the pressure or weight of ice or water whether driven by wind or not.

2. To building materials and supplies not attached as part of the building, unless held for sale by you, caused by or resulting from theft. We will cover "loss" to building materials and supplies located in the building described in the "Declarations" caused by a peril insured against including theft. We will pay up to 10% of the **Building(s) - Coverage 1** limit but not to exceed $100,000 for any one "loss".

3. To vegetated roofs for "loss" caused by or resulting from:
   a. Dampness or dryness of atmosphere or of soil supporting the vegetation;
   b. Changes in or extremes of temperature;
   c. Disease;
   d. Frost or hail; or
   e. Rain, snow, ice, or sleet.

**D. Coverage 2**

We do not cover under **Business Personal Property and Personal Property of Others - Coverage 2** "loss" or damage caused:

1. From your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title or possession of any property.

2. By breakage of glassware, statuary, marble, bric-a-brac, porcelains, and other articles of a fragile or brittle nature. We will cover such "loss" caused by fire; lightning; aircraft; explosion; sonic boom; riot; civil commotion; smoke; vehicles; windstorm; hail; vandalism or malicious mischief; falling objects (the ex-

terior of the building must first sustain damage to roof or walls by falling objects); sinkhole collapse; volcanic action; weight of ice, snow, or sleet; sprinkler leakage; or water damage.

3. By rain, snow, or sleet to property in the open.

4. By any legal proceeding.

5. By actual work upon property being altered, repaired, installed, serviced, or faulty materials or workmanship, unless fire ensues, and then only for "loss" through ensuing fire.

6. By delay, loss of use, or loss of market.

7. To property that has been transferred to a person or to a place outside the premises described in the "Declarations" on the basis of unauthorized instructions.

8. By theft of furs and fur garments. We will pay for "loss" of furs and fur garments by "burglary" up to $10,000 for any one "loss".

9. By theft of gold and other precious metals and alloys. We will pay for theft of any one article of jewelry up to $500, but our payment will not exceed $10,000 for any one "loss". Jewelry means jewelry, necklaces, bracelets, rings, earrings, gems, precious and semi-precious stones, articles containing one or more gems, and articles made of gold or other precious metals.

**E. Coverage 3**

We do not cover under **Income Protection - Coverage 3**:

1. Increase of loss resulting from ordinance or law regulating construction or repair of buildings.

2. Consequential damages resulting from the breach of contractual obligations.

3. Increase of loss caused by or from delay in rebuilding, repairing, or replacing the property or resuming operations, due to interference at the location of the rebuilding, repair, or replacement by strikers or other persons.

4. Loss due to delay or loss of market.

5. Increase of loss caused by or resulting from the suspension, lapse, or cancellation of any license, lease, or contract. We will pay for loss of "income" and/or "rental income" during the "interruption of business" and during the period of Full Resumption of Operations if the suspension, lapse, or cancellation is caused by the suspension of your business.

6. "Extra expense" caused by the suspension, lapse, or cancellation of any license, lease, or contract beyond the "interruption of business".

7. Increase of loss resulting from ordinance or law regulating the prevention, control, repair, clean-up, or restoration of environmental damage.

8. Income protection specifically insured in whole or in part by this or any other insurance.

8

# SECTION IV - ADDITIONAL COVERAGES

**A. Collapse**

The coverage provided under this **Additional Coverage - Collapse** applies only to an abrupt collapse as described and limited in **A.1.** through **A.7.**:

1.  For the purpose of this **Additional Coverage - Collapse**, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2.  We will pay for direct physical "loss" or damage to covered property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Part or that contains Covered Property insured under this Coverage Part, if such collapse is caused by one or more of the following:

    a.  Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

    b.  Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

    c.  Use of defective material or methods in construction, remodeling, or renovation if the abrupt collapse occurs during the course of construction, remodeling, or renovation; or

    d.  Use of defective material or methods in construction, remodeling, or renovation if the abrupt collapse occurs after the course of the construction, remodeling, or renovation is complete, but only if the collapse is caused in part by:

        1)  A cause of loss listed in **2.a.** and **2.b.** above;

        2)  Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism or malicious mischief; breakage of building glass; falling objects; weight of snow, ice, or sleet; sinkhole collapse; or volcanic action.

            Sinkhole collapse means "loss" caused by sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite.

            This peril does not include:

            a)  The cost of filling sinkholes, except as provided in Paragraph **3.** below; or

            b)  "Loss" or damage to property caused by or resulting from the sinking or collapse of land into man-made underground cavities.

        3)  Water damage resulting from the accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of plumbing, heating, air

conditioning, or other equipment or appliances, but does not include damage from a sump pump, sump pump well, or any other system designed to remove subsurface water which is drained from the foundation areas;

        4)  Breakage of building glass;

        5)  Weight of people or personal property; or

        6)  Weight of rain that collects on a roof.

3.  We will pay up to $20,000 for expenses involved in replacing, stabilizing, refilling, or rebuilding the land necessary to support the building described in the "Declarations" damaged by sinkhole collapse. This payment of $20,000 is an additional amount of insurance and will increase the total amount of insurance available.

4.  This **Additional Coverage - Collapse** does not apply to:

    a.  A building or any part of a building that is in danger of falling down or caving in;

    b.  A part of a building that is standing, even if it has separated from another part of the building; or

    c.  A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.

5.  With respect to the following property:

    a.  Outdoor radio or television antennas (including satellite dishes) and its lead-in wiring, masts, or towers;

    b.  Awnings, gutters, and downspouts;

    c.  Yard fixtures;

    d.  Outdoor swimming pools;

    e.  Fences;

    f.  Piers, wharves, and docks;

    g.  Beach or diving platforms or appurtenances;

    h.  Retaining walls; and

    i.  Walks, roadways, and other paved surfaces;

    if an abrupt collapse is caused by a cause of "loss" listed in **2.a.** through **2.d.**, we will pay for "loss" or damage to that property listed in **4.a.** through **4.i.** only if:

    a.  Such "loss" or damage is a direct result of the abrupt collapse of a building insured under this Coverage Part; and

    b.  The property is Covered Property under this Coverage Part.

6.  If business personal property and personal property of others falls down or caves in and such collapse is **not** the result of an abrupt collapse of a building, we will pay for "loss" or damage to insured property

9

caused by such collapse of business personal property and personal property of others only if:

a. The collapse of business personal property and personal property of others was caused by a cause of loss listed in **2.a.** through **2.d.**;

b. The business personal property and personal property of others which collapses is inside a building; and

c. The property which collapses is not of a kind listed in **4.a**. through **4.i.**, regardless of whether that kind of property is considered to be business personal property or real property.

The coverage stated in this Paragraph **5.** does not apply to business personal property and personal property of others if marring and/or scratching is the only damage to that business personal property and personal property of others caused by the collapse.

7. This **Additional Coverage - Collapse** does not apply to business personal property and personal property of others that has not abruptly fallen down or caved in, even if the business personal property and personal property of others shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.

8. This **Additional Coverage - Collapse** will not increase the Limits of Insurance provided in this Coverage Part, except as provided in **Section IV - Additional Coverage** – **Collapse,** paragraph **A. 3**.

9. The term peril insured against includes the **Additional Coverage - Collapse** as described and limited in **A.1.** through **A.7.**

B. **Limited Coverage for "Fungus", Wet Rot, Dry Rot, And Bacteria**

1. The coverage described in Paragraphs **2.** through **6.** below only applies when the "fungus", wet or dry rot, or bacteria is the result of a peril insured against, other than fire and lightning, that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

2. We will pay for "loss" or damage by "fungus", wet or dry rot, or bacteria. As used in this Limited Coverage, the term "loss" or damage means:

a. Direct physical "loss" or damage to Covered Property caused by "fungus", wet or dry rot, or bacteria, including the cost of removal of the "fungus", wet or dry rot, or bacteria;

b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot, or bacteria; and

c. The cost of testing performed before, during, or after removal, repair, replacement, or restoration of the damaged property is completed, provided

there is a reason to believe that "fungus", wet or dry rot, or bacteria are present.

3. The coverage described in Paragraph **2.** above of this Limited Coverage is limited to $25,000. Regardless of the number of claims, this limit is the most we will pay for the total of all "loss" or damage arising out of all occurrences caused by a peril insured against, other than fire and lightning, which takes place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of "loss" which results in "fungus", wet or dry rot, or bacteria, we will not pay more than a total of $25,000 even if the "fungus", wet or dry rot, or bacteria continues to be present, active, or recurs, in a later policy period.

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in "loss" or damage by "fungus", wet or dry rot, or bacteria, and other "loss" or damage, we will not pay more, for the total of all "loss" or damage, than the applicable Limit of Insurance on the affected Covered Property.

If there is covered "loss" or damage to Covered Property, not caused by "fungus", wet or dry rot, or bacteria, our loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot, or bacteria causes an increase in the "loss". Any such increase in the "loss" will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under **Exclusions B.4. Coverages 1, 2,** and **3** in **Section III - Exclusions** or under **Section IV - Additional Coverages - A. Collapse.**

6. The following Paragraphs **6. a.** or **6. b.** applies only if the "interruption of business" satisfies all terms and conditions of **Income Protection - Coverage 3**.

a. If the covered loss which resulted in "fungus", wet or dry rot, or bacteria does not itself necessitate an "interruption of business", but such "interruption of business" is necessary due to "loss" or damage to covered property caused by "fungus", wet or dry rot, or bacteria, then we will pay the actual loss of "income" or "rental income" sustained by you in a period of not more than 30 days. The days need not be consecutive.

b. If the "interruption of business" was caused by loss or damage other than "fungus", wet or dry rot, or bacteria but remediation of "fungus", wet or dry rot, or bacteria prolongs the "interruption of business", we will pay the actual loss of "income" or "rental income" sustained by you during the delay (regardless of when such a delay occurs during the "interruption of business") in a

10

period of not more than 30 days. The days need not be consecutive.

7. The coverage described under Paragraph **6.a.** and **6.b.** of this Limited Coverage is limited to $25,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss of "income" or "rental income" arising out of your "interruption of business" in a 12-month period (starting with the beginning of the present annual policy period). With respects to a particular occurrence of loss which results in "fungus", wet or dry rot, or bacteria, we will not pay more than a total of $25,000 for loss of "income" or "rental income" even if the "fungus", wet or dry rot, or bacteria continues to be present, active, or recurs in a later policy period resulting in an "interruption of business".

8. This coverage does not apply to lawns, trees, shrubs, or plants which are part of a vegetated roof.

**C. Electronic Data Processing Equipment and Electronic Data Coverage**

Payments under this Electronic Data Processing Equipment, Electronic Data Coverage, and Income Protection are an Additional Amount of Insurance and will increase the total amount of insurance available for the coverage involved.

1. **Electronic Data Processing Equipment - Computer Virus**

We will cover "loss" or damage to "electronic data processing equipment" caused by magnetic injury or computer virus. We will pay up to $15,000 for any one "loss" to "electronic data processing equipment".

We do not cover:

a. "Electronic data processing equipment" which the insured rents or leases to others while it is away from the premises described in the "Declarations".

b. "Loss" caused by processing operations or "loss" that occurred while the insured property is being worked on unless fire or explosion ensue, and then only for "loss", damage, or expense caused by the ensuing fire or explosion.

"Electronic data processing equipment" means computers, terminals, teleprinters, readers, telephone systems, computerized cash registers, word processing equipment, and equipment and parts related to the processing unit.

"Electronic data processing equipment" does not include computer operated or controlled production or processing machinery or equipment or a separate computer or computerized control panels used to operate the production or processing machinery or equipment.

We will pay for "loss" to "electronic data processing equipment" which is in excess of the deductible amount shown in the "Declarations".

2. **Electronic Data – Expenses for Reproduction or Replacement**

We will cover the expenses incurred to reproduce or replace your "electronic data" when destruction or corruption is caused by a peril insured against including loss by theft. This includes your "electronic data" that is destroyed or corrupted by magnetic injury, "accident", "electronic circuitry impairment", virus, harmful code, or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupts its normal operation.

Coverage is limited to "electronic data" which is owned by you, licensed or leased to you, originates and resides in your computers, and is used in the e-commerce activity of your business.

This Additional Amount of Insurance does not apply to "electronic data" which is integrated in and operates or controls the building's elevator, lighting, heating, ventilation, air conditioning, or security systems.

The business of e-commerce and e-commerce activity means commerce conducted by the Internet or other computer based interactive communication network. This includes business-to-business conducted in that manner.

"Loss" or damage to "electronic data" will be valued at the cost of reproduction or replacement including the cost of data entry, re-programming, and computer consultation services. But we will not pay the cost to duplicate research that led to the development of your "electronic data".

To the extent that "electronic data" is not reproduced or replaced, the "loss" will be valued at the cost of replacement of the "media" on which "electronic data" was stored, with blank "media" of substantially identical type.

The most we will pay for the expenses incurred in the reproduction or replacement of your "electronic data" is $25,000.

"Media" means materials on which "electronic data" are recorded, such as magnetic tapes, disc packs, paper tapes, and cards.

We will pay for the expenses incurred in the reproduction or replacement of your "electronic data" which is in excess of the deductible amount shown in the "Declarations".

11

3. **Income Protection – Computer Operations**

    a. **Income Protection – Coverage 3** is extended to cover your loss of "income" you sustain due to partial or total "interruption of business" resulting directly from an interruption in your computer operations due to your "electronic data" being destroyed or corrupted by a peril insured against including loss by theft. This includes your loss of "income" resulting from your "electronic data" that is destroyed or corrupted by magnetic injury, "accident", "electronic circuitry impairment", virus, harmful code, or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation.

    b. The most we will pay for your loss of "income" due to "interruption of business" resulting from an interruption to your computer operations in any one policy year, regardless of the number of interruptions or the number of premises, locations, or computer systems involved is $25,000. If the loss payment relating to the first interruption does not exhaust this amount of insurance, then the balance is available for loss or expense sustained or incurred as a result of subsequent interruptions during that policy year. With respect to any interruption which begins in one policy year and continues or results in additional loss or expense in a subsequent policy year(s), all loss and expense is deemed to be sustained or incurred in the policy year in which the interruption began.

    c. This Income Protection coverage does not apply to loss sustained or expense incurred after the end of the period of restoration even if the $25,000 amount of insurance has not been exhausted.

    d. Coverage for Income Protection does not apply when "interruption of business" is due to damage or corruption of "electronic data", or any "loss" to "electronic data", except as provided under Paragraphs **a.** through **c.** of this **Income Protection - Computer Operations**.

    No deductible applies to **Income Protection – Coverage 3.**

4. **Exclusions – Electronic Data – Expenses for Reproduction or Replacement and Income Protection – Computer Operations**

    We do not cover under Electronic Data – Expenses for Reproduction or Replacement and Income Protection – Computer Operations :

    a. "Media" and "electronic data" which cannot be replaced with the same kind or quality.

    b. Program support documentation such as flow charts, record formats, or narrative descriptions unless they are converted to "electronic data" form and then only in that form.

    c. "Loss" caused by errors or omissions or deficiency in design, specifications, materials, or workmanship, unless fire or explosion ensues, and then only for "loss", damage, or expense caused by the ensuing fire or explosion.

    d. "Loss" caused by errors or omissions in programming or processing operations or "loss" that occurred while the insured property is being worked on unless fire or explosion ensues, and then only for "loss", damage, or expense caused by the ensuing fire or explosion.

    e. "Loss" or damage caused by or resulting from manipulation, including the introduction or enaction of any virus, harmful code, or similar instruction of a computer system (including "electronic data") by any employee, including a temporary or leased employee, or by an entity retained by you, or for you, to inspect, design, install, modify, maintain, repair, or replace that system.

D. **Equipment Breakdown Coverage**

    The term Covered Cause of Loss in **Section II – Perils Insured Against** includes the Additional Equipment Breakdown Coverage as described and limited below. Without an "accident" or "electronic circuitry impairment", there is no Equipment Breakdown Coverage. This **Additional Coverage – Equipment Breakdown Coverage** is subject to the policy deductible shown in the "Declarations".

    1. We will pay for direct physical damage to "covered equipment" that is the direct result of an "accident" or "electronic circuitry impairment". We will consider "electronic circuitry impairment" to be physical damage to "covered equipment".

    2. The following coverages also apply to the direct result of an "accident" or "electronic circuitry impairment". However, with respect to **Section VIII - Extensions of Coverage – Income Protection – Off-Premises Utility Properties Failure** and **Contingent Business Interruption** coverages provided in this policy, coverage will only apply to the direct result of an "accident" and will not apply to the direct result of an "electronic circuitry impairment".

        a. Electronic Data Restoration

            1) We will pay for your reasonable and necessary cost to research, replace, and restore lost "electronic data".

            2) The most we will pay for loss or expense under this coverage, including loss of "income" you sustain and necessary "extra expense" you incur is $25,000.

12

3) The amount of insurance provided in **Section IV – Additional Coverages** – Paragraph **C. 2. Electronic Data – Expenses for Reproduction or Replacement** does not apply to coverage provided in Paragraph **1)** above.

b. Expediting Expenses

With respect to your damaged "covered equipment" resulting from an "accident" or "electronic circuitry impairment", we will pay up to $25,000 for the reasonable extra cost to:

1) Make temporary repairs; and

2) Expedite permanent repairs or permanent replacement

c. Hazardous Substances

1) We will pay your additional cost to repair or replace covered property because of contamination by a "hazardous substance". This includes the additional expenses to clean up or dispose of such property.

2) As used in this coverage, additional costs mean those beyond what would have been payable under this coverage had no "hazardous substance" been involved.

3) We will pay up to $25,000 for "loss", damage or expense under this coverage, including actual loss of "income" and "rental income" you sustain and necessary expense you incur.

d. Off Premises Equipment Breakdown

1) We will pay for physical damage to transportable "covered equipment" that, at the time of the "accident" or "electrical circuitry impairment", is not at a location you do not own, lease or operate. As respects to this Off Premises Equipment Breakdown coverage only, the "accident" or "electronic circuitry impairment" may occur in the United States, its territories and possessions, Puerto Rico, and Canada.

2) We will also pay for your reasonable and necessary cost to research, replace, and restore lost "electronic data" contained within "covered equipment" as described under Paragraph **1)** above.

3) We will pay up to $25,000 for "loss" or damage to transportable "covered equipment" including your reasonable and necessary cost to research, replace, and restore lost "electronic data" contained within "covered equipment" as described in Paragraph **1)** above.

4) The amount of insurance provided in **Section IV - Additional Coverages – C. 2.**

**Electronic Data – Expenses for Reproduction or Replacement** does not apply to coverage provided in Paragraph **2)** above.

e. Off-Premises Utility Properties Failure

1) Any insurance provided under this **Additional Coverage – Equipment Breakdown** for Income Protection, Electronic Data Restoration as described in Paragraph **2.a.** above or Spoilage as described in Paragraph **2.g.** below is extended to apply to your loss, damage, or expense resulting from the interruption of service to the premises described in the "Declarations". The interruption of service must be caused by an "accident" to equipment, including overhead transmission lines, that is owned by a utility, landlord, a landlord's utility or other supplier who provides you with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, Internet access, telecommunications services, "cloud computing services", wide area networks, or data transmission. The equipment must meet the definition of "covered equipment" except that it is not covered property, and be located on or within 1,500 feet of the premises described in the "Declarations".

2) "Cloud computing services" must be provided by a profession provider with whom you have a contract.

3) With respect to the Electronic Data Restoration portion of this Off-Premises Utility Properties Failure coverage, coverage will also apply to "electronic data" stored in the equipment of a provider of "cloud computing services".

4) Any insurance provided for Income Protection or Electronic Data Restoration will not apply under this Off-Premises Utility Properties Failure coverage unless the failure or interruption of service exceeds 24 hours immediately following the "accident". If the interruption exceeds 24 hours, coverage will begin at the time of the disruption, and the applicable deductible will apply.

5) The most we will pay in any "one equipment breakdown" for loss, damage, or expense under this coverage is the applicable limit for Electronic Data Restoration as described in Paragraph **2.a.** above or Spoilage as described in Paragraph **2.g.** below. The most we will pay in any "one equipment breakdown" for loss of "income" you sustain and "extra expense" you incur under Income Protection – Coverage 3 is $25,000.

13

f. Public Relations

1) This coverage only applies if you have sustained an actual loss of "income".

2) We will pay for your reasonable costs for professional services to create and disseminate communications, when the need for such communications arises directly from the interruption of your business. This communication must be directed to one or more of the following:

a) The "media";

b) The public; or

c) Your customers, clients or members.

3) Such costs must be incurred during the period of restoration or up to 30 days after the period of restoration has ended.

4) We will pay up to $5,000 for loss or expense for this coverage.

g. Spoilage

1) We will pay for:

(a) Physical damage to "perishable goods" due to spoilage;

(b) Physical damage to "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia; and

(c) Any necessary expenses you incur to reduce the amount of loss under this coverage to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

2) If you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the sales price of the "perishable goods" at the time of the "accident" or "electronic circuitry impairment", less discounts and expenses you otherwise would have had. Otherwise our payment will be determined in accordance with the Loss Payment condition.

3) The most we will pay for loss, damage, or expense under this coverage is $25,000.

3. Equipment Breakdown Coverage Exclusions

a. We will not pay for "loss", damage or expense caused by or resulting from:

1) Your failure to use all reasonable means to protect covered property from damage following an "accident" or "electronic circuitry impairment"; or

2) A hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment.

b. Coverage under this Additional Equipment Breakdown Coverage does not apply to an "accident" or "electronic circuitry impairment" caused by or resulting from:

1) Fire (including fire resulting from an "accident" or "electronic circuitry impairment"), or water or other means to extinguish a fire;

2) Explosion of gas or unconsumed fuel within the furnace of any boiler or fired vessel or within the passages from that furnace to the atmosphere;

3) Any other explosion, except as specifically covered under this policy;

4) Vandalism;

5) Lightning; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; sprinkler leakage; elevator collision;

6) Breakage of glass; falling objects; weight of snow, ice, or sleet; freezing (caused by cold weather); collapse; or molten material;

7) Water

a) Flood, surface water, waves (including tidal water and tsunami), tides, tidal waves, or overflow of any body of water, or their spray from any of these, all whether or not driven by wind (including storm surge);

b) Mudslide or mudflow;

c) By water or sewage which backs up through sewers or drains or which enters into and overflows or is otherwise discharged from a sewer, drain, sump pump, sump pump well, or any other system designed to remove subsurface water which is drained from the foundation area.

However, if electrical "covered equipment" requires drying out because of the above, we will pay for the direct expenses of such drying out subject to the applicable Limit of Insurance and deductible for Buildings – Coverage 1 and Business Personal Property and Personal Property of Others – Coverage 2.

8) Earth Movement

b) Earthquake, including tremors and aftershocks, and any earth sinking, rising, or shifting related to such event;

c) Landslide, including any earth sinking, rising, or shifting related to such event;

14

d) Mine subsidence meaning subsidence of a man-made mine, whether or not mining activity has ceased; or

e) Earth sinking, rising, or shifting.

c. With respect to Income Protection Coverage – Coverage 3 including Extra Expense Coverage, we will also not pay for:

1) Loss caused by your failure to use due diligence and dispatch and all reasonable means to resume business; or

2) Any increase in loss resulting from an agreement between you and your customer or supplier.

d. We will not pay for any "loss" or damage to animals.

e. Exclusions **b. 5)** and **b. 6)** above shall not apply if:

1) The excluded cause of loss occurs away from any covered premises and causes an electrical surge or other electrical disturbance;

2) Such surge or disturbance is transmitted through utility service transmission lines to the covered location and results in an "accident" or "electronic circuitry impairment"; and

3) The loss, damage, or expense caused by such surge or disturbance is not covered elsewhere under the policy.

f. Any cause of loss set forth in exclusion **b. 6)** above that is not a Covered Cause of Loss in this policy shall be excluded only as respects Section **VIII – Extension of Coverage – Income Protection – Off-Premises Utility Properties Failure.**

## SECTION V - DEDUCTIBLES

1. Building(s) - Coverage 1, Business Personal Property and Personal Property of Others - Coverage 2 and Extensions of Coverage - We will pay the amount of "loss" to property in any one occurrence which is in excess of the deductible amount shown in the "Declarations," unless otherwise stated in the Extensions of Coverage.

2. Glass covered under Building(s) - Coverage 1 or Business Personal Property and Personal Property of Others - Coverage 2 - $200 deductible applies.

3. Signs covered under Building(s) - Coverage 1 or Business Personal Property and Personal Property of Others - Coverage 2 - $200 deductible applies.

4. Theft - We will pay the amount of "loss" to property caused by theft in any one occurrence which is in excess of either $200 or the deductible amount applying to Building(s) - Coverage 1 and Business Personal

Property and Personal Property of Others - Coverage 2 shown in the "Declarations," whichever is the greater amount.

5. When the occurrence involves "loss" to more than one building (or building and business personal property) and separate limits of insurance apply or blanket limits of insurance apply, the losses will not be combined in determining the application of the deductible. The deductible will be applied only once per occurrence.

6. Income Protection - Coverage 3 - No deductible applies.

## SECTION VI - SPECIAL LOSS PAYMENTS - COVERAGE 1

Improvements and Betterments Made By Others is subject to special treatment when damaged by a peril insured against:

1. If you pay for repair or replacement, we will pay you the expenses involved not exceeding the replacement cost of damaged property.

2. If repaired or replaced at the expense of others, there is no loss payable to you.

3. If the damaged property is not repaired or replaced by you or at the expense of others, there is no loss payable to you.

## SECTION VII - SPECIAL LOSS PAYMENTS - COVERAGE 2

The following property is subject to special treatment when damaged by a peril insured against:

1. Accounting Books, Records, Tapes, and Recording Media. We will pay you the cost of blank items (books, film, or other written documents). Extensions of Coverage - **B.29.** - Valuable Papers and Records provides for reproduction of these items.

2. Improvements and Betterments:

a. If you pay for repair or replacement, we will pay you the expenses involved not exceeding the replacement cost of damaged property.

b. If not repaired or replaced, we will pay you a proportion of your original cost. We will determine the proportionate value as follows:

1) Multiply the original cost by the number of days from the "loss" or damage to the expiration of the lease; and

2) Divide the amount determined in **1)** above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

c. If repaired or replaced at the expense of others, there is no loss payable to you.

3. Sold Property. If you have sold property but not delivered it, we will pay you the net selling price.

## SECTION VIII - EXTENSIONS OF COVERAGE

**A. Extensions of Coverage**

We will pay the following "losses" at your option. Payments under these Extensions are not an additional amount of insurance and will not increase the total amount of insurance available for the coverage involved.

1. **Electrical Service Panels.** We will pay for damage to your electrical service panels caused by electricity.

   This extension of coverage applies to each building described in the "Declarations".

2. **Fences, Walks, Unattached Outbuildings, Tennis Courts, and Inground Swimming Pools - Coverage 1.** We will cover "loss" to fences, walks, unattached outbuildings, tennis courts, and inground swimming pools caused by a peril insured against on the premises described in the "Declarations." We will pay up to 10% of the Building(s) - Coverage 1 limit but not to exceed $25,000 for any one "loss". If you are a tenant and no limit is shown for Building(s) - Coverage 1, we will pay up to 10% of the Business Personal Property and Personal Property of Others - Coverage 2 limit (minimum of $1,000) but not to exceed $25,000 for any one "loss".

   Unattached outbuildings include garages, storage areas, and tool sheds but do not include those buildings used for dwelling purposes or in connection with manufacturing, servicing, or farming operations.

   If specific insurance is carried on any item covered by this extension, then this extension does not apply to that item.

   This extension of coverage applies to each building described in the "Declarations".

3. **Merchandise in Shipment**. Business Personal Property and Personal Property of Others - Coverage 2 includes protection for "loss" by a peril insured against to merchandise which you have sold but for which you have not received payment, while in the custody of a common carrier. This extension of coverage only applies when the "loss" is not recoverable from the purchaser, transporter, or any other insurance.

4. **Moving Clause**. When you move, coverage for "loss" to business personal property and personal property of others will apply for 60 days while in transit and at each location. The amount of insurance applying at each location will be the proportion that the value in each such location bears to the total value of Business Personal Property and Personal Property of Others - Coverage 2 covered at the original location. After the completion of your move, the coverage will apply at the new location only.

5. **Refrigerated Property**. Business Personal Property and Personal Property of Others - Coverage 2 covers "loss" to the contents of refrigeration equipment on the premises described in the "Declarations" from either an "accident" or "electronic circuitry impairment".

   This extension of coverage applies to each building described in the "Declarations".

6. **Temperature Change**. Business Personal Property and Personal Property of Others - Coverage 2 covers "loss" resulting from temperature or humidity change. There must first be damage from a peril insured against to the premises described in the "Declarations". "Loss" resulting from riot and civil commotion is not covered.

   This extension of coverage applies to each building described in the "Declarations".

7. **Trees, Shrubs, Lawns, and Plants - Coverages 1 & 2**. We will cover "loss" to trees, shrubs, lawns, and plants (except vegetated roofs) on the premises described in the "Declarations" caused by fire; lightning; explosion; riot or civil commotion; vehicles; aircraft; smoke; falling objects; sonic boom; sinkhole collapse; volcanic action; or collapse caused by any of the perils specified in this paragraph.

   If trees, shrubs, and plants are inside buildings, on the premises described in the "Declarations", we will also cover "loss" caused by windstorm; hail; weight of snow, ice, or sleet; vandalism or malicious mischief; or temperature change. There must first be damage from a peril insured against to the premises described in the "Declarations".

   We will not be liable for more than $1,000 for any one tree, shrub, or plant, including expenses for removing debris, or $10,000 for any one "loss", unless trees, shrubs, or plants are held for sale inside buildings, or trees, shrubs, or plants are used for decorative purpose inside the building, in which case the Business Personal Property and Personal Property of Others - Coverage 2 limit applies. We will not be liable for more than $2,500 for any one "loss" to lawns.

   This extension includes expenses for the removal of debris of trees, shrubs, and plants from the premises described in the "Declarations" caused by a peril insured against which are the property of others. If you are a tenant, we will not cover removing debris of trees, shrubs, and plants owned by the landlord at the premises described in the "Declarations".

   There is no coverage under this policy for trees, shrubs, lawns, and plants grown outside of buildings held for sale.

This extension of coverage applies to each building described in the "Declarations".

**B. Extensions of Coverage**

Payments under these Extensions of Coverage are an ADDITIONAL AMOUNT of insurance and will increase the total amount of insurance available for the coverage involved.

1. **Accounts Receivable**. This policy covers damage to records of accounts receivable up to $25,000 for any one "loss" caused by a peril insured against at the premises described in the "Declarations", while being conveyed outside the premises or while temporarily within other premises for any purpose except storage. It covers:

    a. All sums due the insured from customers, provided the insured is unable to collect such sums as the direct result of "loss" to records of accounts receivable;

    b. Interest charges on any loan to offset impaired collections pending repayments of such sums made uncollectible by such "loss";

    c. Collection expense in excess of normal collection cost which is made necessary because of such "loss"; and

    d. Other expenses, when reasonably incurred by the insured in re-establishing records of accounts receivable following such "loss".

    Coverage will also apply while the records of accounts receivable are being moved to and while at a place of safety because of imminent danger of "loss", and while being returned from such place.

    This extension of coverage applies to each building described in the "Declarations".

    The deductible does not apply to this extension.

2. **Arson and Theft Reward**. We will pay up to $10,000 as a reward to any individual or group for information which results in the arrest and conviction of any person committing an act of arson resulting in damage to covered property or in the arrest and conviction of any person who commits theft of covered property.

    The deductible does not apply to this extension.

3. **Building Ordinance or Law Coverage.**

    **A. Application of Coverage**

    The building ordinance or law coverage applies to **B. Coverage for the Value of the Undamaged Part of the Building** and **C. Coverage for the Increased Cost of Construction** for any building covered by this policy at the premises described in the "Declarations" or for tenant's improvements and betterments as described under business personal property and personal property of others only if Paragraphs **A. 1.** and

**A.2.** below are satisfied and an amount of insurance is shown on the "Declarations" for Buildings or for tenant's improvements and betterments an amount of insurance is shown in the "Declarations' for Business Personal Property and Personal Property of Others:

1. The ordinance or law:

    a. Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the premises described in the "Declarations"; and

    b. Is in force at the time of "loss";

    but coverage applies only in response to the minimum requirements of the ordinance or law. Losses and costs incurred in complying with recommended actions or standards that exceed actual requirements are not covered.

2. The building sustains:

    a. Direct physical damage caused by a peril insured against under this policy and such damage results in enforcement of or compliance with the ordinance or law; or

    b. Both direct physical damage that is covered under this policy and direct physical damage that is not caused by a peril insured against under this policy, and the building damage in its entirety results in enforcement of or compliance with the ordinance or law.

    but if the building sustains direct physical damage that is not caused by a peril insured against under this policy and such damage is the subject of the ordinance or law, then there is no coverage even if the building has also sustained direct physical damage caused by a peril insured against.

This extension of coverage applies to each building described in the "Declarations".

**B. Coverage for the Value of the Undamaged Part of the Building**

1. **Coverage Agreement**

If the building sustains direct damage caused by a peril insured against, we will pay for the value of the undamaged part of the building caused by enforcement of or compliance with any ordinance or law regulating the construction or repair of building(s) that:

    a. Requires the demolition of the undamaged parts of the building;

    b. Regulates the construction or repair of the building, or establishes zoning or

17

land use requirements at the premises described in the "Declarations"; and

c. Is in force at the time of "loss" or damage.

Coverage for the Value of the Undamaged Part of the Building is not an additional amount of insurance. Payment is included within the amount of insurance for the covered building described in the "Declarations".

2. **Loss Payment - Value of the Undamaged Part of the Building**

We will pay for the value of the undamaged portion of the building as a result of any ordinance or law regulating the construction, use, or repair of building(s) as follows:

a. We will pay the smallest of the following if the covered building is not repaired or rebuilt:

1) The actual cash value of the undamaged part of the building;

2) The amount of insurance shown in the "Declarations" for the building described in the "Declarations"; or

3) The difference between the amount of insurance on the insured building at the time of "loss" or damage and the amount paid for "loss" to the damaged or destroyed portion of the insured building.

b. We will pay the smallest of the following if the covered building is being repaired or replaced on the same premises or another premises:

1) The actual cash value for the undamaged part of the building, if the insured building is covered on an actual cash value basis;

2) The replacement cost for the undamaged part of the building if the insured building is covered on a replacement cost basis;

3) The amount of insurance shown in the "Declarations" for the building described in the "Declarations"; or

4) The difference between the amount of insurance on the insured building at the time of "loss" or damage and the amount paid for "loss" to the damaged or destroyed portion of the insured building.

C. **Coverage for Increased Cost of Construction**

1. **Coverage Agreement**

If the building or tenant's improvements and betterments sustain direct physical damage caused by a peril insured against, we will pay up to $25,000 for the increased cost to:

a. Repair, replace, or construct the damaged portions of the building or tenant's improvements and betterments; or

b. Reconstruct or remodel undamaged portions of the building or tenant's improvements and betterments whether or not demolition is required.

caused by enforcement of or compliance with any ordinance or law regulating the construction, use, or repair of buildings. If the building is repaired or replaced, it must be intended for the same use as the current building, unless otherwise required by an ordinance or law. We will not pay for the increased cost of construction if the building is not repaired, replaced, or remodeled.

When a building described in the "Declarations" is damaged or destroyed and increased cost of construction applies to that building in accordance with **C.1.a.** above, coverage for the increased cost of construction also applies to repairs or reconstruction of the following, subject to the same conditions stated in **C.1.a.**:

a. The cost of excavations, grading, backfilling, and filling;

b. Foundation of the building;

c. Pilings; and

d. Underground pipes, flues, and drains.

2. **Loss Payment - Increased Cost of Construction**

The most we will pay is $25,000 for the increased cost of construction that results from any building ordinance or law. Payment for the increased cost of construction is an additional amount of insurance.

D. **Building Ordinance or Law - No Coverage**

We will not pay for "loss" due to any ordinance or law that:

1. You were required to comply with before the "loss", even if the building was undamaged; and

2. You failed to comply with the ordinance or law.

We will not pay any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, de-

18

toxify or neutralize, or in any way respond to or assess the effects of "pollutants", "fungus", wet or dry rot, or bacteria.

Also, we will not pay any costs associated with the enforcement of or compliance with an ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling, or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread, or any activity of "fungus", wet or dry rot, or bacteria.

4. **Check, Credit, Debit or Charge Card Forgery or Alteration.** We will pay up to $5,000 for any one "loss" resulting directly from:

   a. Forgery or alteration of credit, debit, or charge cards; and

   b. Forgery or alteration of any checks, drafts, promissory notes, or similar written promises, orders, or directions to pay a sum certain in money that are:

      1) Made or drawn by or drawn upon you;

      2) Made or drawn by one acting as your Agent;

      or that are purported to have been so made or drawn.

We will not pay for "loss" caused by dishonest or criminal acts committed by you, any of your members of a limited liability company, or any of your employees, directors, trustees, or authorized representatives:

   a. Acting alone or in collusion with other persons; or

   b. While performing services for you or otherwise.

We will not pay for any "loss" arising from forgery or alteration of a credit, debit, or charge card if you have not complied fully with the provisions, conditions, or other terms under which the card was issued.

All "losses" committed by any person, whether acting alone or in collusion with others, are considered one occurrence which is subject to the $5,000 limit.

If you are sued for refusing to pay any covered instrument on the basis that it has been forged or altered and you have our written consent to defend against the suit, we will also pay for any reasonable legal expense that you incur and pay in that defense. The amount we will pay is in addition to the amount of insurance applicable to this extension. The deductible does not apply to legal expenses.

You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

Electrical and Mechanical Signatures. We will treat signatures that are produced or reproduced electronically, mechanically, or by other means same as handwritten signatures.

"Covered instruments" includes checks, drafts, promissory notes, or similar written promises.

"Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own named signed with or without authority, in any capacity or for any purpose.

"Occurrence" means for this coverage only, all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments.

This extension applies anywhere in the world.

A $200 deductible applies to this extension.

5. **Contingent Business Interruption.** We will pay up to $25,000 for your contingent income meaning loss of "income" or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to Building(s) or Business Personal Property of "dependent properties" from a peril insured against.

However, coverage for contingent income does not apply when the only loss to "dependent properties" is "loss" or damage to "electronic data", including destruction or corruption of "electronic data". If the "dependent property" sustains "loss" or damage to "electronic data" and other property, this coverage will not continue once the other property is repaired, rebuilt, or replaced.

We will reduce the amount of your "income" or "rental income" loss, other than "extra expense", to the extent you can resume normal operations by using an available:

   a. Source of materials; or

   b. Outlet for your products.

"Dependent property" means premises operated by others whom you depend on in any way for continuation of your normal business operations. The "dependent properties" are:

   a. Contributing Locations which mean those premises you depend on as a source of materials or services that you need for your operations. Services does not include water, communication, power supply, or waste water removal properties;

   b. Recipient Locations which mean those premises you depend on as a customer for your products or services;

   c. Manufacturing Locations which mean those premises you depend on to manufacture products for your customers under contract or sale; or

d. Leader Locations which mean those premises you depend on to attract customers to your business.

"Dependent properties" do not include roads, bridges, tunnels, waterways, airfields, pipelines, or any other similar areas or structures.

"Interruption of business" for contingent business interruption means the period of time that your business is suspended and it:

a. Begins with the date of direct "loss" or damage to the "dependent property" caused by a peril insured against; and

b. Ends on the date when the "dependent property" should be repaired, rebuilt, or replaced with reasonable speed and similar quality.

"Interruption of business" for contingent business interruption does not include any increased period required due to the enforcement of any ordinance or law that:

a. Regulates the construction, use, or repair, or requires the tearing down, of any property; or

b. Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of "pollutants".

The deductible does not apply to this extension.

6. **Counterfeit Money**. We will pay up to $1,000 per workday for loss from the acceptance in good faith of counterfeit money. "Workday" means a day on which your operations are usually performed.

The deductible for this extension is $50.

7. **Debris Removal**. We will pay the cost of removal of debris to covered property on the premises described in the "Declarations" caused by a peril insured against. This does not apply to any increase of "loss" resulting from ordinances or laws regulating construction or repair of buildings. We will pay up to 5% of the total limits for Coverages 1 and 2 plus $25,000 for debris removal expense.

This extension does not cover the cost to:

a. Remove debris of your property that is not insured under this policy, or property in your possession that is not covered property under Building(s) – Coverage 1 or Business Personal Property and Personal Property of Others – Coverage 2;

b. Remove debris of property owned by or leased to the landlord of the building where your described premises are located, unless you have a contractual responsibility to insure such property and it is insured under this policy;

c. Remove any property that is property not covered under Building(s) – Coverage 1 or Business Personal Property and Personal Property of Others – Coverage 2;

d. Remove property of others of a type that would not be covered property under Building(s) - Coverage 1 or Business Personal Property and Personal Property of Others – Coverage 2; or

e. Extract "pollutants" from land or water, or to remove, restore, or replace polluted land or water.

This extension of coverage applies to each building described in the "Declarations".

8. **Demolition Cost**. This policy covers the cost, not to exceed $25,000, of demolishing and removing any undamaged portion of the building after a covered "loss". The demolition must be required by enforcement of any ordinance or law regulating the construction, use of, or repair of buildings.

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

9. **Employee Dishonesty**. We will pay for loss of "money", "securities", and Business Personal Property and Personal Property of Others - Coverage 2 up to $10,000 per occurrence resulting from dishonest acts committed by any of your "employees", whether identified or not, acting alone or in collusion with other persons (except you or your partner(s)) with the intent to:

a. Cause you to sustain loss; and

b. Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment) for:

1) Any "employee"; or

2) Any other person or organization.

This extension is subject to the following:

a. For any loss, our payment shall not exceed the replacement cost of business personal property and personal property of others at the time of loss, except the cost of "securities" may be determined by the market value at the time of settlement;

b. All loss caused by, or involving, one or more "employees", whether the result of a single act or a series of acts, is considered one occurrence;

c. We will pay for loss you sustain through acts committed or events occurring during the policy period and if loss is discovered during the policy period or is discovered within one year from the end of the policy period;

d. Our payment is not increased regardless of the number of people we protect;

e.  Regardless of the number of years our policy is in force, the amount of insurance shall not be cumulative from year to year;

f.  If you sustained a loss during the policy period shown in the "Declarations" resulting directly from an "occurrence" taking place:

1)  Partly during the policy period shown in the "Declarations"; and

2)  Partly during the policy period(s) of any prior renewals;

we will first settle the amount of loss that you sustained during this policy period. We will then settle the remaining amount of loss that you sustained during the policy period(s) of the prior renewals.

g.  If you sustained a loss during the period of any prior insurance that you could have recovered under your prior insurance, except that the time to discover the loss had expired, we will pay the loss under this Extension of Coverage, provided:

1)  This policy became effective at the time of cancellation or termination of your prior insurance; and

2)  The loss would have been covered by this insurance had it been in effect when the act or events causing the loss were committed or occurred.

We will pay up to $10,000 or the amount of insurance under your prior insurance, whichever is less.

The loss under this part **g.** is not an additional amount of insurance and will not increase the total amount of insurance for Employee Dishonesty.

We do not cover:

a.  Loss caused by any dishonest or criminal act committed by you, or any of your members of a limited liability company, or any of your partners, whether acting alone or in collusion with other persons;

b.  Loss or that part of any loss, the proof of which as to its existence or amount is dependent upon:

1)  An inventory computation; or

2)  A profit and loss computation.

c.  Loss that is an indirect result of any act or occurrence covered by this policy including, but not limited to, loss caused by:

1)  Your inability to realize income that you would have realized had there been no loss of, or loss from damage to covered property;

2)  Payment of damages of any type for which you are legally liable. We will pay compen-

satory damages arising directly from a loss covered by this policy;

3)  Payment of costs, fees, or other expenses you incur in establishing either the existence or the amount of loss under this policy; or

4)  Payment of expenses related to any legal action.

d.  Any "employee" immediately upon discovery by:

1)  You; or

2)  Any of your partners, officers, directors, or members of a limited liability company not in collusion with the "employee";

of any dishonest act committed by that "employee" before or after being hired by you.

e.  Loss caused by any "employee" for whom similar prior insurance has been cancelled and not reinstated since the last such cancellation;

f.  Loss resulting directly or indirectly from trading whether in your name or in a genuine or fictitious account; or

g.  Loss resulting from fraudulent or dishonest signing, issuing, cancelling, or failing to cancel a warehouse receipt or any papers connected with it.

"Employee" means for this coverage only:

a.  Any natural person:

1)  While in your service (and for 30 days after termination of service);

2)  Whom you compensate directly by salary, wages, or commissions; and

3)  Whom you have the right to direct and control while performing services for you.

b.  Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, however, any such person while having care, custody, and control of property outside the premises described in the "Declarations".

c.  Any natural person who is leased to you under a written agreement between you and a labor leasing firm to perform duties related to the conduct of your business.

d.  Any natural person who is a former "employee", director, partner, member of a limited liability company, representative, or trustee retained as a consultant while performing services for you.

e.  Any natural person who is a guest student or intern pursuing studies or duties, excluding however, any such person while having care, custody, or control of covered property outside the premises described in the "Declarations".

f. Any natural person who is a property manager of properties owned by you.

g. Any natural person who is acquired as an "employee" through consolidation or merger.

"Employee" does not mean any:

a. Agent, broker, factor, commission merchant, consignee, independent contractor, or representative of the same general character; or

b. Manager of a limited liability company, director, or trustee except while performing acts coming within the scope of the usual duties of an "employee".

"Occurrence" means for this coverage only:

a. An individual act;
b. The combined total of all separate acts whether or not related; or
c. A series of acts whether or not related;

committed by an "employee" acting alone or in collusion with other persons, during the policy period shown in the "Declarations", except as provided under Paragraphs **f.** and **g.** of This extension subject to the following under **Employee Dishonesty – Section VIII Extensions of Coverage**.

The deductible for this extension is $200.

10. **Expenses for Loss Adjustment**. We will pay up to $5,000 for expenses involved in the preparation of loss data, inventories, and appraisals. This does not include expenses incurred in using a public adjuster.

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

11. **Expenses for Security**. We will pay up to $2,500 for expenses incurred for security after a covered "loss" to protect the covered property from further damage.

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

12. **Exterior Signs, Lights, and Clocks.** We will pay up to $5,000 for "loss" caused by a peril insured against to lights, clocks, and permanently mounted unattached exterior signs which you own or which are in your care, custody, or control and for which you are contractually responsible. We will cover all lights, clocks, and permanently mounted unattached signs on the premises described in the "Declarations".

We will not pay for "loss" caused by:

a. Wear and tear, gradual deterioration, faulty manufacture or installation, inherent vice, extremes of temperature, dampness of atmosphere, or mechanical breakdown;

b. Damaged to electrical apparatus which is part of covered property caused by electricity other than lightning, except for ensuing fire damage; or

c. Breakage during installation, repairing or dismantling, or breakage during transportation, unless caused by fire, lightning, collision, derailment, or overturn of vehicle.

13. **Fine Arts.** We will pay up to $25,000 for a "loss" caused by a peril insured against, to your fine arts on the premises described in the "Declarations". Fine arts mean property that is rare or has historical value, such as paintings, etchings, drawings, rare books, tapestries, or stained glass.

We will not cover fine arts that are on display at fairgrounds or at a national or international exposition.

We do not cover "loss" caused by a process to repair, retouch, restore, adjust, service, or maintain your fine arts. If a fire or explosion results, we do cover the "loss" caused by the fire or explosion.

This extension of coverage applies to each building described in the "Declarations".

14. **Fire Department Service Charges**. We will pay reasonable charges made by a fire department for services rendered as a result of an insured "loss".

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

15. **Fire Extinguisher Recharge**. We will pay expenses incurred to recharge portable fire extinguishers after they are used to fight a fire.

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

16. **Income Protection - Off-Premises Utility Properties Failure**. We will pay up to $25,000 for your loss of "income", "rental income", and "extra expense" you sustain due to partial or total "interruption of business" resulting from the interruption of service to the premises described in the "Declarations".

The "interruption of business" must result directly from "loss" to the following property, not on the premises described in the "Declarations" from a peril insured against:

A. Communication Supply Property, meaning property supplying communication services, including telephone, radio, microwave, or television services, to the premises described in the "Declarations", such as:

1) Communication transmission lines (including fiber optic transmission lines);

2) Coaxial cables; and

3) Microwave radio relay except satellites.

B. Power Supply Property, meaning the following types of property supplying electricity, steam, or gas to the premises described in the "Declarations":

1) Utility generating plants;

2) Switching stations;

3) Substations;

4) Transformers; and

5) Transmission lines.

C. Water Supply Property, meaning the following types of property supplying water to the premises described in the "Declarations":

1) Pumping stations; and

2) Water mains.

D. Wastewater Removal Property, meaning a utility system for removing wastewater and sewage from the premises described in the "Declarations", other than a system designed primarily for draining storm water. The wastewater removal property includes sewer mains, pumping stations, and similar equipment for moving the effluent to a holding treatment or disposal facility, and includes such facilities.

Coverage under this policy does not apply to interruption in service caused by or resulting from a discharge of water or sewage due to heavy rainfall or flooding.

We will only pay for loss of "income", "rental income", and "extra expense" sustained by you after the first 24 hours following "loss" to off-premises communication supply property, power supply property, water supply property, or waste water removal property.

Transmission lines include all lines which serve to transmit communication service or power, including links which may be identified as distribution lines.

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

17. **Key Replacement**. If keys to your building(s) are stolen during a theft loss, we will pay, at your request, up to $5,000 to replace the keys and locks to the doors of your premises.

This extension of coverage applies to each building described in the "Declarations".

18. **Leasehold Interest.** We will pay for leasehold interest you sustain due to the cancellation of your lease resulting directly from "loss" or damage to building(s) or business personal property at the premises described in the "Declarations" from a peril insured against.

We will not pay any "loss" you sustain caused by your cancelling the lease.

This extension of coverage applies to each building described in the "Declarations".

Leasehold interest means the following:

a. Tenant's Lease Interest, meaning the difference between the:

1) Rent you pay at the premises described in the "Declarations"; and

2) Rental value of the premises described in the "Declarations".

B. Bonus payments, meaning the unamortized portion of the cash bonus that will not be refunded to you. A cash bonus is money you paid to acquire your lease. It does not include:

1) Rent, whether or not prepaid; or

2) Security.

C. Improvements and Betterments, meaning the unamortized portion of payments made by you for improvements and betterments. It does not include the value of improvements and betterments recoverable under any other insurance, but only to the extent such other insurance is valid.

Improvements and betterments are fixtures, alterations, installations, or additions:

1) Made a part of the building or structure you occupy but do not own; and

2) You acquire or made at your expense but cannot legally remove.

D. Prepaid Rent, meaning the unamortized portion of any amount of advance rent you paid that will not be refunded to you. This does not include the customary rent due at:

1) The beginning of each month; or

2) Any other rental period.

**Amount of Insurance**

We will pay your "net leasehold interest" at the time of loss up to $15,000 for loss you sustain because of the cancellation of any one lease. This applies to:

a. Tenant's Lease Interest

1) But, if your lease is cancelled and your landlord lets you continue to use your premises under a new lease or other arrangement, the most we will pay for loss because of the cancellation of any one lease is the lesser of:

a) The difference between the rent you now pay and the rent you will pay under the new lease or other arrangement; or

b) Your "net leasehold interest" at the time of loss.

2) Your "net leasehold interest" decreases automatically each month. The amount of "net leasehold interest" at any time is your "gross leasehold interest" times the leasehold interest factor for the remaining months of your lease. A proportionate share applies for any one period of time less than a month.

b. Bonus Payments, Improvements and Betterments, and Prepaid Rent

1) If your lease is cancelled and your landlord lets you continue to use your premises under a new lease or other arrangement, the most we will pay for loss because of the cancellation of any one lease is the lesser of:

a) The loss sustained by you; or

b) Your "net leasehold interest" at the time of loss.

2) Your "net leasehold interest" decreases automatically each month. The amount of each decrease is your "monthly leasehold interest". A proportionate share applies for any period of time less than a month.

### Definitions

"Gross leasehold interest" means the difference between the:

a. Monthly rental value of the premises you lease; and

b. Actual monthly rent you pay including taxes, insurance, janitorial, or other services that you pay as part of the rent.

This amount is not changed:

a. Whether you occupy all or part of the premises; or

b. If you sublet the premises.

"Monthly leasehold interest" means the monthly portion of covered Bonus Payments, Improvements and Betterments, and Prepaid Rent. To find your "monthly leasehold interest", divide your original costs of Bonus Payments, Improvements and Betterments, and Prepaid Rent by the number of months left in your lease at the time of the expenditure.

"Net Leasehold Interest":

a. Applicable to Tenant's Lease Interest

"Net leasehold interest" means the present value of your "gross leasehold interest" for each remaining month of the term of the lease at the rate of interest.

The "net leasehold interest" is the amount that, equivalent to your receiving the "Gross Leasehold Interest" for each separate month of the unexpired term of the lease.

b. Applicable to Bonus Payments, Improvements and Betterments, or Prepaid Rent.

"Net leasehold interest" means your "monthly leasehold interest" times the number of months left in your lease.

19. **Money and Securities**. We will pay up to $10,000 for any one "loss" caused by a peril insured against to "money" or "securities" while in or on the premises described in the "Declarations" or within a bank or savings institution.

We will pay for "money" and "securities" while being conveyed by the insured or by an authorized employee up to $10,000 for any one "loss" caused by a peril insured against.

We will pay up to $10,000 for "loss" if the "loss" occurs inside the home of the insured or an authorized employee.

We will pay for "money" and "securities" destruction up to $10,000 for any one "loss" caused by a peril insured against. "Money" and "securities" destruction means "loss" by destruction of "money" and "securities" within the premises described in the "Declarations".

This does not include "loss" caused by unexplained or mysterious disappearance or abstraction.

This extension of coverage applies to each building described in the "Declarations".

20. **Newly Acquired or Constructed Property**.

A. If this policy covers Building(s), you may extend that insurance to apply up to 50% of the limit for Coverage 1 or $500,000, whichever is less, on:

1) Newly acquired buildings at other than the location(s) described in the "Declarations"; or

2) New additions, new buildings, and new structures when constructed on the insured premises, including materials, equipment, and supplies on or within 1,500 feet of the insured premises;

provided there is no other insurance applicable.

B. If this policy covers your Business Personal Property and Personal Property of Others, you may extend that insurance to apply up to 25% of the limit for Coverage 2 or $250,000, whichever is less, on newly acquired Business Personal Property and Personal Property of Others in a newly acquired or leased building other than the location(s) described in the "Declarations";

provided there is no other insurance applicable.

C. You may apply up to one month's actual business income loss or $250,000, whichever is less on:

1) Newly acquired Building(s) or Business Personal Property and Personal Property of

Others in a newly leased building at other than the location(s) described in the "Declarations"; or

2) New additions, new buildings, and new structures when constructed on the described premises, including materials, equipment, and supplies on or within 1,500 feet of the described premises, if "loss" to the new additions, new buildings, and new structures delays the start of your business. The "interruption of business" will start on the day your business would have started if the "loss" had not occurred;

provided there is no other insurance applicable.

This extension shall apply for 90 days after the acquisition or start of construction, provided the policy remains in force or is renewed.

You shall report values involved and pay any additional premium.

This extension does not apply to property while in transit.

21. **Non-Owned Detached Trailers**. Business Personal Property and Personal Property of Others - Coverage 2 is extended to cover non-owned detached trailers that you do not own, provided that:

A. The trailer is used in your business;

B. The trailer is in your care, custody, or control at the insured premises described in the "Declarations"; and

C. You have a contractual responsibility to pay for "loss" or damage to the trailer.

We will not pay for any "loss" or damage that occurs:

a. While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion; or

b. During hitching or unhitching operations or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

We will pay up to $5,000 for any one "loss" caused by a peril insured against to non-owned detached trailers.

This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

This extension of coverage applies to each building described in the "Declarations".

22. **Peak Season Coverage - Business Personal Property and Personal Property of Others - Coverage 2**. We will pay up to 25% of the limit for Business Personal Property and Personal Property of Others - Coverage 2 to cover "loss" to business personal property during a peak season. We will only provide this increase if you have insured business personal property to 100% of full replacement cost of your average monthly values during the 12 months immediately preceding the date when the "loss" or damage occurs.

23. **Personal Articles.** Business Personal Property and Personal Property of Others - Coverage 2 is extended to cover household and personal articles of the insured, the insured's partners, members or managers of a limited liability company, the insured's officers, or the insured's employees for loss caused by a peril insured against. We will pay up to $10,000 for any one "loss" at the premises described in the "Declarations".

This extension of coverage applies to each building described in the "Declarations".

24. **Pollutants Clean Up and Removal**. We will cover the cost to extract "pollutants" from land or water on the premises described in the "Declarations" if the release, discharge, or dispersal of "pollutants" is caused by a peril insured against during the policy period. We will pay up to $25,000 for all "losses" throughout the year. The "loss" must be reported to us within 180 days after the "loss" or the end of the policy period, whichever is the later date.

25. **Property in Danger**. This policy covers up to 45 days for any "loss" to covered property removed from the premises described in the "Declarations" or at a temporary location because of danger of damage by a peril insured against or to repair damage to the covered property.

This extension of coverage applies to each building described in the "Declarations".

26. **Temporarily Off-Premises - Business Personal Property and Personal Property of Others - Coverage 2**. This extension includes coverage for business personal property and personal property of others up to $25,000, and coverage for salesmen's samples up to $5,000 for "loss" caused by a peril insured against except while in transit and other than "equipment breakdown" to transportable "covered equipment" as provided in **Section IV – Additional Coverages – D. Equipment Breakdown Coverage**. This extension applies only to business personal property and personal property of others at a location you do not own, lease, or operate and for not more than 60 days.

We will cover business personal property and personal property of others and salesmen's samples at exhibitions or trade shows for not more than 60 days.

This extension shall not apply to property rented to others and property sold on installment or deferred payment plans after delivery to customers.

27. **Transportation - Airborne Property.** We will pay up to $25,000 for "loss" to Business Personal Property and Personal Property of Others - Coverage 2 in or

25

on an "aircraft" owned, leased, or operated by or for you or in or on an "aircraft" of a common or contract carrier. The "loss" must be caused by fire; lightning; flood; earthquake; landslide; windstorm; theft; robbery; or crashing of the "aircraft".

This extension applies anywhere in the world.

28. **Transportation**. We will pay up to $25,000 for "loss" to Business Personal Property and Personal Property of Others - Coverage 2 in or on a vehicle owned, leased, or operated by or for you; in or on a vehicle of a common or contract carrier; or on a dock, pier, bulkhead, platform, or station while in the custody of a common or contract carrier. The "loss" must be caused by fire; lightning; flood; earthquake; landslide; windstorm; collapse of bridge, dock, or culvert; theft; "robbery"; or collision (excluding roadbed collision), upset, or overturn of transporting vehicle.

This extension includes $1,000 of coverage for tools and equipment.

This extension applies away from premises only while in the United States of America, its territories or possession, Puerto Rico, or Canada.

29. **Valuable Papers and Records**. Business Personal Property and Personal Property of Others - Coverage 2 is extended to cover the "extra expense" incurred in the reproduction of your valuable papers and records and your interest in the valuable papers of others when destroyed by a peril insured against at the premises described in the "Declarations", while being conveyed outside the premises, or temporarily within other premises for any purpose except storage.

Coverage will also apply while your valuable papers and records and your interest in the valuable papers of others are being moved to and while at a place of safety because of imminent danger of "loss" and while being returned from such place.

"Loss" or damage to valuable papers and records will be valued at the cost of restoration or replacement of the lost or damaged information. To the extent that the contents of the valuable papers and records are not restored, the valuable papers and records will be valued at the cost of replacement with blank materials of substantially identical type.

Valuable papers and records means inscribed, printed, or written:

   a. Documents;

   b. Manuscripts; and

   c. Records;

including: abstracts, books, deeds, drawings, films, maps, or mortgages. But valuable papers and records does not mean "money" or "securities".

This extension is limited to $25,000 for any one "loss".

This extension of coverage applies to each building described in the "Declarations".

The deductible does not apply to this extension.

30. **Heating and Air Conditioning Equipment**. Business Personal Property and Personal Property of Others – Coverage 2 is extended to cover heating or air conditioning equipment which is in your care, custody, or control and for which you are contractually responsible. The heating and air conditioning equipment must be permanently attached to the building on the premises described in the "Declarations".

We will pay up to $20,000 for any one "loss" caused by a peril insured against to heating and air conditioning equipment.

This extension of coverage applies to each building described in the "Declarations".

31. **Laptop Computers Off-Premises.** We will pay up to $10,000 for laptops, notebooks, and other handheld computers for "loss" caused by a peril insured against while in transit, temporarily at your home, or at a premise you do not own, lease, or occupy. We will only cover laptops, notebooks, and handheld computers while in the United States of America, its territories or possessions, Puerto Rico, or Canada.

32. **Data Breach Response Expenses.** We will pay up to $10,000 for Data Breach Response Expenses if you have a "personal data breach" that is:

   a. First discovered by you during the policy period;

   b. Reported to us within 30 days from the date it is first discovered by you; and

   c. The "personal data breach" takes place in the "coverage territory".

This $10,000 limit of insurance is the most we will pay for the sum of all costs covered by Data Breach Response Expenses under Paragraph **A. Data Breach Response Expenses - What is Covered**, because of all "personal data breaches" occurring during the policy period.

We will pay up to $5,000 for the sum of all costs covered under Paragraph **A.1)** Legal Services and Forensic Information Technology Services because of all "personal data breaches" occurring during the policy period. This sublimit is part of, and not in addition to, the $10,000 limit of insurance for Data Breach Response Expenses.

These limits apply regardless of the number of "personal data breaches" occurring during the policy period.

A "personal data breach" may first be discovered by you in one policy period, but it may result in cause covered costs in one or more subsequent policy peri-

ods. If so, the most we will pay for covered costs arising from such "personal data breach" is $10,000.

Coverage for Services to Affected Individuals provided under Paragraph **A.3)**, is limited to costs to provide such services for a period of up to one year from the date of the notification to the "affected individuals". Notwithstanding, coverage for Identity Restoration Case Management Services initiated within such one year period may continue for a period of up to one year from the date such Identity Restoration Case Management Services are initiated.

The deductible does not apply to this extension.

**A. Data Breach Response Expenses -What is Covered**

1) Legal and Forensic Information Technology Services – We will pay your necessary and reasonable costs for the following outside professional services:

   a) Legal Services - Professional legal counsel review of the "personal data breach" and how you should best respond to it.

   b) Forensic Information Technology Services - Professional information technologies review, if needed, to determine the nature and extent of the "personal data breach", and the number and identities of the "affected individuals".

2) Notification to Affected Individuals - We will pay your necessary and reasonable costs to provide notification of the "personal data breach" to "affected individuals".

3) Services to Affected Individuals - We will pay your necessary and reasonable costs to provide the following services to "affected individuals":

   a) Informational Materials – A packet of loss prevention and customer support information is available.

   b) Help Line – A toll-free telephone line for "affected individuals" with questions about the "personal data breach" or wanting to request additional services as listed in Paragraphs **c)** and **d)** below.

   c) Monitoring Services – An electronic service automatically monitoring for activities affecting an individual's credit files, public records, and/or criminal records. Monitoring Services are subject to the type of data released and to the "affected individuals" enrolled for this service with the designated service provider.

   d) Identity Restoration Case Management – This covers the services of an identity restoration professional. This professional will help the "affected individual" to recover control over their personal identity. This includes, with the permission and cooperation of the "affected individual", contacting authorities, credit bureaus, creditors, and businesses for the process of correcting credit, other records, and accounts, within the constraints of what is possible and reasonable, to restore control over their personal identity

**B. Exclusions**

We do not cover any costs for a "personal data breach" arising from the following:

1) Your intentional or willful complicity in a "personal data breach".

2) Any criminal; fraudulent; dishonest act, error, or omission; or any intentional or knowing violation of the law by you.

3) Any "personal data breach" occurring prior to the time when Data Breach Response Expenses coverage was added to the Ultrapack Plus Commercial Property Coverage Part regardless of when the first "personal data breach" was discovered by you.

4) Any third party liability or defense costs.

5) Costs to research any deficiency, except as specifically provided under Paragraph **A. 1)b)** Forensic Information Technology Services. This includes, but is not limited to, any deficiency in your systems, procedures, or physical security that may have contributed to a "personal data breach".

6) Costs to correct any deficiency in your systems, procedures, or physical security that may have contributed to a "personal data breach".

7) Any fines or penalties including, but not limited to, fees or surcharges from affected financial institutions.

8) Any costs arising out of criminal investigations or proceedings.

9) Any threat, extortion, or blackmail including, but not limited to, ransom payments and private security assistance.

10) Any virus or other "malicious code" that is or becomes named and recognized by the CERT Coordination Center, McAfee, Secunia, Symantec, or other comparable third party monitors of malicious code activity.

11) Your reckless disregard for the security of "personally identifying information" in your care, custody, or control.

12) Your purposeful off-shoring of the processing, storage, or other use of data containing "personally iden-

27

tifying information" to a jurisdiction outside of the "coverage territory".

**C. Additional Conditions**

1) Bankruptcy or Insolvency - Bankruptcy or insolvency of you or your estate will not relieve us of our obligations under this Data Breach Response Expenses coverage.

2) Due Diligence - You agree to use due diligence to prevent and mitigate costs covered under this Data Breach Response Expenses coverage. This includes, but is not limited to, complying with reasonable and industry-accepted protocols for the following:

   a) Providing and maintaining appropriate physical security for your premises, computer systems, and hard copy files, electronic media, handheld devices, and storage devices;

   b) Providing and maintaining appropriate computer, network, and Internet security;

   c) Maintaining and updating at appropriate intervals back-ups of computer data;

   d) Protecting transactions, such as using encryption when processing credit card, debit card, and check payments;

   e) Appropriate disposal of files containing "personally identifying information", including shredding hard copy files and destroying physical media used to store "electronic data"; and

   f) Providing appropriate security awareness training on your physical, electronic, and procedural security measures.

3) Legal Advice - The services provided under this Data Breach Response Expenses coverage are not legal recommendations for action. Our determination of what is, or is not covered under this coverage does not represent legal advice or counsel from us about what action you should, or should not do.

4) Pre-Notification Consultation - You agree to consult with us prior to issuing any notification to "affected individuals". We assume no responsibility under this Data Breach Response Expenses coverage for any services promised to "affected individuals" without our prior agreement. If possible, this pre-notification consultation will also include the designated service provider(s) as agreed to under the Service Providers Condition. You must provide the following at our pre-notification consultation with you:

   a) Information about the "personal data breach" that may appropriately be com-

municated with "affected individuals"; and

   b) The scope of services that you desire for the "affected individuals". For example, coverage may be structured to provide fewer services in order to make those services available to more "affected individuals" without exceeding the available Data Breach Response Expenses coverage limit.

5) Service Providers

   a) We will only pay under this Data Breach Response Expenses coverage for services that are provided by service providers approved by us. Approval of an alternate vendor must be obtained prior to the consultation process. We will only pay reasonable and customary charges associated with services covered under this Data Breach Response Expenses coverage provided by an alternate vendor.

   b) Prior to the pre-notification consultation described in the Pre-Notification Consultation Condition, you must come to an agreement with us regarding the service provider(s) to be used for the Notification to Affected Individuals and Services to Affected Individuals as described in Paragraph **A. Data Breach Response Expenses - What is Covered,** Paragraphs **2)** and **3)**. We will suggest a service provider. If you prefer to use an alternate service provider, our coverage is subject to the following limitations:

      i. Such alternate service provider(s) must be approved by us prior to the consultation process;

      ii. Our payment for services provided by any alternate service provider will not exceed the amount that we would have paid using the service provider we had suggested; and

      iii. Such alternate service provider must provide services that are reasonably equivalent or superior in both kind and quality to the services that would have been provided by the service provider we had suggested.

   c) We will only pay for Legal Services under this Data Breach Response Expenses coverage from licensed legal counsel.

6) Services - The following conditions apply regarding any services provided to you or any "affected individual" by us, our designees, or any service firm paid

for in whole or in part under this Data Breach Response Expenses coverage:

  a) The effectiveness of such services depends on your cooperation and assistance;

  b) All services may not be available or applicable to all "affected individuals". For example, "affected individuals" who are minors or foreign nationals may not have credit records that can be provided or monitored. Service in Canada will be different from service in the United States and Puerto Rico in accordance with local conditions;

  c) We cannot guarantee, after our vendor has provided the applicable services, that the problems associated with the covered "personal data breach" will be eliminated; and

  d) You will have a direct relationship with the professional service firms paid for in whole or in part under this coverage. Those firms work for you.

7) Time Limits

  a) You must report a "personal data breach" to us within 30 days of your discovery of the "personal data breach".

  b) You have up to one year from the date of reporting a "personal data breach" to initiate the services provided for you.

  c) An "affected individual" has up to one year from the date the notification is received of a "personal data breach" to initiate the credit report monitoring services provided.

  Once initiated the credit monitoring services will continue to be provided to that person for two years.

  d) Credit Report Monitoring and Identity Restoration Case Management Services will be provided by our Designated Service Provider for a period of 12 consecutive months from the inception of the Credit Report Monitoring and Identity Restoration Case Management Services.

8) Additional Duties After a Personal Data Breach - In case of a covered "personal data breach", you must perform the following duties:

  a) Give us prompt notice of the "personal data breach". As stated in the Time Limits condition, you must report the "personal data breach" to us within 60 days of "your" discovery.

  b) Take all reasonable steps to protect "personally identifying information" remaining in your care, custody, or control.

  c) Preserve all evidence of the "personal data breach".

  d) Permit us to inspect the property and records proving the "personal data breach".

  e) Send us, within 60 days after the "personal data breach", your signed and sworn proof of loss statement which includes:

      i. Time and cause of the "personal data breach";

      ii. Other policies which may cover the "personal data breach";

      iii. The method of the "personal data breach";

      iv. The approximate number of "affected individuals" as a result of the "personal data breach";

      v. A detailed description of the type and nature of the information that was compromised;

      vi. Whether or not the information was encrypted and if so, the level of encryption;

      vii. Whether or not law enforcement has been notified;

      viii. If available, the states in which the "affected individuals" are domiciled; and

      ix. If available who received the "personally identifying information" as a result of the "personal data breach".

**D. Additional Data Breach Definitions**

- "Affected Individual" means any person who is your current, former, or prospective customer, client, member, director, or employee and whose "personally identifying information" is lost, stolen, accidentally released, or accidentally published by a "personal data breach" covered under this Extension of Coverage. This definition is subject to the following provisions:

  1. "Affected individual" does not include any business or organization. Only an individual person may be an "affected individual".

  2. An "affected individual" must have a direct relationship with your interests as an insured under this policy. The following are examples of individuals who would not meet this requirement:

      a. If you aggregate or sell information about individuals as part of your business, the individuals about whom you keep such information do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours.

      b. If you store, process, transmit, or transport records, the individual whose "personally identifying information" you are storing, processing, transmitting, or transporting for another entity do

not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours.

c.  You may have operations, interests, or properties that are not insured under this policy. Individuals who have a relationship with you through such other operations, interests, or properties do not qualify as "affected individuals". However, specific individuals may qualify as "affected individuals" for another reason, such as being an employee of yours.

3.  An "affected individual" may reside anywhere in the world but must be a citizen or legal alien of the United States (its territories and possessions), Puerto Rico, or Canada with a valid Social Security Number (SSN) or Social Insurance Number (SIN).

• "Malicious code" means any loss of data that results from a worm, virus, Trojan, BOT, or other piece of computer code, software, spyware, or malware that is used to collect, destroy, alter, retrieve, or affect computer software and/or data on a computer system, network, storage device, Smartphone, or other peripheral device; and on the date the "personal data breach" occurred is named and recognized by the CERT Coordination Center or any other industry acceptable third party antivirus, antimalware, or other solution that monitors malicious code activity.

• "Personal data breach" means the loss, theft, accidental release, or accidental publication of "personally identifying information" regarding one or more "affected individual(s)", if such loss, theft, accidental release, or accidental publication has or could reasonably result in the fraudulent use of such information. This definition is subject to the following provisions:

1.  At the time of the loss, theft, accidental release, or accidental publication, the "personally identifying information" must be in your direct care, custody, or control.

2.  "Personal data breach" includes disposal or abandonment of "personally identifying information" without appropriate safeguards such as shredding or destruction, subject to the following provisions:

a.  Your failure to use appropriate safeguards must be accidental and not reckless or deliberate; and

b.  Such disposal or abandonment must take place during the time period for which this Data Breach Response Expenses coverage is effective.

3.  "Personal data breach" includes situations where there is a reasonable cause to suspect that such "personally identifying information" has been lost, stolen, accidentally released, or accidentally published, even if there is no firm proof.

All "personal data breach" that are discovered at the same time or arise from the same cause will be considered one "personal data breach".

• "Personally identifying information" means information that could be used to commit fraud or other illegal activity involving the credit or identity of an "affected individual". This includes but is not limited to, social security numbers, drivers' license numbers, credit card numbers, bank account information, or any other account numbers correlated with names and addresses.

## SECTION IX - WHEN AND WHERE THIS POLICY APPLIES

1.  **When**

    This policy applies to losses that occur during the policy period. Unless otherwise specified in the "Declarations", "Renewal Certificate", "Amended Declarations", "Revised Declarations", or endorsement, the policy period begins and ends at 12:01 AM Standard Time at the stated address of the Named Insured. An "Amended Declarations" or endorsement tells you that the policy has been changed. A "Renewal Certificate" tells you that the policy is being renewed for another policy period.

2.  **Where**

    The United States, its territories and possessions, Puerto Rico, and Canada.

## SECTION X - COMMERCIAL PROPERTY CONDITIONS

1.  **ABANDONMENT OF PROPERTY**

    We will not accept abandoned property.

2.  **APPRAISAL**

    If you and we fail to agree on the amount of "loss", either party may make written demand for an appraisal. Each party will select an appraiser and notify the other of the appraiser's identity within 20 days after the demand is received. The appraisers will select a competent and impartial umpire. If the appraisers are unable to agree upon an umpire within 15 days after both appraisers have been identified, you or we can ask a judge of a court of record in the state where your principal office is located to select an umpire.

    The appraisers shall then set the amount of "loss". If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of "loss". If they cannot agree, they will submit their differences to the umpire. A written award by two will determine the amount of "loss".

Each party will pay the appraiser it chooses and equally bear expenses of the appraisal. However, if the written demand for appraisal is made by us, we will pay for the reasonable cost of your appraiser and your share of the cost of the umpire.

We will not be held to have waived any rights by any act relating to appraisal.

3. **DIVISIBLE CONTRACT**

The breach of a policy condition in one building or location will have no effect on the coverage on another where no breach exists.

4. **ENVIRONMENTAL, SAFETY, AND EFFICIENCY IMPROVEMENTS**

If "covered equipment" requires replacement due to an "accident" or "electronic circuitry impairment", we will pay your additional cost to replace with equipment that is better for the environment, safer for people, or more energy or water efficient than the equipment being replaced. However, we will not pay to increase the size or capacity of the equipment and we will not pay more than 150% of what the cost would have been to replace with like kind and quality. This provision does not apply to the replacement of component parts or to any property to which Actual Cash Value applies and does not increase any of the applicable limits.

5. **JURISDICTIONAL INSPECTION**

If any property that is "covered equipment" under this policy requires inspection to comply with state or municipal boiler and pressure vessel regulations, we agree to perform such inspection on your behalf. We do not warrant that conditions are safe or healthful.

6. **LIMITATION – ELECTRONIC MEDIA AND RECORDS**

We will not pay for any loss of "income" or "rental income" caused by direct physical damage to electronic media and records after the longer of:

a. Sixty (60) consecutive days after the date of the physical "loss" or damage; or

b. The period beginning with the date of direct physical "loss" or damage to repair, rebuild, or replace, with reasonable speed and similar quality, other property at the insured premises due to "loss" caused by the same occurrence.

Electronic media and records mean:

a. Electronic data processing, recording, or storage media such as films, tapes, discs, drums, or cells;

b. Data stored on such media; or

c. Programming records used for electronic data processing or electronically controlled equipment.

This condition does not apply to "extra expense".

7. **LOSS PAYMENT**

We will adjust all "losses" with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. We will not pay you more than your financial interest in the covered property.

"Loss" will be payable 30 days after we receive your proof of "loss" if you have complied with all the terms of this coverage part and one of the following has been done:

a. We have reached an agreement with you;

b. There is an entry of final judgment; or

c. There is a filing of an appraisal award on your behalf.

We have the option to:

a. Pay the value of that part of the damaged property;

b. Pay the cost to repair or replace that part of the damaged property, but this does not include the increased cost of construction due to enforcement of or compliance with any ordinance or law regulating the construction or repair of the damaged building;

c. Take all or part of the damaged property at an agreed or appraised value; or

d. Repair or replace that part of the damaged property with material of like kind and quality, but this does not include the increased cost of construction due to any ordinance or law regulating the construction or repair of the damaged building.

We will not pay more than the amount of insurance shown in the "Declarations" applicable to the damaged or destroyed property.

**Pennsylvania only:**

We must give the insured notice of our intent to repair or replace within 15 working days after we receive your sworn proof of loss.

8. **MORTGAGEE**

"Loss" shall be payable to mortgagees named in the "Declarations", to the extent of their interest and in the order of precedence.

**Our Duties**

We will:

a. Protect the mortgagee's interest in an insured building. This protection will not be invalidated by any act or neglect of the insured, any breach of warranty, increase in hazard, change of ownership, or foreclosure if the mortgagee has no knowledge of these conditions; or

b. Give the mortgagee 30 days notice before cancellation or refusal to renew this policy.

**Mortgagee's Duties**

The mortgagee will:

a. Furnish proof of "loss" within 60 days if you fail to do so;

b. Pay upon demand any premium due if you fail to do so;

c. Notify us of any change in ownership or occupancy or any increase in hazard of which the mortgagee has knowledge;

d. Give us his or her right of recovery against any party liable for "loss". This shall not impair the right of the mortgagee to recover the full amount of the mortgage debt; and

e. After a "loss", permit us to satisfy the mortgage requirements and receive full transfer of the mortgage and all "securities" held as collateral to the mortgage debt.

Policy conditions relating to **APPRAISAL, LOSS PAYMENT,** and **SUITS AGAINST US** apply to the mortgagee.

This mortgagee interest provision shall apply to any trustee or loss payee named in the "Declarations".

9. **NO BENEFIT TO BAILEE**

No bailee shall benefit, directly or indirectly, from this insurance.

10. **OTHER INSURANCE**

You may have other insurance subject to the same plan, terms, conditions, and provisions as insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covered on the same basis.

If there is other insurance covering the same loss or damage, other than that described in the paragraph above, we will pay only for the amount of covered loss or damage in excess of the amount due from the other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

11. **PROPERTY OF OTHERS**

If we are called upon to pay a "loss" for property of others, we reserve the right to adjust the "loss" with the owner. If we pay the owner, such payments will satisfy your claims against us for the owner's property.

In case of disagreement with the property owner, we will conduct the defense on your behalf at our expense.

12. **PROTECTIVE SAFEGUARDS**

You must maintain, as far as is within your control, any protective safeguards shown in the "Declarations". Failure to do so will suspend the coverage of this policy at the affected location. Coverage will not be suspended if you notify us immediately when the system is not in operation because of repairs or maintenance and you comply with our requests and directions at that time.

13. **RECORDS**

You must keep proper records so that we can accurately determine the amount of "loss".

14. **RECOVERIES**

If either you or we recover any property after settlement, that party must notify the other. Expenses of recovery will be deducted from the value of the property. The balance of the proceeds will be divided according to your and our interests.

At your option, the recovered property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay the expenses of the recovery and the expenses to repair the recovered property, up to the Limit of Insurance.

15. **REPLACEMENT COST COVERAGE**

After a covered "loss" to your Building(s) - Coverage 1 or Business Personal Property or Personal Property of Others - Coverage 2, our payment will be on a replacement cost basis, instead of an actual cash value basis, thereby eliminating deduction for depreciation. Payment will not exceed the Limit of Insurance shown in the "Declarations".

We will not pay replacement cost until the damaged or destroyed property is actually repaired or replaced. Repairs or replacement must be made as soon as practicable.

We will pay the smaller of the following:

a. The amount of insurance applicable to the damaged or destroyed property;

b. The cost of replacement on the same premises with material of like kind and quality and intended for the same use; or

c. The amount actually spent in repairing or replacing the property.

In order to obtain replacement cost on Business Personal Property or Personal Property of Others – Coverage 2, the amount of insurance shown in the "Declarations" for Business Personal Property or Personal Property of Others – Coverage 2 must be 100% or more of your average monthly values for the last 12 months preceding the date of "loss". In the event you have been in business for less than 12 months, the average monthly value will be based on the shorter period of time.

We will not pay for "loss" on a replacement cost basis:

a. Due to any ordinance or law regulating the construction or repair of buildings;

b. To stock (raw, in process, or finished) or merchandise including materials and supplies in connection therewith;

c. To household furniture or apartment and dwelling contents;

d. To manuscripts;

e. To paintings, etchings, pictures, tapestries, statuary, marbles, bronzes, antique furniture, rare books, antique silver, porcelains, rare glassware,

32

bric-a-brac, or other articles of art, rarity, or antiquity; or

f. To obsolete property.

You may choose to accept payment on an actual cash value basis. If you do choose an actual cash value basis, you can still select a replacement cost basis if the building(s) or business personal property or personal property of others is repaired or replaced within six months of "loss".

As respects "covered equipment" that sustains a "loss" resulting from an "accident" or "electronic circuitry impairment":

a. The amount of our payment will be based on the most cost-effective means to replace the function, capacity, and remaining useful life of the damaged property. This may include the use of generic, used, or reconditioned parts, equipment, or property.

b. Except as described in **Section X Commercial Property Conditions – 4. Environmental, Safety and Efficiency Improvements**, you must pay the extra cost of replacing damaged property with property of a better kind or quality or of a different size or capacity.

c. The most we will pay in any "one equipment breakdown" for "loss", damage, or expense is the applicable limit of protection as set forth in the "Declarations".

16. **RESUMPTION OF YOUR BUSINESS**

We will reduce the amount of your:

a. Income protection loss, other than "extra expense", to the extent that you can resume your business, in whole or in part, by using damaged or undamaged property (including business personal property) at the premises described in the "Declarations" or elsewhere.

b. "Extra expense" loss to the extent you can return your business to normal and discontinue such "extra expense".

17. **SUITS AGAINST US**

We may not be sued unless there is full compliance with all the terms of this policy. Suit must be brought within 2 years (Maryland and North Carolina - 3 years) after the "loss" occurs.

18. **SUSPENSION**

Whenever "covered equipment" is found to be in or exposed to a dangerous condition, any of our representatives may immediately suspend the insurance against "loss" from an "accident" or "electronic circuitry impairment" to that "covered equipment". This can be done by delivering or mailing a written notice of suspension to:

a. Your last known address; or

b. The address where the object is located.

Once suspended in this way, your insurance can be reinstated only by an endorsement for that "covered equipment". If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment" for the period of suspension. But this suspension will be effective even if we have not yet made or offered a refund.

19. **VACANCY AND UNOCCUPANCY**

Property may be unoccupied without limit of time. If the building at which the "loss" occurs is vacant for more than 60 consecutive days before the "loss", then we will:

a. Not pay for any "loss" caused by:

1) Vandalism or malicious mischief, water damage, glass breakage, or theft; or

2) Sprinkler leakage unless you have exercised reasonable care to protect the system against freezing.

b. Pay for other covered "losses", but we will reduce the amount of payment by 15%.

For a tenant operated business, the building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

For the owner of the building, the building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

a. Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

b. Used by the building owner to conduct customary operations.

Buildings under construction or renovation are not considered vacant or unoccupied.

20. **VALUATION**

We will determine the value of covered property in the event of "loss" to stock you have sold but not delivered. It will be valued at the selling price less any discounts and expenses you otherwise would have had.

21. **YOUR DUTIES AFTER A LOSS**

In case of a covered "loss", you must perform the following duties:

a. Give us or our Agent immediate notice. If a crime "loss", also notify the police (except Virginia);

b. Protect the property from further damage. If necessary for property protection, make reasonable repairs and keep a record of all repair costs;

c. Furnish a complete inventory of damaged property stating its original cost. At our request, furnish a complete inventory of undamaged property stating its original cost. If a "loss" is both less than $10,000 and less than 5% of the amount of insurance, no special inventory and appraisal of the undamaged property shall be required;

d. Produce for examination, with permission to copy, all books of accounts, bills, invoices, receipts, and other vouchers as we may reasonably require;

e. Show us or our representative the damaged property, as often as may be reasonably required;

f. Cooperate with us in our investigation of a "loss" and any suits;

g. Separately submit to examinations under oath and sign a transcript of the same;

h. Send us, within 90 days after the "loss", your signed and sworn proof of loss statement which includes:

   1) Time and cause of "loss";

   2) Your interest in the property and the interest of all others involved;

   3) Any encumbrances on the property;

   4) Other policies which may cover the "loss";

   5) Any changes in title, use, occupancy, or possession of the property which occurred during the policy term;

   6) When required by us any plans, specifications, and estimates for the repair of the damaged building; and

   7) The inventory of damaged property as prepared in **c.** above;

i. In addition to the other conditions under **Income Protection - Coverage 3**, make necessary replacements or repairs and use all available means to eliminate any unnecessary delay in order to resume operations as soon as possible;

j. Agree to help us enforce any right of recovery against any party liable for "loss" under this policy. This will not apply if you have waived recovery rights in writing prior to a "loss".

## SECTION XI - DEFINITIONS

- "Accident" means a fortuitous event that causes direct physical damage to "covered equipment". This event must be one of the following:

   1. Mechanical breakdown, including rupture or bursting caused by centrifugal force;

   2. Artificially generated electrical current, including electrical arcing, that disturbs electrical devices, appliances, or wires;

   3. Explosion of steam boilers, steam piping, steam engines, or steam turbines owned or leased by you or operated under your control;

   4. "Loss" or damage to steam boilers, steam pipes, steam engines, or steam turbines caused by or resulting from any condition or event inside such equipment;

   5. "Loss" or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such equipment.

None of the following is an "accident"

   1. Defect, programming error, programming limitation, computer virus, malicious code, loss of "data", loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media" of any kind; or

   2. Misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.

However, if an "accident" results, we will pay for the resulting "loss", damage or expense caused by that "accident"

- "Aircraft" means any machine or device capable of atmospheric flight except model airplanes.

- "Automobile" means a land motor vehicle, trailer, or semi-trailer designed for travel on public roads (including any attached machinery or equipment), but does not include "mobile equipment".

- "Burglary" means the taking of business personal property and personal property of others from inside the premises described in the "Declarations" by a person unlawfully entering or exiting the premises as evidenced by visible marks of forcible entry or exit. It includes "loss" to the building and its equipment resulting from "burglary" or attempted "burglary".

- "Cloud computing services" means professional, on-demand, self-service data storage or data processing services provided through the Internet or over telecommunications lines. This includes services known as IaaS (infrastucture as a service), PaaS (platform as a service), SaaS (software as a service) and NaaS (network as a service). This includes business models known as public clouds, community clouds, and hybrid clouds. "Cloud computing services" include private clouds if such services are owned and operated by a third party.

- "Covered equipment" means covered property:

   1. That generates, transmits, or utilizes energy including electronic communications and data processing equipment; or

   2. Which, during normal usage, operates under vacuum or pressure, other than weight of its contents.

34

"Covered equipment" may utilize conventional design and technology or new or newly commercialized design and technology.

None of the following is "covered equipment":

1. Insulating or refractory material;

2. Buried vessel or piping;

3. Sewer piping, piping forming a part of a fire protection system, or water piping other than:

   a. Feed water piping between any boiler and its feed pump or injector;

   b. Boiler condensate return piping;

   c. Water piping forming a part of refrigerating and air conditioning system; or

   d. Vessels and piping used for cooling, humidifying, or space heating purposes.

4. Structure, foundation, cabinet, or compartment containing the object or air supported structure or building;

5. Dragline, excavation, or construction equipment;

6. "Vehicle" or any equipment mounted on a "vehicle" as respects **Section IV – Additional Coverages – D. Equipment Breakdown Coverage** means any machine or apparatus that is used for transportation or moves under its own power. "Vehicle" includes, but is not limited to: car, truck, bus, trailer, train, "aircraft", watercraft, forklift, bulldozer, tractor, or harvester.

   However, any property that is stationary, permanently installed at a covered location, and that receives electrical power from an external power source will not be considered a "vehicle";

7. Satellite, spacecraft, or any equipment mounted on a satellite or spacecraft; or

8. Equipment manufactured by you for sale.

- "Declarations", "Amended Declarations", "Revised Declarations", and "Renewal Certificate" means the form which shows your coverages, limits of protection, premium charges, and other information. This form is part of your policy.

- "Electronic circuitry" means microelectronic components, including but not limited to circuit boards, integrated circuits, computer chips, and disk drives.

- "Electronic circuitry impairment" means a fortuitous event involving "electronic circuitry" within "covered equipment" that causes the "covered equipment" to suddenly lose its ability to function as it had been functioning immediately before such event. This definition is subject to the conditions specified in **1., 2.,** and **3.** Below.

  1. We shall determine that the reasonable and appropriate remedy to restore such "covered equipment's" ability to function is the replacement of one or more "electronic circuitry" components of the "covered equipment".

2. The "covered equipment" must be owned or leased by you, or operated under your control.

3. None of the following is an "electronic circuitry impairment":

   a. Any condition that can be reasonably remedied by:

      1) Normal maintenance, including but not limited to replacing expendable parts, recharging batteries, or cleaning;

      2) Rebooting , reloading, or updating software or firmware; or

      3) Providing necessary power or supply.

   b. Any condition caused by or related to:

      1) Incompatibility of the "covered equipment" with any software or equipment installed, introduced, or networked within the prior 30 days; or

      2) Insufficient size, capability, or capacity of the "covered equipment".

   c. Exposure to adverse environmental conditions, including but not limited to change in temperature or humidity, unless such conditions result in an observable loss of functionality. Loss of warranty shall not be considered an observable loss of functionality.

- "Electronic data" means information, facts, or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, DVDs, tapes, drives, cells, data processing devices, or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of "electronic data", means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve, or send data. This paragraph does not apply to your stock of prepackaged software.

- "Extra expense" means the necessary expenses incurred by you during the "interruption of business" that would not have been incurred if there had been no direct "loss" to covered property caused by a peril insured against.

- "Fungus" means any type or form of "fungus", including mold or mildew and any mycotoxins, spores, scents, or by-products produced or released by "fungi".

- "Hazardous substance" means any substance other than ammonia that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

- "Income" means the sum of net income (net profit or loss before income taxes) that would have been earned or incurred and necessary continuing operating expenses incurred by the business such as payroll expenses, taxes, interests, and rents.

- "Interruption of business" means the period of time that your business is partially or totally suspended and it:
  1. Begins with the date of direct "loss" to covered property caused by a peril insured against; and
  2. Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality.
- "Loss" means direct and accidental loss of or damage to covered property.
- "Media" means material on which "data" is recorded such as solid state drives, hard disks, optical disks, flash drives, magnetic tapes, or floppy disks.
- "Mobile equipment" means any of the following types of land vehicles (including any attached machinery or equipment):
  1. Bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;
  2. Vehicles maintained for use solely on or next to premises you own or rent;
  3. Vehicles that travel on crawler treads;
  4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:
     a. Power cranes, shovels, loaders, diggers, or drills; or
     b. Road construction or resurfacing equipment such as graders, scrapers, or rollers;
  5. Vehicles not described in **1.**, **2.**, **3.**, or **4.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:
     a. Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well servicing equipment; or
     b. Cherry pickers and similar devices used to raise or lower workers;
  6. Vehicles not described in **1.**, **2.**, **3.**, or **4.** above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but are considered "automobiles":
     a. Equipment designed primarily for:
        1) Snow removal;
        2) Road maintenance, but not construction or resurfacing; or
        3) Street cleaning;
     b. Cherry pickers and similar devices mounted on an "automobile" or truck chassis and used to raise or lower workers; and

    c. Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well servicing equipment.

- "Money" means:
  1. Currency, coins, and bank notes in current use and having a face value; and
  2. Travelers checks, register checks, credit card slips, and money orders held for sale.

"Money'" does not include crypto-currencies such as Bitcoin.

- "One equipment breakdown" means if an initial "accident" or "electrical circuitry impairment" causes other "accidents" or "electronic circuitry impairments", all will be considered "one equipment breakdown". All "accidents" or "electronic circuitry impairments" that are the result of the same "accident" or "electronic circuitry impairment" will be considered "one equipment breakdown".
- "Perishable goods" means business personal property and personal property of others maintained under controlled conditions for its preservation and susceptible to "loss" or damage if the controlled conditions change.
- "Pollutants" mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned, or reclaimed.
- "Rental income" means:
  1. The rents from the tenant occupancy of the premises described in the "Declarations";
  2. Continuing operating expenses incurred by the business such as:
     a. Payroll; and
     b. All expenses for which the tenant is legally responsible and for which you would otherwise be responsible;
  3. Rental value of the property described in the "Declarations" and occupied by you; or
  4. Incidental income received from coin-operated laundries, hall rentals, or other facilities on the premises described in the "Declarations".
- "Robbery" means the taking of business personal property and personal property of others from the care, custody, and control of a person by one who has:
  1. Caused or threatened to cause that person bodily harm; or
  2. Committed an obviously unlawful act witnessed by that person.
- "Securities" means negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes:

36

1.  Tokens, tickets including lottery tickets, food stamps, revenue, and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

2.  Evidences of debt issued in connection with credit or charge cards not issued by you.

"Securities" does not include "money".

# EXHIBIT F



Dale A. Sabo, MBA, CPCU
Vice President & Claims Manager

# Erie Insurance®

Branch Office • 2407 North Main Street • P.O. Box 2410 • East Peoria, IL 61611-0410
309.698.1825 • Toll Free 1.888.335.3743 • Fax 888.339.3743 • erieinsurance.com

May 11, 2020

Jerry's Sandwiches, LLC
Jerry's Sandwiches AV, LLC
5416 N Clark St
Chicago, IL 606040-1209

|  | Re: | ERIE Claim | A00002506683 |
|---|---|---|---|
|  |  | ERIE Policy: | Q97 1607426 |
|  |  | Date of Loss: | 3/17/2020 |
|  |  | Location: | 4739-47-43 N Lincoln Ave, Chicago, IL |

Dear Mr. Bires,

This letter is in reference to the above-captioned claim which was reported to Erie Insurance Exchange(ERIE) on March 17, 2020, seeking coverage under the Ultrapack Policy # Q97 1607426 issued to Jerry's Sandwiches LLC; Jerry Sandwiches AV, LLC; Jerry's Sandwiches LS, LLC.

In your email you provided answers to our questions, you explained that your business experienced an interruption due to the mandatory government shut down of all non-essential business. We regret to inform you that there is no coverage for your loss of income because there is no direct physical loss to your building or business personal property.

Please reference the Insuring Agreement for Building(s) – Coverage I, Business Personal Property – Coverage II and Income Protection – Coverage III reads in relevant part:

## SECTION I - COVERAGES

## INSURING AGREEMENT

We will pay for direct physical "loss" of or damage to covered property at the premises described in the "Declarations" caused by or resulting from a peril insured against.

SECTION II – PERILS INSURED AGAINST states:

## SECTION II - PERILS INSURED AGAINST

## BUILDING(S) - COVERAGE 1

## BUSINESS PERSONAL PROPERTY AND PERSONAL PROPERTY OF OTHERS - COVERAGE 2

## INCOME PROTECTION - COVERAGE 3

Jerry PK PKRA



Dale A. Sabo, MBA, CPCU
Vice President & Claims Manager

Branch Office • 2407 North Main Street • P.O. Box 2410 • East Peoria, IL 61611-0410
309.698.1825 • Toll Free 1.888.335.3743 • Fax 888.339.3743 • erieinsurance.com

**Covered Cause of Loss**

This policy insures against direct physical "loss", except "loss" as excluded or limited in this policy.

## Business Interruption Coverage

Refer to SECTION I of the policy for what constitutes Covered Property under INCOME PROTECTION – COVERAGE 3. **Income Protection** means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against. **Extra Expense Coverage** under paragraph B of Coverage 3 also requires a partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" from a peril insured against.

As defined in Section XI of the policy, "Loss" means direct and accidental loss of or damage to covered property. "Interruption of business" means the period of time that your business is partially or totally suspended and it: (1) Begins with the date of direct "loss" to covered property caused by a peril insured against; and (2) Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality.

*Income Protection does not apply because there was no partial or total "interruption of business" due to direct physical "loss" or damage to Covered Property on the premises from a peril insured against.*

## Additional Coverages - Civil Authority

Additional Coverages - Civil Authority under paragraph C of the Income Protection Coverage Section of the policy (SECTION I, Coverage 3) reads:

**C. Additional Coverages**

1. **Civil Authority**

   When a peril insured against causes damage to property other than property at the premises described in the "Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" provided that both of the following apply:

   a. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" are within that area but are not more than one mile from the damaged property; and

   b. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Jerry PK PKRA



Dale A. Sabo, MBA, CPCU
Vice President & Claims Manager

Branch Office • 2407 North Main Street • P.O. Box 2410 • East Peoria, IL 61611-0410
309.698.1825 • Toll Free 1.888.335.3743 • Fax 888.339.3743 • erieinsurance.com

Civil Authority coverage for "income" and/or "rental income" will begin 72 hours after the time of the first action of civil authority that prohibits access to the premises described in the "Declarations" and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

*Civil Authority coverage does not apply because a Civil Authority did not order that the business be closed due to damage to property within one mile of the premises described in the "Declarations," caused by a peril insured against.*

### Extension of Coverage – Contingent Business Interruption

The Extension of Coverage for loss of "income" or "rental income" for Contingent Business Interruption under SECTION VIII (B)(5) also requires a partial or total "interruption of business" resulting directly from "loss" or damage to Building(s) or Business Personal Property of "dependent properties" from a peril insured against.

"Dependent property" means premises operated by others whom you depend on in any way for continuation of your normal business operations. The "dependent properties" are:

a. Contributing Locations which mean those premises you depend on as a source of materials or services that you need for your operations. Services do not include water, communication, power supply, or waste water removal services;

b. Recipient Locations which mean those premises you depend on as a customer for your products or services;

c. Manufacturing Locations which mean those premises you depend on to manufacture products for your customers under contract or sale; or

d. Leader Locations which mean those premises you depend on to attract customers to your business.

"Interruption of business" for contingent business interruption means the period of time that your business is suspended and it:

a. Begins with the date of direct "loss" or damage to the "dependent property" caused by a peril insured against; and

b. Ends on the date when the "dependent property" should be repaired, rebuilt, or replaced with reasonable speed and similar quality.

*Contingent Business Interruption does not apply because there was no partial or total "interruption of business" directly from "loss" or damage to Buildings or Business Personal Property of "dependent properties" from a peril insured against.*

In addition to the discussion above, the following exclusions apply to this loss:

Jerry PK PKRA



Dale A. Sabo, MBA, CPCU
Vice President & Claims Manager

# Erie Insurance®

Branch Office • 2407 North Main Street • P.O. Box 2410 • East Peoria, IL 61611-0410
309.698.1825 • Toll Free 1.888.335.3743 • Fax 888.339.3743 • erieinsurance.com

## SECTION III - EXCLUSIONS

### E. Coverage 3

We do not cover under **Income Protection - Coverage 3**:

1. Increase of loss resulting from ordinance or law regulating construction or repair of buildings.

2. Consequential damages resulting from the breach of contractual obligations.

4. Loss due to delay or loss of market.

6. "Extra expense" caused by the suspension, lapse, or cancellation of any license, lease, or contract beyond the "interruption of business".

7. Increase of loss resulting from ordinance or law regulating the prevention, control, repair, clean-up, or restoration of environmental damage.

8. Income protection specifically insured in whole or in part by this or any other insurance.

*Part 919 of the Rules of the Illinois Department of Insurance* require that we advise you that the Illinois Amendatory Endorsement, PK-RA (Ed. 6/10), states:

THE FOLLOWING AMENDS THE ULTRAPACK PLUS COMMERCIAL PROPERTY COVERAGE PART
Additionally, the following policy provision applies:

B. Suits Against Us of Section X - Commercial Property Conditions is replaced by the following:
Suits Against Us We may not be sued unless there is full compliance with all the terms of this policy. Suit must be brought within two years after the "loss" occurs.

However, this two year period is extended by the number of days between the date proof of loss is submitted and the date the claim is denied in whole or in part.

Nothing in this letter is intended to waive, alter or restrict any of the terms, conditions or defenses of the policy of insurance in question, all of which are expressly reserves and affirmed.

Part 919 of the Rules of the Illinois Department of Insurance requires that our company advise you that, if you wish to take this matter up with the Illinois Department of Insurance, it maintains a Consumer Division in Chicago at 122 S. Michigan Ave., 19th Floor, Chicago, Illinois 60603 and in Springfield at 320 West Washington Street, Springfield, Illinois 62767.

We regret that we could not assist you in this matter.  If you have any questions or concerns regarding this letter, please feel free to contact me at the number listed below.

Jerry PK PKRA



Dale A. Sabo, MBA, CPCU
Vice President & Claims Manager

Branch Office • 2407 North Main Street • P.O. Box 2410 • East Peoria, IL 61611-0410
309.698.1825 • Toll Free 1.888.335.3743 • Fax 888.339.3743 • erieinsurance.com

Sincerely,

Marianne Schiff
Property Adjuster
(815) 519-3869

cc: The Lesser Agency

Jerry PK PKRA